J591dun1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
               v.                          18 Cr. 289 (SHS)
4
    BRYAN DUNCAN, RYAN RAINFORD,
5   ROBERT LOCUST,
6               Defendants.                Trial
    ------------------------------x
7
                                           New York, N.Y.
8                                          May 9, 2019
                                           9:41 a.m.
9
    Before:
10
                        HON. SIDNEY H. STEIN,
11
                                           District Judge,
12                                         -and a Jury-
13                        APPEARANCES
14  GEOFFREY S. BERMAN
         United States Attorney for the
15       Southern District of New York
    BY:  NICHOLAS W. CHIUCHIOLO
16       ALEXANDRA N. ROTHMAN
         NICHOLAS FOLLY
17       Assistant United States Attorneys
18  AL-SHABAZZ LAW GROUP, PC
         Attorneys for Defendant Bryan Duncan
19  BY:  IKIESHA TAQUET AL-SHABAZZ, ESQ.
20  THE C.H. SCHOLAR LAW FIRM
         Attorneys for Defendant Ryan Rainford
21  BY:  CALVIN H. SCHOLAR, ESQ.
22  MITCHELL J. DINNERSTEIN, ESQ.
    ANTHONY CECUTTI, ESQ.
23       Attorneys for Defendant Robert Locust
24  ALSO PRESENT:  CAROLINE LEFEVER, Paralegal Specialist, USAO
                   RICHARD PRINCE, Special Agent, FBI
25

J591dun1

                    (In open court; jury not present)

1                   THE COURT:  Good morning.  All the jurors are here,

2       which is excellent.  I'm also told the government has

3       something?

4                   MR. FOLLY:  Yes, your Honor.

5                   THE COURT:  Please be seated.

6                   MR. FOLLY:  There's a lawyer in the courtroom, Donald

7       duBoulay, who represents a patient.

8                   THE COURT:  I don't see Mr. duBoulay.  Oh, there's

9       Mr. duBoulay, behind Mr. Dinnerstein.

10                  Yes.  Go ahead.

11                  MR. FOLLY:  He represents a government witness named

12      Jasmond Cunningham, and he has represented to the government,

13      and intends to represent here today to the Court, that

14      Mr. Cunningham will invoke the Fifth Amendment, and we have

15      provided to the Court an immunity application for that witness.

16                  THE COURT:  All right.  Thank you.

17                  Mr. duBoulay, if you'd come forward, sir.

18                  I do have an application for an immunity order for

19      Jasmond Cunningham in this case, and it's supported by a

20      declaration of Mr. Folly, who says that the witness may refuse

21      to testify about certain subjects on the basis of his privilege

22      against self-incrimination.  I felt I really needed something

23      more substantial than he may refuse to testify.  What can you

24      tell me, sir?  You represent Mr. Cunningham in this matter?

J591dun1

1          MR. DUBOULAY:  I do, your Honor.

2          THE COURT:  What can you tell me?

3          MR. DUBOULAY:  Good morning, Judge Stein.  Donald

4     duBoulay.

5          THE COURT:  Good morning.

6          MR. DUBOULAY:  Mr. Cunningham will revoke his Fifth

7     Amendment right, if called as a witness in this matter.

8          THE COURT:  All right.  Thank you.  You're telling me

9     that as an officer of the court, correct?

10         MR. DUBOULAY:  That's correct.

11         THE COURT:  Government, do you have questions for

12    Mr. DuBoulay?  Because that satisfies my concern.  He's an

13    officer of the court and he represents Mr. Cunningham.

14         MR. FOLLY:  No, your Honor.  No further questions.

15         THE COURT:  All right.  I'm signing this.  The order

16    as drafted by the government is for "Judge Sidley H. Stein," so

17    I'm going to change my name, with the permission of the

18    government --

19         MR. FOLLY:  Apologies, your Honor.

20         THE COURT:  -- to Sidney H. Stein.

21         All right.  I've done that.

22         All right.  Let's bring this jury in.  Put your

23    witness on the witness stand.  Thank you, Mr. duBoulay.

24         MR. DUBOULAY:  Thank you, your Honor.

25         THE COURT:  Now Ms. Al-Shabazz is on for

J591dun1                        Nichols – Cross

1   cross-examination, correct?

2              MS. AL-SHABAZZ:  No.  I believe it's Mr. Cecutti.

3              THE COURT:  And then you?

4              MS. AL-SHABAZZ:  Yes.

5              THE COURT:  All right.  How long are you going to

6   have, sir?

7              MR. CECUTTI:  Under five minutes.

8              THE COURT:  All right.

9              We're going to end today around 4:30.  I have other

10  matters.

11             Jury entering.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Please be seated in the courtroom.

3              Good morning, ladies and gentlemen of the jury, and

4    welcome.

5              THE JURORS:  Good morning.

6              THE COURT:  We're now going to have the continuation

7    of the cross-examination of Ms. Nichols.  And the next defense

8    attorney who is going to cross-examine Ms. Nichols is

9    Mr. Cecutti.

10             Ms. Nichols, I remind you that you remain under oath.

11   You understand that, correct?

12             THE WITNESS:  Yes.

13             THE COURT:  All right.  Good morning to you.

14             THE WITNESS:  Good morning.

15             THE COURT:  Your witness, sir.

16             MR. CECUTTI:  Thank you, your Honor.

17   TINA NICHOLS, resumed.

18   CROSS-EXAMINATION

19   BY MR. CECUTTI:

20   Q.  Good morning, Ms. Nichols.

21   A.  Good morning.

22   Q.  I believe yesterday you testified that you had a staged

23   accident, correct?

24   A.  Excuse me?  Can you repeat that?

25   Q.  Sure.  Yesterday you testified that you had a staged

J591dun1                     Nichols - Cross

1    accident, correct?

2    A.  Yes.

3    Q.  And that was in 2014?

4    A.  Yes.

5    Q.  And you talked about a variety of people that were involved

6    in that staged accident.  Do you remember that?

7    A.  Yes.

8    Q.  Now Robert -- you know Robert, right?

9    A.  Yes.

10   Q.  He didn't recruit you to do the staged accident, correct?

11   A.  No.

12   Q.  Robert didn't help you either, correct?

13   A.  No.

14   Q.  Robert didn't drive you to any appointments with lawyers?

15   A.  No.

16   Q.  He didn't drive you to your deposition, correct?

17   A.  No, he did not.

18   Q.  And you went to a variety of medical appointments, right?

19   A.  Yes, I did.

20   Q.  And you didn't deal with Robert in driving you to those

21   medical appointments, correct?

22   A.  No, I did not.

23   Q.  You met Robert in 2015, correct?

24   A.  I'm sorry.  Let me see.  Make sure.

25          I do believe so, yes.  It was '15.

1    Q.  And he became a friend of yours?

2    A.  Yes.

3    Q.  You spent time together?

4    A.  Yes, he was around, yes.

5    Q.  Hung out with him?

6    A.  Yes.

7    Q.  Got to know him fairly well?

8    A.  Yes.

9    Q.  You learned what he did for work?

10   A.  Yes.

11   Q.  That he was a driver?

12   A.  Yes.

13   Q.  That he drove for Pete K?

14   A.  Yes.

15   Q.  He drove Pete K around?

16   A.  Pete K around?  No.

17   Q.  Pete K.

18   A.  No, he did not drive Pete K around, no.

19   Q.  To your knowledge he did not, correct?

20   A.  Yes, to my knowledge.

21   Q.  You know that Robert had other customers that he drove,

22   correct?

23   A.  Yes.

24   Q.  And you also know that Robert worked in computers?

25   A.  Yes.

J591dun1                    Nichols - Cross

1   Q.  And that he got a certificate on how to fix computers?

2   A.  I don't know about a certificate.

3   Q.  But he fixed computers for other people, correct?

4   A.  Yes.

5   Q.  He had customers, right?

6   A.  Yes.

7   Q.  Ms. Nichols, I believe you testified yesterday that you're

8   49 years old?

9   A.  Yes, I am.

10  Q.  And Robert's older than you, right?

11  A.  Yes, he is, yes.

12  Q.  And you wouldn't consider Robert to be a skinny man,

13  correct?

14  A.  A skinny man?

15  Q.  Yes.

16  A.  No, not skinny.

17  Q.  He's not slim either, right?

18  A.  Slim, no, I wouldn't -- not slim.

19          MR. CECUTTI:  I have nothing further.

20          THE COURT:  All right.  Thank you.

21          Ms. Al-Shabazz.

22          MS. AL-SHABAZZ:  Thank you, your Honor.

23          THE COURT:  What's the estimated length of your

24  cross-examination?

25          MS. AL-SHABAZZ:  I hope to keep it around 30 minutes.

J591dun1                         Nichols - Cross

1            THE COURT:  All right.  Thank you.

2    CROSS-EXAMINATION

3    BY MS. AL-SHABAZZ:

4    Q.  Good morning, Ms. Nichols.

5    A.  Good morning.

6    Q.  My name is Ikiesha Al-Shabazz.  I represent Bryan Duncan.

7    I have a few questions.  If I ask you something confusing, let

8    me know and I'll do my best to rephrase it, okay?

9    A.  Okay.

10   Q.  Can you hear me good?

11   A.  Yes.

12   Q.  Okay.  You met Reginald Dewitt in October of 2012, right?

13   A.  No, I did not.

14   Q.  Isn't it a fact that when you had an interview with the

15   agents, you told them you met him around Hurricane Sandy,

16   right?

17   A.  I didn't say we met.  We -- we got back together.

18   Q.  You got back together.

19   A.  Yes.

20   Q.  Okay.  So when did you meet?

21           THE COURT:  You mean when she first met him?

22           MS. AL-SHABAZZ:  When you first met him, yes.  Thank

23   you, Judge.

24   A.  I first met him when I was 15.

25   Q.  Okay.  And did you date then?

J591dun1                         Nichols - Cross

1   A.  Excuse me?

2   Q.  Did you date then?

3   A.  Yes.

4   Q.  Okay.  Do you have children in common?

5   A.  Yes, we do.

6   Q.  Okay.  How old are they?

7   A.  Our daughter is 32.

8   Q.  You told us that you have been dating Reginald Dewitt for

9   eight years on your direct testimony.  Do you recall that?

10  A.  Yes.

11  Q.  But you have a 32-year-old daughter with this man?

12  A.  Yes.

13  Q.  Be fair to say that it was more than eight years you've

14  been dating him, right?

15  A.  That's not true.

16  Q.  No?

17  A.  No.

18  Q.  Explain it.

19  A.  We were not together.  We broke up, when I was seven

20  months' pregnant.  I raised my daughter.  We was apart all this

21  time.  We got back together.

22  Q.  When did you get back together?

23  A.  We -- I came back out to Brooklyn in -- when Sandy hit, and

24  we officially started our relationship back a little after --

25  yeah, a little after with Sandy -- after Sandy hit.

J591dun1                        Nichols - Cross

1    Q.   A little after Hurricane Sandy.

2    A.   Yes.

3    Q.   Okay.  And that was October 2012, correct?

4    A.   When Sandy hit?

5    Q.   Yes.

6    A.   Yes.

7    Q.   Okay.  So that was how long ago, six and a half years,

8    right?

9    A.   Well, yes, that was -- yeah, right.

10   Q.   Not eight years.  Ms. Nichols --

11   A.   Okay, yes.  I was doing the count.

12   Q.   Okay.  It's important that you tell the truth, right?

13   A.   Yes.

14   Q.   You're under oath, right?

15   A.   Yes.

16   Q.   You've lied under oath in the past, haven't you?

17   A.   Yes, I did.

18   Q.   When you had your deposition, right?

19   A.   Yes, I did.

20   Q.   You were sworn to tell the truth, right?

21   A.   Yes.

22   Q.   And you lied.

23   A.   Yes, I did.

24   Q.   And you had no problem doing it, right?

25   A.   That's not true.

J591dun1                          Nichols - Cross

1    Q.  Well, you didn't tell the truth about your accident, right?

2    A.  I know I didn't, but doesn't mean that I was okay with

3    everything, with lying, you know, inner -- I was not okay with

4    it.

5    Q.  But you did it because you wanted to get a benefit, right?

6    A.  I did it at the time.  I explained I was going through a

7    lot with him, with Rasul, and at the time I was planning on

8    leaving.  I wanted to --

9    Q.  Leaving Rasul?

10   A.  Yes, I was.

11   Q.  And the slip-and-fall cases, what, made you stay together?

12   A.  No.

13   Q.  Okay.  So explain how you were going to leave and then you

14   decided to do a slip-and-fall case.  How is that connected?

15   A.  When it was brought to my attention about where -- okay.

16   Pete K said about, okay, we can both benefit from it, so I

17   said -- I went along with it, and I was like, you know, with

18   the money, I can leave, because I let go my apartment and

19   everything --

20   Q.  Okay.  And you --

21   A.  -- and I moved in with him.  So I had nothing to leave him.

22   He was a heavy drinker.  We was going through a lot.

23   Q.  Okay.  And this was after he had his own staged

24   slip-and-fall case, right?

25   A.  Yes, he did.  Yes, he did.  He had -- yes.

J591dun1                        Nichols - Cross

1   Q.  And he was the one who told you about the slip-and-fall

2   scheme, right?

3   A.  Yes.  I knew about it 'cause he was working with Pete K.

4   Q.  And that was in 2014, or 2013?

5   A.  What are you asking me?  What?  His slip-and-fall case?

6   Q.  Yes.

7   A.  I'm not sure.  I'm not sure.  I don't remember --

8   Q.  Okay.  Do you remember if he --

9   A.  -- the year with him.  I don't remember.

10  Q.  You don't remember if he received a settlement check in

11  connection with his case?

12  A.  He never received the settlement check, no.

13  Q.  Okay.  What does Rasul do for work?

14  A.  What does he do for work?

15  Q.  Yes.

16  A.  He's with me at the businesses.  And he --

17  Q.  At which business?

18  A.  I have the party hall and the frozen seafood.

19  Q.  And he used to have a business called The Hole in the Wall,

20  correct?

21  A.  Yes, he did.

22  Q.  When was that?

23  A.  He had that -- he -- he had that one for maybe about -- I

24  do believe about 10, 11 years.  We wasn't together.

25  Q.  During the time you were apart from Rasul, did he take care

1   of your daughter?

2   A.  No, he did not.

3   Q.  Now you also own the party hall that you mentioned is

4   called Secrets, right?

5   A.  Yes, it is.

6   Q.  And what is the capacity there?

7   A.  175.

8   Q.  And you rent this place out for like baby showers and

9   different types of events, correct?

10  A.  Yes.

11  Q.  And it gets pretty crowded there, right?

12  A.  Yes, some parties do, yes.

13  Q.  Okay.  And when did Reginald start working for

14  Mr. Kalkanis, if you remember?  For Peter Kalkanis.

15  A.  I can't give you exact.  I don't remember.

16  Q.  Okay.  You had a workers' compensation case, correct?

17  A.  Yes, I did.

18  Q.  And you sustained an injury at work, right?

19  A.  Yes, I did.

20  Q.  That was a real injury.

21  A.  Yes, it was.

22  Q.  You didn't fake that one, right?

23  A.  No, it wasn't.

24  Q.  Okay.  And what was the nature of your injury that you

25  sustained?

J591dun1                          Nichols - Cross

1    A.  It was my left shoulder and my upper neck.

2    Q.  And did you start a lawsuit regarding that?

3    A.  Yes.  It was -- I went out on workers' comp.

4    Q.  And when did you injure yourself at work?

5    A.  It was January -- my last date was January -- it was either

6    the 4th or the 6th, 2014.

7    Q.  Okay.  And with respect to the staged case, that was in

8    August of 2014, correct?

9    A.  Yes.

10   Q.  Now you said you met with Peter Kalkanis and he took you --

11   or withdrawn.

12         You met with Peter, and at some point you met with

13   George, the attorney George Constantine?

14   A.  Yes.

15   Q.  Do you recall that?

16   A.  Yes.

17   Q.  Okay.  And did you have a conversation with

18   Mr. Constantine?

19   A.  With Mr. Constantine?  I don't remember that.  Pete K was

20   doing more of the talking.

21   Q.  Okay.  Did you sign any paperwork?

22   A.  Yes, I did.

23   Q.  What did you sign?

24   A.  Actually, I don't know what it was that I signed.  All I

25   know, he said it's to start the lawsuit.

J591dun1                         Nichols - Cross

1   Q.  Okay.  So do you have a habit of signing things you don't

2   read?

3   A.  Sometimes.  Sometimes I do, sometimes I don't.

4   Q.  Okay.  What about with respect to the proffer agreement in

5   this case?  Do you remember that?

6   A.  Yes.

7   Q.  You signed that?

8   A.  Yes, I did.

9   Q.  Did you read it?

10  A.  Yes, I did.

11  Q.  Okay.  What did it say?

12  A.  It was saying that I won't be brought up on any charges,

13  just as long as I tell the truth, I provide them with any

14  evidence that needs to be turned in, I'm available whenever

15  they need me to come in -- what else?  That's about it.

16  Q.  Did you also sign a nonprosecution agreement?  Or is that

17  what you're referring to when you describe what you just

18  described?

19  A.  Yes.

20  Q.  Okay.  Did you sign something separate than the

21  nonprosecution agreement that's called a proffer agreement?  Do

22  you remember that?

23  A.  I -- the thing is, I don't know it by the name.  I don't

24  remember the name on it, so --

25  Q.  Okay.  The first time you met with the government, do you

J591dun1                         Nichols - Cross

 1   remember when that was?

 2   A.  It was last year.

 3   Q.  Do you remember when?  A year ago from January, or is it

 4   December?  Do you remember what month?

 5   A.  It was the beginning.  I do believe it was like -- was it

 6   February?

 7   Q.  Are you asking me?

 8   A.  I do believe it was around February.

 9   Q.  Okay.  February 2018?

10   A.  Yes, 2018, yes.

11   Q.  Okay.  And the deposition that you lied in, that was in

12   September 2016?  The deposition.

13   A.  I want to say -- I don't remember the date.

14   Q.  Do you remember the day Rasul was arrested?

15   A.  No, I do not.

16   Q.  You were home, weren't you?

17   A.  Yes, I was.

18   Q.  You don't remember the FBI coming to your house?

19   A.  I remember them coming to the house.  You said the date.  I

20   don't remember the date.

21   Q.  You don't remember when that occurred?

22   A.  I don't remember the date.

23   Q.  Okay.

24   A.  You asked me for the date.  I don't remember the date.

25   Q.  Okay.  Understood.  Do you remember about when that

J591dun1                          Nichols - Cross

1    happened, what month or year?

2    A.  Well, if I met with them in February, it had to have been

3    around February.

4    Q.  So you think that Rasul was arrested sometime in February

5    of 2018.

6    A.  I do believe so, yes.

7    Q.  That's your recollection.

8    A.  Yes.

9    Q.  And you were there.

10   A.  Yes.

11   Q.  Would you be surprised to learn that he was arrested in

12   June of 2017?

13           MR. CHIUCHIOLO:  Objection.  Asked and answered.

14           MS. AL-SHABAZZ:  I did not ask that.

15           THE COURT:  I'll allow that.

16           MS. AL-SHABAZZ:  Thank you, Judge.  Sorry.

17           THE COURT:  Are you surprised?

18           THE WITNESS:  Wait.  Ask the question?  What's the

19   question?

20           THE COURT:  Go ahead.  Ask the question again, please.

21   BY MS. AL-SHABAZZ:

22   Q.  Are you surprised to learn that Rasul was arrested in June

23   of 2017?

24           MR. CHIUCHIOLO:  Your Honor --

25           THE COURT:  Is that a factual issue, basis issue?

J591dun1                    Nichols – Cross

1          MR. CHIUCHIOLO:  Well, Ms. Al-Shabazz is feeding the

2   witness facts.

3          MS. AL-SHABAZZ:  She was there.

4          THE COURT:  I will allow it.

5          MS. AL-SHABAZZ:  Thank you.

6   A.  Well, with you giving me the date -- 'cause I'm not sure of

7   the date.  That's what I said.

8   Q.  Right.  So I'm asking you, does that date surprise you,

9   June 2017?  Does that sound accurate?

10          THE COURT:  I think she's answered it.  Move on.

11  Q.  Now you remember the day the FBI came to your home.  You

12  were not arrested, though, correct?

13  A.  Yes, I wasn't arrested.

14  Q.  Okay.  And they did take Rasul, right?

15  A.  Yes.

16  Q.  And how long was he gone before he returned home, if you

17  recall?

18  A.  He was -- he returned home the same day.

19  Q.  The same day.  And did you talk to him about what happened

20  to him while he was in custody?

21  A.  Well, actually, I had to come down.  I came down, so I

22  found out what the charges was when I came down.

23  Q.  Okay.  So let me just ask you again.  You came down, but

24  when he was released and you guys got back home, did you talk

25  about the experience that he had?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J591dun1                       Nichols - Cross

```
 1    A.  Yes, we did.

 2    Q.  What did he say?

 3    A.  He said that he was being brought up on some charges, he

 4    was naming some, and he was saying that some of them is not

 5    true.

 6    Q.  He was saying some of the charges were not true?

 7    A.  Yes.

 8    Q.  Okay.  But then he later pled guilty to those charges,

 9    you're aware?

10    A.  I can't answer that.  I don't know.

11    Q.  You don't know if he pled guilty to the charges?

12    A.  I -- we haven't discussed -- with everything going on,

13    we're not discussing this case, so I don't know.

14    Q.  So you don't know that he's currently facing 60 years in

15    prison?

16    A.  No, I do not.

17    Q.  You do not know that.

18             When the police brought -- I'm sorry.  When you met

19    with the officers, you say back in February 2018, did you have

20    an attorney?

21    A.  Yes, I did.

22    Q.  Did you hire that attorney?

23    A.  No, I did not.

24    Q.  It was provided to you by the government?

25    A.  By the -- yes.
```

J591dun1                          Nichols - Cross

1  Q.  And did you know you had the right to remain silent,

2  Ms. Nichols?

3          Did anybody ever tell you you have the right to remain

4  silent?

5  A.  I don't recall.  I don't --

6  Q.  Nobody ever told you that, right?

7  A.  I was never under arrest.

8  Q.  But you got a nonprosecution letter, right?

9  A.  The letter that I explained?  If that's what it's called.

10 Q.  Right?

11 A.  Yes.

12 Q.  And that letter says that they won't prosecute you for the

13 crimes you've committed, right?

14 A.  Yes.

15 Q.  Okay.  So you said some things about yourself in that

16 meeting that you pretty much gave yourself up, right, in the

17 meeting?

18 A.  I was answering the questions to tell the truth.

19          THE COURT:  Did you tell the truth at that meeting?

20          THE WITNESS:  Yes.

21          THE COURT:  Did you answer the questions of the

22 prosecutors?

23          THE WITNESS:  Yes.

24 Q.  And did you admit that you had committed crimes?

25 A.  I admitted -- yes.

1    Q.  And before you made that admission, did anybody tell you

2    you had the right to remain silent --

3              MR. CHIUCHIOLO:  Objection.

4    Q.  -- and not say anything?

5              THE COURT:  Sustained.  Next question.

6    Q.  Now when you were speaking with the agents, you did tell

7    them that Rasul had a drinking problem, correct?

8    A.  Yes, I did.

9    Q.  Tell us about it.

10   A.  He was a heavy drinker.

11   Q.  What does that mean?

12   A.  He used to drink a lot of alcohol.

13   Q.  Every day, all day?

14   A.  Yes.  He would go on little spurs.  He'd go for two weeks

15   drinking, stop a week, start back up, yes.

16   Q.  So he would binge drink.

17   A.  Yes.

18   Q.  During what period of time was this?  What years?  From

19   what years to what years?

20   A.  Well, actually, he's been clean now over a year.

21   Q.  All right.  We're not talking about the clean part.  I'm

22   trying to find out when he was having difficulty.  What period

23   of time was that?

24   A.  Well, when I -- when me and him got back together, he was

25   drinking.  Before that, I can't answer.  But --

J591dun1                          Nichols - Cross

1   Q.  I'm not asking before that.

2   A.  It was -- excuse me?

3   Q.  I'm not asking before that.  The times that you experienced

4   where you said he was drinking a lot and binge drinking --

5   A.  From the time we was together up to a year ago.

6   Q.  So from 2012 to 2018.

7   A.  Yes, I -- yes.

8   Q.  Be fair to say that he was still drinking after he was

9   arrested?

10  A.  After he was arrested.  And that was June.  Yes, he did.

11  Yes, he did.

12  Q.  And you're aware that he was driving regularly while he was

13  drinking, or drunk.

14  A.  Well, he did get behind the wheel before, yes, he did.

15  Q.  Now on your direct testimony you said Bryan drove you to

16  one of your medical appointments?

17  A.  Yes.

18  Q.  Okay.  When was that?

19  A.  He took me to Dr. Krieger's office.

20  Q.  Not where.  When?

21  A.  You're asking me for the dates?

22  Q.  About, round about, approximate, something like that.

23          THE COURT:  If you can estimate, Ms. Al-Shabazz is

24  entitled to the estimate, estimation; but if it's simply a

25  guess, nobody wants to hear your guess.

J591dun1                          Nichols - Cross

1          THE WITNESS:  Okay.  Well, then I can't -- I don't

2    recall.

3    Q.  Do you recall what he was driving when he picked you up?

4    A.  It was a sports car.

5    Q.  What, four-door, two-door?

6    A.  I don't recall that.  I know it was a little car, little

7    sports car.

8    Q.  And when you were interviewed by the agents, you said that

9    there were several other people in the car, right?

10   A.  Yes.

11   Q.  How many people fit in the small sports car?

12   A.  You have one that can fit next to the driver --

13   Q.  No, no, not generally.  In this particular car, how many

14   people would fit in there?

15          MR. CHIUCHIOLO:  Your Honor, objection.  She's not

16   allowing the witness to answer the questions.

17          THE COURT:  All right.  Go ahead.  How many people

18   were in that car?  If you remember.

19   A.  Can you ask the question again, 'cause --

20   Q.  You said that he came to pick you up in the sports car,

21   right?

22   A.  Yes.

23          THE COURT:  Bryan came to pick you up, correct?

24          THE WITNESS:  Mm-hmm.

25          THE COURT:  You have to say yes or no.

J591dun1                    Nichols - Cross

1              THE WITNESS:  Yes.

2              THE COURT:  All right.  Do you know about when that

3    was?

4              THE WITNESS:  About -- I said I didn't remember the

5    date, no.

6              THE COURT:  Okay.  Now on that day, where did he drive

7    you?

8              THE WITNESS:  It was Dr. Krieger's office.

9              THE COURT:  Okay.  When he picked you up in that

10   sports car, how many people were in that car besides Bryan

11   Duncan and yourself?

12             THE WITNESS:  Two more.  Two more.

13             THE COURT:  Two more.  Okay.

14   BY MS. AL-SHABAZZ:

15   Q.  Do you know the names of those people?

16   A.  No, I don't.

17   Q.  Where did you sit when you got in the car?  Did you get in

18   the car?

19   A.  Yes, but I don't remember the seat, where we were sitting,

20   the seats.

21   Q.  You don't remember where you sat inside the car?

22   A.  No.

23   Q.  Okay.  And you were bandaged?  You were bandaged up at the

24   time, right?

25   A.  It depends on which -- which one are you talking about?

J591dun1                         Nichols - Cross

1    Q.  Okay.  How many times did Bryan drive you to a doctor's

2    appointment?

3    A.  Let me see.

4    Q.  If you recall.  If you don't recall, like the judge said,

5    we ask that you not guess.

6    A.  Okay.  Well, I don't recall, I have to say.

7    Q.  Now when you were being interviewed by the government, you

8    told them that Bryan left, walked away from Pete.  Do you

9    remember that?

10   A.  Bryan left -- yes, yes, yes.

11   Q.  That happened, right?

12   A.  Yes.

13   Q.  That was the truth, right?

14   A.  Yes.

15   Q.  And that happened around 2015, right?

16   A.  The time, the date and all that, I'm not sure.

17   Q.  Okay.  Did you learn this information from Rasul?

18   A.  Oh, how did I -- I don't remember how I learned the

19   information.  I don't remember.

20   Q.  You also told the government that when Bryan walked away

21   from Pete, that Pete was upset due to him leaving.  Do you

22   remember that?

23            MR. CHIUCHIOLO:  Objection.

24   A.  Yes.

25   Q.  Did you learn that from Rasul?

J591dun1                         Nichols - Cross

1   A.  I don't recall.

2   Q.  Okay.  Did you talk to anyone else in connection with

3   slip-and-falls besides Rasul and Kalkanis?

4   A.  I don't understand the question.

5   Q.  Okay.  Who else would have had the information that you

6   know --

7           THE COURT:  Sustained as to form.

8   Q.  Did Pete Kalkanis tell you that Bryan left and walked away?

9   A.  I don't recall who told me, but I know that's what

10  happened.

11  Q.  Did the government tell you that in your meeting and you

12  just repeated it?

13  A.  No.

14  Q.  Is it your intention to make sure your testimony matches

15  Rasul's testimony?

16  A.  No.

17  Q.  Now you had a lawyer, you said it wasn't George

18  Constantine, correct?

19  A.  Yes.

20  Q.  And you said it started with a P, right?

21  A.  Yes.

22  Q.  Was it Pontisakos?

23  A.  Yes.

24  Q.  Is that right?

25  A.  Yes.

J591dun1                          Nichols - Cross

1   Q.  Okay.  And Pontisakos had scheduled you for a deposition in

2   2016, right?

3   A.  Yes, I want -- yes.

4   Q.  Okay.  And Bryan didn't drive you to the deposition, did

5   he?

6   A.  I don't -- let me see.  I don't recall.

7   Q.  Okay.  So let's back up.

8        The deposition was 2016, right?

9   A.  Yes.

10  Q.  You said Bryan left Pete in 2015, right?

11  A.  Yes.

12  Q.  So he would not have been around to take you to your

13  deposition in 2016, right?

14  A.  If that was the date when he left, he wouldn't have been

15  around.  If that's the date.  I'm not sure of the date, but I

16  know he left.

17  Q.  Ms. Nichols, you smoke marijuana?

18  A.  Yes, I do.

19  Q.  Did you smoke this morning?

20  A.  No, I did not.

21  Q.  Did you smoke last night?

22  A.  No, I did not.

23  Q.  When was the last time you smoked marijuana?

24  A.  Actually, it was -- it was like -- I would say like three

25  nights ago, it was.  Three -- two, three.

J591dun1                    Nichols - Cross

1   Q.  That was the night before you met with the government?

2   A.  I met with them -- I'm not sure.

3   Q.  Does it affect your memory?

4   A.  No.

5   Q.  How does it affect you, if at all?

6   A.  Well, actually, it helps me to sleep at night.

7   Q.  Now did you have more than one surgery in connection with

8   the fake slip-and-fall?

9   A.  Yes.

10  Q.  Okay.  How many surgeries did you have?

11  A.  I had two surgeries.

12  Q.  The first surgery that you had was when?

13  A.  Excuse me?

14  Q.  When was the first surgery?

15  A.  Okay.  The first one -- I don't know.  I don't recall the

16  exact date.

17  Q.  Okay.  What about the second surgery?

18  A.  I know it was within -- the first and the second was within

19  like a -- maybe about a month, but I don't recall the dates.

20  Q.  Okay.  And it's true that Rasul drove you to a number of

21  your medical appointments, right?

22  A.  No, it's not.

23  Q.  He didn't drive you to any of your appointments?

24  A.  Yes, he did.

25  Q.  Okay.  How many?

J591dun1                    Nichols - Cross

1    A.  He took me for my knee.

2    Q.  Okay.  That's one.

3    A.  That's all that I can recall.

4    Q.  Did you ever take public transportation to any of your

5    appointments?

6    A.  No.

7    Q.  Did you ever take any livery services, like a cab, Uber,

8    something like that?

9    A.  No, not that I can recall.

10          MS. AL-SHABAZZ:  I'm almost done, your Honor.  One

11   second.

12   Q.  Now when you did your fake slip-and-fall, you were told to

13   go to the hospital, right?

14   A.  Yes.

15   Q.  And Peter Kalkanis told you that, right?

16   A.  No.

17   Q.  Okay.

18   A.  No.

19          THE COURT:  Who told you that?

20          THE WITNESS:  That I had to go for -- to the hospital?

21   It was Bryan.

22   Q.  When was that?

23   A.  I don't remember the exact dates.

24   Q.  Okay.  Do you remember what year?

25   A.  The year was -- the year was in -- it was '14.

J591dun1                              Nichols - Cross

1   Q.  Where were you?  How was this communicated to you?  Were

2   you on the phone?

3   A.  We were -- no.  We were talking in person.

4   Q.  And where was that?

5   A.  That was outside where my apartment -- outside where I live

6   at.

7   Q.  In Brooklyn?

8   A.  Yes.

9   Q.  Was he alone?

10  A.  Yes.

11  Q.  When Rasul had his accident, he went to the hospital,

12  right?

13          THE COURT:  You're talking about when he had the fake

14  slip-and-fall?

15          MS. AL-SHABAZZ:  Yes, Judge.

16  A.  Yes.  Yes.

17  Q.  And isn't it a fact that you learned you had to go to the

18  hospital from Rasul?

19  A.  No.

20  Q.  He never told you that?  He never told you how the

21  slip-and-fall scheme works?

22  A.  Because at the beginning, it wasn't supposed to be that.

23  Q.  Okay.  What was it supposed to be?

24  A.  It was just supposed to find out about getting a doctor, a

25  good doctor for my knee.

J591dun1                         Nichols - Cross

```
1    Q.  And how did it morph into you faking a slip-and-fall and
2    lying under oath?
3    A.  After talking with Pete K and Pete K said we could put a
4    smile on your face and a smile on his face.
5    Q.  So Peter Kalkanis, it was Peter Kalkanis's idea for you to
6    fake the slip-and-fall, right?
7    A.  Yes.
8    Q.  It wasn't Bryan --
9    A.  To start a case, yes.
10   Q.  It wasn't Bryan's idea, right?
11   A.  I never said it was Bryan's idea to start the lawsuit.
12   Q.  I'm not accusing you, all right?  I'm just asking that it
13   wasn't Bryan's idea, right?
14   A.  Not to start the case, but it was his idea that I -- to get
15   the case, to hand in the paperwork, the paperwork that I
16   needed.
17   Q.  Did Peter Kalkanis explain to you that he needed you to go
18   to the hospital and bring him back the discharge paper?
19   A.  No.
20   Q.  Okay.  And when you were talking to Peter Kalkanis, what
21   did you talk about?
22   A.  I asked him about a doctor, seeing that he's in that field,
23   a good doctor that he can recommend for my knee.
24   Q.  And he said he had a way to put a smile on your face.
25   A.  And he said that he has -- he said, sure, I have a good
```

J591dun1                         Nichols - Cross

1    doctor that I can introduce you to, and then he says, and we

2    can also get you going and put a smile on my face, your face.

3    Q.  And by "get you going," that means get you involved in the

4    fake slip-and-fall scheme, right?

5    A.  Yes.

6    Q.  Okay.  And did he tell you which body parts you needed to

7    say were injured?

8    A.  Did who tell me?

9    Q.  Kalkanis.

10   A.  No.

11   Q.  How many times did you meet with Peter Kalkanis?

12   A.  I had to meet with him -- that one -- that one time when I

13   brought the paperwork in.

14   Q.  So only once?

15   A.  That I had to -- that I had to meet with him?  Yes.

16   Q.  And when you say "brought the paperwork in," what are you

17   referring to?

18   A.  That was when I had to go so I can sign, you know, to start

19   the lawsuit.

20   Q.  So you said "brought the paperwork in."  Are you referring

21   to discharge papers from the hospital?

22   A.  Well, I didn't bring the discharge papers to him myself,

23   but I had to come in to sign paperwork.

24   Q.  So when you say, I had to bring in the paperwork, what are

25   you referring to?

J591dun1                          Nichols - Cross

1    A.  Well, I didn't mean it like that.  I meant me coming in to

2    sign paperwork.

3    Q.  Did you get any money from Peter Kalkanis --

4    A.  No.

5    Q.  -- in connection with the fake slip-and-fall?

6    A.  Directly from Pete?

7    Q.  Directly or indirectly.

8    A.  Indirectly, he's the head of the scam, so yes.

9    Q.  Okay.  How much money did you receive?

10   A.  A thousand dollars.

11   Q.  Now did you eventually settle your workers' compensation

12   case?

13   A.  Yes.

14   Q.  Did you receive a check for that?

15   A.  Yes.

16   Q.  How much did you get?

17   A.  My -- what was it?  Settlement -- oh, the exact?  I don't

18   remember the exact numbers.

19   Q.  Okay.  And that was one of two settlements that you

20   received, right?  You had another case where you got a

21   settlement, correct?

22           THE COURT:  Are you talking about the fake

23   slip-and-fall?

24           MS. AL-SHABAZZ:  No.

25           THE COURT:  In addition to the fake slip-and-fall

J591dun1                           Nichols - Redirect

1    case, and in addition to the workmen's comp case, did you

2    receive money from some other litigation?

3          THE WITNESS:  From another -- no.

4    BY MS. AL-SHABAZZ:

5    Q.  You never received two separate settlements outside from --

6    okay.  Withdrawn.

7          Did you receive a settlement in your slip-and-fall

8    case?

9    A.  No, I did not.

10   Q.  So you only received one settlement between 2013 and 2018?

11   A.  No.  I had two workers' comp cases on my job.

12   Q.  Okay.  So you had two workers' comp cases.  Did they settle

13   separately?

14   A.  Yes.

15   Q.  Okay.  So you got two settlements.

16   A.  Okay.  Well, I didn't understand the way you was asking the

17   question.

18   Q.  Well, we got there, didn't we?

19   A.  Yeah, we're there now.

20         THE COURT:  How much longer do you have?

21         MS. AL-SHABAZZ:  I'm wrapping up now.

22         THE COURT:  All right.

23   Q.  How much was the second settlement, if you remember?

24   A.  I don't remember the exact numbers.

25   Q.  Okay.  What did you do with the money?

J591dun1                    Nichols - Redirect

1    A.  It helped me get my businesses going.

2              MS. AL-SHABAZZ:  I have nothing further.  Thank you,

3    your Honor.

4              THE COURT:  All right.  Thank you.

5              Any redirect by the government?

6              MR. CHIUCHIOLO:  Briefly, your Honor.

7    REDIRECT EXAMINATION

8    BY MR. CHIUCHIOLO:

9    Q.  Good morning, Ms. Nichols.

10   A.  Good morning.

11   Q.  Who told you to falsely claim you fell in front of the

12   Payless?

13   A.  This was Bryan.

14   Q.  Who told you to falsely claim that you injured your back

15   and your knee?

16   A.  Bryan.

17   Q.  Who told you that you'd be getting surgery on your back?

18   A.  Bryan.

19   Q.  Who told you to go to the hospital after -- who told you to

20   go to the hospital to falsely claim those injuries?

21   A.  I was told by Bryan.

22   Q.  And who did you give your discharge paperwork to after the

23   hospital visit?

24   A.  It was Bryan.

25   Q.  Where was this conversation with Bryan?

J591dun1                          Nichols - Redirect

1   A.   In -- when he came to where I live at in Brooklyn, in his

2   car.

3   Q.   That's the Bryan sitting in the courtroom?

4   A.   Yes.

5   Q.   Now do you remember yesterday Mr. Scholar --

6          THE COURT:   Is that Mr. Duncan?   You know him as

7   Bryan.

8          THE WITNESS:   I know him as Bryan, yes.

9   Q.   Do you know Bryan's last name?

10  A.   No, I don't know his last name.

11  Q.   Now yesterday do you recall that Mr. Scholar, who is seated

12  right here, asked you questions about taxes?

13  A.   Yes.

14         MR. CHIUCHIOLO:   Ms. Lefever, if you could pull up

15  Government Exhibit 827, which was your nonprosecution agreement

16  we looked at yesterday.

17         Specifically, if we can look at the first paragraph.

18  Q.   Now, Ms. Nichols, this is the nonprosecution agreement you

19  entered into with the government, is that correct?

20  A.   Yes.

21         Yes.   Sorry.

22  Q.   Do you see the first sentence, "On the understandings

23  specified below, the Office of the United States Attorney for

24  the Southern District of New York ("this Office") will not

25  criminally prosecute your client, Tina Nichols, for any crimes

J591dun1                          Nichols - Recross

1  except for criminal tax violations, if any, as to which this

2  Office cannot and does not make any agreement"?  Do you see

3  that?

4  A.  Yes.

5  Q.  Ms. Nichols, your nonprosecution agreement provides you no

6  promises with respect to tax violations, is that correct?

7  A.  Yes.

8  Q.  Ms. Nichols, have you told the jury the truth?

9  A.  Yes, I have.

10          MR. CHIUCHIOLO:  No further questions.

11          MR. SCHOLAR:  Just very briefly, Judge.

12          THE COURT:  Yes.  Recross.

13  RECROSS EXAMINATION

14  BY MR. SCHOLAR:

15  Q.  Ms. Nichols --

16  A.  Yes.

17  Q.  -- you've never filed taxes, right?

18  A.  I have filed taxes before, yes.

19  Q.  But you've not filed any business taxes for your

20  businesses, right?

21  A.  No, I have not.

22  Q.  And you told this to the government how many times?

23  A.  Excuse me?

24  Q.  How many times have you told that to the government?

25  A.  How many times?  I don't know.

J591dun1

1    Q.  You met with them many times, right?

2            THE COURT:  Answer was "I don't know."  Next question.

3    Q.  You told them that on more than one occasion that you've

4    not paid taxes, correct?

5            I'll move on.

6    A.  Yes.

7    Q.  You haven't been arrested for tax evasion, correct?

8    A.  No, I have not.

9    Q.  You haven't been charged with tax evasion, right?

10   A.  No, I have not.

11   Q.  And in the agreement there's no requirement that you pay

12   taxes, correct?

13   A.  In the agreement here?

14   Q.  Yes.

15   A.  No, it does not.

16           MR. SCHOLAR:  Nothing further, Judge.

17           THE COURT:  All right.  Thank you.

18           MR. CHIUCHIOLO:  Nothing.

19           THE COURT:  You may step down.  You are excused,

20   Ms. Nichols.

21           (Witness excused)

22           THE COURT:  Next witness for the government, please.

23           MS. ROTHMAN:  Your Honor, the government calls

24   Clarence Tucker.

25           MR. DINNERSTEIN:  Your Honor, before Mr. Tucker takes

J591dun1

1    the stand, can we take a five-minute break.  I'd like to

2    show --

3              THE COURT:  Well, if you need it, yes.  It's a little

4    early, but if you need it, yes.

5              MR. DINNERSTEIN:  Thank you.

6              THE COURT:  Well, you have to tell me you need it.

7              MR. DINNERSTEIN:  Yes, I do.

8              THE COURT:  Five minutes.

9              (Recess taken)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J59TDUN2

```
 1              THE COURT:  What's the order of cross with this
 2     witness?  Let me ask it again.  What's the order of cross with
 3     this witness?
 4              MR. DINNERSTEIN:  I think this witness is me pretty
 5     much.
 6              THE COURT:  Mr. Dinnerstein first.  How long is the
 7     direct by the government?
 8              MS. ROTHMAN:  30 to 40 minutes.
 9              THE COURT:  Mr. Dinnerstein, how long is the cross?
10              MR. DINNERSTEIN:  I don't expect it to be more than 15
11     or 20 minutes.
12              THE COURT:  How about Mr. Scholar?
13              MR. SCHOLAR:  I don't believe we'll have more than
14     five minutes, if anything.
15              THE COURT:  Ms. Al-Shabazz?
16              MR. DINNERSTEIN:  Five minutes.
17              THE COURT:  All right.  Let's bring this jury in.
18              Jury entering, please rise.
19              (Continued on next page)
20
21
22
23
24
25
```

J59TDUN2                    Tucker - Direct

1          (Jury present)

2          THE COURT:  Government, put your witness on, please.

3          MS. ROTHMAN:  Thank you, your Honor, the government

4   calls Clarence Tucker.

5          THE COURT:  That's about as close to five minutes as I

6   could make it, ladies and gentlemen, thank you.

7          The lunch break will be at 1:00, so that's two and a

8   half hours, so we'll need to take a break before lunch, or the

9   Court will need to take a break before lunch, therefore we will

10  take a break before lunch.

11         Please step up on the witness stand, sir.

12   CLARENCE TUCKER,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15  DIRECT EXAMINATION

16  BY MS. ROTHMAN:

17         THE COURT:  Good morning, Mr. Tucker.  And welcome,

18  sir.

19         THE WITNESS:  Good morning.

20         THE COURT:  Do me a favor, twist the mic down so it's

21  toward your face and slide your chair forward.  I sense you

22  speak quite softly, so please try to speak loudly, slowly, and

23  clearly.

24         Your witness, Ms. Rothman.

25         MS. ROTHMAN:  Thank you, your Honor.

J59TDUN2                          Tucker - Direct

 1   BY MS. ROTHMAN:

 2   Q.  Good morning, Mr. Tucker.

 3   A.  Good morning.

 4   Q.  How old are you?

 5   A.  63 years old.

 6   Q.  Where do you currently live?

 7   A.  At 33 Saratoga Avenue, Brooklyn, New York.

 8   Q.  Mr. Tucker, take your time in answering the questions so

 9   the court reporter can record what you're saying.  Okay?

10         Who do you live with?

11   A.  My mother.

12   Q.  Anyone else?

13   A.  My fiancée, Cecilia Blocker.

14         THE COURT:  How do you spell that name?

15         THE WITNESS:  Cecilia, C-E-C-I-L-I-A, Blocker,

16   B-L-O-C-K-E-R.

17         THE COURT:  Thank you.

18   Q.  Mr. Tucker, I want to direct your attention to May 2017.

19   Did you have a slip and fall accident around that time?

20   A.  Yes.

21   Q.  Was it real or staged?

22   A.  It was staged.

23   Q.  Who, if anyone, told you about staging an accident?

24   A.  Roger.

25   Q.  Mr. Tucker, can you look in the courtroom and tell me if

J59TDUN2                          Tucker - Direct

1   you see Roger here today?

2            Feel free it to stand up if you need to.

3   A.   Yes.

4   Q.   Where is he seated, Mr. Tucker?

5   A.   Right there.

6            THE COURT:   Where is there?

7            THE WITNESS:   The second -- at the end on the left,

8   second one.

9            THE COURT:   I'm sorry, the second row?

10           THE WITNESS:   Second -- it's the last row.

11           THE COURT:   Last row.   Go ahead.

12           THE WITNESS:   And second seat.

13           THE COURT:   Is that the table the three men are in?

14           THE WITNESS:   Three men, yes.

15           THE COURT:   Where is Roger?

16           THE WITNESS:   In the middle.

17           THE COURT:   What is he wearing as a shirt?

18           THE WITNESS:   He's wearing a shirt and no tie.

19           THE COURT:   The witness has identified Mr. Robert

20   Locust.   Please be seated.

21   BY MS. ROTHMAN:

22   Q.   Mr. Tucker, moving forward, I will refer to who you called

23   Roger as Mr. Locust, okay?

24   A.   Yes.

25   Q.   So let's take a step back and let me ask you a few

1    questions on Roger or Mr. Locust.  How did you learn that that

2    individual was named Roger?

3    A.  He told me his name.  That's what he told me his name was.

4    Q.  How did you meet him?

5    A.  At 33 Saratoga Avenue in Brooklyn, New York.

6    Q.  Do you know why he was there?

7    A.  I presume he lived there.

8            MS. AL-SHABAZZ:  Objection.

9            THE COURT:  That's what he said.

10           MS. AL-SHABAZZ:  Presume, Judge.

11           MR. DINNERSTEIN:  Your Honor, I have no objection to

12   the question.

13           THE COURT:  Objection overruled.  Proceed.

14   Q.  And why were you there, Mr. Tucker?

15   A.  My mother lives there and I live with my mother.

16   Q.  Let's pull up Government Exhibit 4.

17           Who is that Mr. Tucker?

18   A.  That's Roger.

19   Q.  Now let's pull up Government Exhibit 247.

20   A.  Yes, that's the front of Saratoga, 33 Saratoga.

21   Q.  Now prior to --

22           MS. ROTHMAN:  And let's pull back up Government

23   Exhibit 4, Ms. Lefever.

24   Q.  Prior to you spoking with Mr. Locust about staging an

25   accident, had you spoken with him before?

J59TDUN2                          Tucker - Direct

1    A.  Yes, we spoke.  He fixed computers, so I told him I had a

2    laptop that needed to be fixed.

3    Q.  Approximately how long had you known Mr. Locust before you

4    spoke about staging an accident?

5    A.  Several months, several months.

6    Q.  Mr. Tucker, let's focus on the conversation you had with

7    Mr. Locust about staging an accident.  Do you remember where

8    that took place?

9    A.  That took place in front of Saratoga.

10   Q.  Who was present for the conversation?

11   A.  Just him and I.

12   Q.  What did Mr. Locust tell you?

13   A.  He asked me did I want to make any extra money, and I said

14   yes.  And he said, you know, you can could make a thousand

15   dollars and then you would have to stage an accident, but he

16   will call me and tell me anything I that I needed to know about

17   it, he would give me a call.

18   Q.  What, if anything, did Mr. Locust tell you would happen

19   after you staged the accident?

20   A.  He told me that I would go through the ambulance, after the

21   ambulance that I would go to a series of doctors and therapy

22   and so forth.

23   Q.  Did you discuss with Mr. Locust the type of injuries you

24   would claim?

25   A.  Yes, we discussed what I was going to say that was going to

J59TDUN2                        Tucker - Direct

1   be hurting me, as far as my right shoulder.

2   Q.  Do you know why you discussed your right shoulder during

3   this conversation?

4   A.  Because I had a prior incident on my left side and I had

5   serious back injury back in 1986.

6   Q.  So what, if anything, did Mr. Locust say when you told him

7   about your previous injury?

8   A.  Well, I had a series of conversations with a doctor on the

9   phone, I wouldn't say who he was, but he got on the phone and

10  we discussed my medical history.

11  Q.  So let's focus on this conversation you're having with

12  Mr. Locust outside of 33 Saratoga Avenue.  Did you discuss the

13  amount of money you could make doing this?

14  A.  Yes, he said I could make, depending on insurance and the

15  incident, my fall, that I could make 100,000 or better.

16  Q.  Were you going to get any other money from this accident,

17  Mr. Tucker?

18  A.  Yes, a thousand dollars initial.

19  Q.  When would you receive that money?

20  A.  After the accident.

21  Q.  If you could try your best to let me finish my questions

22  before you respond, that the way the court reporter can take

23  down both of our words.

24  A.  Okay.

25  Q.  Were you going to get any other money in connection with

J59TDUN2                              Tucker - Direct

1   your staged accident?

2   A.  Yes, a thousand dollars.

3   Q.  When were you going to receive that money?

4   A.  After the accident and after we go through a series -- we

5   went to talk to another guy after that and then they let us

6   know whether or not we was accepted for the case.

7   Q.  Did Mr. Locust tell you when you would receive that

8   thousand dollars?

9   A.  Didn't tell me when, he just told me after everything is

10  completed.

11  Q.  Did you agree to stage an accident?

12  A.  Yes, I did.

13  Q.  How did your conversation with Mr. Locust end that day?

14  A.  Well, it ended that I was going to receive the money after

15  I had been accepted, and I have to go through a series of

16  things and I had to sign some papers and so forth and so on in

17  reference to what it is.

18  Q.  Did you speak with Mr. Locust again?

19  A.  Yes, I did.

20  Q.  How did he contact you?

21  A.  By phone.

22  Q.  How did Mr. Locust have your phone number?

23  A.  I gave it to him.

24  Q.  What was your telephone number at the time?

25  A.  917-929-1015.

J59TDUN2                        Tucker - Direct

1   Q.  So let's talk about the next time that you spoke --

2   withdrawn.

3           Let's talk about the next time you saw Mr. Locust.

4   A.  The next time I saw him is when he made contact with me.

5   Q.  Did he pick you up?

6   A.  Yes, he did.

7   Q.  What kind of car was he driving?

8   A.  A black Pathfinder.

9   Q.  Where were you at the time?

10  A.  I was at 156037 First Avenue.

11  Q.  Is that in Queens?

12  A.  Queens.

13  Q.  What kind of car did Mr. Locust drive?

14  A.  He drove --

15          MR. DINNERSTEIN:  Objection, your Honor, asked and

16  answered.

17          THE COURT:  Sustained.  I think it's a black

18  Pathfinder.  Is that correct, sir?

19          THE WITNESS:  Yes, it's a black Pathfinder.

20          MS. ROTHMAN:  Ms. Lefever, please pull up what has

21  been marked for identification as Government Exhibit 224.

22  A.  Yes, that's the car.

23  Q.  Let me ask you a few questions, Mr. Tucker.  Do you

24  recognize that photograph?

25  A.  Yes.

J59TDUN2                        Tucker - Direct

1   Q.  What is that a photograph of?

2   A.  Roger and the Pathfinder.

3           MS. ROTHMAN:  Your Honor, the government offers

4   Government Exhibit 224.

5           THE COURT:  Admitted without objection.

6           MR. DINNERSTEIN:  Your Honor, I would object to the

7   introduction of the photograph until we know how the photograph

8   was taken and who took it.

9           THE COURT:  Can you identify that, sir?

10          THE WITNESS:  Yes.

11          THE COURT:  As being of Mr. Locust and the Pathfinder?

12          THE WITNESS:  Yes.

13          THE COURT:  Is that an accurate depiction?

14          THE WITNESS:  Yes, it is.

15          THE COURT:  All right.  Admitted.

16          (Government's Exhibit 224 received in evidence)

17          MS. ROTHMAN:  Thank you, your Honor.  May we publish?

18          THE COURT:  Yes.

19  BY MS. ROTHMAN:

20  Q.  Mr. Tucker, on that day when Mr. Locust came to pick you

21  up, who got into the car with you?

22  A.  Cecilia Blocker and somebody else was in there.

23  Q.  Someone else was already in the car?

24  A.  Yes.

25  Q.  Do you remember his or her name?

1   A.  No, I don't know the people.

2   Q.  And what did you do with Mr. Locust that day?

3   A.  That day we drove to a series of places and we ended at

4   this party, party hall.

5   Q.  So let's take the first part of that day first.  You

6   testified that you drove to a series of places with Mr. Locust.

7   What type of places did he drive you to?

8   A.  He drove us to a series of spots where certain incidents

9   could happen, you could fall.

10  Q.  What do you mean, sir, incidents?

11  A.  Different spots we could go to to have an accident at.

12  Q.  Could you describe those spots for the jury, Mr. Tucker?

13  A.  Yes, I could describe it.

14  Q.  What were they?

15  A.  It was like you have a hole on the floor you had these

16  metal things on the ground where you have to take stuff

17  downstairs and those things is lifted up a certain amount, you

18  could fall over that.

19  Q.  What, if anything, did Mr. Locust explain to you in the car

20  that day?

21  A.  He explained to me that you have to fall -- you have to

22  fall a certain way.  When you fall, you have to fall.  I mean

23  it's not -- you can't just -- it's a certain way you got to

24  fall.  Just fall.

25  Q.  Now Mr. Tucker, you testified that after you were driven

J59TDUN2                          Tucker - Direct

1   around to see those different spots, you went to a party hall,

2   is that correct?

3   A.  Yes.

4           MS. ROTHMAN:  Ms. Lefever, could you please pull up

5   what is in evidence as Government Exhibit 205.

6   Q.  Do you recognize this photograph?

7   A.  Yes, I do.

8   Q.  What is this, Mr. Tucker?

9   A.  That is the place they took me to where we got something to

10  eat, we chilling and waiting, another fellow came in, he was

11  talking about how to fall, certain things, how to fall and so

12  forth.

13  Q.  When you say that "they" took us to, who are you referring

14  to?

15  A.  Another gentleman, but I don't see him in here.

16  Q.  So let's take it step by step.  You testified that they

17  took you to a party hall.  Who drove you to the party hall?

18  A.  Roger.

19  Q.  Mr. Locust, right?

20  A.  Yes, Mr. Locust.

21          MR. DINNERSTEIN:  Your Honor, he knows him as Roger,

22  so I ask the government to use Roger, too.

23          THE COURT:  No, the government can call him whatever

24  it wants as long as he understands who is being referred to.

25          Proceed.

J59TDUN2                          Tucker - Direct

1   BY MS. ROTHMAN:

2   Q.  When so when you got to party hall, what did you do,

3   Mr. Tucker?

4   A.  We basically talked, we drank, we talked about how to fall.

5   One of the guys, he said he didn't like the way I was -- I

6   would fall at one time, you know, but I told him I could do it.

7          And what else?  Also there was an incident with one of

8   his friends, one of his associates, he had an incident with his

9   lady.

10  Q.  What happened?

11  A.  She sprayed mace in his face.

12  Q.  What, if anything, did Mr. Locust say?

13  A.  That he should -- he should get her locked up for spraying

14  mace in his face and she would learn not to do that.

15  Q.  So you overheard that conversation in the party hall?

16  A.  I overheard that conversation.

17  Q.  Mr. Tucker, how did you get home that day?

18  A.  Roger took me home.

19  Q.  Was Ms. Blocker with you at the party hall?

20  A.  Yes.

21  Q.  Had you and Mr. Locust discussed whether or not Ms. Blocker

22  would do an accident?

23  A.  Yes, she discussed it.

24  Q.  What did she decide to do?

25  A.  Well, she decided that she was going to -- at first they

1    didn't really want her to do it, but she decided she was going

2    to do it.  That because she has health issues.

3    Q.  We'll come back to those, Mr. Tucker.

4           Let's talk about the day that you staged your

5    accident.  Who contacted you that day?

6    A.  Roger contact me.

7    Q.  And do you remember how many days after your trip to the

8    party hall the accident happened?

9    A.  It was a couple of days, several days.  I don't know how

10   many days, but I know it was a couple of days, not too far

11   after that.

12   Q.  So not too far after you went to party hall.

13          When Mr. Locust contacted you, what did he tell you?

14   A.  He told me that:  You ready to go through this accident?  I

15   said yeah.  And we got ourselves together and all got into the

16   car, the truck, the Pathfinder, and we started out.

17   Q.  When you say "we," who are you referring to?

18   A.  It was Cecilia and I and another fellow was that was

19   sitting in front.

20   Q.  Where did you go with Mr. -- where did Mr. Locust take you

21   that day?

22   A.  Well, he took me to Atlantic Avenue.

23   Q.  Anything happen before he took you to Atlantic Avenue?

24   A.  He took Cecilia Blocker to another location that I don't

25   know, but it was in Brooklyn, but it was a little distance

J59TDUN2                              Tucker - Direct

 1    away.

 2    Q.   What was Ms. Blocker supposed to do there?

 3    A.   She was supposed to stage an accident, stage a fall.

 4    Q.   What did you observe Ms. Blocker do?

 5    A.   She -- I didn't really see her, but I waited for the

 6    ambulance to come, and when we saw the ambulance come they know

 7    that everything was done.

 8    Q.   After you saw the ambulance come for Ms. Blocker, where did

 9    you and Mr. Locust go?

10    A.   I'm sorry.

11    Q.   Let me help you, Mr. Tucker.  You testified that Mr. Locust

12    took you to Atlantic Avenue?

13    A.   Yes.

14    Q.   What happened when you got to Atlantic Avenue with

15    Mr. Locust?

16    A.   He drove me through there the first time and drove me back

17    through a second time and told me where I'm going to fall at.

18    And we got out some distance, so I had to walk and I staged a

19    fall.

20             MS. ROTHMAN:  Ms. Lefever, please pull up for the

21    witness and the Court and defense counsel what has been marked

22    for identification as Government Exhibit 228 to start.

23    Q.   Mr. Tucker, do you recognize this photograph?

24    A.   Yes, I do.

25    Q.   What is this a photograph of?

1   A.  That's the photograph of where I fell at.

2            MS. ROTHMAN:  Your Honor, the government offers

3   Government Exhibit 228.

4            THE COURT:  Admitted without objection.

5            (Government's Exhibit 228 received in evidence)

6            MS. ROTHMAN:  We can publish that to the jury.

7   Q.  Mr. Tucker, what were you supposed to fall on?

8   A.  I was supposed to fall on the grating area where the metal

9   pieces at sticking up, I was supposed to fall there.

10  Q.  Is that right to the left of the white car?

11  A.  Yes, to the left of the white car.

12  Q.  Thank you, Mr. Tucker.

13           Let's pull up for the witness what's been marked for

14  identification as Government Exhibit 229.

15           Do you recognize this?

16  A.  Yes.

17  Q.  What is this?

18  A.  That is the same place where I fell at.

19           MS. ROTHMAN:  Your Honor, the government offers

20  Government Exhibit 229.

21           THE COURT:  Admitted without objection.

22           (Government's Exhibit 229 received in evidence)

23           MS. ROTHMAN:  We can publish that.

24  Q.  Mr. Tucker, tell us what happened once you got out of the

25  car with Mr. Locust.

J59TDUN2                      Tucker - Direct

1   A.  Well, I just walked and I had a bag of potato chips on me,

2   and I fell, I just tripped over that -- tripped over it and

3   just fell.

4   Q.  What happened next?

5   A.  Ambulance came.

6          THE COURT:  Did you call the ambulance?

7          THE WITNESS:  No, the people that was in the shop,

8   they were standing over there and saw me when I fell, and they

9   told the guy inside to make the call for the ambulance.

10  Q.  Did the ambulance come?

11  A.  Yes, they did.

12  Q.  Where did you go?

13  A.  I went to Brooklyn Hospital.

14  Q.  What injuries did you complain of at the hospital?

15  A.  My knee and my shoulder, my right shoulder.

16         THE COURT:  Which knee?

17         THE WITNESS:  The right knee and my right shoulder.

18  Q.  How long were you at the hospital?

19  A.  About four to six hours.

20  Q.  How did you get home?

21  A.  I took a cab.

22  Q.  What did you do on the way home?

23  A.  I went to Brookdale where Cecilia Blocker was taken to.

24  Q.  You picked up Ms. Blocker after her accident, is that

25  right?

1    A.  Yes.

2    Q.  So let's move ahead to after your accident.  When is the

3    next time that you saw Mr. Locust?

4    A.  Well, I saw him the next time and he picked me up and took

5    me to this MRI place where I had to get my X-rays and stuff

6    from.

7    Q.  Before you went to get an MRI, did you meet with any

8    lawyers?

9    A.  Yes, I did, I did.

10   Q.  How did you get to lawyer's office?

11   A.  Roger took me to the office.

12   Q.  What car was Roger driving?

13   A.  A black Pathfinder.

14   Q.  Who was in the car that day?

15   A.  Roger and I.

16   Q.  Anyone else?

17   A.  And another person.

18   Q.  Where was the lawyer's office located?

19   A.  It was in the Rockaway Beach area.

20          MS. ROTHMAN:  Ms. Lefever, please pull up Government

21   Exhibit 211.

22   Q.  Do you recognize this photograph, Mr. Tucker?

23   A.  Yes.

24   Q.  What is this a photograph of?

25   A.  That's a photograph of the building I went to.

```
 1    Q.  On the ride to the attorney, what, if anything, did you
 2    discuss with Mr. Locust?
 3    A.  Well, we go inside, we go upstairs, they discuss --
 4    Q.  Let me stop you right there.  Before you got to the lawyer,
 5    did you discuss anything?
 6    A.  Yeah, we discussed the story and how I -- the way where I
 7    went to fall at and what was the reason I was there.
 8    Q.  What was your story going to be?
 9    A.  My story was I went to meet this someone in the shelter on
10    Bedford Avenue, Bedford shelter, and that I had to walk back
11    that way.
12    Q.  So what happened when you got to attorney's office?
13    A.  Well, they put us in a little conference room and then from
14    the conference room we waited until we was called to come into
15    another little office where a man was in there waiting, the
16    lawyer or whatever he supposed to be, we had to meet up with.
17    Q.  When you say "we," who was in the waiting room?
18    A.  There was another person, another guy that was there.
19    Q.  Was Ms. Blocker there?
20    A.  And Ms. Blocker also.
21    Q.  Where was Mr. Locust?
22    A.  He was outside there.  He went, he came in every now and
23    then, but he was basically right outside of the office.
24    Q.  What happened during your meeting with the attorney?
25    A.  Well, you go in, you explain to him where you fell at, he
```

1  came up with -- he had a screen, he had a little computer, and

2  he showed us the place where we fell at, where the location

3  was.  He asked me a series of questions, he wrote it down, he

4  was writing down the information.  I explained to him where he

5  fell at, the reason why I was there, to meet my friend.

6  Q.  Was your case accepted by the lawyer?

7  A.  Yes, it was.

8  Q.  After you met with the lawyer, did Ms. Blocker meet with

9  the lawyer?

10 A.  Yes.

11 Q.  Do you know what happened to her case?

12 A.  She was denied.

13 Q.  Do you know why?

14 A.  No, I don't know exactly why, but I know that she had many

15 health issues.

16 Q.  How did you get home from the attorney's office that day?

17 A.  Roger took me home.

18 Q.  Now Mr. Tucker, you testified that you also had an MRI in

19 connection with this accident.  How did you get to the MRI

20 appointment?

21 A.  Roger took me to this place.

22 Q.  Do you remember where it was located?

23 A.  No, I didn't.  It's in Queens somewhere, but I didn't know

24 exactly where.

25 Q.  Which body parts did you have MRIs on?

1  A.  I had an when MRI on my shoulder, my right shoulder, and my

2  knee.

3  Q.  Other than having an MRI, did you see any other doctors in

4  connection with your staged accident?

5  A.  Yes, I saw a therapist.

6  Q.  How did you get there?

7  A.  Roger brought me there also.

8  Q.  Where was the therapist located?

9  A.  Somewhere on Rockaway Boulevard, Rockaway Beach area.

10  Q.  Mr. Tucker, did there come a time when you had surgery in

11  connection --

12          THE COURT:  How many times did you go to physical

13  therapy?

14          THE WITNESS:  Only once.

15          THE COURT:  Just once?

16          THE WITNESS:  Just one time.

17  Q.  Mr. Tucker, did there come a time when you had surgery in

18  connection with your staged accident?

19  A.  I'm sorry, I didn't quite understand.

20  Q.  I will repeat the question.  Did there come a time when you

21  had surgery in connection with your staged accident?

22  A.  Yes, I did.

23  Q.  Which body part did you have surgery on?

24  A.  On my right shoulder.

25  Q.  Who took you to surgery?

J59TDUN2                          Tucker - Direct

1   A.  Roger.

2   Q.  Where did you have surgery?

3   A.  On my right shoulder here.

4   Q.  My question was poorly phrased.

5        THE COURT:  Yes.

6   Q.  Do you recall the location of the place where you had

7   surgery?

8   A.  It was in Yonkers, St. Joseph Hospital.

9   Q.  Tell us what happened on the day of your surgery.

10  A.  They took me in, I fill out some administration papers, a

11  few administration papers, they prepped me, I got prepped, and

12  they did the surgery and I was able to leave.

13  Q.  How did you get home from surgery that day?

14  A.  Roger took me home.

15  Q.  Did you receive any money after you had surgery?

16  A.  Not right then and there, but the next time we went out --

17  I believe the next time we went out we made another stop, we

18  picked up the papers, picked up some papers for me to sign, and

19  I received a check.

20  Q.  So let's talk about that day, Mr. Tucker.  Who picked you

21  up?

22  A.  Roger.

23  Q.  Where did you go?

24  A.  We went somewhere in Queens, there was a nice place with

25  nice houses at, I don't know exactly where.

1    Q.  What happened when you got there?

2    A.  Roger stepped out the vehicle, he went to wherever he had

3    to go at, he came back with some papers, I signed the papers

4    and then I received a check.

5    Q.  What did Mr. Locust do with the papers after you signed

6    them?

7    A.  He took them back inside to wherever he was going, whatever

8    house he went to.

9    Q.  Did you read the papers before you signed them?

10   A.  No, I really didn't, I just signed it.  I just wanted to,

11   you know, do whatever they told me to do to sign it up and

12   that's it.

13           MS. ROTHMAN:  Ms. Lefever, please pull up for the

14   witness what has been marked for identification as Government

15   Exhibit 830.

16   Q.  Do you recognize that document?

17   A.  Yes.

18   Q.  What is that document?

19   A.  That's the check that I received.

20           MS. ROTHMAN:  Your Honor, the government offers

21   Government Exhibit 830.

22           MR. DINNERSTEIN:  No objection.

23           THE COURT:  Admitted without objection.

24           (Government's Exhibit 830 received in evidence)

25   Q.  Mr. Tucker, do you know what Sunset Properties is?

J59TDUN2                           Tucker - Direct

1    A.  I'm sorry?

2    Q.  Do you know what Sunset Properties is?

3    A.  No.

4    Q.  Is this is the check that you received?

5    A.  Yes.

6    Q.  Where did you receive this check?

7    A.  In his vehicle.

8    Q.  With Mr. Locust?

9    A.  Yes.

10            MS. ROTHMAN:  If we could take that down, Ms. Lefever,

11   thank you.

12   Q.  After you had your surgery and you received your check for

13   a thousand dollars, did you speak with Mr. Locust again about

14   your case?

15   A.  Yes, I was going to get contact by the lawyer, I was going

16   to get contact by the lawyer, the lawyer was going to let me

17   know who I was going to, you know -- well, anyway, he made a

18   phone call and called me up and explained to me that he has

19   another person that he wanted me to be my lawyer, and he was

20   coming out of New Jersey, because I had to mail some papers

21   over to a New Jersey residence.

22   Q.  So the lawyer that you met in Queens, he was no longer

23   going to be your lawyer, is that correct?

24   A.  That is correct.

25   Q.  Got a new lawyer for your case.

1          Mr. Tucker, what happened to your case?

2    A.   Well, as the process was going, I got another call about

3    another lawyer who was going to take the case, so it was a

4    little conflict in between there between the first one because

5    he took so long to get to me, the second one called me and she

6    start the process.

7    Q.   And has your case been resolved?

8    A.   Yes, it has.

9    Q.   How was it resolved?

10   A.   Still just a settlement of 100,000.

11   Q.   How much did you receive?

12   A.   19,000.

13   Q.   Do you know what happened to the rest of the money?

14   A.   Well, it went to the doctor's fee and the loan.

15   Q.   At the time that you signed --

16          THE COURT:  What loan.

17          THE WITNESS:  The loan that I signed that paper with,

18   that was the loan that I didn't really look at the paper, I

19   just signed it, but what it was, it was the lien for a loan.

20   Q.   At the time you signed the agreement, did you know it was a

21   loan?

22   A.   I didn't know it until I found out from the lawyer that I

23   took out a loan, and I said I don't remember taking no loan

24   out.

25   Q.   Mr. Tucker, have you experienced mental health issues in

J59TDUN2                        Tucker - Direct

1    the past?

2    A.  Yes, I have.

3    Q.  When did they start?

4    A.  It started back in 1986 when I had a bad accident.

5    Q.  Did there come a time when they worsened?

6    A.  It got bad after 9/11.

7    Q.  Just briefly, Mr. Tucker, what happened?

8    A.  Well, basically, there was people that I know that was in

9    9/11.

10            THE COURT:  All right.  Thank you.  Next.

11   Q.  How were you affected by that?

12   A.  Well, I went into depression.

13   Q.  Were you prescribed medication for that?

14   A.  Yes.

15   Q.  Around the time of your slip and fall accident, were you

16   regularly taking your medication?

17   A.  I was taking them.

18   Q.  Were you taking them regularly around that time?

19   A.  Yes.

20   Q.  Do you believe that your mental health issues have

21   negatively impacted your ability to remember the events

22   surrounding your staged accident, Mr. Tucker?

23   A.  No.

24            MR. DINNERSTEIN:  Objection, your Honor.

25            THE COURT:  Well, I'll allow his belief.  Go ahead.

J59TDUN2                        Tucker - Direct

1   Q.  Mr. Tucker, I want to change topics.  Did there come a time

2   when you started meeting with the government in connection with

3   your staged slip and fall accident?

4   A.  I'm sorry.

5   Q.  Did there come a time when you started meeting with the

6   government in connection with your accident?

7   A.  Yes.

8   Q.  Approximately how many times have you met with the

9   government?

10  A.  Three times.

11  Q.  Who was present for those meetings?

12  A.  My lawyer and Cecilia.

13  Q.  Who else -- for the meetings you had with the government?

14  A.  I'm sorry?

15  Q.  That's okay.  Let's --

16         THE COURT:  Did you meet with the government about

17  this case?

18         THE WITNESS:  I met with them not during the time,

19  just recently they just contact me.

20         THE COURT:  So when did they recently contact you?

21  Approximately, if you can estimate.  The jury does not want a

22  guess.  Was it within the last month?

23         THE WITNESS:  Yeah, within the last two or three

24  weeks.

25         THE COURT:  All right.  And how many times did you

J59TDUN2                          Tucker - Direct

1    meet with them, sir?

2              THE WITNESS:  Three times.

3              THE COURT:  Three times.  And were the same people

4    present each of the three times?

5              THE WITNESS:  Yes.

6              THE COURT:  And obviously you were there.

7              THE WITNESS:  My lawyer and the DA.

8              THE COURT:  And the DA.  All right.

9    BY MS. ROTHMAN:

10   Q.  Mr. Tucker, when you met with the government to talk about

11   the events of your slip and fall, your lawyer was present?

12   A.  Yes.

13   Q.  Was there someone from the FBI present?

14   A.  Yes, the agent and the DA.

15   Q.  Was Ms. Blocker ever present --

16   A.  Yes.

17   Q.  -- during the meetings that you had with the government?

18   A.  Yes.

19   Q.  Was she in the room with you and the government and your

20   attorney?

21   A.  No.

22   Q.  So when you spoke about your staged accident, Ms. Blocker

23   wasn't in the room, correct?

24   A.  No, she was not in the room.

25   Q.  Were you truthful in your meetings with the government?

J59TDUN2                         Tucker - Direct

1    A.  Yes.

2    Q.  Have you entered into an agreement with the government,

3    Mr. Tucker?

4    A.  Yes, I made an agreement.

5            MS. ROTHMAN:  Ms. Lefever, please pull up Government

6    Exhibit 809.  Zoom in on the top paragraph, including that

7    subject line.

8    Q.  Mr. Tucker, do you recognize this document?

9    A.  Yes.

10   Q.  What is this document?

11   A.  It's a document stating that I agreed that I made -- that I

12   did -- I staged the incident.

13           THE COURT:  Can the jury hear the witness?

14           All right.  Speak a little louder, sir, and move

15   yourself closer.

16           Thank you, next question.

17   Q.  Is this your agreement with the government?

18   A.  Yes, it is.

19           MS. ROTHMAN:  Your Honor, the government offers

20   Government Exhibit 809.

21           THE COURT:  Admitted without objection.

22           (Government's Exhibit 809 received in evidence)

23           MR. DINNERSTEIN:  That's correct, your Honor.

24   BY MS. ROTHMAN:

25   Q.  Under the terms of this agreement --

1            MS. ROTHMAN:  Before we get to that, Ms. Lefever,

2    please turn to second page of the agreement.

3            You can zoom in on the bottom paragraph.

4    Q.  I'll read this, Mr. Tucker.  This office will, however,

5    bring the cooperation of Tucker to the attention of other

6    prosecuting offices if requested by Tucker.

7            Mr. Tucker, in 2006 -- withdrawn.

8            In 2016, before your staged accident, were you

9    arrested for an unrelated crime?

10   A.  Yes.

11   Q.  In 2018 did you plead guilty to that crime?

12   A.  Yes.

13   Q.  Have you been sentenced yet for that crime?

14   A.  No.

15   Q.  Are you hoping to receive no jail time in connection with

16   that crime?

17   A.  Yes.

18   Q.  Does that case relate in any way to your staged accident?

19   A.  No.

20   Q.  Mr. Tucker, have you asked the government to contact

21   your -- the prosecutor in your other case --

22   A.  No.

23   Q.  -- to inform them that you assisted the government here?

24   A.  No, I didn't.

25   Q.  Did you intend to ask the government to contact that other

1    prosecutor to inform them of your assistance?

2               MR. DINNERSTEIN:  Objection, your Honor.

3               THE COURT:  I will allow it to his present intentions.

4               As you sit here today, do you intend to contact that

5    other prosecutor to inform them of your assistance to the

6    government in this case?

7               THE WITNESS:  I'm sorry?

8               THE COURT:  Do you intend to inform the state

9    prosecutor that you have assisted the government here?

10              THE WITNESS:  No, I'm not going to.

11              THE COURT:  Okay.

12   BY MS. ROTHMAN:

13   Q.  To your knowledge, has the government done that on your

14   behalf?

15   A.  No, they haven't done that.

16              MS. ROTHMAN:  We can zoom back out, Ms. Lefever.

17   Q.  Mr. Tucker, what happens if you don't tell the truth today?

18   A.  If I don't tell the truth, then -- I just have to tell the

19   truth, that's it, it's --

20   Q.  Let me ask you a few final questions.  Mr. Tucker, do you

21   know anyone named Dexter Baldwin?

22   A.  No, I don't.

23   Q.  Willie Barbour?

24   A.  No.

25   Q.  Yvette Battle?

J59TDUN2                          Tucker - Direct

1   A.   No.

2   Q.   Jabari Buckner?

3   A.   No.

4   Q.   Wanda Diaz?

5   A.   No.

6   Q.   Colette Ford?

7   A.   No.

8   Q.   Marco Gaudin?

9   A.   No, I don't.

10   Q.   Kasheem Jones?

11   A.   No, I don't.

12   Q.   Carol white?

13   A.   No.

14   Q.   Robert Rosario?

15   A.   No.

16   Q.   Tyesha Swain?

17   A.   No, I don't.

18   Q.   Keona Norwood?

19   A.   No.

20   Q.   Tina Nichols?

21   A.   No, I don't.

22   Q.   Alvin Martin?

23   A.   No.

24        MS. ROTHMAN:   Your Honor, I have no further questions

25   for this witness.

1          THE COURT:  Thank you.

2          Mr. Dinnerstein, is there any cross, sir?

3          MR. DINNERSTEIN:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. DINNERSTEIN:

6    Q.  Mr. Tucker, my name is Mitch Dinnerstein.  I will ask you

7    some questions.

8          The gentleman sitting over there, he's your lawyer,

9    right?

10   A.  Yes.

11   Q.  He's your lawyer in this proceeding?

12   A.  Yes.

13   Q.  And also your lawyer in the state proceeding, right?

14   A.  Yes.

15         MR. DINNERSTEIN:  Can the government put up

16   Exhibit 809, please.

17   Q.  This gentleman's name is Mr. Koenig, right?

18   A.  Yes.

19   Q.  And he's been representing you for a few years, is that

20   correct?

21   A.  Yes.

22   Q.  From the time you were arrested in the state court case,

23   right?

24   A.  Yes.

25   Q.  And you've retained him to represent you, is that correct?

1   A.  Yes, I retained him.

2   Q.  You paid him some money?

3   A.  Yes.

4           MR. DINNERSTEIN:  Now could you go to the second page,

5   please, to the paragraph that Ms. Rothman asked for you to

6   enhance.

7   Q.  Do you see where it says:  This office will, however, bring

8   the cooperation of Tucker to the attention of other prosecuting

9   offices, if requested by Tucker.

10  A.  Yes.

11  Q.  You see that, right?

12  A.  Yes.

13  Q.  Now Mr. Koenig could suggest to you that the government

14  should do that, is that correct?

15          MS. ROTHMAN:  Objection, calls for speculation.

16          THE COURT:  Yes, sustained.

17  Q.  Well, the government's probably not going to do anything,

18  you would agree with me, until this case is resolved.

19          MS. ROTHMAN:  Objection.

20          THE COURT:  Sustained.  There's no way that he could

21  know that, I assume, one way or the other.

22  Q.  Do you think --

23          THE COURT:  You're not a lawyer, are you, sir?

24          THE WITNESS:  No, I am not.

25  Q.  You have a non-prosecution agreement, sir, correct?

J59TDUN2                          Tucker - Cross

1   A.  Yes.

2   Q.  You're not going to be prosecuted for this case and the

3   government will decide whether or not you are being truthful,

4   isn't that correct?

5   A.  Yes.

6   Q.  Right?

7   A.  Yes.  I mean they going to decide -- I mean I'm being

8   honest straight up, so I don't understand what you mean by --

9   what you saying to me now because --

10  Q.  But --

11          THE COURT:  Let him finish.

12          Are you finished?

13          THE WITNESS:  I'm saying I don't quite understand what

14  he's saying because I didn't really get to what -- I didn't

15  quite understand what you just said.

16  Q.  The government is the one that you have the agreement with,

17  is that correct?

18  A.  I have an agreement with them.

19  Q.  With the government?

20  A.  With the government, but I have an agreement with myself to

21  be straight up with whatever.

22  Q.  I understand that, but it's up to the government to decide

23  whether you are being truthful or not, is that correct?

24  A.  Pretty much so.

25  Q.  And if they decide you're not being truthful -- I'm not

1    saying you're not, but if they decide you're not being

2    truthful, they could prosecute you, is that correct?

3    A.  I don't know that for sure.  I don't know.

4              THE COURT:  What happens -- to your understanding,

5    sir, what happens to you if you are not truthful today?

6              THE WITNESS:  If I'm not truthful today, that means

7    that I have been lying to them.

8              THE COURT:  And what does that mean?  What happens

9    then?

10             THE WITNESS:  They may -- I'm not sure what they will

11   do with that.  I'm not sure what they will do with that.

12             THE COURT:  Thank you.  Next.

13   BY MR. DINNERSTEIN:

14   Q.  Now the state case that you have that Mr. Koenig

15   represented you with, you have a mandatory sentence of three

16   and a half years, isn't that correct?

17   A.  Well, I thought it was five.

18   Q.  You thought it was five years?

19   A.  Yeah.

20   Q.  Now the government -- you've been told by your lawyer that

21   if you are in this program you may not get those five years,

22   right?

23             MS. ROTHMAN:  Objection, your Honor.

24             THE COURT:  It's a little unclear.

25   Q.  If the government provides information, that may mean that

J59TDUN2                        Tucker - Cross

1   you won't get those five years, is that correct, sir?

2              MS. ROTHMAN:  Objection, calls for speculation.

3              THE COURT:  Just a moment.

4              I'm not sure what's being asked.

5   Q.  I will try to rephrase the question.

6              Do you believe -- you believe that you could get five

7   years in a state case, is that correct?

8   A.  I'm not supposed to get into more trouble, so if I get into

9   any more trouble, that's when it's going to affect my freedom.

10  Q.  And do you think, sir, that if the government helps you out

11  that that will affect your freedom in a positive way?

12             MS. ROTHMAN:  Objection.

13             THE COURT:  I'll allow it.

14             MS. ROTHMAN:  It's confusing.

15             THE COURT:  Yes, I agree, but I will allow it.

16  Q.  Could I have the last question reread?

17             THE COURT:  No, say it again.

18  Q.  The government might help you with that five years, right?

19             MS. ROTHMAN:  Calls for speculation.

20             THE COURT:  Sustained.

21  Q.  Do you believe, sir, if the government says that you helped

22  them that that would help not get a five-year sentence?

23             THE COURT:  I allow it.

24  A.  Well, from what I understand, I'm not supposed to get in

25  any more trouble, so if this was exposed, yes, I probably will

J59TDUN2                        Tucker – Cross

1    get time.

2    Q.  You will receive a benefit, right?

3          THE WITNESS:  What is he trying to tell me?  I'm

4    getting --

5          THE COURT:  The witness just turned and said to me:

6    What is he trying to tell me?

7          So ask the witness, as he says, a straight up question

8    and move on.

9    Q.  Now sir, you're hoping to get no jail time on your state

10   court case, is it that correct?

11   A.  That is correct.

12   Q.  And you, of course, are hoping not to ever be prosecuted

13   for lying about this slip and fall case?

14          THE COURT:  Is correct?

15          Do you hope never to be prosecuted for staging the

16   fake slip and fall?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.  Next question.

19   Q.  Now --

20          THE COURT:  Let's move on.

21          MR. DINNERSTEIN:  I'm going to, your Honor, thank you.

22   Q.  Now when was the first time that you spoke to the

23   government about this case?

24   A.  Two or three weeks ago.

25   Q.  And that was the first time, is it that correct?

J59TDUN2                         Tucker - Cross

1    A.  Yes.

2    Q.  Now you spoke first to this agent sitting at the end of the

3    table, Agent Prince?

4    A.  No, they came to my house.

5    Q.  Who is they?

6    A.  The agent.

7    Q.  Which agent?

8    A.  I don't know because didn't see him, I just got a card.  My

9    mother told me that the agent came to house, and I contact my

10   lawyer and I asked him, I wanted to know what this was all

11   about because I didn't know what it was all about.

12   Q.  And your lawyer was Mr. Koenig, is that correct?

13   A.  Yes.

14   Q.  And he arranged for you to talk to the agents, is that

15   correct?

16   A.  Yes.

17   Q.  And you went to their office and talked to them, is that

18   right?

19   A.  Yes.

20   Q.  And Mr. Koenig, he was present when you talked to the

21   agents, right?

22   A.  Yes.

23   Q.  Excuse me, did I interrupt?

24   A.  No, you didn't interrupt.

25   Q.  I thought I did.  Sorry.

J59TDUN2                         Tucker - Cross

1          THE COURT:  Proceed.

2     Q.  And when you spoke to the agents, was Agent Prince there,

3     the gentleman sitting at the end of the table?

4     A.  He was there for one of the -- he was there when I went to

5     the government office.

6     Q.  Who else was there?

7     A.  My lawyer, the DA, and a few other agents.

8     Q.  Now when you said the "other agents," who were the other

9     agents, if you know their names?

10    A.  I don't know their names.  I'm lucky just to go in.  I

11    don't know what is going on.

12    Q.  And that's why you had Mr. Koenig there to help you, is

13    that correct?

14    A.  Yes.

15    Q.  Now you said at some point you fell on the street, is that

16    correct?

17          You staged an accident?

18    A.  I staged an accident.

19    Q.  And you were holding a bag of potato chips, correct?

20    A.  Yes.

21    Q.  Was that your idea to hold the bag of potato chips?

22    A.  That was my idea.

23    Q.  No one told you?

24    A.  Nobody told me to do anything except stage the fall.

25    Q.  So you thought about making it look better by holding a bag

J59TDUN2                          Tucker - Cross

1    of potato chips, is that correct, sir?

2    A.  Yes.

3    Q.  Now in the end you mentioned -- did you ever meet a man by

4    the name of Pete?  Do you know who Pete is?

5    A.  I don't know who Pete is.

6    Q.  Did you ever -- you said at some point that you got a

7    different lawyer, is that correct?

8    A.  Yes, I never seen nobody by face, if you want to know that

9    I -- did I talk to, I just had somebody on the phone, they just

10   tell me I wasn't going to see this one, I was going to see

11   another lawyer, I don't remember their names, all I know is

12   that I just followed procedure.

13   Q.  Do you know when that was that that --

14   A.  No, I don't recall when it was.

15   Q.  Do you remember the date that you had the accident?

16   A.  May '17.

17   Q.  May of 2017?

18   A.  Yes.

19   Q.  And can you remember saying that you received a phone call

20   about a new lawyer?

21   A.  Yeah, but I don't recall who -- I don't recall the time, I

22   don't recall none of that.

23   Q.  And it was a woman who called you, is that correct?

24   A.  No, it was a man that called me.

25   Q.  What?

J59TDUN2                          Tucker - Cross

1   A.  It was a man that called me, it wasn't a woman.

2   Q.  And did the man say he was going to be the lawyer?

3   A.  He said that he's going to be -- he said that he was not

4   going to take my case, he was going to give it to somebody

5   else.

6   Q.  And do you know the name of that man?

7   A.  No, I don't.

8   Q.  Do you know the name of -- eventually a woman took your

9   case, is that correct?

10  A.  No.

11  Q.  Who took your case, do you know?

12  A.  A woman did finally took my case.

13  Q.  And she was the lawyer, right?

14  A.  She is the lawyer for the accident.

15  Q.  And she's the one who settled the case, right?

16  A.  Yes.

17  Q.  And she's the one who paid you your $19,000, right?

18  A.  That is correct.

19  Q.  And she's the one who told you about the liens, is that

20  correct?

21  A.  Yes, she is.

22  Q.  Now you never saw the person you know as Roger speaking to

23  that particular lawyer, did you?

24  A.  No.

25  Q.  You say that you one time went to Far Rockaway, is that

J59TDUN2                         Tucker - Cross

1  correct?

2  A.  Yes.

3  Q.  And you spoke to a lawyer there?  You spoke to a lawyer in

4  Far Rockaway.

5  A.  Step back from that, because between going to the lawyer --

6  going to a lawyer to talk to someone to see if I was to going

7  to be accepted for the case, and then there was another time I

8  went to see the therapist.  I don't know if it's the same day

9  or another time afterwards, so I'm not sure about that

10  particular situation.  But I do know that I went from Far

11  Rockaway to be evaluated and that was it.

12  Q.  And you also said that Roger -- the person you know as

13  Roger fixed your computer, is that correct?

14  A.  No, he never really fixed it.  I told him about it, but he

15  never fixed my computer.  We talked about it, and I haven't got

16  an opportunity to give him my computer.

17  Q.  So he had said he would fix your computer, is that correct?

18  A.  Yes, because he said he knows how to fix the laptops.

19  Q.  And it just never happened?

20  A.  Right.

21  Q.  And that was a few months before the slip and fall?

22  A.  No, it was long ago.

23  Q.  How long before it?

24  A.  It was several, several months ago.  It was long time

25  before he approached me about the slip and fall.

J59TDUN2                           Tucker - Cross

1    Q.  So did you speak about your computer on more than one

2    occasion?

3    A.  No, we never -- we got into it one time, I keep forgetting

4    to bring it.  We bump into each other from time to time, but we

5    never discussed about the computer anymore.

6    Q.  So he asked you if you could bring the computer so that he

7    could work on it?

8    A.  It was only one -- it was only that time that we talked

9    about it, and each time I bump into him I say I keep forgetting

10   about the computer.  It wasn't no run-on conversation we had.

11   Q.  I understand.  But if you had brought the computer, he

12   would have worked on it?

13   A.  Yes, he would have, I'm pretty sure.  He wanted to make

14   money.

15            MR. DINNERSTEIN:  Okay, thank you very much,

16   Mr. Tucker, and thanks for coming today.

17            THE COURT:  Thank you, Mr. Dinnerstein.

18            Mr. Scholar, is there any cross?

19            MR. SCHOLAR:  No, your Honor.

20            THE COURT:  Ms. Al-Shabazz, any cross?

21            MS. AL-SHABAZZ:  Five minutes.

22            THE COURT:  Proceed.

23   CROSS-EXAMINATION

24   BY MS. AL-SHABAZZ:

25   Q.  Good morning.

J59TDUN2                          Tucker - Cross

1   A.  Good morning.

2   Q.  I only have a few questions for you.  You said that your

3   lawsuit from your staged accident, that happened in May of

4   2017?

5   A.  Well, that's when I staged it.

6   Q.  So the staged the accident actually was May 2017, right?

7   A.  Yes.

8   Q.  And then the case settled, right?

9   A.  I'm sorry?

10  Q.  It settled.  You said you received money?

11  A.  It settled, yes.

12  Q.  Do you remember when that was?

13  A.  No, not exactly.

14  Q.  Around about when you got a check for $19,000?

15  A.  No, it was way after that.

16  Q.  Way after what?

17  A.  When I got the 19,000, it was about, I don't know, about

18  two or three months ago, something.  I just really settled at

19  that time, somewhere between that time.

20  Q.  In connection with that slip and fall case, did you have to

21  testify at a deposition?

22  A.  No, I did not have to.

23  Q.  And Cecilia Blocker, that's your fiancée, right?

24  A.  Yes.

25  Q.  She also filed a lawsuit, right?

1   A.  No, she did not.

2              MS. AL-SHABAZZ:  I have nothing further, thank you.

3              THE COURT:  Government?

4              MS. ROTHMAN:  No redirect.

5              THE COURT:  All right.  Thank you, sir, you are

6   excused and you may step down.

7              THE WITNESS:  Thank you.

8              THE COURT:  That's a sigh of relief.

9              Next witness for the government.

10             MR. FOLLY:  Your Honor, the government will call

11  Kasheem Jones.  I would ask for a very quick break to use the

12  facilities.

13             THE COURT:  All right.  Let's take ten minutes, ladies

14  and gentlemen.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  How long is the direct on Kasheem Jones?

3              MR. FOLLY:  Approximately 30, 40 minutes.

4              THE COURT:  Who is doing the first cross?

5              MR. SCHOLAR:  I guess me, maybe 10 or 15 minutes.

6              THE COURT:  Next.

7              MS. AL-SHABAZZ:  I don't believe I have any questions

8    for the witness.

9              THE COURT:  I understand.  I'm getting honest

10   estimates here.

11             MR. DINNERSTEIN:  Probably be less than five minutes,

12   your Honor.  There is one matter I would like to bring to the

13   Court's attention.

14             THE COURT:  Kasheem Jones any of the numbered

15   witnesses in which there are pending applications?

16             MR. FOLLY:  Your Honor, my understanding is there's an

17   unopposed application that was submitted.

18             THE COURT:  For what?

19             MR. FOLLY:  On Sunday to preclude.

20             THE COURT:  Sunday night special for what?

21             MR. FOLLY:  To preclude cross-examination,

22   cross-examination of a number of convictions.

23             THE COURT:  It's unopposed?

24             MR. FOLLY:  Yes, your Honor.

25             THE COURT:  Fine.  Who is the next witness?  Jasmond

1   Cunningham?

2              MR. FOLLY:  Your Honor, it may be Jasmond Cunningham

3   and may be Cecilia Blocker.

4              THE COURT:  What number of witnesses are they?

5              MS. ROTHMAN:  Ms. Blocker was not given an a number.

6              THE COURT:  No applications.

7              MS. ROTHMAN:  And Mr. Cunningham is number one.

8              THE COURT:  Any applications?

9              MS. ROTHMAN:  None that are pending.

10             THE COURT:  Thank you.

11             Yes, Mr. Dinnerstein?

12             MR. DINNERSTEIN:  Your Honor, I spoke to the

13  government prior to Mr. Tucker's testimony and asked the

14  government if they would offer Mr. Locust a plea at this time.

15             I was told by Mr. Folly that he could not do it at

16  this time but would discuss it with the office over the lunch

17  break.

18             THE COURT:  All right.  That is now on the record.

19  Any particular office that he was going to?  You say "the

20  office," any particular office?

21             MR. DINNERSTEIN:  I presume the U.S. Attorney's Office

22  for the Southern District, but he didn't tell me.  I presume

23  that's right.

24             THE COURT:  Thank you.  All right.  The DAs usually

25  say their office.

 1              (Recess taken)

 2              THE COURT:  Take your places, please.

 3              MR. FOLLY:  Your Honor, we anticipate this witness's

 4      direct testimony will be about 30 to 40 minutes.  It sounds

 5      like the cross is somewhat limited.  It's possible that we'll

 6      conclude little bit before 1:00 when we typically have been

 7      taking the break.  Could we ask if, we do that, we break

 8      slightly early?  Because we have several witnesses en route,

 9      but not here.

10              THE COURT:  Let's try to be as efficient as possible.

11      I don't mind breaking for lunch before one o'clock.

12              MS. ROTHMAN:  If I could put one more thing on the

13      record, because the of crosses, we're moving very quickly,

14      which I imagine your Honor is appreciating.  It is possible

15      that we're going to need to start Peter Kalkanis this

16      afternoon.  He would not be done with his testimony by any

17      means.  We have intended to start him it tomorrow, but I did

18      just advise defense counsel of that.  It's also possible we

19      don't get to him.  It just depends upon how long the testimony

20      this afternoon takes.

21              THE COURT:  And we have to leave -- I have other

22      matters at 4:30, and I may have to prepare for that at 4:15.

23              MS. ROTHMAN:  Understood, your Honor.

24              MS. AL-SHABAZZ:  I would ask that we are allowed to

25      cross tomorrow if they put Kalkanis on.

J59TDUN2                          Tucker - Cross

1              THE COURT:  On Kalkanis, absolutely.

2              MS. ROTHMAN:  We won't finish Mr. Kalkanis, to be

3    clear.

4              THE COURT:  But your request is granted.  I understand

5    PK is an important witness here.

6              MS. ROTHMAN:  That's how I plan to address him, your

7    Honor, PK.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (Jury present)

 2                THE COURT:  You may be seated in the courtroom.

 3                Ladies and gentlemen, the intention of the Court is to

 4       proceed without a break until lunch.

 5                Next witness.

 6                MR. FOLLY:  The government calls Kasheem Jones.

 7                THE COURT:  Sir, if you would take the witness stand.

 8        KASHEEM JONES,

 9            called as a witness by the Government,

10            having been duly sworn, testified as follows:

11       DIRECT EXAMINATION

12       BY MR. FOLLY:

13                THE COURT:  You may be seated, sir, welcome.

14                Move that mic down toward your face and speak loudly

15       and slowly and clearly.

16                Mr. Folly, your witness.

17                MR. FOLLY:  Thank you, your Honor.

18       BY MR. FOLLY:

19       Q.  Mr. Jones, how old are you?

20       A.  I'm 41 years old.

21       Q.  Where do you live?

22       A.  I live in Brooklyn.

23       Q.  How long have you lived in Brooklyn?

24       A.  All my life, excluding the two years I lived in Staten

25       Island.

1    Q.   What do you do for a living?

2    A.   I manage a property management company.

3    Q.   Directing your attention to 2014, were you involved in a

4    lawsuit at that time?

5    A.   Yes, I was.

6    Q.   What was the nature of that the lawsuit?

7    A.   Slip and fall.

8    Q.   Just to be clear, were you the one who brought the lawsuit

9    or were you sued?

10   A.   I was the one who brought the lawsuit.

11   Q.   What did you claim in that lawsuit?

12   A.   I claimed that I slipped and fell in a parking lot of the

13   New Floridian Diner.

14   Q.   Did you in fact fall in the parking lot of the Floridian

15   Diner?

16   A.   No, I did not.

17   Q.   Why did you say that you had fallen in the parking lot of

18   Floridian Diner if you had not fallen there?

19   A.   I was informed, if you were willing to have a surgery, it

20   was a quick way you could make 200 grand, and it took about a

21   year.  But you had to be willing to have the surgery.

22   Q.   Before we get into the details of what happened with that,

23   do you see anyone in the courtroom who was involved with your

24   slip and fall case?

25              THE COURT:  You can stand up if that assists you, sir.

J59TDUN2                         Jones - Direct

1   A.  I only see Ryan.

2              THE COURT:  You see Ryan?

3              THE WITNESS:  Yes.

4              THE COURT:  Who is that?

5              THE WITNESS:  He's the gentleman right here with the

6   dreadlocks.

7              THE COURT:  What is he wearing.

8              THE WITNESS:  Blue vest and blue shirt.

9              THE COURT:  The witness has identified Ryan Rainford.

10             All right.  Anyone else?

11             THE WITNESS:  No.

12             THE COURT:  All right.  Thank you.

13  BY MR. FOLLY:

14  Q.  You identified that witness by the name of Ryan, do you

15  know him by any other names?

16  A.  Ace.

17  Q.  Let's go back to beginning of this.  How did you first hear

18  about doing a slip and fall case?

19  A.  There was a guy named Craig, Craig Smith, I met him on

20  Craig's List looking for a handyman in Queens.

21  Q.  What did Craig Smith explain to you about how this works?

22  A.  He said he had done it.  All you had to do is be willing to

23  have surgery, his friend had hooked him up with it, and let me

24  know if I wanted to do it.

25  Q.  And when you say that he told you that he had done it, what

J59TDUN2                          Jones - Direct

1   are you referring to?

2   A.  He had done -- he had pretty much did the slip and fall.

3   He was waiting to do surgery at the time.

4          MR. SCHOLAR:  Who is he, Judge?

5          THE COURT:  Who is he?

6          THE WITNESS:  Craig Smith.

7   Q.  Did Craig Smith indicate if he was working alone or with

8   anyone else?

9   A.  No, he just referred to them as his mans.

10  Q.  And did you eventually learn who that was?

11  A.  I met Ryan, some other kid named Mel, and it was Dr. K, it

12  was a Caucasian guy named Dr. K, but I only seen them maybe

13  once or twice.

14  Q.  Did you eventually take Craig on this offer to get involved

15  with your own case?

16  A.  Yes.

17  Q.  Describe what happened.

18  A.  I had an argument with my wife, punched the TV.  I left the

19  house, I got in the car, I drove.  I was drinking, I got pulled

20  over, I fell asleep at the light.  I got a DWI.  I got out the

21  next day, my hand was broke, it was swelling, it was swollen,

22  looked like a mini basketball.  I wound up going to the

23  hospital.  When I went to the hospital I told them that I had

24  slipped and fell and I broke my hand.

25  Q.  Why did you tell them at the hospital that you had slipped

1   and fell and broke your hand?

2   A.  Well, it was something that I was thinking about, I really

3   was at the hospital anyway, so I went with the story that me

4   and Craig discussed a few weeks prior.

5   Q.  When you left the hospital, what, if anything, did you

6   receive?

7   A.  Discharge papers.

8   Q.  What did you do with those discharge papers?

9   A.  When I left the hospital I took them home, but I wind up

10  bringing them to attorney.

11  Q.  So we'll discuss that in just a moment.  But when you say

12  the attorney, what attorney are you referring to?

13  A.  George Constantine.

14  Q.  What happened next after you left the hospital?

15  A.  Went home, I called Craig the next day, he put me in

16  contact with Ryan.

17  Q.  What happened after Craig put you in contact with Ryan?

18  A.  I was set up to meet at the attorney's office the next day

19  which is -- that was in Queens on Vernon Boulevard.

20  Q.  When you refer to an attorney, is that the same attorney,

21  George Constantine?

22  A.  Yes.

23  Q.  Describe what happened when you arrived at that location of

24  the attorney's office.

25  A.  I met with a kid named Mel and Dr. K, and they pretty much

1    briefed me on you had to choose one side, either your left side

2    or right side, always go with the knee and the back, it was the

3    easiest, don't do shoulder unless you absolutely have to

4    because it takes longer to heal.  And then we went in to meet

5    the attorney.

6    Q.  Now I show you what is in evidence as Government Exhibit 2.

7         MR. FOLLY:  If we could publish that.

8    Q.  Do you recognize that?

9    A.  Yes.

10   Q.  How do you recognize it?

11   A.  That was the gentleman I met at Constantine's office.

12   Q.  What name did you know him by?

13   A.  Mel, I knew him by Mel.

14   Q.  And you mentioned that you had a discussion with Mel before

15   meeting with the lawyer.  What did you discuss during that

16   conversation with Mel?

17   A.  He pretty much briefed me on what to say, always go with --

18   you can only go with one side, either your right side or left

19   side.  The knee and the back was always the easiest.  Then

20   Dr. K mentioned the shoulder, only do the shoulder -- unless

21   there's something really wrong, don't do the shoulder because

22   it takes longer to heal.

23   Q.  And what, if anything, did you discuss with Mel about the

24   location of the accident?

25   A.  He showed me a bunch of pictures.  He showed me a bunch of

J59TDUN2                          Jones - Direct

1    pictures on his phone.  These were locations that didn't have

2    cameras.  He showed me the picture of the Floridian Diner, and

3    because I lived around the corner from there and I used to go

4    there often, I choose that location.

5              MR. SCHOLAR:  Judge, for clarification it's Mel?

6              THE WITNESS:  Yes.

7    Q.  Now you mentioned something about Mel showing you locations

8    without cameras.  What did you understand that to be?

9    A.  This was the locations that you would choose to say you

10   fell at.

11   Q.  Did you eventually select one of those locations?

12   A.  Yes.

13   Q.  Which location did you select?

14   A.  The Floridian Diner.

15   Q.  Showing you what's been marked as Government Exhibit 241,

16   do you recognize that?

17   A.  Yes.

18   Q.  How do you recognize it?

19   A.  That's the parking lot of the New Floridian Diner.

20             MR. FOLLY:  The government offers Government

21   Exhibit 241.

22             THE COURT:  Admitted without objection.

23             (Government's Exhibit 241 received in evidence)

24   Q.  When Mel showed you the photograph of the location at the

25   Floridian Diner, what was in that photograph?

1    A.  We saw the pictures of the potholes in the parking lot, it

2    was maybe about three different -- three or four different

3    photos of three or four different angles of the diner, the

4    parking lot, the holes in the parking lot.

5    Q.  After the meeting with Mel, what happened next?

6    A.  We went inside the attorney's office.

7    Q.  What did you discuss during your meeting with the attorney?

8    A.  I explained to him that I had fell, I had broken my hand,

9    that my back and my right knee was hurt.  And I was sitting

10   down actually with the guy Mel sitting next to me, Constantine

11   asked me a series of different questions about my background,

12   what I did, did I have a history, and my history and so on.

13   Q.  You mentioned that Mel was present during that meeting, is

14   that true?

15   A.  Yes.

16   Q.  Was he present for the whole meeting or part of the

17   meeting?

18   A.  The whole meeting.

19   Q.  What happened next after you had a meeting with the lawyer

20   and with Mel?

21   A.  I signed a bunch of papers, a bunch of forms, they told me

22   they would get back to me with a hand doctor because they

23   didn't have a hand doctor.  And I was scheduled to start with

24   therapy, therapy and MRI.  I wound up contacting a hand doctor

25   on my own because I couldn't wait, my hand was really broken,

1  and I went to -- first I started going to therapy, but I went

2  to the hand doctor who wound up sending me to a surgeon.

3  Q.  Did you eventually get surgery on your hand?

4  A.  About a week after, yes.

5  Q.  During your doctor's appointments regarding your hand,

6  what, if anything, did you say to your doctor about how you

7  injured yourself?

8  A.  I told him I had actually hit a TV.

9  Q.  Why did you tell him that?

10  A.  It was the truth.

11  Q.  Now did you eventually see a chiropractor?

12  A.  Yes.

13  Q.  Do you recall the name of that chiropractor?

14  A.  Dr. Krieger.

15  Q.  Where was Dr. Krieger's office located?

16  A.  He was located in Astoria right off of Steinway.

17  Q.  Showing you what is in evidence as Government Exhibit 210,

18  do you recognize that?

19  A.  Yes.

20  Q.  How do you recognize it?

21  A.  That's Dr. Krieger's office.

22  Q.  How long were your appointments with Dr. Krieger,

23  typically?

24  A.  Around five minutes.

25  Q.  Did you ever see anyone else who you knew at Dr. Krieger's

1  office?

2  A.  Only Mel and Ryan, that they was usually dropping people

3  off.  They would have people in the car dropping them off for

4  therapy and going to the therapy and then taking them home.

5  Q.  I show you what's in evidence as Government Exhibit 5.  Do

6  you recognize this?

7  A.  Yes.

8  Q.  Who is that?

9  A.  That's Ryan.

10  Q.  How did you get to your appointments with Dr. Krieger?

11  A.  Because my license was revoked at first for maybe the first

12  month, month and a half, I couldn't drive, so I used their

13  transportation.  And I guess that's how I met Ryan and maybe

14  one other driver with him coming to pick me up and take me

15  back.

16  Q.  You mentioned -- was Ryan one of the drivers who drove you?

17  A.  Yes.

18  Q.  And approximately how long would it take you when Ryan

19  would drive you to those appointments?

20  A.  Maybe three, three and a half hours.  He would have to pick

21  other people up and then take us all to the therapy and then

22  everybody in there maybe for five minutes, then we have to drop

23  everybody off.  So if I was closer, I got dropped off first, if

24  I was last, I would get dropped off last.

25  Q.  Do you recall the type of vehicle that Ryan would drive you

J59TDUN2                              Jones - Direct

1    in?

2    A.   It was a Jeep, then it was -- last time I think it was a

3    Nissan Maxima.

4    Q.   During those drives with Ryan, what, if anything, did you

5    discuss with him?

6    A.   He would discuss various things, like the type of people,

7    the quality of people that the other guy brought in, would

8    bring in, they wouldn't be working, they was from certain areas

9    and so on.

10   Q.   How many people would typically be in the car during those

11   drives?

12   A.   Minimum of two or three.

13   Q.   During the time that your case going on, did you see any

14   other medical providers besides Dr. Krieger and the doctor you

15   mentioned for your hand?

16   A.   Yes, I seen Dr. Ribeiro for my back and Dr. Dowd for my

17   knee.

18   Q.   Let's start with Dr. Ribeiro.  You mentioned that you saw

19   him for your back?

20   A.   Yes.

21   Q.   Did you eventually get back surgery?

22   A.   Yes.

23   Q.   Was your back injured?

24   A.   No.

25   Q.   Why did you get surgery on your back if it was not injured?

J59TDUN2                         Jones - Direct

1   A.   Because it was basically the more surgeries you had, the

2   more money you was looking to get back from your settlement.

3   Q.   Who told you that?

4   A.   Dr. K, Ryan, Mel, I believe.  That was what was said.

5   Q.   Did you eventually get a second surgery?

6   A.   Yes.

7   Q.   What area of your body was the second surgery on?

8   A.   My right knee.

9   Q.   Who was your doctor for the knee surgery?

10  A.   Dr. Dowd.

11  Q.   Was your knee injured?

12  A.   At the time, no.

13  Q.   Why did you get surgery on your knee if it was not injured?

14  A.   Again, it was the more surgeries you have, the more money

15  you would get in your settlement.

16  Q.   Did you receive any payments after your surgeries?

17  A.   I received a thousand dollars before Christmas of 2014.

18  Q.   Approximately how long was that after your surgery?

19  A.   Within a month or so after, or within a month or two.

20  Q.   What was the form of that payment?

21  A.   It was a cash payment.

22  Q.   Who gave you that payment?

23  A.   The receptionist in my attorney's office.

24  Q.   What was the next thing that happened connected to your

25  case?

1   A.   A few years later we went for a deposition.

2   Q.   During that deposition did you tell the truth about your

3   accident?

4   A.   No, I did not.

5   Q.   Why not?

6   A.   Because the goal was to stick to the story for the

7   settlement.

8   Q.   Did your case eventually settle?

9   A.   Yes, it did.

10   Q.   How much money did you receive?

11   A.   I received $35,000.

12   Q.   What was the total settlement amount?

13   A.   $225,000.

14   Q.   Why did you receive less than the full amount of the

15   settlement?

16   A.   It was explained that the finance companies had to charge

17   an enormous amount of interest because they had to pay the

18   doctors up front, and then I argued back and forth with the

19   lawyer.  And that was pretty much the bottom line, anything

20   else he explained wasn't going to happen.

21   Q.   What did you do with the money that you received from your

22   lawsuit?

23   A.   I invested the majority in equipment for the company,

24   equipment for the company, I paid the credit card bill for the

25   company, I may have spent maybe around 3 to $5,000 for personal

1   use.

2   Q.  Did you ever tell anyone else about this scam?

3   A.  Yes.

4   Q.  Who did you tell?

5   A.  My girlfriend, Colette Ford.

6   Q.  What did you tell Ms. Ford about this scam?

7   A.  At the time it was probably the end of 2014, beginning of

8   2015.  I told her she would be able to do the same thing and we

9   would have 200-plus thousand dollars within a year or so.

10  Q.  What did you tell her she would have to do in order to

11  participate in this?

12  A.  Well, what she had to be willing to do was have the

13  surgery.

14  Q.  What was her response when you told her about getting

15  involved in this?

16  A.  Okay.

17  Q.  What did you do next after Ms. Ford told you she was

18  interested in doing this?

19  A.  I called Ryan.

20  Q.  Did you speak with Ryan in person or over the phone?

21  A.  Over the phone.

22  Q.  What did you discuss with Ryan during that phone call?

23  A.  I told him that my girlfriend wanted to pretty much do the

24  same thing, and I would walk her through it and take her to the

25  hospital and so on.

1    Q.  What was Ryan's response when you told him that?

2    A.  He told me we're not doing it like we used to do it, we

3    don't do the same thing no more, you actually have to go the

4    place, you have to fall, you have to call an ambulance and go

5    to the hospital.  It's not you just go to the hospital and pick

6    up papers.

7    Q.  What was the next thing that happened after that

8    conversation?

9    A.  I spoke with her, I spoke with Ryan again in regards to the

10   location of the place that would be picked.  And maybe a few

11   days after she got off of work we went to a Burger King parking

12   lot, and she went and bought some chicken nuggets and fell when

13   she came out in the parking lot.

14   Q.  What did you discuss with Ryan about the location that

15   Ms. Ford could do her accident at?

16   A.  Pretty much it was we knew she had to actually go there,

17   you know, he explained it to me that she had to actually fall,

18   it was right across the street from the Floridian, and it

19   wasn't the same as the way I did it.

20   Q.  What was the location that you provided?

21   A.  The Burger King parking lot for Burger King, PetCo and

22   Popeye's.

23   Q.  Showing you what's been marked as Government Exhibits 240

24   and 241, do you recognize these?

25   A.  Yes, one is the Floridian Diner, and one is the Burger

1   King, PetCo and Popeye's.

2   Q.  If we could put side by side with 240 Government

3   Exhibit 239.

4           Do you recognize that?

5   A.  Yes.

6   Q.  What is that?

7   A.  That is the parking lot for Burger King, PetCo and

8   Popeye's.

9           MR. FOLLY:  The government offers Government Exhibits

10  239 and 240.

11          THE COURT:  Admitted without objection.

12          (Government's Exhibit 239 and 240 received in

13  evidence)

14          MR. FOLLY:  If we could publish Government Exhibits

15  239 and 240.

16  Q.  First on the right side of Government Exhibit 239, what's

17  shown there?

18  A.  That's the parking lot of the drive-through.

19  Q.  And which parking lot are you referring to?

20  A.  Burger King parking lot.

21  Q.  Is that the location that Ryan provided to you for

22  Ms. Ford?

23  A.  Yes.

24  Q.  Describe what happened on the date that Ms. Ford did her

25  accident.

1    A.   I picked her up from work.  I parked right there on Filmore

2    and 53rd.  She walked to Burger King, she walked back.  She

3    purchased chicken nuggets and she walked back out.  She walked

4    through the parking lot, she fell where one of the cars was at.

5    There was a pothole there.  She fell.  I called 911.  The

6    ambulance was right around the corner on Avenue U.  They came

7    in maybe about two minutes, they put her on the gurney, put her

8    in the ambulance, took her to the hospital, Mount Sinai on

9    Kings Highway, and I got in the car and I followed.

10   Q.   What happened after Ms. Ford went to the hospital?

11   A.   She complained of the same thing, her knee and her back,

12   she had her discharge papers, and we left and went home after

13   they treated her.

14   Q.   What, if anything, did you discuss with Ryan about her

15   fall?

16   A.   We scheduled the meet after that, maybe a day or two after

17   that, we met at a doctor's office, medical office in Queens.

18   We met with Dr. K and I seen Ryan outside as she was going in.

19   Q.   Did Ms. Ford eventually file her own lawsuit?

20   A.   Yes.

21   Q.   Did she eventually get surgery?

22   A.   Yes.

23   Q.   What happened to her case?

24   A.   They settled.  I believe they settled her case.  She got

25   55,000 out of 250,000.

J59TDUN2                          Jones - Direct

1    Q.  Mr. Jones, I want to switch topics for a moment.  Prior to

2    today's testimony, did you meet with prosecutors in this case?

3    A.  Yes.

4    Q.  Did you attend meetings at the U.S. Attorney's Office?

5    A.  Yes.

6    Q.  Who was present during those meetings?

7    A.  My attorney, prosecutor, and special agent from the FBI.

8    Q.  During your meetings with the prosecutors from this office,

9    were you truthful?

10   A.  Yes.

11   Q.  Did you tell the government about other crimes you had

12   committed in addition to the slip and fall scheme we have been

13   discussing?

14   A.  Yes.

15   Q.  Did you tell the government about other crimes you had not

16   been charged with?

17   A.  Yes.

18   Q.  What did you tell the government?

19   A.  I told them I had been receiving Medicaid benefits when I

20   was employed and making enough and could afford to pay for

21   medical insurance.

22   Q.  After meeting with the government, did you enter into an

23   agreement with the government?

24   A.  Yes.

25   Q.  Was that agreement in writing?

J59TDUN2                         Jones - Direct

1    A.  Yes, it was.

2            MR. FOLLY:  If we could show the witness what's been

3    marked as Government Exhibit 822.

4    Q.  Do you recognize that?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's a non-prosecution agreement.

8            MR. FOLLY:  The government offers Government

9    Exhibit 822.

10            THE COURT:  Hearing no objection, admitted.

11            (Government's Exhibit 822 received in evidence)

12   Q.  What was your understanding of what you are required to do

13   under this agreement with the government?

14   A.  Tell the truth.

15   Q.  And are you allowed to commit any more crimes?

16   A.  No.

17   Q.  What would happen if you commit any new crimes?

18   A.  I will be violating the agreement and I will be prosecuted.

19   Q.  If you hold up your end of this agreement, what is your

20   understanding of what you will receive in return from the

21   government?

22   A.  Immunity.  I won't be prosecuted.

23   Q.  For which crimes won't you be prosecuted for?

24   A.  For the fraud crime of slipping and falling, the perjury,

25   and receiving Medicare benefits even though I make enough money

J59TDUN2                          Jones – Direct

1   to afford medical insurance.

2   Q.  Do you know whether the outcome of this trial has any

3   bearing on whether you can be prosecuted for those crimes?

4   A.  No.

5   Q.  What is your understanding of what will happen if you do

6   not tell the truth here today?

7   A.  I will be prosecuted.

8   Q.  What is your understanding of whether you could be

9   prosecuted for perjury if you don't tell the truth here today?

10  A.  If I lie I will be prosecuted for perjury.

11  Q.  Mr. Jones, I'm going to ask you if you know anyone by the

12  following names:  Reginald Dewitt?

13  A.  No.

14  Q.  Peter Kalkanis?

15  A.  No.

16  Q.  Dexter Baldwin?

17  A.  No.

18  Q.  Willie Barbour?

19  A.  No.

20  Q.  Yvette Battle?

21  A.  No.

22  Q.  Wanda Diaz?

23  A.  No.

24  Q.  Marco Gaudin?

25  A.  No.

J59TDUN2                          Jones - Direct

1   Q.  Alvin Martin?

2   A.  No.

3   Q.  Tina Nichols?

4   A.  No.

5   Q.  Keona Norwood?

6   A.  No.

7   Q.  David Pierre?

8   A.  No.

9   Q.  Tina Roper?

10  A.  No.

11  Q.  Robert Rosario?

12  A.  No.

13  Q.  Tyesha Swain?

14  A.  No.

15  Q.  Carol White?

16  A.  No.

17          MR. FOLLY:  No further questions.

18          THE COURT:  All right.  Thank you.

19          Cross-examination, Mr. Scholar?

20          MR. SCHOLAR:  Yes, your Honor.

21          Your Honor, could I have one second to talk to

22  stenographer about a question that was asked, the last

23  question?

24          THE COURT:  Why don't you ask it.  Stand there and ask

25  it.

1              You want him to read something back?

2              MR. SCHOLAR:  No, I wanted to make sure.  I didn't

3     know if I heard it correctly.

4              THE COURT:  Would you read last question and answer

5     back, sir?

6              (Record read)

7              THE COURT:  Thank you.

8     CROSS-EXAMINATION

9     BY MR. SCHOLAR:

10    Q.  Now Mr. Folly, the prosecutor, asked you if you had

11    admitted to the crimes in your meetings with the government.

12    A.  Yes.

13    Q.  Do you remember that question?

14    A.  Yes.

15    Q.  And you indicated that you admitted to Medicaid fraud?

16    A.  Yes.

17    Q.  And you also admitted to using marijuana, correct?

18    A.  Yes.

19    Q.  But you didn't say what when he asked you the question.

20    A.  Sorry, I forgot.

21    Q.  And you still use marijuana, correct?

22    A.  Not frequently.

23    Q.  Not frequently.  When was the last time you used marijuana?

24    A.  Maybe three weeks ago.

25    Q.  And it's not legal to possess marijuana, right?

J59TDUN2                          Jones - Cross

1    A.  No, it's not.

2    Q.  That's a crime, right?

3    A.  Yes, it is.

4    Q.  And you fully expect your agreement to be ripped up now,

5    right?

6              MR. FOLLY:  Objection.

7              THE COURT:  Sustained as to form.

8    Q.  Do you know whether your agreement will be ripped up as a

9    result of your possession of marijuana?

10             MR. FOLLY:  Objection.

11             THE COURT:  I'll allow it.  He may know, he may not.

12   A.  I shared that information with the prosecutor.

13   Q.  That wasn't my question.

14             THE COURT:  You shared that information before you

15   entered into the non-prosecution agreement?

16             THE WITNESS:  Yes, the last time, they asked me the

17   last time that I smoked marijuana.

18             THE COURT:  That was before you entered into the

19   non-prosecution agreement?

20             THE WITNESS:  Yes.

21             THE COURT:  Next question.

22   BY MR. SCHOLAR:

23   Q.  And as a result of that, you won't be prosecuted at all for

24   that, right?

25             THE COURT:  As a result of what?

1   Q.  As a result of the cooperation agreement, you won't be

2   prosecuted at all, correct?

3   A.  As long as I tell the truth.

4   Q.  Now first time you met Ryan was after you staged the

5   accident with Craig, right?

6   A.  First time I met with Ryan was after -- I didn't stage the

7   accident with Craig, Craig put me in contact with Ryan, Ryan

8   put me in contact with the kid Mel who I met at the attorney's

9   office.  I didn't see the kid Mel too often.  I wound up

10  getting not close with Ryan, but I wound up knowing Ryan

11  through contact.  I didn't really have contact with the other

12  kid.

13  Q.  But when you staged your accident, it was you and Craig,

14  right?

15  A.  No, it wasn't me and Craig.  Me and Craig didn't stage the

16  accident, sir.

17  Q.  Who was with you when you fell at the staged accident?

18  A.  I didn't fall.

19  Q.  What did you do?

20  A.  They allowed me to select a picture.  I selected the

21  picture.  I met with the attorney and we choose that location,

22  the location that was around the corner from my house.

23  Q.  But you didn't take a picture with Ryan.

24  A.  No, I didn't take a picture with Ryan.

25  Q.  The first time you met Ryan you had a hand injury, right?

J59TDUN2                              Jones - Cross

```
 1   A.  Yes.  First time I met Ryan he was picking me up to take me
 2   to the chiropractor.
 3   Q.  He was driving you, right?
 4   A.  Yes, he was.
 5   Q.  And your hand was bandaged, right?
 6   A.  Yes, it was.
 7   Q.  Now didn't you tell the government that Dr. K called Ryan
 8   Ace?
 9   A.  Yes.
10   Q.  And that's Peter Kalkanis?
11   A.  Who?
12   Q.  Was that Peter Kalkanis?
13           THE COURT:  Is who?
14   Q.  Is Dr. K Peter Kalkanis?
15   A.  I don't know.  He was Dr. K, that's all I knew, Dr. K.  I
16   didn't know his real name.
17   Q.  So when the government asked you whether you knew Peter
18   Kalkanis, you don't know that Dr. K is Peter Kalkanis?
19   A.  No.
20   Q.  Now do you know whether Dr. K called Ryan Ace as a
21   euphemism?
22   A.  I didn't really meet Dr. K that often.  I seen him maybe
23   twice.  I seen him maybe twice.  First time he told me be
24   careful, don't do shoulder unless you absolutely have to.  The
25   second time he was saying to Colette this one is a big one
```

1  because it's three stores on one lot.  I didn't have too much

2  contact with him.

3  Q.  And you indicated to the government you made how much money

4  in your settlement?

5  A.  $35,000.

6  Q.  And what did you do with that money?

7  A.  Maybe three to five grand on personal use, the rest went

8  into business equipment and maybe paying off the business debt

9  on the credit card.

10  Q.  And as part of that agreement Mr. Folly showed you, is

11  there any requirement to pay that back?

12  A.  No, there's not.

13  Q.  I want to get into the conversation you claim to have had

14  with Ryan.  You indicated that you spoke to him about Colette

15  Ford?

16  A.  Colette Ford.

17  Q.  And on direct you told Mr. Folly that you said pretty much

18  you wanted to do the same thing.  Is that what you said exactly

19  on the telephone?

20  A.  I can't say word for word, 2014 was a minute ago, but

21  pretty much I called Ryan --

22  Q.  That wasn't -- thank you, but --

23          MR. FOLLY:  Your Honor, I ask the witness be allowed

24  to finish.

25          MR. SCHOLAR:  I don't believe it to be responsive to

J59TDUN2                         Jones - Cross

1    the question, Judge.

2              THE COURT:  Were you finished with your answer, sir?

3    A.  Basically I called Ryan to let him know that she wanted to

4    do the same thing, and that's when he explained to me that they

5    don't do it like that anymore, that you have to actually go to

6    a location and call the ambulance and go to the hospital.  It's

7    not just pick a spot.

8              THE COURT:  Next question.

9    Q.  So the long and short, you actually had to have an injury?

10   A.  No, you actually had to go to a place and fall and not just

11   go to the hospital and say you fell.  That was the difference.

12   Q.  Actually have an injury?

13             THE COURT:  He just answered that.  Next.

14             MR. SCHOLAR:  Yes, Judge.

15   Q.  Now --

16             THE COURT:  You asked it and he said no.  Go ahead.

17             MR. SCHOLAR:  Yes, Judge.

18   Q.  Now you indicated to Mr. Folly you were also getting

19   Medicaid without being eligible.

20   A.  Yes, sir.

21   Q.  And what did you fill out to get Medicaid without being

22   eligible?

23   A.  There's a form that you fill out.

24   Q.  How many times did you fill out that form?

25   A.  Several.  I don't recall exactly how much, but several.  It

J59TDUN2                         Jones - Cross

1    was several times.

2    Q.  And that's between 2016 and 2018?

3    A.  Yeah.  Well, between 2016 and 2018 I am going to say twice.

4    Q.  And is there any requirement in that agreement that

5    Mr. Folly showed you to pay back Medicare?

6    A.  No.

7               MR. SCHOLAR:  Judge, nothing further.

8               THE COURT:  Thank you.

9               Ms. Al-Shabazz, anything?

10              MS. AL-SHABAZZ:  Just one question.

11              THE COURT:  Yes, ma'am.

12   CROSS-EXAMINATION

13   BY MS. AL-SHABAZZ:

14   Q.  You don't know anyone named Bryan Duncan, right?

15   A.  Say that again?

16   Q.  You don't know anyone named Bryan Duncan?

17   A.  No.

18   Q.  You don't know anyone named Kerry Gordon?

19   A.  No.

20              MS. AL-SHABAZZ:  Thank you.

21              THE COURT:  Mr. Dinnerstein.

22              MR. DINNERSTEIN:  Thank you.

23   CROSS-EXAMINATION

24   BY MR. DINNERSTEIN:

25   Q.  Good afternoon, Mr. Jones.  I have a few questions to ask

J59TDUN2                         Jones - Cross

1    you.  You mentioned a Dr. K, is that correct?

2    A.  Yes.

3    Q.  And you also mentioned somebody named a Dr. Krieger, is

4    that correct?

5    A.  Yes.

6    Q.  Now are they different people?

7    A.  Yes.

8    Q.  Now could you describe what Dr. K looks like?

9    A.  Similar to you, a little smaller.  This was about five

10   years ago.  The features could have changed, but I definitely

11   didn't mean any offense, but he was tall, Caucasian, slimmer

12   than you are, gray hair.

13          THE COURT:  Mr. Dinnerstein, have you ever been known

14   as Dr. K?

15          Proceed.

16   Q.  Did he have white curly hair, do you remember that?

17   A.  I remember his hair being gray.

18   Q.  Like mine, right?

19   A.  Yes.

20   Q.  Now you mentioned that in 2012 you learned about this scam,

21   is that correct?

22   A.  2014.

23   Q.  You spoke to a person by the name of Charles Smith?

24   A.  Craig Smith.

25   Q.  Smith?

1   A.  Craig Smith.  I met him in 2014.

2   Q.  Not the old basketball player?

3   A.  No.

4   Q.  Craig Smith.  And Mr. Smith, you didn't know him, but you

5   had contacted him to do some work for you, is that correct?

6   A.  Yes.

7   Q.  And that was on Craig's List, right?

8   A.  I met him on Craig's List.

9   Q.  And then he and you spoke, is that correct?

10  A.  No, it didn't happen that way.

11  Q.  Did you ever have a conversation with Mr. Smith?

12  A.  I met -- I called Craig because I was doing an eviction in

13  Queens and I needed a locksmith, but the owner couldn't afford

14  it, so I went to Craig's List to find a cheap handyman.

15  Q.  And that was Mr. Smith?

16  A.  Yes.  And after that I called him again for painting, and

17  then I called him again to sand some floors.  I didn't just

18  meet him one day and he told me about it.  I didn't know Craig.

19  It took -- it was a series of different times and different

20  occasions with different apartments or properties that he did

21  some work for us, and over time, over the course of time I got

22  to know him.

23  Q.  And you developed a relationship with him, is that correct?

24  A.  Yes.

25  Q.  And then he told you about this slip and fall scam, is that

1  correct?

2  A.  Yes.

3  Q.  And that would have been in about 2014, is that correct?

4  A.  Yes.

5  Q.  And that's how it all started, right?

6  A.  Yes.

7  Q.  Now you have never seen -- this is my client.  You have

8  never seen him before, have you?

9  A.  No.

10  Q.  You don't know him, right?

11  A.  No.

12       MR. DINNERSTEIN:  Thank you very much, sir, I have

13  nothing else.

14       THE COURT:  Any redirect by the government?

15       MR. FOLLY:  Your Honor, very briefly.

16       If we could pull up what is in evidence as Government

17  Exhibit 2.

18  REDIRECT EXAMINATION

19  BY MR. FOLLY:

20  Q.  Mr. Jones, what name do you know this individual by?

21  A.  Mel.

22  Q.  And can you describe what happened when you met Mel for the

23  first time?

24       MS. AL-SHABAZZ:  Objection, beyond the scope.

25       MR. SCHOLAR:  Yes, Judge, objection.

J59TDUN2

1            THE COURT:  Just a moment.  Sustained.

2            MR. FOLLY:  Your Honor, I believe it's within the

3    scope of what Ms. Al-Shabazz asked about not knowing anyone

4    named Kerry Gordon.

5            THE COURT:  Well, rephrase your question.

6            MR. FOLLY:  Your Honor, I'll leave it at what the

7    witness has testified to.

8            THE COURT:  All right.  That's it?

9            MR. FOLLY:  Yes.

10            THE COURT:  You may step down, sir, you are excused.

11            Sidebar.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J59TDUN2

1              (At sidebar)

2              THE COURT:  What's the status of the next government

3     witness?

4              MR. FOLLY:  They are en route to the courthouse and

5     will be available after lunch.  We would respectfully ask for

6     an early lunch break today.

7              THE COURT:  How much time do you need to deal with

8     Mr. Dinnerstein's application in regard to his client?  In

9     other words, can I do an hour lunch or do you need more time to

10    resolve that?

11             MS. ROTHMAN:  I think we have to confer with our

12    chiefs in our office.  I think it's likely going to be

13    difficult to resolve it during the lunch break.

14             THE COURT:  All right.  It's now 12:30, why don't I

15    have them back at 1:45.

16             MS. AL-SHABAZZ:  Could the government tell us who they

17    are calling this afternoon?

18             THE COURT:  Yes.

19             MR. FOLLY:  It's Jasmond Cunningham, Ms. White, and

20    Peter Kalkanis.

21             THE COURT:  And for Cunningham and White, once again

22    are there numbers that I need to know?

23             MR. FOLLY:  I believe Cunningham is one, but it's been

24    ruled on.

25             MR. CHIUCHIOLO:  Carol White was unopposed.

J59TDUN2

1          MS. ROTHMAN:  And last night we emailed defense

2     counsel to indicate that Cecilia Blocker would testify this

3     afternoon.  We do not intend to call her this afternoon.  It's

4     possible we put her on tomorrow morning.  She had to go to a

5     doctor's appointment at one o'clock, and that also factored

6     into our timing adjustments this afternoon.

7          THE COURT:  This afternoon, that is 1:45, we have

8     Cunningham then White, and if there's time, Dr. K.

9          All right.  Thank you.  Let me excuse the jury.

10          MS. ROTHMAN:  Judge, there is one issue to discuss

11     outside of the presence of the jury, which we can do once you

12     excuse them.

13          THE COURT:  In regard to?

14          MS. ROTHMAN:  In regard to witnesses for tomorrow,

15     several law enforcement witnesses for tomorrow.

16          THE COURT:  All right.

17          (In open court)

18          THE COURT:  Ladies and gentlemen, we're going to take

19     a early lunch break.  It's now 12:35.  Be back at 1:45.  Keep

20     an open mind, enjoy your lunch.  Don't discuss this case.

21     1:45.

22          (Jury not present)

23          THE COURT:  Please be seated.

24          Somebody has an issue?

25          MR. CHIUCHIOLO:  Yes, your Honor, as the Court is

1    aware, scheduling permitting, the government may call Peter

2    Kalkanis today, if there is time; if there is not, and we don't

3    call Peter Kalkanis today, the government may call a number of

4    law enforcement witnesses tomorrow.  These are the law

5    enforcement witnesses to establish chain of custody to various

6    electronic devices that were seized on the day of arrest.

7    There's four or five witnesses that the government will need to

8    call to establish chain of custody.

9              As your Honor knows, the government moved in limine

10   for a ruling that cross-examination shall be limited to the

11   scope of the direct.  The government has proffered that it will

12   not ask on direct any of the witnesses questions beyond chain

13   of custody.  The government confirmed again last night with

14   defense counsel their intention not to go beyond the scope of

15   direct.  Ms. Al-Shabazz indicated last night that she intends

16   to ask agents about investigative techniques and certain

17   communications between agents and some of the witnesses, so the

18   government would renew its application for an order precluding

19   cross-examination beyond the scope of direct.

20             THE COURT:  Well, I don't understand.  It's pretty

21   Black letter law that cross is limited to the scope of direct.

22   You say you made a written application to the Court?

23             MR. CHIUCHIOLO:  This was in the motions in limine the

24   Court ruled.

25             THE COURT:  Before trial started.

J59TDUN2

```
 1                MR. CHIUCHIOLO:  Yes.

 2                THE COURT:  Well, I don't think there could be any

 3     contest on the rule that cross is limited to scope of direct.

 4                What's the issue, Ms. Al-Shabazz?

 5                MS. AL-SHABAZZ:  So there is no misunderstanding,

 6     there was a message from Mr. Dinnerstein indicating he was

 7     considering calling law enforcement on his case in chief, in

 8     which I indicated I would question.  I obviously know that I

 9     have to stay within the bounds of the law.

10                THE COURT:  Fine.

11                MR. DINNERSTEIN:  I would say --

12                THE COURT:  Mr. Chiuchiolo, I assume that, based on

13     what I heard so far, there's no issue.

14                MR. CHIUCHIOLO:  The issue is moot then.

15                THE COURT:  Mr. Dinnerstein.

16                MR. DINNERSTEIN:  Obviously, your Honor, yesterday I

17     sent a 2E letter to the Court.

18                THE COURT:  You didn't send it to the Court, but you

19     gave me a copy of it, yes.

20                MR. DINNERSTEIN:  I put it on ECF because I didn't

21     know your email address, but it's filed on ECF.

22                THE COURT:  What are you saying?

23                MR. DINNERSTEIN:  Obviously I will follow the Judge's

24     instructions, obviously I will not ask questions beyond the

25     chain of custody issues.
```

J59TDUN2

1          THE COURT:  I think we're discussing nothing here.

2          MR. CHIUCHIOLO:  Your Honor I think had directed

3     counsel at sidebar on the issue Mr. Dinnerstein raised with the

4     possibility of calling several FBI agents to examine them on

5     surveillance.  The parties are in discussions about that, as

6     per the Court's instructions, although there is a dispute that

7     we'll not be able to resolve by the parties, and that is the

8     relevance of observations of law enforcement officers

9     conducting certain surveillance.  So the government would

10    request that the parties be able to brief this issue.

11         THE COURT:  All right.  Brief it.  There are too many

12    lawyers in the case.  That's what I draw from it.  So far

13    they're just non-issues.

14         Mr. Cunningham, how long is the direct?

15         MR. FOLLY:  Approximately 30 minutes.

16         THE COURT:  Who is next?  Who is the first on cross

17    for Mr. Cunningham?

18         MS. AL-SHABAZZ:  I will go first.

19         THE COURT:  How long, Ms. Al-Shabazz?

20         MS. AL-SHABAZZ:  I don't know, Judge.  If they're

21    going to be 30, I may do 30 as well.

22         Is the witness that will invoke his Fifth Amendment

23    right?

24         THE COURT:  Is it?

25         MR. FOLLY:  Yes, I believe he has already done so

J59TDUN2

1    through his attorney outside the presence of the jury.

2              THE COURT:  While everyone was here.  I didn't know

3    who it was.

4              And who is after Ms. Al-Shabazz?  Mr. Scholar, are you

5    next, for Mr. Cunningham?

6              MR. SCHOLAR:  About 15 minutes.

7              MR. DINNERSTEIN:  Your Honor, we have no idea how long

8    we're going to be.

9              THE COURT:  All right.  1:45.  Thank you.

10             (Luncheon recess taken)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J591dun3                        Cunningham - Direct

                              AFTERNOON SESSION

                                  2:20 p.m.

            (In open court; jury not present)

            THE COURT:  Please be seated in the courtroom.

            I understand we have some students from Spain.
Welcome.  We have a new witness in this ongoing trial, which
charges mail fraud and wire fraud and conspiracy to commit mail
and wire fraud.  If we have a chance, we'll take a break.  It's
now 2:20.  We'll try to take a short break sometime between
3:45 and 4.  I don't know what your schedule is.  If you have
to leave, that's certainly understandable.  And I'll take a few
moments, if I can, to speak with you.

            The charges are essentially that the three defendants
conspired to stage false slip-and-fall accidents.  In other
words, the allegations, which they have denied, are that they
got together and they enlisted people to fall down and then say
they were injured and to sue the owners of the property.  As I
say, they have denied doing that, and therefore they are
presumed to be innocent.

            Jury entering.  Please rise for the jury.

            (Continued on next page)

1              (Jury present)

2              MR. FOLLY:  The government calls Jasmond Cunningham.

3              THE COURT:  Mr. Cunningham, if you would step up to

4    the witness box, please.

5              (Witness sworn)

6              THE COURT:  Thank you.  Sir, if you'd be seated.

7              Welcome.  Good afternoon.

8              THE WITNESS:  Thank you.

9              THE COURT:  If you would move your chair forward and

10   speak loudly, slowly, and clearly into the microphone.  You can

11   move that microphone up or down, however you like.

12             Your witness, Mr. Folly.

13             MR. FOLLY:  Thank you, your Honor.

14   JASMOND CUNNINGHAM,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. FOLLY:

19   Q.  Mr. Cunningham, how old are you?

20   A.  Thirty-five.

21   Q.  Where do you live?

22   A.  In the Bronx.

23   Q.  How long have you lived in the Bronx?

24   A.  All my life.

25   Q.  What do you do for a living?

1    A.  I'm disabled.  I don't work.

2    Q.  Directing your attention to 2015, did you have a

3    slip-and-fall accident at that time?

4    A.  Yes.

5    Q.  Was that accident on purpose or by accident?

6    A.  Purpose.

7    Q.  If you could please look around the courtroom and see if

8    you recognize anyone who was involved in your accident.

9    A.  Yes.

10   Q.  Who do you see?

11   A.  Bryan.

12   Q.  Do you know Bryan's last name?

13   A.  Duncan.

14   Q.  Can you identify him by an article of clothing.

15           Can you describe what he's wearing?

16   A.  Yeah.

17           THE COURT:  What is he wearing?

18           THE WITNESS:  I don't know.  I can't see him from

19   here.  A suit?

20           THE COURT:  Stand up and point out -- stand up, sir.

21   Point out who Bryan Duncan is, please.

22           THE WITNESS:  The gentleman to the far right.

23           THE COURT:  Well, there are two gentlemen to the far

24   right.

25           THE WITNESS:  The one that's here for this case, sir.

1          THE COURT:  Well, tell me.  Is it the gentleman with

2     the blue tie in the front?

3          THE WITNESS:  Yeah.  No, no, no, that's not him.  He's

4     not here for the case.  The gentleman behind him.

5          THE COURT:  All right.  The gentleman behind him,

6     that's Mr. Duncan?

7          THE WITNESS:  Yes.

8          THE COURT:  All right.  Thank you.  The witness has

9     identified Bryan Duncan.

10    BY MR. FOLLY:

11    Q.  Mr. Cunningham, before we talk about the circumstances of

12    your slip-and-fall case, I want to ask you some questions about

13    why you're here today.

14          Were you subpoenaed to testify?

15    A.  Yes.

16    Q.  Are you testifying pursuant to an immunity order?

17    A.  Yeah.

18    Q.  Have you been appointed a lawyer to help you understand

19    that order?

20    A.  Yes.

21    Q.  What's your understanding of the purpose of the immunity

22    order?

23    A.  That -- that the main thing is that they can't incriminate

24    me for anything that I say here or haunt me for any crimes that

25    I did in the past.

J591dun3                        Cunningham - Direct

1    Q.  Now does the immunity order protect you from what you say

2    being used against you here today?

3    A.  Yeah.

4              THE COURT:  I don't understand the question.

5    Q.  Are you being protected for the statements that you make

6    here in court today?

7    A.  Yup.

8    Q.  Do you understand that you're under oath and required to

9    tell the truth?

10   A.  Yes.

11   Q.  Do you understand that you can be prosecuted for perjury if

12   you do not tell the truth here today?

13   A.  Yes.

14   Q.  Let's go back to 2015, the year that you said that you had

15   a slip-and-fall accident.

16             MS. AL-SHABAZZ:  Objection.  Facts not in evidence.

17             THE COURT:  Let's go back to 2015.  Next question.

18             MR. FOLLY:  Your Honor, I believe the witness

19   testified that in 2015 --

20             THE COURT:  Why don't you just ask another question.

21   You're now in 2015.

22   BY MR. FOLLY:

23   Q.  Where were you living in 2015?

24   A.  I was in the Bronx, in a shelter.

25   Q.  Were you living at any particular shelter?

1   A.  I was in the Father Smith shelter in the Bronx.

2            THE COURT:  What was that?

3            THE WITNESS:  The Father Smith shelter.

4            THE COURT:  Father Smith shelter?  Okay.

5   Q.  How long did you live there for?

6   A.  For about a year and a half.

7   Q.  Did you live alone or with any roommates?

8   A.  I had roommates.

9   Q.  Did you have the same roommate or did your roommates change

10  over time?

11  A.  It changed.

12  Q.  Did there come a time when one of your roommates came into

13  the possession of some money?

14  A.  Yes.

15  Q.  What did you observe about that roommate?

16           MS. AL-SHABAZZ:  Objection.  Leading.

17           THE COURT:  I'll allow it.

18  A.  They -- they had -- they had money, and they had new stuff.

19  Q.  Did you discuss with your roommate where he had gotten that

20  money?

21  A.  Yeah.

22  Q.  What did you discuss with him?

23  A.  He say he got the money from a lawsuit that he got, that he

24  got a lawsuit going and, you know, he -- he -- he got a lawsuit

25  going so he's got an attorney to do something, and, you know,

1     he's about to get some money.

2     Q.  Did he describe the nature of that lawsuit?

3     A.  The nature?  Slip-and-fall, injuries, accidents.

4     Q.  Did your roommate indicate whether he was working alone or

5     with anyone else?

6     A.  No.  He -- he said that he know -- he know people that

7     could take me to -- to lawyers and physical therapy if I have a

8     accident.

9     Q.  Did he mention who any of those people were?

10    A.  No, not at the time, no.

11    Q.  Did he eventually?

12    A.  Yeah.

13    Q.  Who did he say they were?

14    A.  Somebody named B in the beginning.

15    Q.  Did you eventually learn B's name?

16    A.  Yes.

17    Q.  What was his name?

18    A.  Bryan.

19    Q.  Did you eventually meet Bryan?

20    A.  Yes, I met him.

21    Q.  Is that the same Bryan that you identified here in the

22    courtroom?

23    A.  Yeah, yeah, yes.

24    Q.  When did you first meet Bryan?

25    A.  I met him like three weeks after, after my roommate told me

1    about him.

2    Q.  Is that in 2015?

3    A.  Yes.

4    Q.  Where did you first meet him?

5    A.  I met him in the Bronx, by my shelter.

6    Q.  How far from your shelter were you when you met him?

7    A.  I don't know how far it was.  It wasn't -- it wasn't far.

8    It was just by my shelter.

9    Q.  Describe what happened when you first met with Bryan

10   Duncan.

11   A.  He know -- he say me -- my roommate introduced me to him,

12   you know, he said that, you know, he can help me to get a

13   lawsuit going and he knows doctors and lawyers, stuff like

14   that.

15   Q.  Where did that conversation take place?

16   A.  Oh, in -- in the car.

17   Q.  Who was present during that conversation?

18            MS. AL-SHABAZZ:  Objection.  Leading.

19            THE COURT:  Overruled.

20            Was anyone present during that conversation besides

21   you and Bryan?

22            THE WITNESS:  Yes.

23            THE COURT:  Who?

24            THE WITNESS:  It was me, my roommate, like two other

25   people, maybe, three, and -- and Bryan was there.

J591dun3                      Cunningham - Direct

1   BY MR. FOLLY:

2   Q.  What did you discuss during that conversation in the car

3   with Bryan?

4   A.  How he could -- the same thing, like, you know, getting me

5   to see lawyers and doctors if I have a accident or -- or, you

6   know, if I -- if I have a accident, slip-and-fall accident, if

7   I have a accident.

8   Q.  At that point had you had an accident?

9   A.  No.

10  Q.  During that first meeting with Bryan, did he give you

11  anything of value?

12  A.  No.

13  Q.  What about your roommate, did Bryan give your roommate

14  anything of value?

15  A.  Yes, he could have gave him like $50 or something, hundred

16  dollars.

17  Q.  Why did he give your roommate $50?

18  A.  I don't know.  I guess it was 'cause I was there; he

19  brought me to meet him.

20  Q.  After that meeting with Bryan Duncan, what was the next

21  thing that happened?

22  A.  The next thing that happened was eventually I had a

23  slip-and-fall -- I had a slip-and-fall accident and I went to

24  the emergency room.

25  Q.  What was the location where you had the slip-and-fall

J591dun3                          Cunningham - Direct

1    accident?

2    A.   Location was in the Bronx, Boston Road.

3    Q.   What was located at that spot in the Bronx at Boston Road?

4    A.   CubeSmart.

5              THE COURT:  I'm sorry.  I didn't hear it, sir.

6              THE WITNESS:  CubeSmart.

7              MR. FOLLY:  If we can show the witness what's been

8    marked as Government Exhibit 223.

9              I apologize.  That's not the correct exhibit.  Pull

10   that down.

11             If we could please show the witness Government

12   Exhibit 209.

13             If we could scroll through the photos on that exhibit.

14   BY MR. FOLLY:

15   Q.   Do you recognize that?

16   A.   Yeah.

17   Q.   What is shown in those photographs?

18   A.   That's where I -- that's where I fell.  I fell over there.

19             MR. FOLLY:  The government offers Government

20   Exhibit 209.

21             THE COURT:  Hearing no objection, admitted.

22             (Government's Exhibit 209 received in evidence)

23             MR. FOLLY:  If we could please publish that.

24             THE COURT:  Next question.

25             Can the jury see it?

J591dun3                           Cunningham - Direct

1                    THE JURORS:  No.

2                    THE COURT:  Nor can I.

3                    MR. FOLLY:  Your Honor, we can move forward and

4        publish the --

5                    THE JURORS:  Now we can see it.

6                    THE COURT:  Now you can see it?  I can't.

7                    All right.  Let's move forward.  Next.  As long as the

8        jury can see it.

9        BY MR. FOLLY:

10       Q.  What did you do after you fell at this location?

11       A.  When I fell, I took pictures.

12       Q.  Why did you take pictures?

13       A.  For my case.

14       Q.  Who, if anyone, told you to take those pictures?

15       A.  My roommate, Bryan.

16       Q.  Sorry.  Did you say your roommate and Bryan?

17       A.  Yes.

18       Q.  What happened next after you fell at that location?

19       A.  After I fell, I -- I eventually -- I told my roommate, he

20       contacted Bryan, and -- and I started going to physical

21       therapy.

22       Q.  Did you go to the hospital on the day that you fell?

23       A.  Yes.

24       Q.  What happened when you arrived at the hospital?

25       A.  I arrived there, they treated me, they held me for a few

J591dun3                        Cunningham - Direct

1   hours, and they let me go.

2   Q.  Did you speak with anyone while you were at the hospital?

3   A.  Yes, I spoke --

4   Q.  Who did you speak with?

5   A.  Doctors.

6   Q.  What did you discuss with those doctors?

7   A.  The current injuries that I came in with.

8   Q.  What areas of your body did you say had been injured?

9   A.  My shoulder, my left shoulder, and my back.

10  Q.  Why did you say that you had injured those particular areas

11  of your body?

12  A.  'Cause -- 'cause those was specific areas -- those was the

13  best areas that I could tell them to help my case.

14          THE COURT:  Could you move toward -- move the mic.

15  Speak in front of the mic.

16          That's right.  That will do it.  Thank you.

17  A.  Because that's -- that's the -- that's the injuries that --

18  that -- that was for my case.

19  Q.  Who, if anyone, did you discuss those injuries with before

20  you had your accident?

21  A.  My -- my room -- my roommate, Bryan.

22  Q.  Your roommate and Bryan?

23  A.  Yes.  Bryan, my roommate, or -- either/or.

24  Q.  Just to be clear, are Bryan and your roommate two different

25  people?

1   A.  Yes, of course.

2   Q.  After you were -- were you eventually discharged from the

3   hospital?

4   A.  Yeah, I was discharged the same day.

5   Q.  What happened after you were discharged from the hospital?

6   A.  After I was discharged, not too long ago, I -- I got back

7   in contact with Bryan.

8   Q.  What happened after you got in contact with Bryan?

9   A.  I was going to physical therapy, I went to physical therapy

10  on my own, and then, you know, he was just driving me to

11  physical therapy, to and from physical therapy, stuff like

12  that.

13  Q.  Who was driving --

14          THE COURT:  Let me go back.  When you had the

15  slip-and-fall on Boston Road at the CubeSmart, did you fall on

16  purpose?

17          THE WITNESS:  On purpose, yes.

18          THE COURT:  Did you injure yourself?

19          THE WITNESS:  Yes.

20          THE COURT:  What were your injuries?

21          THE WITNESS:  My injuries was my shoulder was -- it

22  was not -- not dislocated, it was -- it was severely swollen,

23  and my back, I put -- I put pain on my -- I put pressure on my

24  back.

25          THE COURT:  Is that what you told the doctors, at the

J591dun3                        Cunningham - Direct

1   hospital?

2              THE WITNESS:  No.  No, I just told them that I fell on

3   my -- I fell on my shoulder and on my whole left side of my

4   body.

5              THE COURT:  All right.  When you fell on your

6   shoulder, did you injure your shoulder?

7              THE WITNESS:  Yeah, yeah, I -- yeah.

8              THE COURT:  All right.

9              THE WITNESS:  I kind of injured it, yeah.

10             THE COURT:  Did you injure your back?

11             THE WITNESS:  Yeah, I put pressure on my back.  I

12  already -- I have a weak spot due to a prior car accident that

13  I had, so yeah, I put -- I put -- I put pressure on my -- on my

14  back when I did that.

15             THE COURT:  All right.

16  BY MR. FOLLY:

17  Q.  You mentioned a moment ago that you started to go to

18  physical therapy.  Where was that physical therapy located?

19  A.  In the Bronx, uptown somewhere.

20  Q.  You also mentioned that someone had driven you to some of

21  those physical therapy appointments.  Who drove you to some of

22  those appointments?

23  A.  The same person -- Bryan.

24  Q.  Aside from physical therapy appointments, did you go to any

25  other types of appointments?

1    A.   Yes.

2    Q.   What kinds of appointments did you go to?

3    A.   Lawyers, that's it.

4    Q.   Who was your lawyer?

5    A.   My lawyer was Michael Singer.

6    Q.   The first time you went to meet Mr. Singer, did you go

7    alone or with anyone else?

8    A.   No, I was -- I was with other people.

9    Q.   Who did you go see Mr. Singer with?

10   A.   Bryan.

11   Q.   Were you alone in the car with Bryan or was there anyone

12   else in the car?

13   A.   I don't remember.  It probably was other people there.

14   Q.   Where was Mr. Singer's office located?

15   A.   In Manhattan somewhere; down here somewhere.

16   Q.   Did Mr. Singer file a lawsuit on your behalf?

17   A.   Yes.

18   Q.   Who did you sue in that lawsuit?

19   A.   CubeSmart.

20   Q.   During the course of that lawsuit did you have a

21   deposition?

22   A.   Yeah.

23   Q.   What did you say about your accident during that

24   deposition?

25   A.   That I slipped and fell.

1   Q.  Did you disclose that your accident was on purpose?

2   A.  No.

3   Q.  Why not?

4   A.  Why not?  'Cause I was ashamed, I was embarrassed, I was --

5   I was mad.

6   Q.  Did you ever receive any money from that lawsuit?

7   A.  No.

8   Q.  While this was going on did you eventually get an MRI?

9   A.  Yes.

10  Q.  Do you remember what area that MRI office was located in?

11  A.  In either Brooklyn or Queens.

12  Q.  Who drove you to those medical appointments?

13          MS. AL-SHABAZZ:  Objection.  Leading.

14          THE COURT:  How did you get to the medical

15  appointments?

16          THE WITNESS:  I was driven, by the same person.

17          THE COURT:  Who is the same person?

18          THE WITNESS:  Bryan.

19          THE COURT:  Thank you.

20  BY MR. FOLLY:

21  Q.  Were you alone or were there other people in the car with

22  you and Bryan?

23  A.  There was other people.

24  Q.  Did you observe anything about those other passengers?

25  A.  No.  They were there for the same reason I was there, I

J591dun3                    Cunningham - Direct

 1    guess.

 2              MS. AL-SHABAZZ:  Objection.  Move to strike.

 3              THE COURT:  Denied.

 4              When you say you guess, what do you mean?

 5              THE WITNESS:  I mean, like, they was there for the

 6    same reason I was there, but, you know, I can't -- I'm not

 7    completely sure why other people was there.

 8              THE COURT:  All right.  You don't know one way or the

 9    other.

10              THE WITNESS:  Yeah, I don't -- I don't know.  I don't

11    know why they -- the reason why they was there.  They could

12    have been there for something else, but I'm just -- there was

13    other people there.

14              THE COURT:  What led you to believe that they were

15    there for the same reason?

16              THE WITNESS:  'Cause they was in the same car as me.

17              THE COURT:  All right.

18              THE WITNESS:  With the same person.

19              THE COURT:  All right.

20    BY MR. FOLLY:

21    Q.  Did you observe their appearance or demeanor?

22    A.  Yeah.

23    Q.  What did you observe?

24    A.  I don't know.  Some people was old, some people was young,

25    like stuff like that.  Some people was, you know, was dressed

J591dun3                          Cunningham - Direct

1   like -- like people walk the streets, you know, stuff like

2   that.

3   Q.  Did you eventually get surgery?

4   A.  Yes.

5   Q.  What areas of your body did you get surgery on?

6   A.  I got surgery in my left shoulder, my -- my -- the top left

7   of my shoulder, and in my lower back.

8   Q.  Why did you get those surgeries?

9   A.  I got the surgeries to go with my lawsuit.  I was told if I

10  got those surgeries, then I could receive money, and it's a

11  part of my lawsuit.

12  Q.  Who told you that?

13  A.  Bryan.

14  Q.  Did you receive anything in exchange for getting those

15  surgeries?

16  A.  Yeah, a few dollars.

17  Q.  How much money did you receive?

18  A.  All together, probably like $2800.

19  Q.  Who gave you that money?

20  A.  I thought it was coming from Fast Trak, but I was

21  received -- I received the money in money orders.

22  Q.  What is Fast Trak?

23  A.  Fast Trak, from what I was told, was a funding company for

24  people that -- that's -- that got lawsuits.

25              THE COURT:  Who gave you the money orders, if anyone?

1

2            THE WITNESS:  Bryan.

3    Q.  Did there come a time when you became upset with Bryan

4    Duncan?

5    A.  Yes.

6    Q.  Why were you upset with him?

7    A.  I was upset with him 'cause, you know I'm saying, you know,

8    he was using me, man.  I found out he was using me and shit,

9    man.  Excuse my language.

10   Q.  What do you mean when you say --

11   A.  He was using me man.  He's using me, man.

12   Q.  What do you mean when you say that?

13   A.  What do I mean?  I mean by what I'm saying, he was using

14   me, to put money in his pockets; that's what I'm saying.

15   Q.  What about Michael Singer, were you ever upset with him?

16   A.  Yeah.

17   Q.  Why were you upset?

18   A.  'Cause he kept telling me -- he kept switching up my story

19   and shit, man.  Excuse me.  He kept switching up my story,

20   telling me I ain't gonna get no money and like that, yo.

21   Trying to make me seem like I'm a dummy.

22   Q.  I want to direct your attention now to approximately 2010.

23   Were you arrested at that time in connection with a stolen

24   property offense?

25   A.  Yes.  Yes.

1    Q.  What were the circumstances of your arrest on that day?

2    A.  The circumstances was I got the lowest charge, a

3    misdemeanor.

4    Q.  What happened on that day of your arrest?

5    A.  My family member and some other people, they -- they robbed

6    a rehabilitation clinic and they ran -- my cousin ran in my

7    grandmother's house and the police ran in behind him.  He ran

8    in my room that I was in with my girlfriend and ran into my bed

9    to try to hide, and the cops ended up locking me up and my

10   girlfriend, 'cause the other person that was with him got away.

11   Q.  Were you charged with crimes as a result of that?

12   A.  Yeah, I was charged with crimes.

13   Q.  Did you have any involvement in that robbery?

14   A.  No.

15   Q.  Did you eventually enter a guilty plea to that?

16   A.  Yeah.

17   Q.  To being involved with that?

18   A.  Yes.

19   Q.  Why did you enter that guilty plea?

20   A.  Because my co -- my cousin was my co-defendant and he

21   wouldn't clear my name.  The police gave him chances to clear

22   my name to say I didn't have nothing to do with it, but for

23   some reason he didn't do that, so they said that being as

24   though, you know, he's already pled guilty to that, you know,

25   you know, it's not looking good, if he's not clearing my name

J591dun3                         Cunningham - Direct

1   and I'm still trying to fight it, so I pled guilty.

2   Q.  At the time you pled guilty, how long had you been in jail

3   for?

4   A.  For like -- for like two -- a year and a half.

5   Q.  Mr. Cunningham, when you first met with the government,

6   were you truthful about how your accident happened?

7   A.  No, I wasn't.

8   Q.  Why weren't you truthful?

9   A.  I told you why earlier.  I was embarrassed, I was mad, and

10  I was ashamed.

11  Q.  Were you eventually truthful about what happened with your

12  accident?

13  A.  Yes, I was.

14  Q.  When was that?

15  A.  The same day, like a few -- like a little while after.

16  After the beginning.

17  Q.  Mr. Cunningham, do you have any medical conditions?

18  A.  Yes.

19  Q.  Do you have any mental health issues?

20  A.  Yes.

21  Q.  What are those issues?

22  A.  I got bipolar, I got depression, memory loss, and anxiety.

23  Q.  Do you receive medication for those conditions?

24  A.  Yes.  Yes.

25  Q.  How long have you been receiving that medication?

J591dun3                        Cunningham - Direct

1   A.  For years; since 2009.

2   Q.  Do you take your medication?

3   A.  Yes.

4   Q.  Mr. Cunningham, I'm going to ask you now if you know anyone

5   by the following names:

6           Reginald Dewitt?

7   A.  No, I don't know him.

8   Q.  Peter Kalkanis?

9   A.  No.

10  Q.  Willie Barbour?

11  A.  No.  No.

12  Q.  Dexter Baldwin?

13  A.  No.

14  Q.  Yvette Battle?

15  A.  No.

16  Q.  Jabari Buckner?

17  A.  No.

18  Q.  Wanda Diaz?

19  A.  No.

20  Q.  Colette Ford?

21  A.  No.

22  Q.  Marco Gaudin?

23  A.  No.

24  Q.  Kasheem Jones?

25  A.  No.

J591dun3                         Cunningham - Cross

1    Q.  Alvin Martin?

2    A.  No.

3    Q.  Tina Nichols?

4    A.  No.

5    Q.  Keona Norwood?

6    A.  No.

7    Q.  David Pierre?

8    A.  No.

9    Q.  Kino Roper?

10   A.  No.

11   Q.  Roberto -- Robert Rosario?

12   A.  No.

13   Q.  Tyesha Swain?

14   A.  No.

15   Q.  Carol White?

16   A.  No.

17           MR. FOLLY:  No further questions.

18           THE COURT:  All right.  Thank you.

19           Cross-examination.  Ms. Al-Shabazz.

20           MS. AL-SHABAZZ:  Thank you, your Honor.

21   CROSS-EXAMINATION

22   BY MS. AL-SHABAZZ:

23   Q.  Good afternoon, Mr. Cunningham.

24   A.  Good afternoon.

25   Q.  How are you?

1    A.  I'm all right.

2    Q.  Do you need to take a break or are we good to go?

3    A.  No, I don't need to take a break.  Thank you.

4    Q.  So you're good?

5    A.  Yeah.

6    Q.  Okay.  When is the first time that you met with the

7    government about this case?

8    A.  About two weeks ago.

9    Q.  Would that have been April of this year, April 2019?

10   A.  Yeah.

11   Q.  And the first time you met with them, you told them that

12   you don't know anyone named Bryan Duncan, right?

13   A.  Miss, you just heard me say I wasn't truthful in the

14   beginning.

15   Q.  Okay.  So let me -- how this works is, once the

16   government --

17           THE COURT:  Just ask questions, please.

18           MS. AL-SHABAZZ:  Judge, I'm just trying to make sure

19   the witness understands.

20           THE WITNESS:  No, you're not.  You're -- you're asking

21   me the same questions that this man here just asked me.

22           THE COURT:  All right.  Just let her ask the question,

23   then you can answer it.

24           Go ahead.

25   BY MS. AL-SHABAZZ:

J591dun3                    Cunningham - Cross

1   Q.  Now my question was:  When you first met with them, you

2   told them that you don't know anyone named Bryan Duncan,

3   correct?

4   A.  Yes.

5   Q.  Okay.  And when you met with them, was there any FBI agents

6   in the room?

7   A.  I don't know.  Yeah, probably, yeah, yeah.  Huh?

8   Q.  How many?

9   A.  One, two -- two of them.

10  Q.  Okay.  And do you see any of those agents in the courtroom

11  today?

12  A.  Yes.

13  Q.  Which one?  You can stand up and look around, and tell me

14  what he's wearing, what he has on.

15  A.  It's the Asian lady, the -- the little Asian lady.  She's

16  in here.

17          THE COURT:  In the first row?  Where?

18  Q.  Where?

19  A.  I can't see her.  She's here.

20          THE COURT:  All right.  Why don't you stand up and

21  take a look.

22          And you said -- I thought you said she's here.

23          THE WITNESS:  Yeah, I seen her.  She's in there

24  somewhere.

25  Q.  In the back of this row, the back row?

J591dun3                          Cunningham - Cross

1    A.  Yeah, yeah, yeah.  The young lady right there, yes.

2              THE COURT:  There's a person, woman, in the back of

3    the courtroom.  Is that who you're saying was there?

4              THE WITNESS:  Yeah.

5              THE COURT:  All right.  Thank you.  You may be seated.

6    Q.  Okay.  How about Agent Prince, was he there, another agent?

7    A.  No, no Agent Prince.

8    Q.  Okay.  Now you said that you had your fall, it was June of

9    2015, correct?

10   A.  Yes.

11   Q.  Do you recall what the date was, the actual day, what day

12   it was?

13   A.  No.  I think it was on June 25th.

14   Q.  Okay.  June 25, 2015, right?

15   A.  Yeah.

16   Q.  And then you said after your accident, you spoke with

17   Bryan, right?

18   A.  Yes, yes.

19   Q.  And how did you communicate with him?

20   A.  How did I communicate with him?  With words.

21   Q.  I mean, was it on the phone, was it in person?

22   A.  Yeah, I spoke to him on the phone.  I spoke to him in

23   person, yeah.

24   Q.  Okay.  So let's take that one step at a time.

25              You spoke to him on the phone after your accident.

J591dun3                        Cunningham - Cross

1    How soon after your accident?  Was it the same day?

2    A.   It could have been.  I'm not sure.  It could have been.

3    Q.   Could have been?

4    A.   Yes.

5    Q.   Same day or the next day?

6    A.   Yes.

7    Q.   And you said you saw him after your accident.  How soon?  I

8    think in your statement you said you saw him about three days

9    after your accident, something like that, is that correct?

10   A.   Yes.

11   Q.   So you would have saw him -- if you fell on the 25th, you

12   would have saw him around June 28th?

13   A.   Yeah.

14   Q.   You're certain about that?

15   A.   No, I'm not, but I know it wasn't -- it wasn't too far

16   from -- from -- from what I said, though.

17   Q.   Okay.  So help us understand.  When you say you're not

18   certain --

19   A.   I'm not certain -- I'm not sure if it was a week or two

20   weeks after, but I know I seen him shortly after I came from

21   the emergency room.

22   Q.   Now when you were meeting with the agents, you said that

23   you had a lawyer, right?

24   A.   Yes.

25   Q.   Did you hire that lawyer?

1    A.  No.

2    Q.  That lawyer was appointed to you, right?

3    A.  Yes.

4    Q.  Did you trust the lawyer?

5    A.  No.

6    Q.  So the lawyer, he was advising you, but you didn't trust

7    him?

8    A.  I mean, I don't trust anybody, ma'am.  I have mental

9    issues.  People trying to get over on me a lot and play on my

10   mental issues, so it's hard for me to trust anybody.  I have a

11   hard time trusting people in my family.  I mean, he's a good

12   guy and we communicate and, you know, I trust him enough for

13   him to -- for him to help me in this matter, yes.  If that's

14   what you want to know, yeah, I trust him enough to deal with me

15   in this matter, but as far as me, like -- like -- like -- like

16   trusting him and -- no, I don't trust anybody.

17   Q.  You understand, Mr. Cunningham, that the jury has to trust

18   you here today?

19   A.  No, I --

20              MR. FOLLY:  Objection.

21              THE COURT:  Sustained.

22   A.  No.

23              THE COURT:  No.  Next question.

24   Q.  Do you understand that you have to tell the truth today?

25   A.  Yeah.

J591dun3                           Cunningham - Cross

1   Q.  Okay.  When you were meeting with the government, you

2   signed a nonprosecution agreement, right?

3   A.  Yes.

4               MR. FOLLY:  Objection.

5   Q.  Do you know what that meant?

6               THE COURT:  I'll allow it.

7   A.  That meant that I can't -- nothing can be used against me

8   to incriminate me here today or they can't go over my past and

9   try to convict me for a case I had in the past.

10  Q.  Okay.  So you have the nonprosecution agreement, but

11  today -- I'm sorry.  The nonprosecution agreement that you

12  signed --

13              MR. FOLLY:  Objection.

14              THE COURT:  Yes, sustained.  Why don't you just refer

15  to it as the agreement.

16  Q.  Okay.  Do you recall -- withdrawn.

17              Do you recall talking to your attorney about a

18  nonprosecution agreement?

19  A.  Yes.

20  Q.  Okay.  What was your understanding of the nonprosecution

21  agreement?

22  A.  I just told you.

23  Q.  Okay.

24              MR. FOLLY:  Your Honor, may we approach.

25              THE COURT:  Yes.

1                  (Continued on next page)

2                  (At the sidebar)

3                  THE COURT:  Government, is there a nonprosecution

4     agreement?

5                  MR. FOLLY:  There's not a nonprosecution agreement, so

6     I think this line of cross is misleading to the jury.

7                  THE COURT:  Let me see the agreement that you're

8     talking about.

9                  MS. AL-SHABAZZ:  I didn't bring it.

10                 THE COURT:  Please.  Or rather, Ms. Al-Shabazz, is

11    your position that it is a nonprosecution agreement?

12                 MS. AL-SHABAZZ:  Yes.

13                 THE COURT:  All right.  Let me take a look at it.

14                 All right.  Now the document that Ms. Al-Shabazz is

15    showing me is dated April 22, 2019.  The Office of the United

16    States Attorney for the Southern District of New York will not

17    criminally prosecute your client for any crimes --

18                 MR. FOLLY:  Your Honor, if you flip to the last page,

19    this was not an agreement that was entered into.  It has no

20    binding effect on anyone.

21                 THE COURT:  Ah, ah.  It was not -- wait.  Your point

22    is, it was never signed.

23                 MR. FOLLY:  It was never signed.  It was never entered

24    into.

25                 MS. AL-SHABAZZ:  That does not mean he did not discuss

J591dun3                          Cunningham - Cross

1    it with his lawyer, and maybe he didn't sign it because he

2    didn't trust him.  It's still an appropriate line of

3    questioning because he did read it, he was advised about it,

4    and if he chose not to sign it, then I think that's a proper

5    line of questioning.

6              MR. FOLLY:  Your Honor, I'm not sure what that's

7    relevant to, but I would just say that Ms. Al-Shabazz has said

8    several times already that he signed it.  That's completely

9    misleading and confusing to the jury.

10             MS. AL-SHABAZZ:  Okay.  That I can fix.

11             THE COURT:  Let's make sure it's clear that he never

12   entered into it.  What is the relevance of a document that he

13   never agreed to?

14             MS. AL-SHABAZZ:  Well, he didn't trust the attorney

15   who advised him on this document, and that's why he --

16             THE COURT:  Wait.  I thought his testimony was he did

17   trust him in regard to this matter.

18             MS. AL-SHABAZZ:  Oh, when he said he didn't at first

19   and then he said he did.

20             THE COURT:  Right.

21             MS. AL-SHABAZZ:  And then he didn't sign this, and

22   then he came in and asked for immunity, and so I'd like to know

23   why he didn't sign this agreement and then came and asked for

24   immunity.  What was the disconnect?  'Cause this would have

25   given him the same thing immunity did.

J591dun3                         Cunningham – Cross

1           THE COURT:  Well, I must say, based on this witness's

2      answers, he's not going to follow that line of questioning at

3      all.

4           MS. AL-SHABAZZ:  Good.

5           THE COURT:  And it will lead to jury confusion.

6           MS. AL-SHABAZZ:  Oh, Judge.

7           THE COURT:  Do you think he's going to understand your

8      questions?

9           MS. AL-SHABAZZ:  I do, because I think I can phrase it

10     in a way that he will.

11          THE COURT:  All right.  Let's clear up that --

12          MS. AL-SHABAZZ:  That it wasn't signed.

13          THE COURT:  Right.

14          MS. AL-SHABAZZ:  Okay.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2      BY MS. AL-SHABAZZ:

 3      Q.   Okay.  Mr. Cunningham, I'm going to apologize.  I think I

 4      said you signed the agreement.  You did not sign the agreement,

 5      right?  You remember that?

 6      A.   Yes.

 7              MS. AL-SHABAZZ:  Judge, may I show the witness the

 8      agreement so he knows?

 9              THE COURT:  You're talking about the --

10              MS. AL-SHABAZZ:  The document, rather.  Sorry.  So he

11      knows what we're referring to.

12              THE COURT:  Well, you said, "You did not sign the

13      agreement, right?  You remember that?"  And he said, "Yes."

14              So go ahead.

15      BY MS. AL-SHABAZZ:

16      Q.   Okay.  But you talked earlier how you went over it with

17      your lawyer, right?

18      A.   Yes.

19      Q.   Okay.  And then why didn't you sign it?

20      A.   Why didn't I sign it?

21      Q.   Yeah.

22      A.   'Cause I didn't want to be here.  I didn't want to testify.

23      Q.   Okay.  And so how did you come to be here today?

24      A.   I got subpoenaed.

25      Q.   And is that why when you got here today, you asked for
```

1    immunity, correct?

2    A.  Yeah.

3    Q.  Okay.  So, which operates the same way as a nonprosecution

4    agreement, right?

5            MR. FOLLY:  Objection.

6            THE COURT:  Sustained.  The man is not a lawyer, I

7    assume.

8            MS. AL-SHABAZZ:  Understood.

9    A.  Yeah.

10           THE COURT:  You don't have to answer that, sir.  If I

11   sustain an objection, it means you don't have to answer.

12           THE WITNESS:  All right, all right.

13   Q.  Okay.  Now you said you spoke with someone who told you

14   that you needed to injure your shoulder and your left side

15   or -- your back?

16   A.  Yeah, yes.

17   Q.  No one ever told you that you needed to injure your knee?

18   A.  Huh?

19   Q.  No one ever said you needed to injure your knee, you need

20   to hurt your knee?

21   A.  They could have, but I don't -- I don't remember that.

22   Q.  Okay.  Now you said that you testified in a deposition.

23   A.  Yes.

24   Q.  And when you testified, you were under oath.  You had to

25   raise your hand --

J591dun3                        Cunningham - Cross

1   A.   Yeah, yeah, yeah.

2   Q.   -- and you swore to tell the truth?

3   A.   Yeah.

4   Q.   And then you lied.

5   A.   Yeah.

6   Q.   Okay.  And today, you swore to tell the truth, right?

7   A.   Yup, but I didn't lie.

8   Q.   Well, we don't know that.

9            THE COURT:  The jury will disregard the comments of

10  all attorneys, including Ms. Al-Shabazz.

11  Q.   Now there came a time when you said that you were angry at

12  Bryan?

13  A.   Yes.

14  Q.   Did you curse at him?

15  A.   Yeah.

16  Q.   Did you threaten to harm him?  Threaten to hurt him, beat

17  him up, punch his face?

18  A.   Nah, nah.  Well, yeah, I told him -- yeah.

19  Q.   What did you tell him?  What did you say?

20  A.   Yeah, I told him he don't know who he fucking with.  That's

21  what I told him.  I cursed him out a few times, yeah, I did.

22  Q.   And your testimony here today is that you --

23  A.   I never threatened him, though, no, I didn't do that, but

24  yeah, I cursed him out, and I threatened -- yeah, I may have

25  kicked his car, yeah.

1   Q.  What else?  Did you do anything else?

2   A.  No.

3   Q.  Did you tell the government that you kicked his car?

4   A.  Yeah, I told them.  I told my lawyer too.

5   Q.  Now you said that you had been arrested because the police

6   ran in your home chasing your cousin.

7   A.  They ran in my grandmother's home, yes.

8   Q.  Okay.  Do you live there?

9   A.  I was just staying there for the time being.

10  Q.  Okay.  And you said that they weren't able to get your

11  cousin so they locked you up, right?

12  A.  No, that's not what I said, Miss.

13  Q.  Okay.  So tell us what happened.

14  A.  I said that they was chasing my cousin in my grandmother's

15  house, and he ran in my room where I was at and with my

16  girlfriend, and he ran under my bed, and they locked me, him,

17  and my girlfriend up.  They took me because he ran in my

18  grandmother's house with somebody else, but my grandmother has

19  a basement in her house, so the other person was able to get

20  away, so they locked me up instead.

21  Q.  And you maintain that you had nothing to do with anything

22  that --

23  A.  I did not have anything to do with that.

24  Q.  So it's your testimony that the police would arrest you and

25  charge you with something you didn't do?

1   A.  Yeah.

2   Q.  That happens?

3           MR. FOLLY:  Objection.

4           THE COURT:  Sustained.

5   A.  Yeah.

6           THE COURT:  Don't answer that.

7           Proceed.

8   Q.  And you said your cousin did not come to clear your name?

9   A.  No, he didn't.

10  Q.  And you were in jail for a year and a half?

11  A.  Yeah.

12  Q.  And then you said you pled guilty.

13  A.  Yeah.

14  Q.  That means you had to admit your guilt in this case -- in

15  that case, right?

16  A.  I pled guilty to possession of burglary tools.  The only

17  reason why I pled guilty to that is because when they went in

18  my grandmother house, my cousin and whoever did that crime with

19  him, they left whatever tools that they used to break into that

20  facility, in my grandmother's house.  That's why they charged

21  me with that, which was the lowest charge that they could

22  charge me with.

23  Q.  All right.  I'm talking about your plea.  You pled

24  guilty --

25  A.  I pled guilty to possession of burglary tools.  I just told

1    you.

2    Q.   Right.  But you were lying, weren't you, because you said

3    you were innocent?

4    A.   Yeah, I was -- I was innocent.

5    Q.   So you were lying when you pled guilty.

6    A.   Yeah.  Obviously, yeah.

7    Q.   Okay.  And you lied 'cause you were locked up, you wanted

8    to get out of jail, right?

9    A.   No.  I -- I lied -- no, I said what I said because my -- my

10   cousin was my co-defendant and he already had -- he already had

11   copped out to -- to this charge.  They separated us because I

12   had a -- my lawyer knew, he was -- my lawyer was convinced that

13   I didn't have nothing to do with this, so therefore, our cases

14   was separated, but we were still co-defendants.  So when my

15   cousin went to see the judge, he ended up pleading guilty to

16   this, and being as though he pleaded guilty and he didn't clear

17   my name, that still made it look like I had something to do

18   with it, 'cause the police and everybody was looking at it

19   like, if this is your cousin and you didn't have nothing to do

20   with it, why is he not clearing your name?  That's the part --

21   that's the part they couldn't -- they couldn't understand that.

22   So that's why they still held onto me and stuff.

23   Q.   After you copped out, how long before you were released?

24   A.   I was released the same day.

25   Q.   Same day.  Right?

J591dun3                          White - Direct

1    A.  Yes.

2    Q.  So you lied to get out of jail.

3    A.  If you want to say that, yeah.

4    Q.  I do.

5    A.  All right.  Well --

6            MS. AL-SHABAZZ:  Thank you.  I have nothing further.

7            THE COURT:  All right.  Thank you.

8            Mr. Scholar, anything?

9            MR. SCHOLAR:  No, your Honor.

10           THE COURT:  Mr. Dinnerstein, anything?

11           MR. DINNERSTEIN:  Nothing, your Honor.

12           THE COURT:  All right.  Is there any redirect by the

13   government?

14           MR. FOLLY:  No, your Honor.  No redirect.

15           THE COURT:  All right.  Sir, you may step down.  Thank

16   you.  You are excused.

17           THE WITNESS:  Thank you.  Have a good day, man.

18           THE COURT:  Thank you.  You have a good day, too, sir.

19           (Witness excused)

20           THE COURT:  Next witness for the government.

21           MR. CHIUCHIOLO:  Your Honor, the government calls

22   Carol White.

23           (Witness sworn)

24           THE COURT:  All right.  Thank you.  Good afternoon,

25   Ms. White.  Please be seated.

J591dun3                        White - Direct

1              And you speak very softly, so if you would, move your

2     chair forward, and you can turn that mic around -- it's sort of

3     a flexible gooseneck -- so that it's facing you.  That's it.

4     And bring it close to your mouth.  You need to lower it a

5     little.

6              Wonderful.  And speak loudly, slowly, and clearly.

7              Your witness, Mr. Chiuchiolo.

8     CAROL WHITE,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MR. CHIUCHIOLO:

13    Q.  Good afternoon, Ms. White.

14    A.  Good afternoon.

15    Q.  How old are you?

16    A.  Fifty-nine.

17    Q.  Where do you live?

18    A.  In Brooklyn.

19    Q.  How long have you lived in Brooklyn?

20    A.  Since 1989.

21    Q.  Where were you born?

22    A.  Kingston, Jamaica.

23    Q.  Are you a citizen of the United States?

24    A.  Yes, sir.

25    Q.  What do you do for a living?

1  A.  I'm a home health aide.

2  Q.  How long have you been a home health aide?

3  A.  Since 2002.

4  Q.  Directing your attention to the summer of 2012, were you

5  involved in an accident at that time?

6  A.  Yes, sir.

7  Q.  What type of accident did you have?

8  A.  I was coming from work.  At that time I was working in

9  Midwood.  And I was on my phone and I wasn't looking where I

10  was going, so I fell on my right knee.

11  Q.  Just to be clear, did you fall on accident or did you fall

12  on purpose?

13  A.  Accident.

14  Q.  Where was this accident?

15  A.  On East 9th and Quentin.

16        MR. CHIUCHIOLO:  Ms. Lefever, please display for the

17  witness only what has been premarked as Government Exhibit 238.

18  Q.  Ms. White, do you recognize what's depicted in Government

19  Exhibit 238?

20  A.  Yes, sir.

21  Q.  What is it?

22  A.  It's East 9th and Quentin where the fitness center at and

23  the Taco Bell and the KFC on the side.

24  Q.  That's the location where you fell?

25  A.  Correct.

J591dun3                    White - Direct

1              MR. CHIUCHIOLO:  Government offers 238.

2              THE COURT:  Hearing no objection, admitted.

3              (Government's Exhibit 238 received in evidence)

4              MR. CHIUCHIOLO:  Can we publish to the jury.

5    Q.  Now, Ms. White, using Government Exhibit 238, can you

6    please explain where you fell.

7    A.  Okay.  I came down East 9th and I was walking, but when I

8    was walking, I was on my phone, I wasn't looking where I was

9    going, so my shoes hit right here.

10   Q.  When you say "right here," where are you pointing?  The

11   jury can't see.

12   A.  The fitness center.

13   Q.  In front of the fitness center?

14   A.  Yes.

15   Q.  And is that where you fell, where the red circle is?

16   A.  Correct.

17   Q.  Did you injure yourself in the fall?

18   A.  Yes, I did.

19   Q.  What part of your body did you injure?

20   A.  My right knee.

21   Q.  Where did you go after the accident?

22   A.  I went home.

23   Q.  How did you get home?

24   A.  Took the bus, and then I got off at Utica Avenue and I took

25   a dollar van, but on going up there, I couldn't, so I asked the

1  driver -- at the time I was living on St. John, and I asked the

2  driver how much would he charge me to take me home, and he said

3  extra five dollars, which he did.

4  Q.  Did you eventually get home?

5  A.  Yes, I did.

6  Q.  When you got home, who, if anyone, was there?

7  A.  My son and Bryan.

8  Q.  What's your son's name?

9  A.  Alvin Martin.

10  Q.  Who's Bryan?

11  A.  A friend of the family's.

12  Q.  Do you know Bryan's last name?

13  A.  Duncan.

14  Q.  Ms. White, as you look around the courtroom today, do you

15  see Bryan Duncan?

16        You can stand up.

17  A.  Yes, he's over there.

18        THE COURT:  Where?  Which table is he?

19        Mr. Duncan is raising his hand.  All right.  The

20  witness has identified the defendant, Mr. Duncan.

21        Thank you.  You may be seated.

22  Q.  And how do you know Bryan Duncan?

23  A.  He's a friend of the family.

24  Q.  Now when you got home after the accident, what, if

25  anything, did you say?

J591dun3                         White - Direct

1    A.   Well, my daughter was sleeping and Bryan was in the living

2    room with my son talking, so I was explaining about the --

3    the -- the accident that happened to me, then Bryan said he

4    know somebody that he could help me do a lawsuit.

5    Q.   Did you agree?

6    A.   Yeah.

7    Q.   What, if anything, did Bryan tell you to do?

8    A.   He asked me when I'm going back to work.  I said Sunday.

9    So he told me after work, I should go to the emergency room.

10   Q.   What if any instructions did Bryan give you about going to

11   the emergency room?

12   A.   First he --

13            MS. AL-SHABAZZ:  Objection.  Leading.

14            THE COURT:  I'll allow it.

15   Q.   You can answer.

16            THE COURT:  Did Bryan give you instructions in regard

17   to going to the emergency room?

18            THE WITNESS:  Yes, your Honor.

19            THE COURT:  What were those instructions?

20            THE WITNESS:  He said to tell them that I -- I fell

21   and twisted my ankle.

22   BY MR. CHIUCHIOLO:

23   Q.   Did you injure your ankle?

24   A.   No, I didn't.

25   Q.   What else did Bryan say, if anything?

J591dun3                          White - Direct

1    A.  He said go to the emergency room and tell them exactly what

2    happened, and then after, when I go there, I must call him and

3    he will come and pick me up.

4    Q.  What, if anything, did Bryan say about telling them the

5    location where you fell?

6    A.  At that time he didn't tell me the location, he just said

7    go to the emergency room and then when I finish, to call him

8    and he'll come and pick me up.

9    Q.  Did he say anything with respect to the location where you

10   fell?

11   A.  No.

12   Q.  Now, Ms. White, did you eventually go to the emergency

13   room?

14   A.  Yes, I did.  That's on that Sunday evening after work.

15   Q.  What happened at the --

16           THE COURT:  What is your work, Ms. White?

17           THE WITNESS:  I'm a home health aide, your Honor.

18           THE COURT:  Tell the jury.

19           THE WITNESS:  Home health aide.

20           THE COURT:  Home health aide.  Thank you.

21   Q.  What happened at the emergency room?

22           MS. AL-SHABAZZ:  Objection.  Leading.

23           THE COURT:  Overruled.

24           You went to the emergency room.  What happened?

25           THE WITNESS:  Okay.  When I went to the emergency

1  room, I told the doctor what happened, but they said that -- I

2  had a bruise on my knee, and he said the ankle is something

3  different.

4  BY MR. CHIUCHIOLO:

5  Q.  Did you tell the doctor where you injured yourself?

6  A.  Yes, I did.

7  Q.  What did you say?

8  A.  I told him I was coming from work and I fell.

9  Q.  Did you give the doctor a specific location?

10  A.  Yes.

11  Q.  Where did you say?

12  A.  I told him I fell on East 9th.

13         THE COURT:  Did you tell him that you hurt a

14  particular part of your body?

15         THE WITNESS:  Yes, my right knee.

16         THE COURT:  You told him you hurt your right knee.

17         THE WITNESS:  Correct.

18         THE COURT:  And that is actually what happened, is

19  that correct?

20         THE WITNESS:  Yes, your Honor.

21  BY MR. CHIUCHIOLO:

22  Q.  You didn't say anything about your ankle?

23  A.  He looked at my ankle and he said it's something different.

24  He said I have to go to my personal physician about that.

25         THE COURT:  Do you know why he looked at your ankle?

1        THE WITNESS:  At the time I had a -- back in Jamaica,

2   when I was much younger, I fell and twisted my ankle, and as I

3   got older, there was a lump growing on my ankle.

4   Q.  Mr. Duncan told you to claim that you injured your ankle

5   from the fall, is that correct?

6   A.  Correct.

7   Q.  What if anything did you get at the hospital?

8   A.  I got some documentation.

9   Q.  How did you get home from the hospital?

10  A.  Bryan had told me after I finish, I must call him, he would

11  come and pick me up, which he did.

12  Q.  What did you do with the discharge -- or the paperwork that

13  they gave you at the hospital?

14  A.  I hand it over to Bryan.

15  Q.  What, if anything, did Bryan say to you on the car ride

16  home?

17  A.  He said someone would get in touch with me in a couple of

18  days.

19  Q.  What happened next?

20  A.  After a couple days, I got a call from a guy named Kerry;

21  he told me to come downstairs, he wanted to talk to me.

22  Q.  Did you go downstairs?

23  A.  Yes, I did.

24        MR. CHIUCHIOLO:  Ms. Lefever, if you could display

25  what's in evidence as Government Exhibit 2.

1   Q.  Ms. White, do you recognize who's depicted in Government

2   Exhibit 2?

3   A.  That's Kerry.

4   Q.  The same Kerry that you talked to?

5   A.  Yes, sir.

6   Q.  What did you and Kerry discuss?

7   A.  When I went downstairs, he had like three or four pictures

8   of a location to say that's where I fall at.

9   Q.  Was it the location that you actually fell?

10  A.  No, sir.

11  Q.  Where did Kerry tell you to say that you fell?

12  A.  At a shopping area at Ralph Avenue in Brooklyn, in front of

13  AT&T store.

14  Q.  What did you tell Kerry when he showed you the photos, if

15  anything?

16  A.  I told him, "But I didn't fall there."  He said to work

17  with him, just to say this is where I fell.

18          MR. CHIUCHIOLO:  Ms. Lefever, if you could display for

19  the witness only what is premarked as Government Exhibit 237.

20  Q.  Do you recognize what's depicted in Government Exhibit 237?

21  A.  Yes, sir.

22  Q.  What is it?

23  A.  The AT -- AT&T store.

24  Q.  Is that the AT&T store where Kerry told you to say you

25  fell?

J591dun3                          White - Direct

1    A.  Yes, sir.

2              MR. CHIUCHIOLO:  The government offers 237.

3              THE COURT:  Admitted without objection.

4              (Government's Exhibit 237 received in evidence)

5    Q.  Now, Ms. White, using Government Exhibit 237, can you

6    describe where Kerry told you to fall.

7    A.  He said -- told me to say that I came out the cab and,

8    coming out of the cab, I fell into a ditch and then I landed in

9    front of AT&T store.

10   Q.  Is that ditch depicted in Government Exhibit 237?

11   A.  Yes, sir.

12   Q.  Where is it?

13   A.  Right -- the ditch -- AT&T store is right here.

14   Q.  So was there a ditch in the photo that Kerry showed you?

15   A.  Yes.

16   Q.  Is that same ditch in this photo?

17   A.  No.

18   Q.  Where, if anywhere, did you and Kerry go after that

19   conversation?

20   A.  He said he's going to take me to see a doctor.

21   Q.  By the way, while 237 is still up, Ms. White, did you ever

22   in fact fall at this location?

23   A.  No, sir.

24   Q.  I'm sorry.  So you were saying that Kerry took you where?

25   A.  To a doctor, in Queens.

1    Q.  What type of doctor?

2    A.  He said it was a chiropractor.

3    Q.  What, if anything, happened at the doctor's office?

4    A.  Well, on entering the office, he told me to sit outside in

5    the waiting area, and then he went inside and he spoke to them,

6    and then they came back out and escorted me inside the room and

7    they gave me a gown to put on.

8    Q.  What, if anything, happened inside the doctor's office?

9    A.  Okay.  The doctor did the examination, but then he said he

10   can't use the ankle, I have to use the knee, because the ankle

11   is -- that's my personal physician.

12   Q.  What, if anything, did the chiropractor give you?

13   A.  He didn't give me any papers.  He gave them to Kerry.

14   Q.  He gave papers to Kerry?

15   A.  Yes, sir.

16   Q.  What happened?  Do you know what the papers were?

17   A.  He said I have to go do physical therapy and then do a MRI.

18   Q.  Ms. White, did you eventually get an MRI?

19   A.  Yes, sir.

20   Q.  Where was the MRI facility?

21   A.  In Queens.

22   Q.  How did you get to the MRI facility?

23   A.  Kerry took me.

24          MR. CHIUCHIOLO:  Ms. Lefever, could you please display

25   what is in evidence as Government Exhibit 201.

J591dun3                           White - Direct

1    Q.  Ms. White, do you recognize what is depicted in Government

2    Exhibit 201?

3    A.  Yes, the location he told me.

4    Q.  And again, what's this location?

5    A.  In Queens, the chiropractor office.

6    Q.  The chiropractor or the MRI?

7    A.  MRI.

8            MS. AL-SHABAZZ:  Objection.  Leading.

9            THE COURT:  Sustained.

10   Q.  Ms. White, where did Kerry take you?  What were you going

11   to this location for?

12   A.  Say I got to go see -- to do the MRI and see a

13   chiropractor.

14   Q.  Now before you talked about the MRI, you mentioned physical

15   therapy.  Did there come a time when you started going to

16   physical therapy in connection with your accident?

17   A.  Yes, sir.

18   Q.  Who told you that you'd be going to physical therapy?

19           MS. AL-SHABAZZ:  Objection.  Leading.

20   A.  Kerry.

21           THE COURT:  Did anyone tell you to go to physical

22   therapy?

23           THE WITNESS:  Kerry said I have to go to physical

24   therapy.

25   Q.  Did Kerry tell you why you had to go to physical therapy?

1  A.  He told me that if I go to physical therapy a bunch of

2  times, the more I go to physical therapy, the more money I will

3  receive.

4  Q.  Where was the physical therapist's office located?

5  A.  In Queens.

6  Q.  Did you ever go there?

7  A.  Yeah, he took me there.

8  Q.  What happened the first time you went?

9  A.  Around three to four times he took me.

10  Q.  Let's talk about the first time you went.  What happened

11  when you went to the physical therapist's office?

12  A.  When I went there, he told me to sit in the waiting area,

13  then he went in the back to speak to someone.

14          THE COURT:  Who is "he"?

15          THE WITNESS:  Kerry.

16  Q.  And did you eventually go in the back?

17  A.  Yes, I did.

18  Q.  What happened?  Did you meet with the physical therapist?

19  A.  Yes, I did.

20  Q.  What, if anything, happened?

21  A.  He told me to lay on my stomach, and he started to put a

22  heating pad on my back, so I said, "I didn't fall and hit my

23  back.  Why are you putting this there?"  He said, "Okay.  Hold

24  on a second."  He went outside and he came back, and he said,

25  "Wrong person."

1  Q.  Did you talk to Kerry about that?

2  A.  After everything was finished, I spoke with him, but when I

3  tried to talk to him in the car, he sound very irritated and he

4  got real upset.

5  Q.  In what way was he upset?

6  A.  Just the expression on his face and his tone of voice.

7  Q.  Ms. White, how did you get to physical therapy?

8  A.  Kerry.

9  Q.  Were there ever other people in the car when Kerry drove

10  you to physical therapy?

11  A.  Yes, a couple times.

12  Q.  Who else did you see in the car?

13  A.  In one time we went to pick up a lady in the Bronx, she had

14  a cane; and then another time he had a dark-skinned guy in the

15  car, in the front seat.

16  Q.  As you look around the courtroom today, do you see anyone

17  who was in a car with Kerry at any point?  You can stand up.

18  A.  Him there.  Him there, with the blue shirt.

19          THE COURT:  Speak into the mic.

20          THE WITNESS:  Oh, sorry.

21  A.  That man with the blue shirt, short-sleeved shirt.

22          THE COURT:  Blue short-sleeved shirt.  The witness has

23  identified Ryan Rainford.

24  Q.  Ms. White, when you were in -- did you ever overhear a

25  conversation between Kerry and the individual you just

J591dun3                         White - Direct

 1   identified in the courtroom?

 2   A.  Yes.

 3              MR. SCHOLAR:  Objection, Judge.  Leading.

 4   A.  Yes.

 5              THE COURT:  Sustained.  Rephrase.

 6   Q.  Ms. White, you testified that Kerry drove you to physical

 7   therapy, correct?

 8   A.  Correct.

 9   Q.  And was the individual you just identified one of the

10   people you saw in the vehicle with Kerry?

11   A.  Correct.

12   Q.  Were you ever in the vehicle with the defendant you just

13   identified and Kerry?

14   A.  Yes, he was sitting in the passenger side and I was in the

15   back.

16   Q.  Did they have conversation?

17   A.  Well, Kerry was saying to -- to the other guy that he went

18   to -- he went to -- to take pictures at a laundromat, and when

19   he started to take the pictures, the owner for the laundromat

20   kicked him out, and they both laughed about it, but then Kerry

21   turned around and he made a gesture, I don't know if because I

22   was in the car, then they laughed about it and then they

23   stopped the conversation.

24   Q.  What, if anything, did Kerry say about that accident at the

25   laundromat?

1   A.  He said he's got to find somebody to do this, this accident

2   with.

3   Q.  So, Ms. White, I'd like to switch topics.

4           At some point did you go to an attorney's office in

5   connection with your accident?

6   A.  Yes, sir.

7   Q.  How did you get there?

8   A.  Kerry took me.

9   Q.  What was the attorney's name?

10  A.  Mr. George Peters.

11  Q.  Did you meet with Mr. Peters when you went to his office?

12  A.  Not at that first time, I didn't.

13  Q.  What happened when you arrived at Mr. Peters's office?

14  A.  He told me to sit where the secretary is at and --

15  Q.  Who told you to sit there?

16  A.  Kerry did.  And then he went inside and he was like there

17  for like 20, 25 minutes; then he brought out a set of papers

18  and gave to the secretary and tell the secretary to have me

19  sign them.

20  Q.  Did you sign them?

21  A.  Yes, sir, I did.

22  Q.  Do you know what you were signing?

23  A.  That they're going to do a lawsuit on the case.

24  Q.  Approximately how many documents did you sign?

25  A.  Maybe about ten.

1   Q.  Ms. White, do you know who the lawsuit was against?

2   A.  The AT&T store.

3   Q.  Did you fall at that location?

4   A.  No, I didn't.

5   Q.  How did you get home from the lawyer's office?

6   A.  Kerry took me home.

7   Q.  What, if anything, did you and Kerry discuss on the ride

8   home?

9   A.  He said to me to wait for his call, he'll call me when I

10  have to go to do the physical therapy and then get back to me

11  and to go see the doctor.

12  Q.  Did you ask Kerry any questions about the lawsuit?

13  A.  Yes, I did.  And he was like, "Work with me.  This is what

14  happens.  Just say -- just stick we with me and say this is

15  what happened."

16  Q.  Ms. White, did there come a time after your accident when

17  you learned you'd be getting surgery?

18  A.  Kerry called me and told me that I got to do surgery.

19  Q.  What, if anything, did Kerry tell you about why you were

20  getting surgery?

21  A.  He said in reference to where I fell and the lawsuit.

22  Q.  Approximately how long after your accident did you have

23  surgery?

24  A.  About four months after.

25  Q.  What area of your body was the surgery on?

J591dun3                        White - Direct

 1   A.  On my right knee.

 2   Q.  Sorry?

 3   A.  My right knee.

 4   Q.  Where was the surgery center located?

 5   A.  In Queens.

 6   Q.  How did you get there?

 7   A.  Kerry.

 8   Q.  Were you given anesthesia before the surgery?

 9   A.  Yes, I did.

10   Q.  What happened after you woke up from surgery?

11   A.  When I woke up, there was a doctor on my right and Kerry

12   was on my left, and he said they almost lost me 'cause I slept

13   over five hours.

14   Q.  How did you get home from the surgery center after that?

15   A.  Kerry.

16   Q.  What, if anything, did you discuss with Kerry on the ride

17   home?

18   A.  We talked about what happened in the doctor's office, and

19   at that time I got scared, and he said he had called my son to

20   say that I couldn't wake up.

21   Q.  Why were you scared?

22   A.  Well, based on what the doctors said, and I don't do well

23   on the anesthesia.

24   Q.  Now, Ms. White, earlier you talked about going to physical

25   therapy.  You remember that?

1   A.   Yes.

2   Q.   Did you have an understanding that you were supposed to be

3   regularly going to physical therapy?

4   A.   That's what Kerry told me.

5   Q.   Were you in fact regularly going to physical therapy?

6   A.   No.

7   Q.   Did you ever have a discussion with Bryan about that?

8   A.   Yes, I did.  I called him and I said, I needed to speak to

9   you, and he asked me what happened, and I explained the

10  situation.  He said, hold on, he's going to make a phone call.

11          And then like a couple of hours after, some man by the

12  name of Kalkanis, he called me and he said, How you doing?  And

13  I said, fine, and I explained everything to him what's going

14  on, and he said if I got any money the day of the surgery.  I

15  said no.  He said Kerry was supposed to give me $1500, and I

16  said, sir, I didn't get any money.  He said, I don't believe

17  you, because Kerry would never do that.  I said, I didn't get

18  any money.

19          Later on that night, Kerry came and he gave me $800.

20  Q.   How did he give you the $800?

21  A.   He called me downstairs.

22  Q.   You said Kalkanis said you were supposed to get 1500?

23  A.   Yes, that's what he had said on the phone.

24  Q.   Did you ever get 1500?

25  A.   No, sir.

1   Q.  Now when you said you had that conversation with Bryan

2   about the physical therapy, was that over the phone or in

3   person?

4   A.  He came to the house.

5   Q.  What else did you and Bryan discuss?

6   A.  After I did the surgery and Kerry wasn't responding to my

7   calls, and then when I tried to call Mr. Peters, he wasn't

8   taking my calls either, I would hear from the secretary either

9   he's out of the office, he's in court, or when he comes in,

10  he'll call me, and Bryan came to the house and I explained it

11  to him.

12  Q.  And what did Bryan say?

13  A.  Bryan says he's gonna look into it and he said that he gets

14  people for Kerry to do this kind of stuff.

15  Q.  Bryan gets people for Kerry to do this kind of stuff?

16  A.  The incident -- the accidents.

17  Q.  What else did Bryan say?

18  A.  He just said he would just talk to Kerry.  He didn't talk

19  that much to me, just a few words here and there.

20  Q.  Did he say what he was referring to when he said "this kind

21  of stuff"?

22  A.  The staged accidents.

23  Q.  Did Bryan say he worked with Kerry?

24  A.  Yes.

25  Q.  So Ms. White, I'd like to turn back to your civil lawsuit.

1   A.   Yeah.

2   Q.   Did you eventually attend a deposition for your personal

3   injury lawsuit?

4   A.   Day before, Kerry called me and said I have to go to court

5   for deposition, and I say, when was this?  You know, I work.

6   You can't just spring stuff on me like that.  He said, I'll

7   come and get you and I will drop you off downtown.

8   Q.   At any point did Kerry tell you what to say during that

9   deposition?

10  A.   The same thing, over how I fell, how the incident happened,

11  and I took a cab from where I was living at to go to the

12  shopping area.

13  Q.   Did Kerry say where you should say you fell?

14  A.   At an AT&T store.

15  Q.   Was any of that story accurate, true?

16  A.   No, sir.

17  Q.   Did you lie during your deposition?

18  A.   Yes, I did.

19  Q.   Why did you lie?

20  A.   'Cause of what Kerry told me to say.

21  Q.   Did you understand you were under oath?

22  A.   Yes, sir.

23  Q.   Did you understand it was wrong to lie?

24  A.   Yes, sir.

25  Q.   Now, Ms. White, at any point did you learn that your

J591dun3                          White - Direct

1   lawsuit settled?

2   A.  Yes.

3   Q.  How did you learn that?

4   A.  Through Kerry.

5   Q.  What did Kerry tell you?

6   A.  He said the lawsuit was settled and I have to call

7   Mr. Peters.

8   Q.  Did you call Mr. Peters?

9   A.  Yes, I did.

10  Q.  What did Mr. Peters say?

11  A.  He said to come down to the office, he needed to speak to

12  me.

13  Q.  Did you meet with Mr. Peters?

14  A.  Yes, I did.

15  Q.  What, if anything, happened?

16  A.  He said the lawsuit was settled and it was for $80,000.

17  Q.  Eight, zero?

18  A.  Correct.

19  Q.  $80,000?

20  A.  Yes, sir.

21  Q.  How much of the 80,000 did you get?

22  A.  6,000.

23  Q.  6?

24  A.  Correct.

25  Q.  Did Mr. Peters show you the settlement agreement?

1  A.  Well, he showed me some papers that I signed a loan for

2  the -- for the surgery, for physical therapy, and I said,

3  that's not my signature.

4  Q.  Did Mr. Peters explain where he got those documents from?

5  A.  He said he got it from Kerry.

6  Q.  Did Mr. Peters explain where all the money went?

7  A.  He said he has to pay the physical therapy, he have to pay

8  the chiropractor, he got to pay the surgeon, he got to take his

9  fee, and plus a loan that I had take against the -- the

10  lawsuit, he had to pay back that person, and it just leaves me

11  $6,000.

12  Q.  Ms. White, what did you do with the $6,000?

13  A.  Well, I was in the business with this guy from Kenya and he

14  took 3,000, and the other 2,000 -- the other 3,000, I paid

15  bills with them.

16  Q.  You say you were in a business with a guy from Kenya.  Was

17  that a scam?

18  A.  Yes, he scammed me, 'cause I went there a couple of times

19  and I saw a piece of land I wanted to buy, and he said it was

20  good investment to send the money, which then I did.

21  Q.  What did you do with the remaining 3,000?

22  A.  I paid my rent, 'cause I was behind on my rent, and I paid

23  the remaining bills that I had owed.

24  Q.  Ms. White, I'd like to switch topics again.

25          You testified earlier that your son's name is Alvin

J591dun3                        White - Direct

1   Martin, correct?

2   A.   Correct.

3   Q.   Do you know whether Mr. Martin was involved in a fake

4   slip-and-fall accident?

5   A.   Well, when I tried to talk to him, whenever Bryan comes

6   over, he'll tell me to mind my business, I'm too nosy.

7   Q.   Did you ever overhear your son Alvin Martin discussing his

8   fake fall with Bryan?

9           MS. AL-SHABAZZ:  Objection to "fake fall."

10          THE COURT:  Rephrase.

11  Q.   Did you ever hear Mr. Martin discussing his fall with --

12          MS. AL-SHABAZZ:  Objection to the air quotes too,

13  Judge.

14          THE COURT:  Ms. Al-Shabazz, just make your objection,

15  all right?

16          MR. CHIUCHIOLO:  I'll rephrase, your Honor.

17  Q.   Did you ever hear Mr. Martin discussing his accident with

18  Bryan Duncan?

19  A.   Yes, but when I come in the room, he'll stop talking.  My

20  son would stop talking.

21  Q.   What did you hear them discuss, if anything?

22  A.   About his -- his accident.

23  Q.   Did you hear anything else?

24  A.   No.

25  Q.   Now, Ms. White, let's switch topics for a moment.

1          Prior to today's testimony, did you meet with the

2     prosecutors in this case?

3     A.  Yes, I did.

4     Q.  Did you attend meetings at the U.S. Attorney's Office?

5     A.  Yes, I did.

6     Q.  Who was present at those meetings?

7     A.  Yourself and one of the -- the FBI agent, and last week

8     I -- I asked about the cross-examining, and Mr. Folly was

9     cross-examining me.

10    Q.  Mr. Folly was present for one of the meetings?

11    A.  Yes.  He's right there.

12         THE COURT:  The witness is pointing at Mr. Folly.

13    Q.  Was your attorney present for those meetings?

14    A.  Yes.

15    Q.  Were you truthful during those meetings with the

16    government?

17    A.  Yes, I was.

18    Q.  After meeting with the government, did you enter into a

19    nonprosecution agreement?

20    A.  Yes, I did.

21    Q.  Was that agreement in writing?

22    A.  It was typed out.

23         MR. CHIUCHIOLO:  Ms. Lefever, if you could display for

24    the witness only what has been premarked as Government

25    Exhibit 826.

1    And if you could flip through the pages.

2    Q.  Ms. White, do you recognize that document?

3    A.  Yes, sir.

4    Q.  Is that your nonprosecution agreement?

5    A.  Yes, sir.

6          MR. CHIUCHIOLO:  Government offers Exhibit 826.

7          THE COURT:  Without objection, admitted.

8          (Government's Exhibit 826 received in evidence)

9    Q.  Ms. White, what is your understanding of what you're

10   required to do under this nonprosecution agreement?

11   A.  That I should tell the truth, and if they found out I'm

12   lying, they'll prosecute me also.

13   Q.  Does the outcome of this case, the jury's finding in this

14   case, have any outcome as to -- any bearing on whether the

15   government -- what the government will do with this

16   nonprosecution agreement?

17         MS. AL-SHABAZZ:  Objection.

18   A.  No, sir.

19         THE COURT:  Just a moment.

20         Just rephrase.

21   Q.  Do you know whether the outcome of this trial has any

22   effect on whether you can be prosecuted for crimes?

23   A.  If I commit any crimes during the -- during the trial, I

24   could --

25   Q.  Ms. White, if you're truthful today --

1    A.   Yes, sir.

2    Q.   -- and the jury acquits the defendants, finds them not

3    guilty, will you be prosecuted?

4    A.   No, sir.

5    Q.   Ms. White, I'm going to ask you about a few names, and just

6    let me know if you know any of these people.

7    A.   Okay.

8    Q.   Dexter Baldwin?

9    A.   No, I don't.

10   Q.   Willie Barbour?

11   A.   No, I don't.

12   Q.   Yvette Battle?

13   A.   No, I don't.

14   Q.   Jabari Buckner?

15   A.   No.

16   Q.   Wanda Diaz?

17   A.   No, sir.

18   Q.   Colette Ford?

19   A.   No.

20   Q.   Marco Gaudin?

21   A.   No.

22   Q.   Kasheem Jones?

23   A.   No.

24   Q.   Tina Nichols?

25   A.   No.

J591dun3                          White - Cross

1    Q.  David Pierre?

2    A.  No.

3    Q.  Kino Roper?

4    A.  No.

5    Q.  Robert Rosario?

6    A.  No.

7    Q.  Tyesha Swain?

8    A.  No.

9    Q.  Keona Norwood?

10   A.  No.

11   Q.  Cecilia Blocker?

12   A.  No.

13   Q.  Clarence Tucker?

14   A.  No.

15           MR. CHIUCHIOLO:  No further questions.

16           THE COURT:  All right.  Thank you.

17           Mr. Scholar, anything, sir?

18           MR. SCHOLAR:  No, your Honor.

19           THE COURT:  Ms. Al-Shabazz, how long do you think it

20   will be?

21           MS. AL-SHABAZZ:  Half an hour?  Maybe?

22           THE COURT:  All right.  Go ahead.

23           MS. AL-SHABAZZ:  Maybe shorter.

24   CROSS-EXAMINATION

25   BY MS. AL-SHABAZZ:

J591dun3                         White - Cross

1    Q.  Good afternoon, Ms. White.

2    A.  Good afternoon.

3    Q.  I represent Bryan Duncan, and I have a few questions for

4    you.  If I ask you anything confusing, let me know and I'll do

5    my best to rephrase it, okay?

6    A.  Okay.

7    Q.  Okay.  Your son is Alvin White, right?

8    A.  Martin.

9    Q.  Alvin Martin.  I'm sorry.  When was he born?

10   A.  June, June 5, 1986, in Bartow General in Florida.

11   Q.  He was born in Florida?

12   A.  Yes.

13   Q.  Isn't it your testimony that you came here from Kingston,

14   Jamaica, in 1989?

15   A.  No, I didn't.  1981.  He asked me how long been I living in

16   New York; I said 1989.

17   Q.  So you came to America in 1981.

18   A.  Correct, the 11th of November 1981.

19   Q.  Okay.  Now you say you were working as a home health

20   aide --

21   A.  Now?

22   Q.  No.  I'm sorry.  Let me finish the question.

23          -- in the summer of 2012?

24   A.  Correct.

25   Q.  Okay.  And you know Bryan Duncan and his family, right?

J591dun3                         White - Cross

1    A.  Yes.  Mostly his family.

2    Q.  You know them for a long time, right?

3    A.  Only person I really know out the family is his Uncle

4    Mikey.

5    Q.  Okay.  Your son has a nickname, right?

6    A.  Theo.

7    Q.  Theo.  And your son has spent a lot of time with the Duncan

8    family, right?

9    A.  Yes, when he was much younger, he used to go there

10   weekends.

11   Q.  And you would drop him off over there, right?

12   A.  Not at the house.  At the bakery.

13   Q.  Okay.  You would drop him off to be with the Duncans.

14   A.  Correct.

15   Q.  Okay.  And what was the reason why you -- withdrawn.

16           How often did you do that?

17           MR. CHIUCHIOLO:  Objection to relevance.

18           THE COURT:  I assume you'll show the relevance at some

19   point.

20           MS. AL-SHABAZZ:  Yes.

21           THE COURT:  All right.  I'll allow it conditionally,

22   subject to relevance being shown.

23   BY MS. AL-SHABAZZ:

24   Q.  How often did you do that?

25   A.  He used to go there every weekend.

J591dun3                      White - Cross

1   Q.  Every weekend?

2   A.  Yes.  Almost every weekend.

3   Q.  Okay.  Did you do that because you were having difficulty?

4   A.  Not I was having difficulty.  It's -- I knowed -- I know

5   Mikey through somebody that I used to talk to, and talking to

6   Mikey, I get to understand his mother came from the same area,

7   and she knew my grandmother and my mother.

8   Q.  Okay.  Were you having difficulty, though, around that

9   time?

10          THE COURT:  Sustained.  I have no idea what that

11  means.

12  Q.  Were you having trouble taking care of Theo?

13          MR. CHIUCHIOLO:  Objection to relevance.

14  A.  No, I didn't.

15          THE COURT:  I'll allow it.

16  Q.  Now you say when you were coming home from work in the

17  summer of 2012, you really did fall, right?

18  A.  Correct.

19  Q.  You didn't fake an accident, right?

20  A.  No.

21  Q.  And you really did hurt your right knee.

22  A.  Yes, ma'am.

23  Q.  And when you came home, you told Bryan and Theo that you

24  fell, right?

25  A.  Yes.

J591dun3                      White - Cross

1    Q.  Now you know your son has had his own lawsuit, right?

2    A.  Not at that time.

3    Q.  Not in 2012, he hadn't had any lawsuits?

4    A.  My son -- some things my son don't talk to me about.  After

5    talking to Bryan and everything went down, that's when I knew

6    that he was in the accident too.

7    Q.  Isn't it a fact that it's your son Theo that gave you the

8    number to Kerry?

9    A.  No.

10   Q.  Okay.  You say you spoke to Bryan that night?

11   A.  That same Friday night.

12   Q.  Okay.  And he told you that you should go to the emergency

13   room, right?

14   A.  Correct.

15   Q.  And that's all he told you; he didn't tell you that you

16   should tell them you twisted your ankle.

17   A.  Yes, he did.

18   Q.  When you got to the emergency room, they treated you for

19   your knee, right?

20   A.  Both my knee and my ankle.

21   Q.  Isn't it a fact that you said the doctor told you to see

22   your own physician?

23   A.  About my ankle.

24   Q.  Ankle, right?

25   A.  Correct.

J591dun3                        White - Cross

1  Q.  So they didn't treat you for your ankle at the hospital.

2  A.  No.

3  Q.  Okay.  So they only treated you for your knee.

4  A.  Yes.

5  Q.  Okay.  Now that was the last time you spoke to Bryan about

6  your case, right?

7  A.  That was the last time I spoke to him.

8  Q.  He didn't transport you anywhere, right?

9  A.  No, he never did.

10 Q.  He didn't tell you to pick a different spot where you fell.

11 A.  No.

12 Q.  He didn't take you to any doctors, right?

13 A.  No, he didn't.

14 Q.  He didn't introduce you to anyone -- to any chiropractors,

15 right?

16 A.  No.

17 Q.  He didn't take you to any physical therapy.

18 A.  No.

19 Q.  Okay.  You didn't speak to him at all during this period

20 while you were going back and forth to the doctors, right?

21 A.  I spoke to him a couple months after the surgery, when --

22 Q.  Okay.  You didn't speak to Bryan until you were

23 dissatisfied with the way in which Kerry was managing your

24 affairs, right?

25 A.  Yes, ma'am.

J591dun3                         White - Cross

1   Q.  Okay.  And when you spoke to Bryan, he said to you -- what

2   did he say to you, about Kerry?

3   A.  He said he's gonna call Kerry and he'll get back to me.

4   Q.  And then when you spoke to him, you said something on

5   direct about what Bryan said, Kerry does "this kind of stuff"?

6   A.  When he came to the house that night, I started to ask

7   questions, and he says that that's what he and Kerry does.

8   Q.  Oh, Bryan told you that's what he and Kerry does?

9   A.  Yes, that was the conversation; we was having the

10  conversation.

11  Q.  Okay.  Now you said you had a deposition in this case, in

12  your slip-and-fall case?

13  A.  Yes.

14  Q.  And you went to the deposition and you swore to tell the

15  truth, right?

16  A.  Yes.

17  Q.  Much like you did here today, right?

18  A.  At that time I lied.

19  Q.  That time you lied, but you lied under oath, right?

20  A.  Yes, ma'am.

21  Q.  Okay.  And that's perjury; you know that, right?

22  A.  I know.

23  Q.  And you know that's a crime, right?

24  A.  Yes, ma'am.

25  Q.  Okay.  And you did that knowing all of those things because

J591dun3                         White - Cross

1   you wanted the money, right?

2   A.  Yes.

3   Q.  So you cast all of your ethics to the side 'cause you

4   wanted money.

5            MR. CHIUCHIOLO:  Objection.

6            THE COURT:  I'll allow it.  It's cross.

7   A.  Yes.

8   Q.  Now you say you went to a lawyer's office and they showed

9   you some papers and you signed about ten documents, right?

10  A.  About ten documents.

11  Q.  Did you read any of them?

12  A.  No.

13  Q.  Do you have a habit of signing documents that you don't

14  read?

15  A.  Not usually.

16  Q.  When you signed the nonprosecution agreement with the

17  government, did you read that?

18  A.  Yeah, I read it with my lawyer.

19  Q.  Did you read it or did your lawyer read it to you?

20  A.  No, I read it.

21  Q.  Okay.  And what did it say?

22  A.  It says that I won't be prosecuted if I come here and tell

23  the truth.

24  Q.  And when was the first time you read the nonprosecution

25  agreement?  When was the first time you read it?

J591dun3                         White - Cross

1   A.  Last week Thursday.

2   Q.  Was it the same day that you signed it?

3   A.  I signed it the -- I think the Friday when I went back with

4   my lawyer.

5   Q.  Oh.  Did you meet them without a lawyer present?

6   A.  Never, no, never.

7   Q.  You say you went back with your lawyer.  You were there

8   with your lawyer in the first place.

9   A.  Yes, ma'am.

10  Q.  But you didn't sign the agreement that first time, right?

11  A.  The second -- the Friday, last Friday.

12  Q.  I'm just trying to understand if you saw the agreement the

13  first time and you just didn't sign it, and then you saw it

14  again later and that's when it was signed, is that correct?

15  A.  Yes, ma'am.

16  Q.  Okay.  Why didn't you sign it the first time?

17  A.  'Cause I wanted my lawyer to explain it more to me.

18  Q.  Okay.  So your lawyer didn't explain it?  The first time

19  you met, the lawyer didn't explain these five, six paragraphs?

20  A.  Yes, he did.

21  Q.  Okay.  So why didn't you sign it then?

22          MR. CHIUCHIOLO:  Asked and answered.

23          THE COURT:  Sustained.

24          (Continued on next page)

25

J59TDUN4                        White - Cross

1    BY MS. AL-SHABAZZ:

2    Q.  Was there any reason or what was the reason you did not

3    sign the agreement the first time you read it with your lawyer?

4                MR. CHIUCHIOLO:  Objection, asked and answered.

5                THE COURT:  I think she did answer that.

6                MS. AL-SHABAZZ:  Judge, actually she didn't.

7    A.  There was no reason.

8    Q.  There was no reason?

9    A.  No.

10               THE COURT:  I'll allow it.

11               Ms. White, I'm a little confused.  And please, I

12   assure you, I don't want to put words in your mouth, I want to

13   understand it.

14               Ms. White, I believe when Ms. Al-Shabazz asked you why

15   didn't you sign it -- meaning the agreement -- the first time

16   you saw it, you said because I wanted my lawyer to explain it

17   more to me.

18               THE WITNESS:  Correct.

19               THE COURT:  Is that correct?

20               THE WITNESS:  Yes.

21               THE COURT:  Is that why you didn't sign it the first

22   time, you wanted your lawyer to explain it more?

23               THE WITNESS:  Correct.

24               THE COURT:  All right.  Next question.

25               MS. AL-SHABAZZ:  Thank you, your Honor.

J59TDUN4                         White - Cross

1    BY MS. AL-SHABAZZ:

2    Q.   Now with respect to the paperwork, the paperwork that you

3    signed that you did not read, you recall signing it, right?

4    A.   We read it that day.

5    Q.   No, I'm sorry, I don't want to confuse you.  We're moving

6    past the agreement.  We're back to the document you signed at

7    the law office.

8           MR. CHIUCHIOLO:  Objection.  I don't know what

9    documents she's talking about.

10          THE COURT:  I believe, Ms. White, again, I think you

11   testified -- correct me if I'm wrong -- that you signed about

12   ten documents in your lawyer's office without reading them, is

13   that correct?

14          THE WITNESS:  Based on what Kerry told me, this is

15   about the lawsuit, just sign it, and I did sign it.

16          THE COURT:  How many documents do you think you signed

17   at the lawyer's office?

18          THE WITNESS:  Around the time, maybe around ten.

19          THE COURT:  Now Ms. Al-Shabazz wants to question you

20   about that event.

21          Proceed.

22   BY MS. AL-SHABAZZ:

23   Q.   I'm sorry if I'm moving around.

24          THE COURT:  Proceed.

25          MS. AL-SHABAZZ:  Thank you, Judge.

J59TDUN4                        White - Cross

BY MS. AL-SHABAZZ:

1

2  Q.  In the lawyer's office do you recall having a conversation

3  with Bryan about those papers, those ten or so papers you

4  signed at the lawyer's office?

5  A.  Not that time, no, ma'am.

6  Q.  At any point?

7  A.  When I got that check that day, that's when I called Bryan

8  and told him I see my signature on some stuff that I took out

9  loans for surgery and stuff and that's not my signature.

10 Q.  And Bryan told you that somebody forged your signature,

11 right?

12 A.  Yes.

13 Q.  And did he tell you that person probably was Peter

14 Kalkanis?

15            MR. CHIUCHIOLO:  Objection.

16            THE COURT:  Sustained.

17 Q.  You were in Peter -- did you meet Peter Kalkanis?

18 A.  I never did.

19 Q.  The law office that you were in was George Peters?

20 A.  George Peters.

21 Q.  Do you suspect that he forged your signature?

22            MR. CHIUCHIOLO:  Objection.

23            THE COURT:  Sustained.

24 Q.  Do you know if anyone forged your signature?

25 A.  Somebody did, but I don't know who it was.

1   Q.  So you think someone forged your signature?

2   A.  Correct.

3           THE COURT:  Asked and answered.  Move on.

4   Q.  And when you look -- which papers were you looking at that

5   you believe had your forged signature on it?

6   A.  The part that I took out a loan and for the surgery, and

7   that wasn't my signature.

8   Q.  Now you said your case settled though, right?

9   A.  Correct.

10  Q.  For $80,000?

11  A.  Correct.

12  Q.  And you only got 6,000 of it?

13  A.  Yes, ma'am.

14  Q.  Is that because of the paperwork that was signed?

15  A.  I guess.

16          THE COURT:  Do you know?  Do you know?  You said you

17  guess.  Do you know whether or not it was because of the

18  paperwork that you signed?

19          THE WITNESS:  Peters told me that's for the loans and

20  stuff that I took out.  They did not take the money from the

21  $80,000.

22          THE COURT:  Who told you that?

23          THE WITNESS:  George Peters.

24  BY MS. AL-SHABAZZ:

25  Q.  And George Peters, so we can keep up, is the attorney,

1    right, was the lawyer?

2    A.   Yes, ma'am.

3    Q.   Now you said after you spoke to Bryan in the house with

4    your son when you came home that night in the summer of 2012

5    you didn't speak to him anymore, right?

6    A.   No, ma'am.

7    Q.   Now you said that you got some paperwork from the hospital,

8    right?

9    A.   That Sunday night, that was the last time I saw Bryan, when

10   he took the paperwork from me, until further down.

11   Q.   But said you spoke to him the night you came home and you

12   were hurt.

13   A.   Yes, he was in my house at the time with my son, that

14   Friday night.

15   Q.   Then you didn't go to the hospital that night, right?

16   A.   Sunday after work.

17   Q.   Couple of days later?

18   A.   Yes, ma'am.

19   Q.   Okay.  But your testimony just a few minutes ago was that

20   the last time you saw him was the night you injured your knee.

21   Do you recall that?

22   A.   That night I saw him, he was in my house that Friday night

23   when I came from work.

24   Q.   And that was last time you saw him?

25   A.   I saw him that Sunday because he came to pick me up at the

J59TDUN4                        White - Cross

1    hospital.

2    Q.  What was he driving when he came to pick you up from the

3    hospital?

4    A.  I don't recall what car he was driving, but he came to pick

5    me up at the hospital.

6    Q.  Is it possible that you don't recall because he didn't come

7    pick you up?

8              MR. CHIUCHIOLO:  Objection.

9    A.  He did come to pick me up.

10             THE COURT:  Sustained.

11   A.  He came and picked me up that Sunday night.

12   Q.  Now you talked to your son -- sorry, withdrawn.

13             When you were meeting with the lawyers, on direct

14   examination you said Mr. Folly did the cross-examination.  Do

15   you remember that?

16   A.  Because I asked if I was going to be cross-examined.

17   Q.  And so they did a mock cross-examination with you?

18   A.  Correct.

19   Q.  So you went over all of these questions already, right?

20   A.  Not these questions you asked me.

21   Q.  Not the ones I'm asking you, but the questions that the

22   government asked you on direct, you went over those questions

23   already, right?

24   A.  When they was cross-examining me.

25             THE WITNESS:  Your Honor --

J59TDUN4                         White - Cross

1          THE COURT:  You have to say --

2          THE WITNESS:  No.

3          THE COURT:  You don't understand?

4          THE WITNESS:  Can we --

5          THE COURT:  We're going to take a break, ten-minute

6    break for everybody.

7          Thank you, Ms. White.  I will allow Ms. White to

8    leave.  I apologize.  Go ahead.

9          (Recess taken)

10          (Jury not present)

11          THE COURT:  As I said, I have another matter at 4:30.

12   If we can, let's try to finish with this witness by 4:30.

13          Bring the witness in.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J59TDUN4                          White - Cross

1              (Jury present)

2              THE COURT:  Ms. Al-Shabazz, you may continue and

3    conclude your cross-examination.

4              MS. AL-SHABAZZ:  Thank you, your Honor.

5    BY MS. AL-SHABAZZ:

6    Q.  Ms. White, when we left off I believe I was asking you

7    about the meetings that you had with the government and the

8    questions that they asked you.  And so all the questions that

9    Mr. Chiuchiolo asked you today, you have already went over

10   those questions, right?

11   A.  Yes.

12             THE COURT:  You have to say yes or no.

13             Did you go over the questions that Mr. Chiuchiolo

14   asked you before today?

15             THE WITNESS:  Yes, your Honor.

16             THE COURT:  All right.

17   Q.  And now when you went to pick up the check for $6,000 from

18   Mr. Peter's office, did you speak to Bryan about that?

19   A.  I called my son and said all I got was $6,000, and then

20   Bryan called me and said return back the check.  And I said no,

21   I'm done.

22   Q.  Bryan told you not to sign the papers either, right?

23   A.  Yes.

24   Q.  And he said to give the check back, right?

25             MR. CHIUCHIOLO:  Objection, hearsay.

J59TDUN4                          White - Cross

| | |
|---|---|
| 1 | THE COURT:  Just a moment.  Sustained.  Hearsay. |
| 2 | Q.  Bryan told you to give the check back, right? |
| 3 | MR. CHIUCHIOLO:  Objection. |
| 4 | THE COURT:  Sustained. |
| 5 | MS. AL-SHABAZZ:  I didn't hear the answer.  Maybe the |

1      THE COURT:  Just a moment.  Sustained.  Hearsay.

2  Q.  Bryan told you to give the check back, right?

3      MR. CHIUCHIOLO:  Objection.

4      THE COURT:  Sustained.

5      MS. AL-SHABAZZ:  I didn't hear the answer.  Maybe the

6  Court could read it back.

7      THE COURT:  Sorry, the objection is that it's adducing

8  hearsay, which it is, so I am sustaining the objection.

9      MS. AL-SHABAZZ:  It's a party opponent, Judge, it's my

10  client's statement.

11      MR. CHIUCHIOLO:  Party opponent to the government.

12      THE COURT:  Yes.  It's hearsay.

13      MS. AL-SHABAZZ:  Judge, the entire direct was what --

14      THE COURT:  That's because it's a party opponent.

15      MS. AL-SHABAZZ:  I'm asking her what Bryan told her.

16      THE COURT:  Sustained.  Move on.

17      MS. AL-SHABAZZ:  May we approach so I could understand

18  this better?

19      THE COURT:  Yes, of course.

20      MS. AL-SHABAZZ:  I don't understand.

21      (Continued on next page)

22

23

24

25

1             (At sidebar)

2             THE COURT:  Let's take a look, 801.

3             MS. AL-SHABAZZ:  What's the objection?

4             THE COURT:  State the objection.

5             MR. CHIUCHIOLO:  Your Honor, the objection is on

6    hearsay grounds.  The defendant cannot admit his own

7    statements.  A statement of a party opponent is only properly

8    admitted by the government.  Mr. Duncan is an opponent of the

9    government.

10             THE COURT:  I believe that's right.  Is just a moment.

11             MS. AL-SHABAZZ:  But he already testified -- she

12   already testified to things he said on my cross.

13             THE COURT:  That's because the things that he said --

14             MS. AL-SHABAZZ:  You didn't object.  There was no

15   objection.

16             THE COURT:  Just a moment.

17             MR. FOLLY:  Your Honor, if we didn't object on one

18   occasion doesn't mean because we're objecting now --

19             MS. AL-SHABAZZ:  My whole cross --

20             THE COURT:  One at a time.  I think that's right.  I

21   don't think that constitutes a waiver, but let me look at 801.

22   In other words, you can't bolster your own client on

23   cross-examination, that is hearsay.  The government can adduce

24   what your client said because it's the statement of a party

25   opponent.

J59TDUN4                          White - Cross

1               MS. AL-SHABAZZ:  But it completes the narrative.

2               MR. FOLLY:  Judge --

3               THE COURT:  One at a time only.

4               MS. AL-SHABAZZ:  It completes the narrative.

5               THE COURT:  It certainly does.  What does that have to

6      do with whether or not it's hearsay?

7               MS. AL-SHABAZZ:  If the hearsay that's already been in

8      this entire time, it would be prejudicial now to the last

9      question I asked him what for them to object now when all the

10     other statements have come in.

11              THE COURT:  They come in on their examination.  Did

12     you adduce your client's statements on this cross?

13              MS. AL-SHABAZZ:  I believe I did throughout this

14     entire cross.

15              MR. FOLLY:  Your Honor, this is a different topic.

16     She's trying to establish the fact that Bryan Duncan told

17     Ms. White not to cash the check --

18              MS. AL-SHABAZZ:  But she didn't --

19              THE COURT:  Just a moment.

20              MS. AL-SHABAZZ:  Sorry.

21              MR. CHIUCHIOLO:  It's a completely different line of

22     examination.  It wasn't adduced on direct, and it cannot be

23     adduced on cross.

24              THE COURT:  I'm keeping it out as hearsay.  It's

25     clearly hearsay.  It's not a party opponent.  Okay.  Move on.

J59TDUN4                          White - Cross

 1                  (In open court)

 2                  THE COURT:  Next.

 3     BY MS. AL-SHABAZZ:

 4     Q.  Ms. White, were you upset when you received the check for

 5     just $6,000?

 6     A.  Yes, I was.

 7     Q.  And that's why you called Bryan?

 8     A.  I didn't call Bryan, I called my son.

 9     Q.  But your son called Bryan and then you had a conversation

10     with Bryan, right?

11     A.  Bryan called me.

12     Q.  And you had a conversation with Bryan when he called you?

13     A.  Yes, I did.

14     Q.  Now you said you're a citizen?

15     A.  Yes, ma'am.

16     Q.  When did you become a citizen?

17     A.  2004.

18                  MR. CHIUCHIOLO:  Objection.

19                  THE COURT:  Beyond the scope, sustained.

20                  MS. AL-SHABAZZ:  They opened -- they did ask when she

21     came here from Jamaica.

22                  THE COURT:  Yes.  Beyond the scope, sustained.

23     Q.  Did you talk to your son Alvin about your testimony here

24     today?

25     A.  No.

J59TDUN4                          White - Cross

1   Q.  You didn't talk to him about meeting with the federal

2   government?

3   A.  No.

4   Q.  You had no conversation with your son about the fact that

5   you had been coming back and forth to meet with the government?

6            MR. CHIUCHIOLO:  Objection, asked and answered.

7   A.  No, I didn't.

8            THE COURT:  I'll allow it.

9            MS. AL-SHABAZZ:  Thank you, I have nothing further.

10           THE COURT:  Mr. Scholar?

11           MR. SCHOLAR:  Just a few questions.

12           THE COURT:  Go ahead.

13  CROSS-EXAMINATION

14  BY MR. SCHOLAR:

15  Q.  Ms. White, when did the police first contact you about your

16  injury?

17  A.  Police?

18  Q.  Yes, law enforcement.  When did they first contact you

19  about your accident?

20  A.  What accident?  I don't understand.

21  Q.  When did the law enforcement, the federal agents, contact

22  you about your fall in this case?

23           THE COURT:  When did the government contact you about

24  this case?

25           THE WITNESS:  Two weeks ago.

J59TDUN4                          White - Cross

 1          THE COURT:  All right.  Two weeks ago, next question.

 2   Q.  That was the first time they spoke to you about this case?

 3   A.  No, they served me a subpoena.

 4   Q.  When was that?

 5   A.  It was on a Tuesday night.  I just came in from work.

 6          THE COURT:  Wait.  It was a Tuesday night, about how

 7   long ago?

 8          THE WITNESS:  Two weeks ago.

 9          THE COURT:  All right.  Two weeks ago.

10   Q.  And the first conversation with -- the first conversation

11   you had with the government was when?

12   A.  The 6th of May.

13   Q.  How many conversations have you had with the government?

14   A.  Three.

15   Q.  And in each conversation, what did they ask you?

16   A.  About the whole thing, the incident, what happened, how it

17   happened, and showed me pictures to identify.

18   Q.  And first time that you spoke to them, did you know why you

19   were here?

20   A.  Not until when I got the lawyer.

21   Q.  And without telling me what your lawyer said, what did the

22   government ask you when you first met them?

23   A.  They said I'm a witness to an incident that happened and

24   where I was involved in an unlawful crime.

25   Q.  And did they show you photographs?

1   A.  No, they started asking me questions first and then they

2   showed me pictures to see who do I know.

3   Q.  Now you identified a person in a blue vest for us today?

4   A.  Yes.

5   Q.  You were shown photographs of him, correct?

6   A.  Yes.

7   Q.  Every time that you met with the government you were shown

8   a photograph?

9   A.  The first time they showed me the photograph.

10  Q.  And how about during your practice session, did they show

11  you a photograph during that time?

12  A.  Yes.

13  Q.  And the man in the blue vest had nothing to do with your

14  fall?

15  A.  I don't really know, but he was in the car that day when

16  Kerry came to pick me up.

17  Q.  That has nothing to do with your fall, correct?

18  A.  No.

19  Q.  And he had nothing do with your deposition testimony,

20  right?

21  A.  No.

22  Q.  In fact, when Mr. Chiuchiolo asked you why you lied about

23  your deposition testimony you said it's because Kerry told you,

24  right?

25  A.  Correct.

J59TDUN4

1   Q.  But you really lied because you wanted the money, right?

2   A.  Yes.

3   Q.  So when you said it was about Kerry, it wasn't really about

    Kerry, right?

5   A.  I don't understand.

6   Q.  So when you spoke to Mr. Chiuchiolo, when he asked you

7   questions on direct and you said that you lied because of

8   Kerry, it was really because of the money, correct?

9   A.  What Kerry told me to say.

10  Q.  You said that because you wanted the money?

11  A.  Correct.

12          MR. SCHOLAR:  Nothing further, Judge.

13          THE COURT:  Mr. Dinnerstein, anything, sir?

14          MR. DINNERSTEIN:  Just a couple of questions.

15  CROSS-EXAMINATION

16  BY MR. DINNERSTEIN:

17  Q.  This person is my client, Robert Locust.  Have you ever

18  seen him before?

19  A.  No.

20          MR. DINNERSTEIN:  Thank you.

21          THE COURT:  Anything?

22          MR. CHIUCHIOLO:  No, your Honor.

23          THE COURT:  Ms. White, thank you, you are excused.

24  You may step down.

25          THE WITNESS:  Thank you.

J59TDUN4

1          THE COURT:  Ladies and gentlemen, we're going to end

2     for the day.  I would like to get a full day of testimony in

3     tomorrow, but we're starting a little later.  We're going to

4     start at 10, but please be here by 10.  One of the reasons I'm

5     saying 10 is that on Fridays we have our naturalization

6     ceremonies, which are wonderful ceremonies, I love doing those.

7     I'm not doing one tomorrow, but it means there are going to be

8     several hundred more people coming through security than usual.

9          By 9:30, that large group should already have moved

10     through security, but just be aware that you may have to have a

11     little more time for security than otherwise.  But please be

12     here by 10.  We're starting late enough that I don't want to

13     delay it even more.

14          Enjoy the evening, keep an open mind.  In terms of the

15     schedule that I gave you when you first started, we're either

16     on or perhaps even a little ahead of schedule.

17          Proceed.  No guarantees.

18          (Jury not present)

19          THE COURT:  I take it, if the ever changing schedule

20     of the government has not changed, the first witness is PK,

21     correct?

22          MS. ROTHMAN:  That's incorrect, your Honor.

23          THE COURT:  There you are.

24          MS. ROTHMAN:  You can never assume anything.  At

25     present the government intends to call Yvette Battle, James

J59TDUN4

1  Aldag, Jean Charles, Gemma Northrop, Rick Muller, the law

2  enforcement witnesses that we discussed earlier today on the

3  record with respect to the cell phones for Bryan Duncan and

4  Kerry Gordon and Peter Kalkanis, and then the government

5  intends to start testimony of Peter Kalkanis tomorrow.

6           THE COURT:  So you expect to get through all of those?

7           MS. ROTHMAN:  Yes, your Honor.  Many of them are quite

8  short.

9           THE COURT:  So I have --

10          MS. ROTHMAN:  But we don't expect to finish Peter

11 Kalkanis tomorrow.

12          THE COURT:  No, I understand that.  And I take it

13 there are no outstanding applications with regard to any of

14 those.

15          MS. ROTHMAN:  That's correct, your Honor.

16          THE COURT:  All right.  So let's try to be as

17 efficient as possible tomorrow.  And I called it for 10 at the

18 request of Mr. Dinnerstein who asked for some time relief.  If

19 there is going to be a further proceeding in regard to the

20 application Mr. Dinnerstein made earlier today, and if you know

21 that tonight, email my chambers.  My staff will tell you how to

22 do that.  They'll contact me and we'll start at 9:30.

23          Does that make sense?

24          MS. ROTHMAN:  Yes, your Honor.

25          THE COURT:  Otherwise, if that's not necessary, we'll

J59TDUN4

1    start at 10.  In any event we'll start at 10, because if we

2    have that proceeding at 9:30 it will be over around 10.

3              Thank you, and enjoy the evening.  Keep an open mind.

4              (Adjourned to May 10, 2019 at 10:00 a.m.)

5

6                        INDEX OF EXAMINATION

7    Examination of:                         Page

8    TINA NICHOLS

9    Cross By Mr. Cecutti . . . . . . . . . . . . 502

10   Cross By Ms. Al-Shabazz . . . . . . . . . . 506

11   Redirect By Mr. Chiuchiolo . . . . . . . . . 533

12   Recross By Mr. Scholar . . . . . . . . . . . 535

13   CLARENCE TUCKER

14   Direct By Ms. Rothman  . . . . . . . . . . . 539

15   Cross By Mr. Dinnerstein . . . . . . . . . . 570

16   Cross By Ms. Al-Shabazz  . . . . . . . . . . 581

17   KASHEEM JONES

18   Direct By Mr. Folly  . . . . . . . . . . . . 588

19   Cross By Mr. Scholar . . . . . . . . . . . . 609

20   Cross By Ms. Al-Shabazz  . . . . . . . . . . 615

21   Cross By Mr. Dinnerstein . . . . . . . . . . 615

22   Redirect By Mr. Folly  . . . . . . . . . . . 618

23   JASMOND CUNNINGHAM

24   Direct By Mr. Folly  . . . . . . . . . . . . 627

25   Cross By Ms. Al-Shabazz  . . . . . . . . . . 648

```
1    CAROL WHITE

2    Direct By Mr. Chiuchiolo . . . . . . . . . . 665

3    Cross By Ms. Al-Shabazz  . . . . . . . . . . 692

4    Cross By Mr. Scholar . . . . . . . . . . . 713

5    Cross By Mr. Dinnerstein . . . . . . . . . 716

6

7                    GOVERNMENT EXHIBITS

8    Exhibit No.                              Received

9     209  . . . . . . . . . . . . . . . . . . . 635

10    224  . . . . . . . . . . . . . . . . . . . 547

11    228  . . . . . . . . . . . . . . . . . . . 553

12    229  . . . . . . . . . . . . . . . . . . . 553

13    237  . . . . . . . . . . . . . . . . . . . 674

14    238  . . . . . . . . . . . . . . . . . . . 667

15    239 and 240  . . . . . . . . . . . . . . . 603

16    241  . . . . . . . . . . . . . . . . . . . 594

17    809  . . . . . . . . . . . . . . . . . . . 566

18    822  . . . . . . . . . . . . . . . . . . . 606

19    826  . . . . . . . . . . . . . . . . . . . 690

20    830  . . . . . . . . . . . . . . . . . . . 560

21

22

23

24

25
```