J5m1dun1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                          18 Cr. 289 (SHS)
4
    BRYAN DUNCAN, RYAN RAINFORD,
5   ROBERT LOCUST,
6                   Defendants.             Trial
    ------------------------------x
7
                                            New York, N.Y.
8                                           May 22, 2019
                                            10:32 a.m.
9
    Before:
10
                        HON. SIDNEY H. STEIN,
11
                                            District Judge,
12                                           -and a Jury-
13                          APPEARANCES
14  GEOFFREY S. BERMAN
         United States Attorney for the
15       Southern District of New York
    BY:  NICHOLAS W. CHIUCHIOLO
16       ALEXANDRA N. ROTHMAN
         NICHOLAS FOLLY
17       Assistant United States Attorneys
18  AL-SHABAZZ LAW GROUP, PC
         Attorneys for Defendant Bryan Duncan
19  BY:  IKIESHA TAQUET AL-SHABAZZ, ESQ.
20  THE C.H. SCHOLAR LAW FIRM
         Attorneys for Defendant Ryan Rainford
21  BY:  CALVIN H. SCHOLAR, ESQ.
22  MITCHELL J. DINNERSTEIN, ESQ.
    ANTHONY CECUTTI, ESQ.
23       Attorneys for Defendant Robert Locust
24  ALSO PRESENT:  CAROLINE LEFEVER, Paralegal Specialist, USAO
                   RICHARD PRINCE, Special Agent, FBI
25

1           (In open court; jury not present)

2           THE COURT:  All right.  Everyone is here.  I don't

3    know whether you know or not, but a juror was quite late.  He

4    phoned in.  Apparently he states that his daughter was sick and

5    he had to find childcare.  The jury is here now.  Let's bring

6    them in.

7           MR. FOLLY:  Your Honor, we'd just request that

8    Ms. Al-Shabazz put away her face board.  We're not using it

9    during our rebuttal.

10          MS. AL-SHABAZZ:  Yes, your Honor.  It's just laying

11   there.  Their face board has been up the entire trial.  And

12   again, they're asking for a request --

13          MR. FOLLY:  We just ask that it be turned around.

14          THE COURT:  There's no need to be showing it to the

15   jury.  Turn it around.

16          Jury entering.

17          (Jury present)

18          THE COURT:  Please be seated in the courtroom.

19          Ladies and gentlemen, I'm glad all 16 of you are

20   finally here.  I understand someone had an issue with

21   childcare.  Those things do happen.

22          We now are going to hear the rebuttal summation of the

23   government by Mr. Folly.

24          Mr. Folly.

25          MR. FOLLY:  Ladies and gentlemen, you heard hours and

J5m1dun1                    Rebuttal - Mr. Folly

1   hours of arguments yesterday by all of the defense attorneys

2   here about this case.  You heard arguments about ride or die;

3   you heard arguments about crocodile tears; you heard arguments

4   about handshakes; you heard comments about Liberia; you heard

5   discussions about magnets and needles and haystacks.  I'm not

6   going to talk about any of that, because none of that has

7   anything to do with what's relevant in this case.  It's a total

8   sideshow.  It's a distraction from the only thing that matters

9   here -- the evidence.  That's the only thing that matters in

10  this case.  The overwhelming evidence that you have heard over

11  the last two weeks is that each of these defendants, Bryan

12  Duncan, Ryan Rainford, and Robert Locust, knew exactly what was

13  going on here.  They knew that this was a fraud scheme.

14          MR. DINNERSTEIN:  Objection, your Honor.  That's not

15  the standard.

16          THE COURT:  I'll allow that statement.

17          MR. FOLLY:  Do not fall for that distraction, ladies

18  and gentlemen.

19          Now I'm not going to have time to go back through all

20  the arguments that you heard yesterday.  I'm not going to

21  respond to all of them.  But I don't need to.  The evidence in

22  this case speaks louder than anything I can say.  It speaks

23  louder than anything these defense attorneys can say.  You've

24  heard and seen all of that evidence at this point.

25          So I'm just going to focus on the main arguments here

J5m1dun1                    Rebuttal - Mr. Folly

1    today.  Before I do that, I want to make one thing very clear.

2    You've heard this already.  You'll hear this again.  The

3    defendants, they have no burden whatsoever in this case.  The

4    burden is on the government, and we embrace that burden, and

5    we've met that burden.  But when the defense attorneys get up

6    here and they make arguments to you, we are entitled to

7    respond, and you are entitled to think about those arguments

8    carefully, to ask yourselves, do they make any sense; are they

9    consistent with the evidence that you've seen in this case.

10   You are entitled to ask yourself that.  And when you do, you

11   will see that they're a total distraction.  They're not

12   consistent whatsoever with the evidence in this case, the one

13   thing that matters.

14         Before we jump into things, I want to clear up a few

15   things from yesterday, because Ms. Al-Shabazz got up here

16   yesterday and she said some things to you that were deeply

17   misleading, some things that completely contradict the actual

18   evidence in this case.  So let's start there.  Let's clear that

19   up.

20         When Ms. Al-Shabazz got up here, she started talking

21   about Jasmond Cunningham.  She says, "I'm going to get rid of

22   Jasmond Cunningham."  Those were her words.  And you know why

23   she tried to get rid of Jasmond Cunningham.  Because his

24   testimony against her client, Bryan Duncan, is absolutely

25   devastating.  It's crushing.  Cunningham takes us back to 2015,

J5m1dun1                       Rebuttal - Mr. Folly

1    after Bryan Duncan had supposedly left Peter Kalkanis, he had

2    supposedly found out this was a big fraud scheme, cleaned up

3    his act.  That's what he had supposedly done.  That's what

4    Ms. Al-Shabazz said.  And we'll come back to that, ladies and

5    gentlemen.

6            MS. AL-SHABAZZ:  Objection.  That's not what I said.

7            THE COURT:  Ladies and gentlemen, remember, what the

8    lawyers say is not evidence.  I want you to listen to what they

9    have to say, but what the lawyers say is not evidence, and

10   whatever Ms. Al-Shabazz said or didn't say, she said or didn't

11   say.

12           Proceed.

13           MR. FOLLY:  But Cunningham, Cunningham, ladies and

14   gentlemen, that's the individual that Duncan recruited from the

15   homeless shelter in 2015, when he had supposedly turned a new

16   leaf, put everything from Kalkanis behind him.  In 2015,

17   Cunningham is the guy that Bryan Duncan recruits from the

18   homeless shelter.  So this completely blows up this pretty

19   little narrative that Bryan Duncan left everything behind with

20   Kalkanis, started over, was doing things by the book;

21   completely blows that up, so of course Ms. Al-Shabazz got up

22   here and she tried to get rid of Cunningham.

23           So she tried to make a big deal about the fact that

24   Bryan Duncan took this trip.  He left on June 25th, came back

25   on July 2nd from Liberia.  Remember that?  Ms. Al-Shabazz

J5m1dun1                    Rebuttal - Mr. Folly

1    called a witness at this trial just to show you that Bryan

2    Duncan went to Liberia for a week, right?  Remember that?  And

3    guess what?  When I asked that witness on cross-examination the

4    only relevant question, the only question that matters or is

5    relevant to you, "When you returned from that trip, do you know

6    if Bryan Duncan met with Jasmond Cunningham?"

7                MS. AL-SHABAZZ:  Objection.  That was sustained,

8    Judge.

9                MR. FOLLY:  Your Honor, that was not sustained.

10               THE COURT:  Just a moment.

11               MR. FOLLY:  Your Honor, it's on page 1577, and it was

12   overruled and the testimony was allowed.

13               THE COURT:  I did allow that.  I did allow that

14   question to be answered.

15               Proceed.

16               MR. FOLLY:  So you know what he said in response?  He

17   said he didn't know anything about that, he moved to France.

18   That was his response.  The only relevant question to that

19   witness, and that was his response.  It's a total distraction

20   from what matters here.  Yet yesterday, Ms. Al-Shabazz got up

21   here and she tried to suggest to you that Jasmond Cunningham

22   was lying about what happened here.

23               First, ladies and gentlemen, start with Jasmond

24   Cunningham's actual testimony at this trial.  Again,

25   Ms. Al-Shabazz didn't show you his testimony.  That's what

J5m1dun1                          Rebuttal – Mr. Folly

1    matters here.

2            MS. AL-SHABAZZ:  Objection.  I have no burden to show

3    the jury anything.

4            THE COURT:  Well, the jury understands the burden is

5    always on the government.

6            Go ahead.

7            MR. FOLLY:  Here's what he says about when he saw

8    Duncan after Duncan got him to stage the accident:

9            "I'm not sure if it was a week or two weeks after, but

10   I know I seen him shortly after I came from the emergency

11   room."

12           MS. AL-SHABAZZ:  Objection.

13           MR. FOLLY:  That's it.

14           THE COURT:  Ms. Al-Shabazz, this jury will decide what

15   the evidence was.

16           MR. FOLLY:  That's it.  That's the testimony on this,

17   ladies and gentlemen.  It's right there in the transcript.

18           MS. AL-SHABAZZ:  That's a mischaracterization of the

19   record.

20           THE COURT:  That wasn't true on the last objection you

21   raised.

22           Ladies and gentlemen, again, disregard all of this

23   colloquy and all of this frou-frou.  You decide what the

24   evidence shows.

25           Go ahead.

1    MR. FOLLY:  Ladies and gentlemen, when does Duncan get

2    back from Liberia?  July 2nd, one week after Jasmond Cunningham

3    staged the accident, so that's completely consistent with

4    exactly what Jasmond Cunningham told you.  One to two weeks

5    after the accident.  Completely consistent.

6        So what did Ms. Al-Shabazz tell you next?  It turns

7    out this whole Liberia thing is a total distraction from what

8    actually happened and what matters.  This is where things got

9    completely misleading yesterday.  She said, look at the toll

10   records in Government Exhibit 701.  And I'm glad that she said

11   that, because we should look at them again.  She totally misled

12   and misstated the record.

13       THE COURT:  Mr. Folly, just focus on what the evidence

14   says.  Go ahead.

15       MR. FOLLY:  The argument was, there's no messages with

16   Duncan and Cunningham until years after the fact.  Years after

17   the fact.  Years after 2015.

18       MS. AL-SHABAZZ:  Objection.

19       MR. FOLLY:  Nothing could be further from the truth.

20   Look at this chart.  Who does Duncan call?  The first entry on

21   the chart, outgoing call, July 6, 2015.  Four days, four days

22   after Bryan Duncan got back from Liberia, who did he call?

23   It's right there on the chart.  It's the first entry.  It's

24   Jasmond Cunningham.  Black and white.  That's not years after

25   the fact, ladies and gentlemen; it's four days after Bryan

J5m1dun1                    Rebuttal – Mr. Folly

1    Duncan gets back from Liberia.  Who does he make it a priority

2    to call?  He makes it a priority to call Jasmond Cunningham,

3    because that is his recruit.  That's who he brought into this

4    scheme.  So that's high on his priority list, four days after

5    he gets back from Liberia.  That is not years after the fact,

6    ladies and gentlemen; it's four days.  So don't get distracted

7    by these arguments.  Look at the actual evidence.  That's what

8    matters here.

9           Just one other point I want to make about phones and

10   evidence.  There was a suggestion yesterday that the government

11   fabricated evidence in this case, ladies and gentlemen.  There

12   has been not a shred of evidence at this trial supporting that

13   suggestion.  It's a total distraction.  When that exhibit came

14   up on the screen, the exhibit with Clarence Tucker's name and

15   phone number, then it said Rob next to it, because that is who

16   recruited Clarence Tucker.  And you heard that from Peter

17   Kalkanis.  You saw the intake sheet that said Rob with Clarence

18   Tucker.  And you know what else?  You heard about the

19   extraction report from that same phone, ladies and gentlemen.

20   If Ms. Al-Shabazz wanted to introduce something off of that

21   extraction report --

22          MS. AL-SHABAZZ:  Objection.

23          THE COURT:  Yes.  Don't focus on the intentions of the

24   adversary lawyer.  Focus on what the evidence shows.

25          MR. FOLLY:  Ladies and gentlemen, that's exactly

J5m1dun1                       Rebuttal - Mr. Folly

1  right.  Focus on the evidence.  And there is no evidence

2  whatsoever that that contact entry was fabricated here.

3         So let's go back for a moment to the beginning of the

4  trial.  And Ms. Al-Shabazz got up here, she said in the

5  beginning of this trial, Duncan was just a driver, and then

6  when he found out that Peter Kalkanis was using these people to

7  make money off of fraudulent cases, when he found that out, he

8  confronted Peter Kalkanis.  That was the story.  And he left.

9         MS. AL-SHABAZZ:  Objection.

10         THE COURT:  I'll allow it.

11         MR. FOLLY:  The only problem with that story --

12         THE COURT:  What the other side was saying is up to

13  you, the jury, but remember, the arguments of the lawyers are

14  not evidence.

15         Go ahead.

16         MR. FOLLY:  Ladies and gentlemen, the only problem

17  with that story is that it's completely contradicted by all the

18  evidence in this case.  That's what I'm going to continue to

19  focus on here.

20         Let's go back to the beginning of this.  Duncan, he

21  was running cases all the way back in 2012, long before he

22  separated from Peter Kalkanis.  2012.

23         And I want to pause on that point for a second and

24  just clear something up.  Judge Stein is going to instruct you

25  on the law very soon.  And you should listen carefully to those

J5m1dun1                        Rebuttal – Mr. Folly

1    instructions and follow them.  But I expect he's going to tell

2    you something very important about the law of conspiracies.

3    First, it doesn't matter how long any particular defendant was

4    a member of a conspiracy.  Ms. Al-Shabazz said to you yesterday

5    that if Duncan left the conspiracy in 2015, how could he be in

6    that conspiracy from 2015 through 2018.  That's a total

7    distraction here, because he was in the conspiracy from 2013

8    until 2015.  That's enough.  Don't get distracted by the fact

9    that he may have left the conspiracy in 2015.

10           So that brings us back to this other argument that

11   Ms. Al-Shabazz raised to you yesterday, that there's no

12   evidence that Bryan Duncan was involved in this conspiracy

13   between 2013 and 2015.  Think about all the testimony you heard

14   and saw at this trial.  Alvin Martin, Reginald Dewitt, Tina

15   Nichols, Carol White, Brendon Connaught, they were all

16   recruited by Duncan into this scheme.

17           MS. AL-SHABAZZ:  Objection.  Objection.

18           THE COURT:  Just a moment.

19           What Mr. Folly is saying, he believes the evidence

20   will show that all of those people were recruited by Duncan

21   into the scheme.

22           Proceed.

23           MR. FOLLY:  You heard, ladies and gentlemen, from four

24   of those witnesses at this trial.  Four witnesses who told you

25   they were recruited by Duncan before 2015 into this scheme.

J5m1dun1                        Rebuttal - Mr. Folly

1           Just the testimony of one of those witnesses would

2     tell you all you need to know here.  Duncan was a member of

3     this conspiracy way before 2015.  But when you put all of that

4     testimony together, the picture is clear.  It's overwhelming.

5     Duncan was a member of this scheme from the very beginning.

6           Now one thing Ms. Al-Shabazz said yesterday, which

7     actually made a lot of sense, was that when you talk about

8     knowledge, she said, you know what someone knows based on their

9     actions, based on what they do, and that's exactly right.  So

10    we have to focus on the actions of Bryan Duncan, the actions

11    going all the way back to the beginning of this conspiracy.

12          First, let's look at Alvin Martin.  Ms. Al-Shabazz

13    spent a lot of time yesterday talking about Alvin Martin.  And

14    you know exactly why she did that.  Once again, his testimony

15    is devastating against her client.  He's a childhood friend of

16    Bryan Duncan's.  He did not want to come into this courtroom

17    and have to testify about what Bryan Duncan had done here, the

18    fact that he had recruited him into this scheme.  He didn't

19    want to have to do that, but he did.  Remember, he's the one

20    who injured his ankle playing basketball in 2012, and he tells

21    Duncan.  And what does Duncan tell him to do?  He says, go to

22    the hospital, tell them that you fell and that you injured your

23    back -- in other words, lie; that's what he told him to do

24    here, so that he could get him a bogus lawsuit, and at the end

25    of that bogus lawsuit, Bryan Duncan, he gets his $5,000 cut.

1   That's what happens.

2           And he told Alvin Martin to lie again, which we're

3   going to talk about in a few minutes.  But before that happens,

4   he also brought along Alvin Martin's mother, Carol White, to do

5   her own fraudulent case.  Ladies and gentlemen, I know that you

6   remember Ms. White.  She came in here, she described to you

7   what happened.  She told you how she nearly died when she got

8   one of her surgeries.  You cannot forget that, ladies and

9   gentlemen.  That's not something Ms. White would have

10  forgotten, the circumstances of that happening.  That's an

11  event in your life you simply don't forget.

12          So Ms. Al-Shabazz, she came up here and she focused.

13  She said you can't believe either one of them --

14          MS. AL-SHABAZZ:  Objection.

15          MR. FOLLY:  -- because --

16          THE COURT:  Just a moment.

17          Just make your argument based on the evidence or lack

18  of evidence, not ascribing statements to the other side.  Move

19  on.

20          MR. FOLLY:  There was an argument that you can't

21  believe these witnesses, ladies and gentlemen, Alvin Martin and

22  Carol White, because there's a slight difference in their

23  memory.  Carol White remembers that on the day that this all

24  started, when Bryan Duncan got her hooked up with this

25  fraudulent case, she remembers that Duncan was in the house on

J5m1dun1                    Rebuttal - Mr. Folly

1    that day.  Alvin Martin, his memory is that Duncan was not in

2    the house and that he made the call to him when Ms. White got

3    home.  That's it.  That's the difference in their memories.

4    And ladies and gentlemen, this happened seven years ago.  If

5    their stories were identical, that would be something to worry

6    about.  But the fact that there's a slight difference in their

7    memories shows you they're telling you the truth.  They didn't

8    coordinate their stories.  They're just telling you what they

9    remember.  And the one thing that they both remembered clearly

10   is that it was Bryan Duncan that set them up with their

11   fraudulent cases.  They remember that.  Of course they remember

12   that.

13           So let's fast forward about a week before this trial.

14   Bryan Duncan got the witness list, and there was this childhood

15   friend, Alvin Martin, and his mother.  That's a big, big

16   problem for Bryan Duncan.  So what did he do?  He completely

17   panicked, ladies and gentlemen.  Because he knows if they come

18   in here and they tell you the truth, he's going to get

19   convicted.  He practically used those exact words in the text

20   message exchange with Alvin Martin.  So for a period of 12

21   hours overnight -- think about this, it's the middle of the

22   night.  And you saw those messages.  He's relentless.  He will

23   not stop trying to convince his childhood friend, Alvin Martin,

24   to come in this courtroom and lie to you.  And not only that,

25   he wants Carol White to lie to you.  He wants his childhood

J5m1dun1                          Rebuttal - Mr. Folly

 1   friend and he wants his childhood friend's mother to come in

 2   here and also lie to you.  So he spends 12 hours overnight

 3   frantically trying to convince Alvin Martin to do just that.

 4          So ladies and gentlemen, there was this argument

 5   yesterday that these messages are actually Bryan Duncan trying

 6   to get his friend to tell you the truth.  That's what the

 7   argument was yesterday.  You saw those messages -- the messages

 8   where Duncan says to Alvin Martin, "Take care of that."  "Take

 9   care of that."  Get your mom to stop telling the authorities

10   the truth of what happened here.  Take care of that.  The

11   messages where Duncan says, "I was under the impression that

12   testifying wasn't an option."  The messages where Duncan says,

13   "Let me school you."  "Let me school you."  If you say any of

14   your case is fake and they ask if I set that up, don't say my

15   name.  And then, ladies and gentlemen, I know that you have not

16   forgotten that other message, where he says, No one can see our

17   messages or else I'm fucked.  I know you have not forgotten

18   that message, ladies and gentlemen.  He says, Please, I need

19   you.  I need you to go in there and lie for me.  I need you to

20   convince your mother --

21          MS. AL-SHABAZZ:  Objection.

22          MR. FOLLY:  -- to lie for me.

23          MS. AL-SHABAZZ:  Objection.

24          THE COURT:  This is not what's in the WhatsApp

25   message.  This is this lawyer's belief as to what was the

J5m1dun1                         Rebuttal - Mr. Folly

1      intent of the messages.

2           MR. FOLLY:  These are the messages, ladies and

3      gentlemen, that defense counsel wants you to believe are an

4      attempt to get Alvin Martin and his mother to tell the truth,

5      to tell a story that is totally different than the one you

6      heard in this courtroom.  And ladies and gentlemen, that is

7      absolutely ridiculous.  You saw those messages, you know that

8      is not what was going on in those messages.

9           There's one final point I want to make about Bryan

10     Duncan.  I want to address this story that in 2015, he found

11     out that this was all a fraud, he confronted Kalkanis, he was

12     upset because they were using people, and then he cleaned up

13     shop.  You've heard that story several times during this trial.

14     So first, we've already been over the fact that he was involved

15     in this fraud scheme going all the way back to 2012.  So that

16     story about him just finding out about this in 2015 completely

17     doesn't line up with the evidence.  He recruited at least five

18     patients before 2015.  You heard testimony from four of them at

19     this trial.

20          But focus on what he did in 2015.  He started D&G,

21     Duncan and Gordon.  His partner in the new business was Kerry

22     Gordon.  That was the runner that you heard about throughout

23     this trial who had set up a hundred staged accidents through

24     Peter Kalkanis.  That was his business partner in the new,

25     cleaned up 2015 operation.

J5m1dun1                          Rebuttal - Mr. Folly

1              The other point here is, who was he working with?

2     George Constantine, the lawyer who was in on this, ladies and

3     gentlemen; Jason Krantz from Fast Trak, the funder who was in

4     on this; Adrian Alexander, another funder who was in on this;

5     Sady Ribeiro, the doctor who was in on this, the doctor that

6     was emailing him:  Delete the emails.  That's the guy that

7     Bryan Duncan continued to work with in 2015, when he starts the

8     new, cleaned up version of all of this.

9              And guess who he's also still getting patients with?

10    It's not just Kerry Gordon.  Reginald Dewitt, the runner that

11    all the defense attorneys have tried to blame this entire fraud

12    scheme on.

13             MS. AL-SHABAZZ:  Objection.

14             MR. FOLLY:  That's who he's still --

15             MS. AL-SHABAZZ:  Objection.

16             THE COURT:  Just a moment.

17             Jury will disregard the last sentence about what the

18    defense lawyers were trying to do.

19             Go ahead.

20             MR. FOLLY:  You've heard argument, ladies and

21    gentlemen, that Reginald Dewitt and Peter Kalkanis were the

22    only ones in on this fraud and that these three defendants

23    didn't know a thing about it.  But then when Bryan Duncan

24    branches off in 2015, he's getting patients from Reginald

25    Dewitt.

1           Ladies and gentlemen, Bryan Duncan knew this was a
2    fraud all the way back in 2012.  Witness after witness after
3    witness after witness at this trial told you that.  But not
4    only that; when he switched things up in 2015, nothing changed.
5    Gordon, still his partner.  Patients like Wanda Diaz and
6    Jasmond Cunningham, who you heard from both at this trial,
7    they're getting pulled out of homeless shelters to stage
8    accidents.  Nothing changed in 2015.
9           Now I'm going to switch topics here and talk about
10   Ryan Rainford.  Ladies and gentlemen, you know who that is.
11   You heard his name.  Ryan Rainford, Ace, same person.  And you
12   heard this argument, again, that Ryan Rainford didn't know what
13   was going on, was totally in the dark about what was happening
14   here.  Doesn't add up with the evidence, ladies and gentlemen.
15   You heard from Willie Barbour.  You heard from Kasheem Jones.
16   These were people that Ryan Rainford recruited himself into
17   this scheme.  And one point on Kasheem Jones.  Remember, when
18   he first did his accident, he went straight to the hospital.
19   That's what he was told to do.  That's how the fraud scheme
20   worked during that time period.  But then he wanted to get his
21   girlfriend Colette Ford in on this fraud scheme.  So what did
22   he do?  He called Ryan Rainford, because that was his connect,
23   and Rainford says, we're doing things differently now.  Colette
24   Ford, she has to actually go to a spot, she has to
25   intentionally fall on the ground.  Can't just go to the

J5m1dun1                      Rebuttal - Mr. Folly

1    hospital anymore and get the discharge paperwork.  How would

2    Kasheem Jones be able to make that up?  How would he know that

3    the operation had changed, that they were no longer just going

4    to the hospital and getting the paperwork, that now you

5    actually needed to stage the fall?  How could he get that so

6    perfectly matched up with all the other testimony that you

7    heard at this trial?  There's no way he could do that.  There's

8    no way he would know that unless Ryan Rainford had told him.

9            And one other thing about Ryan Rainford.  Think about

10   his role in this operation.  He is entrusted with the money,

11   the checks, the cash.  He is entrusted to hand envelopes of

12   cash to people in vans.  You don't get entrusted to do that

13   unless you are fully on the inside, unless you know exactly

14   what is going on.  And the evidence shows you that Ryan

15   Rainford knew exactly what was going on here.

16           So that brings us to Robert Locust.  So I want to

17   respond to this argument yesterday.  You heard it again and

18   again:  Robert Locust was just a driver.  Ladies and gentlemen,

19   let's get really clear on this.  Robert Locust is not on trial

20   for being an Uber driver.  That's not why we're here.  That's

21   not what this case is about.  Robert Locust is not on trial for

22   being an Uber driver, okay?  He's on trial because he

23   participated in a fraud scheme for years.

24           MR. DINNERSTEIN:  Objection, your Honor.  That's not

25   the standard.

J5m1dun1                        Rebuttal - Mr. Folly

1          THE COURT:  This jury knows that before it can convict

2     a defendant, it has to find beyond a reasonable doubt that the

3     government has proven every element of the charge.

4          Proceed.

5          MR. FOLLY:  And we have.  We have proven every element

6     of the charge beyond a reasonable doubt.

7          So there was this argument yesterday that Robert

8     Locust was just earning an honest living, an honest living in

9     which he was recruiting people to stage accidents and file

10    bogus lawsuits.  That is not an honest living, ladies and

11    gentlemen.  That is participating in a fraud scheme.

12         The first point here -- and Ms. Rothman, she walked

13    you through this with a great level of detail yesterday, so I'm

14    not going to go back through all of this again.  But the first

15    point here is that Robert Locust recruited patients.  So this

16    whole thing about him just being a driver, that's a total

17    distraction to get you to look the other way from the evidence

18    here, which shows you that Robert Locust recruited patients to

19    stage trip-and-fall accidents.

20         Now there was an argument that the only evidence of

21    that, ladies and gentlemen, is the testimony of Clarence

22    Tucker.  That's simply not the case.  There is so much more

23    evidence here, and I want to just remind you of a few pieces of

24    that evidence.

25         First of all, Clarence Tucker, that actually is

J5m1dun1                         Rebuttal - Mr. Folly

1  enough, ladies and gentlemen, because Clarence Tucker does not

2  have a reason in the world to come into this courtroom, to lie

3  under oath, to get his fiancée wrapped up in this by saying,

4  yes, she was with me when I went out to scout locations with

5  Robert Locust in order to stage an accident.

6          MR. DINNERSTEIN:  Objection, your Honor.  That's

7  improper argument.

8          THE COURT:  I'll permit that.

9          MR. FOLLY:  There's no reason, ladies and gentlemen,

10 that he would come in here, commit perjury --

11         THE COURT:  Ladies and gentlemen, you understand, it's

12 really for you to decide whether he had any reason in the world

13 or not.  I mean, it's not for this lawyer to tell you that.

14 You decide that.

15         Move on.

16         MR. FOLLY:  And ladies and gentlemen, when you look at

17 the evidence here, ask yourselves if it makes sense that he

18 would come in here, lie under oath, throw his fiancée into the

19 mix with all this, say that she also committed a crime.  Why

20 would he do that?  There's no reason in the world, ladies and

21 gentlemen.

22         So let's also look at all the ways that Clarence

23 Tucker's testimony is backed up by the hard evidence in this

24 case.

25         So Government Exhibit 837, if we could publish that.

J5m1dun1                    Rebuttal - Mr. Folly

1          So the argument yesterday was that these records,

2     these toll records, they're actually not helpful.  And of

3     course that was the argument, because when you look at these

4     records, they line up perfectly with Clarence Tucker's

5     testimony.

6          Look on May 2nd.  That's the day before Tucker did the

7     staged accident with Locust.  That's the day they went out and

8     they scouted locations.  And there's a spike in their phone

9     calls on that day.

10         Then look at the next day, the day they actually go

11    out and they do the staged accident.  Again, there's a spike in

12    the communications between Robert Locust and Clarence Tucker.

13    So there was this suggestion yesterday, well, maybe they're

14    talking about computer repairs.  That's ridiculous.  It's a

15    massive coincidence that the days that they're talking the most

16    about computer repairs are the days that Clarence Tucker told

17    you that he went out with Robert Locust to stage an accident?

18    And it's a massive coincidence that this spike on the graph is

19    another day when Clarence Tucker told you that he went out to

20    scout with Robert Locust for the location?  A total sideshow.

21    Computer repairs had nothing to do with the spikes in calls on

22    that chart.

23         So then we got to the next argument, which is that,

24    well, you don't know if Clarence Tucker recruited Robert Locust

25    instead of Robert Locust recruiting Clarence Tucker.  Ladies

J5m1dun1                    Rebuttal - Mr. Folly

1    and gentlemen, that is totally ridiculous.  Robert Locust has

2    been participating in the fraud scheme for two years at this

3    point.  It's 2017.  And there wasn't a single witness at this

4    trial who told you that Clarence Tucker was in on this

5    operation, that he was someone, like Robert Locust, recruiting

6    people into this scheme.  That argument makes no sense, ladies

7    and gentlemen.  No sense whatsoever.  It's obvious that Robert

8    Locust recruited Clarence Tucker and not the other way around.

9              So I also want to talk about Reginald Dewitt, because

10   you heard this argument on and on about how terrible Reginald

11   Dewitt is.  That is not the issue here.  It's not about whether

12   you like him; it's about whether you can trust what he told you

13   about Robert Locust.  And think about this.  He's friends with

14   Robert Locust.  And what does he tell you?  He tells you Robert

15   Locust told him he wanted to stage more accidents and that he

16   had staged some accidents.  If Reginald Dewitt was going to

17   come up with a lie to frame Robert Locust, don't you think he

18   would have done a little bit better than that, he would have

19   said, I was with him, we went together, I heard him talking to

20   one of the recruits about how to stage the accidents?  That's a

21   pretty easy lie to come up with.  He didn't say that.  He said,

22   Robert Locust told me that he staged some accidents.  And the

23   most remarkable thing, ladies and gentlemen, is that his memory

24   on this, it's incredible.  It matches up perfectly with the

25   intake sheets.  He said, Robert Locust told me that he staged

J5m1dun1                    Rebuttal - Mr. Folly

1    an accident with a patient at a Wendy's on Utica Avenue in

2    Brooklyn.  And then, ladies and gentlemen, you saw through

3    Peter Kalkanis the intake sheet, and what's in the upper left

4    corner on the ledger that Peter Kalkanis used to keep track of

5    which runner brought in which recruit?  Rob.  How is it

6    possible that Reginald Dewitt would have known exactly, down to

7    the street and location, where Robert Locust staged accidents,

8    unless Robert Locust told Reginald Dewitt.

9              And that's not it.  There's more just like that.  He

10   said he recruited patients from his building.  And you saw

11   that, ladies and gentlemen.  Clarence Tucker, he was from

12   Robert Locust's building.  And within two months, ladies and

13   gentlemen, less than two months of that, you saw the intake

14   sheet from another patient from Robert Locust's building, and

15   in the upper left-hand corner, once again, is Rob's name.  What

16   are the odds?  Less than two months apart, Robert Locust brings

17   two people into this scheme from his building.  It makes sense.

18   He started close to home.  He was nervous about this.  He

19   wasn't sure exactly how to do it, so he picked people close to

20   home.

21             Ladies and gentlemen, Ms. Rothman walked you through

22   other examples of this yesterday, other examples where the

23   things Reginald Dewitt told you about the patients that Robert

24   Locust recruited match up perfectly with the records.

25             So let's put that aside, because it's clear Robert

J5m1dun1                    Rebuttal - Mr. Folly

Locust recruited patients into this scheme.  It could not be
more clear.  Now let's focus on the driving that he was doing,
because again, if you listened to those arguments yesterday,
you would think that what this case is about is Robert Locust
working for Uber and taking some passengers to JFK Airport.
That is not what this case is about.  He was driving people
around who were participating in a fraud scheme.  He was
helping this fraud scheme succeed.  He was essential to get
these recruits to go to get surgery, to go to get MRIs, to go
to get epidural injections, to go to see the lawyer.  This was
critical.  If the lawsuits were going to have any value, all of
this had to get done.  And Peter Kalkanis needed someone
reliable to get this done.  He gets Robert Locust a bigger car.
He helps him get that car, ladies and gentlemen.  And you heard
what he said about it.  It was helpful because they could fit
more passengers, more recruits into the car.

          And ladies and gentlemen, there was argument about,
well, Peter Kalkanis is over here, he made $2 million, and
Robert Locust is getting paid a salary of about $40,000 a year.
He's getting paid a salary for his participation in this fraud
scheme.  He was driving around criminals as they were actively
committing fraud.  That is the driving he was doing, ladies and
gentlemen.

          Ladies and gentlemen, I'm going to move on from this
point, but before I do, I want to highlight something here.

J5m1dun1                        Rebuttal - Mr. Folly

1   Again, this all boils down to this one question:  Did Robert

2   Locust know what was going on here?  The answer is clear.  Of

3   course he did, because he recruited people to stage accidents,

4   so it's obvious he knew.  But let's just think, even if he

5   hadn't recruited people, which he did, even if he was just

6   driving these people around in furtherance of this fraud

7   operation, think about everything he would be seeing.  Hundreds

8   of patients, the exact same types of locations for the

9   accidents, the exact same types of injuries, again and again

10  and again.  They're going to the same MRI facility, they're

11  going to the same doctors, they're getting the same surgeries,

12  they're getting paid in cash in the back of vans after they get

13  surgery.  Does this add up, ladies and gentlemen?  Of course

14  this doesn't add up.  It's obvious what was going on here,

15  ladies and gentlemen.  Even if Locust did not know for certain,

16  he is still guilty.  He was aware there was a high probability

17  that these patients had staged accidents and he took --

18          MR. DINNERSTEIN:  Objection, your Honor.  That's not

19  the standard.

20          THE COURT:  Yes.  Again, ladies and gentlemen, the

21  government's burden is proof beyond a reasonable doubt.

22  Remember that.

23          MR. FOLLY:  And he took conscious steps to avoid

24  confirming that fact, ladies and gentlemen.  He knew.  There's

25  no question about that.

J5m1dun1                    Rebuttal - Mr. Folly

1          Finally, Mr. Dinnerstein spoke yesterday about the law

2     of conspiracy.  Judge Stein is going to give you instructions

3     on this in just a moment, and you should listen very carefully.

4     But there was a suggestion that because Robert Locust joined

5     the conspiracy later, that somehow that's relevant to whether

6     he was actually a part of the conspiracy.  And I expect that

7     Judge Stein will tell you, it does not matter when a particular

8     defendant here joined the conspiracy.  They don't need to have

9     joined the conspiracy at the same time.  It doesn't matter

10    whether some were in the conspiracy longer than others.  Again,

11    that does not matter.  It doesn't even matter if some members

12    of the conspiracy don't even know the identity of some of the

13    other members of this conspiracy.  That doesn't matter either.

14    So don't let that argument, ladies and gentlemen, distract you

15    here.

16          Ladies and gentlemen, I'm going to sit down in just a

17    minute.  But before I do, I just want to leave you with one

18    thing.  For years, years, these three men sitting here in this

19    courtroom were essential members of this fraud scheme.  You

20    heard about that from witness after witness after witness at

21    this trial.  There's been the suggestion that all of these

22    witnesses got together and somehow came up with some elaborate

23    conspiracy to frame these defendants, they got all their

24    stories straight --

25          MR. SCHOLAR:  Objection, Judge.  That's not accurate.

J5m1dun1                          Charge

1                THE COURT:  It's argument.  I'll permit it.

2                MR. FOLLY:  They got all their stories straight, they

3       lined them up just perfectly to match up with all the other

4       evidence in this case that they knew absolutely nothing about,

5       ladies and gentlemen, and that they framed themselves.  They

6       came in here and got on the witness stand and said, yes, I was

7       a participant in this fraud scheme; yes, my brother, my

8       daughter, my wife, my girlfriend, my fiancée, were also

9       participants in this fraud scheme.  Why would they frame

10      themselves?  Why would they frame people who are close to

11      them -- family members, friends?  There's no reason that all of

12      those different witnesses, most of whom had never heard of each

13      other, there's absolutely no reason that they would all come in

14      here and make up a story about what happened and, in the

15      process, frame themselves, frame their family members, just to

16      point the finger at these defendants.  That argument makes no

17      sense whatsoever, ladies and gentlemen.

18               You saw firsthand what the result of these defendants'

19      actions was.  People got surgeries they never needed.

20      Businesses and insurance companies paid out millions of dollars

21      for bogus fraudulent lawsuits, and these defendants made a

22      living off of this.  But now here, in federal court, it's time

23      for these three men to be held accountable for their actions.

24      There is only one verdict that is consistent with all of the

25      evidence in this case -- that these three defendants are

1    guilty.

2            THE COURT:  All right.  Thank you, Mr. Folly.

3            Ladies and gentlemen, I now will give you the charge.

4    I'm going to tell you what the law is, and you have to apply

5    the law as I give it to you to the facts as you find them.

6            We've been here about an hour this morning.  So for

7    about a half hour, I'll read the charge, then I'll give you a

8    midmorning break, and then we'll complete the charge.  The

9    charge will take about an hour, hour and a half or so.

10           You don't have to memorize this charge.  I am going to

11   give you a copy of it, and in fact, if each of you want copies,

12   we can easily make copies.

13           I'm giving copies of the charge to the parties.  The

14   charges are as I discussed with the parties previously.

15           I'm going to instruct you on the law you will apply to

16   the facts.  You will determine the facts in accordance with

17   these instructions on the law.

18           You are vital to the administration of justice.  I

19   hope you fully appreciate your importance.  I truly do.  It's a

20   tradition and a significant safeguard of our individual

21   liberties that parties involved in criminal matters have a jury

22   chosen from the community to decide questions of fact and on

23   that basis render a verdict.

24           It's your duty to decide whether or not the guilt of

25   each defendant has been proved beyond a reasonable doubt.  You

J5m1dun1                    Charge

1    pass on and decide the facts in this case.  I, as the judge, do

2    not find the facts.  You are the sole and exclusive judges of

3    the facts.  You pass on the weight of the evidence; you

4    determine the credibility of the witnesses; you resolve any

5    conflicts that there are in the testimony; and you draw

6    whatever reasonable inferences you decide to draw from the

7    facts as you have determined them.  This is a very great

8    responsibility, and you have to exercise it with complete

9    fairness and impartiality.  Your decision must be based on the

10   evidence or lack of evidence, and it cannot be influenced by

11   bias, by prejudice, or by sympathy.

12          You must accept the law as I state it to you in these

13   instructions and to apply it to the facts as you decide them.

14          You must not substitute your concept of what the law

15   should be for what I tell you the law is.  Just as you alone

16   find the facts, I alone decide what the law is, and you are

17   duty bound to accept the law as I state it to you.  If any

18   attorney has stated a legal principle different from any that I

19   state to you in these instructions -- and that goes for not

20   only the summations but at any time in the trial -- it's these

21   instructions that you have to follow.  Don't single out any one

22   instruction or any one word or phrase in an instruction as

23   alone stating the law.  Consider these instructions as a whole.

24          You will find the facts here, but you must accept the

25   law as I state it to you and apply that law to the facts as you

J5m1dun1                      Charge

1    find them.  The result of the work is going to be the verdict

2    that you return.

3           I'm going to give you some general principles.  I'll

4    explain the burden of proof further; I'll tell you about the

5    charges in the indictment; I'll tell you about the substantive

6    law; and then I'll give you some concluding instructions.

7           You know you must perform your duty of finding the

8    facts without bias or prejudice as to any party.  All parties

9    stand as equals before juries in the courts of the United

10   States.  You must disregard any feelings you may have about

11   each defendant's race, religion, national origin, sex, or age.

12   It also would be improper for you to consider any personal

13   feelings you may have about the race, religion, national

14   origin, sex, or age of any witness or anyone involved in this

15   case.  And it also would be improper for you to allow any

16   feelings you might have about the nature of the crime charged

17   to interfere with your decision-making process.

18          The fact that the government is a party and the

19   prosecution is brought in the name of the United States does

20   not entitle the government or its witnesses to any greater

21   consideration than that given you by any other party.  By the

22   same token, you can't give it less consideration.  The

23   government and each of the three defendants here stand on equal

24   footing before you.  Your verdict has to be based solely on the

25   evidence or lack of evidence.

 1          Also, the personalities and the conduct of lawyers are

 2     not in any way in issue.  If you have formed opinions of any

 3     kind as to any of the lawyers here, whether favorable or

 4     unfavorable, those opinions should not enter into your

 5     deliberations.

 6          You are not to be swayed by sympathy.  You must be

 7     guided solely by the evidence here, and the crucial, hard-core

 8     question that you must ask yourselves as you go through the

 9     evidence is, as you know:  Has the government proven the guilt

10     of each defendant beyond a reasonable doubt?

11          It is for you alone to decide whether the government

12     has proven that each defendant is guilty of the crimes charged

13     solely on the basis of the evidence and subject to the law as I

14     charge you.  It must be clear to you that once you let fear,

15     prejudice, or bias or sympathy interfere with your thinking,

16     there is a risk that you will not arrive at a true and just

17     verdict.

18          If you have a reasonable doubt as to a particular

19     defendant's guilt, do not hesitate for any reason to find the

20     verdict of acquittal.  On the other hand, if you should find

21     that the government has met its burden of proving that

22     defendant's guilt beyond a reasonable doubt, you should not

23     hesitate to render a verdict of guilty because of sympathy or

24     for any other reason.

25          Although the defendants have been indicted, you must

J5m1dun1                          Charge

remember that an indictment is simply an accusation.  It's not

evidence.  And each of the three defendants here has pled not

guilty to the indictment.

As a result, as you know, the burden is on the

government to prove guilt beyond a reasonable doubt.  This

burden on the government never shifts to a defendant, because

the law never imposes on a defendant in a criminal case the

burden or duty of calling any witness or producing any

evidence.

The law presumes each defendant to be innocent of each

of the charges against that defendant.  I therefore instruct

you, ladies and gentlemen of the jury, that you must presume

each defendant is innocent throughout your deliberations until

such time, if ever, you, as a jury, are satisfied that the

government has proven that defendant guilty beyond a reasonable

doubt.

Each of the three defendants here begins this trial

with a clean slate.  This presumption of innocence alone is

sufficient to acquit a defendant unless you, as jurors, are

unanimously convinced beyond a reasonable doubt of their guilt

after a careful and impartial consideration of all of the

evidence here.  If the government fails to sustain its burden,

you must find the defendants not guilty.

This presumption was with each defendant when the

trial began and remains with each defendant even now as I speak

1   to you, and will continue with the defendants into your

2   deliberations unless and until you are convinced that the

3   government has proven them guilty beyond a reasonable doubt.

4          I have said that the government must prove each

5   defendant's guilt beyond a reasonable doubt.  The question

6   therefore is, what is a reasonable doubt?  The words almost

7   define themselves.  It's a doubt based on reason and common

8   sense.  It is a doubt that a reasonable person has after

9   carefully weighing all of the evidence.  It is a doubt that

10   would cause a reasonable person to hesitate in a matter of

11   importance in his or her personal life.  Proof beyond a

12   reasonable doubt must therefore be proof of such a convincing

13   character that a reasonable person would not hesitate to rely

14   and act upon it in the most important of his own affairs.  A

15   reasonable doubt is not a caprice or a whim; it's not a

16   speculation or suspicion; it's not an excuse to avoid the

17   performance of an unpleasant duty.  And it's not sympathy.

18          You know that in a criminal case, the burden at all

19   times is upon the government to prove guilt beyond a reasonable

20   doubt.  The law does not require that the government prove

21   guilt beyond all possible doubt.  Proof beyond a reasonable

22   doubt is sufficient to convict.  This burden never shifts to

23   the defendants, which means it's always the government's burden

24   to prove each of the elements of the crime charged beyond a

25   reasonable doubt.  If, after fair and impartial consideration

J5m1dun1                        Charge

of all the evidence, you have any reasonable doubt about the

guilt of a defendant, it's your duty to acquit the defendant.

On the other hand, if, after fair and impartial consideration

of all of the evidence, you are satisfied of the defendant's

guilt beyond a reasonable doubt, you must vote to convict.

          The fact that one party called more witnesses and

introduced more evidence than the other does not mean that you

should necessarily find the facts in favor of the side offering

the most witnesses.  By the same token, you do not have to

accept the testimony of any witness who has not been

contradicted or impeached if you find that witness not to be

credible.  You also have to decide which witnesses to believe

and which not to believe and which facts are true and which

facts are not true.  To do this, you have to look at all the

evidence, drawing upon your own common sense and personal

experience and good judgment.

          I'm going to discuss in a moment the criteria for

evaluating credibility.  At this point, keep in mind what you

know, that the burden of proof is always on the government and

the defendants don't have to call any witnesses or offer any

evidence, since you must presume them to be innocent.

          Now in determining the facts, you rely upon your own

recollection of the evidence.  You know what evidence is.  It's

the testimony of witnesses and the exhibits that have been

received.  You know there are two types of evidence -- direct

J5m1dun1                    Charge

evidence and circumstantial evidence.

You know that direct evidence is evidence when a witness is testifying to a fact based on what that witness saw, heard, or observed; and you know that circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts.

You remember the example about the umbrella that I gave you when this trial started.  The fact of the wet umbrella, which you can directly observe, is circumstantial evidence that it's raining outside.  It's certainly logical for you to conclude that it's raining outside if you see a wet umbrella.  By the same token, as I said, somebody may have put an umbrella under a faucet, but it's a reasonable inference to draw that it's raining outside.  Whether or not to draw a particular inference is a matter exclusively for you because it's a determination of fact.

Many material facts, such as state of mind, are rarely susceptible to proof by direct evidence.  Usually such facts are established by circumstantial evidence and the reasonable inferences you draw.  Circumstantial evidence may be given as much weight as direct evidence.  The law makes no distinction between direct and circumstantial evidence, but simply requires that before convicting a defendant, you must be satisfied of that defendant's guilt beyond a reasonable doubt based on all the evidence in the case.

J5m1dun1                        Charge

Now you also know that certain things you've heard and
seen during this trial are not evidence.  The indictment isn't
evidence; it's simply an accusation.

The statements and arguments of the lawyers are not
evidence.  Questions put to a witness are not evidence; it's
just the answer that's evidence.

Don't draw any inference or conclusion for or against
any party because of a lawyer's objections or my rulings on the
objections.  Lawyers, to do their job, they're supposed to
object if they think a question is legally impermissible.

Nothing I say is evidence.  Do not draw any inference
from any of my rulings.  My rulings are simply on legal issues,
not factual issues.  I have no opinion on the facts of this
case.  It's for you to judge the facts.

Don't concern yourself with what was said at sidebars.

At times I may have questioned a witness.  Undoubtedly
these were questions that I intended to help clarify the
presentation of evidence and perhaps bring out something that I
thought may have been unclear.  But I have no view on the
credibility of any witness or of any of the facts here.

You've heard testimony about evidence seized in
connection with searches that were conducted by law enforcement
officers.  Evidence obtained from those searches is properly
admitted and may be properly considered by you.

Whether you approve or disapprove of how it was

J5m1dun1                          Charge

1   obtained must not enter into your deliberations.  I hereby

2   instruct you that the government's use of evidence seized in

3   connection with searches in this case is entirely lawful.

4           You must, therefore, regardless of your personal

5   opinions, give that evidence full consideration along with all

6   the other evidence in determining whether the government has

7   proved a defendant's guilt beyond a reasonable doubt.

8           Some of the exhibits that were admitted into evidence

9   were in the form of charts and summaries.  For those charts and

10  summaries that were admitted into evidence, you should consider

11  them as you would any other evidence.

12          Now you've had the opportunity to observe the

13  witnesses.  You must now consider whether the witnesses were

14  truthful and accurate.  A witness could believe that that

15  witness was being truthful, yet be mistaken and not be able to

16  recall facts accurately, or a witness could take the oath and

17  still intentionally testify falsely.

18          It's important for you to carefully listen to and

19  observe the witnesses and think about their testimony.

20          Now you have to decide whether the witnesses told the

21  truth.  Did they know what they were talking about?  How do you

22  decide that?  It's simply a matter of using your common sense,

23  your good judgment, and your life's experience.

24          Consider how good an opportunity a witness had to

25  observe or hear what the witness was testifying about.  A

J5m1dun1                         Charge

witness can be honest but mistaken.  How did the witness's

testimony impress you?  Did you think the witness was honest,

candid?  Were the answers direct or were they evasive?  How was

their demeanor?  What was the strength of the witness's

recollection?  Consider whether outside factors may have

affected a witness's ability to perceive what was happening.

Think about the substance of the testimony.  Do you think the

witness was straightforward?  Do you think the witness was

trying to conceal something?  How did any particular piece of

testimony compare with other proof here?  Was it contradicted?

Is it consistent with other evidence?

          If a witness made statements in the past that are

inconsistent with that witness's testimony during the trial,

you may consider that in deciding how much of that testimony,

if any, to believe.  You may consider whether the witness

purposely made a false statement or whether it was an innocent

mistake.  Consider whether the inconsistency concerns an

important fact or whether it had to do with a small detail.

Did the witness have an explanation for it?  And, if so, did

that explanation appeal to your common sense?

          Consider whether a witness had any possible bias, any

relationship to a party, any motive to testify falsely, any

possible interest in the outcome of the case.  Such a bias or

relationship does not necessarily make the witness unworthy of

belief, but these simply are factors that you can consider.

J5m1dun1                      Charge

In evaluating the credibility of the witnesses, take
into account any evidence that the witness who testified may
benefit in some way from the outcome of this case.  Such an
interest in the outcome creates a motive to testify falsely.
It may sway the witness to testify in a way that advances the
witness's own interests.  If you find that any witness whose
testimony you are considering may have an interest in the
outcome of this case, then you should bear that in mind when
evaluating the credibility of the witness's testimony and
accept it with great care.

I don't mean to suggest that every witness who has an
interest in the outcome of the case is going to testify
falsely.  You decide to what extent, if any, the witness's
interest has affected or colored that witness's testimony.  You
decide -- not the lawyers, not the witnesses, and not me --
what the credibility of the witnesses were who appeared here
and the weight that their testimony deserves.

Now you've heard evidence during this trial that
witnesses have discussed the facts of the case and their
testimony with lawyers before they came here to testify.

Although you may consider that when you are evaluating
a witness's credibility, there is nothing either unusual or
improper about a witness meeting with lawyers before testifying
so that the witness can be aware of the subjects the witness is
going to be questioned about, he can focus on those subjects,

J5m1dun1                              Charge

1    and he will have the opportunity to review relevant exhibits

2    before being questioned about them.  Such consultation helps

3    conserve your time and the Court's time.  In fact, it would be

4    unusual for a lawyer to call a witness without such prior

5    consultations.

6              Again, the weight you give to the fact or the nature

7    of the witness's preparation for his testimony and what

8    inferences you draw from that preparation are matters for you.

9              You've also heard testimony of law enforcement

10   officials.  The fact that a witness may be employed by the

11   federal or municipal government as a law enforcement official

12   does not mean that his testimony is necessarily deserving of

13   more or less consideration or greater or lesser weight than

14   that of an ordinary witness.

15             It's your decision, after reviewing all of the

16   evidence, whether to accept the testimony of that law

17   enforcement witness and to give that testimony whatever weight,

18   if any, you determine that it deserves.

19             You have heard evidence that a witness made a

20   statement on an earlier occasion that counsel argues is

21   inconsistent with that witness's trial testimony.  Evidence of

22   a prior inconsistent statement is not to be considered by you

23   as affirmative evidence bearing on a defendant's guilt.

24   Evidence of the prior inconsistent statement was placed before

25   you for the more limited purpose of helping you decide whether

J5m1dun1                        Charge

to believe the trial testimony of the witness who contradicted

himself.  If you find that the witness made an earlier

statement that conflicts with his trial testimony, you may

consider that fact in deciding how much of his trial testimony,

if any, to believe.

        You may consider whether the witness purposely made a

false statement or whether it was an innocent mistake; whether

the inconsistency concerns an important fact or a small detail;

whether the witness had an explanation for the inconsistency,

and whether that explanation appealed to your common sense.

        It's your duty, ladies and gentlemen, based on all the

evidence and your own good judgment, to determine whether the

prior statement was inconsistent in fact, and if so, how much,

if any, weight to give to that statement in determining whether

to believe all or part of that witness's testimony.

        You've also heard the testimony of witnesses who have

pled guilty to charges arising out of the facts that are

related to the issues here.  I instruct you that you are to

draw no inference or conclusion of any kind about the guilt of

the defendants on trial here from the fact that a prosecution

witness pled guilty to a similar charge.  The decision of the

witness to plead guilty was a personal decision that that

witness made about his or her own guilt.  You cannot use that

decision in any way as evidence against the defendants on trial

here.  That was a decision by that person to plead guilty.

J5m1dun1                    Charge

1            I can tell you that there's nothing improper in the

2    government's use of a cooperating witness.  Do not concern

3    yourself with how you personally feel about the use of a

4    government cooperating witness.  Your concern is to decide

5    whether the government has proven the guilt of each defendant

6    beyond a reasonable doubt regardless of whether evidence was

7    obtained by use of a cooperating witness.  It is the law in

8    federal courts that the testimony of such a witness may be

9    enough in itself for conviction if the jury finds that the

10   testimony establishes guilt beyond a reasonable doubt.

11           When a cooperating witness testifies, that testimony

12   should be examined with greater scrutiny than the testimony of

13   an ordinary witness.  You should consider whether the

14   cooperating witness received any benefits or promise from the

15   government or otherwise benefited from his cooperation with the

16   government that would motivate the witness to testify falsely

17   against the defendant.  It does not follow, however, that

18   simply because a person has admitted to participating in one or

19   more of the crimes, that he is incapable of giving truthful

20   testimony.

21           (Continued on next page)

22

23

24

25

J5MTDUN2                    Charge

1          THE COURT:  I have given you some general

2     considerations on credibility.  I'm not going to repeat them

3     here, I'm not going to repeat the arguments that each side has

4     made, but I do want you to consider certain things, or you may

5     want to consider certain things on the subject of cooperating

6     witnesses.  It's entirely up to you, ladies and gentlemen.

7          Ask yourselves whether these cooperating witnesses

8     would benefit more by lying or by telling the truth.  Was their

9     testimony made up because they believed or hoped they would

10    somehow receive favorable treatment if they testified falsely,

11    or did they believe that their interests would be best served

12    by testifying truthfully?  If you believe that the witness was

13    motivated by hope of personal gain, was the motivation one that

14    would cause him to lie or her to lie, or was it one which would

15    cause him or her to tell the truth?  Did the motivation color

16    that witness's testimony?

17         As with any witness, let me emphasize that the issue

18    of credibility does not have to be decided on the basis of all

19    or nothing.  Even if you find that a witness testified falsely

20    in one part, you may still accept that testimony in other parts

21    or you may disregard all of it.  It's up to you to decide that.

22    Look at all the evidence in deciding what credence and what

23    weight, if any, you will want to give to the cooperating

24    witness.

25         Ladies and gentlemen, it's noon, let's take a

J5MTDUN2                        Charge

1    ten-minute break and we'll come back.

2              (Recess taken)

3              (Jury not present)

4              THE COURT:  All lawyers are here, the defendants are

5    here.

6              (Jury present)

7              THE COURT:  Ladies and gentlemen, I don't normally

8    allow coffee, but I will make an exception this time.  Just be

9    very, very careful.  Normally it's simply water but the jury

10   obviously saw -- I'll allow it this time.

11             Ladies and gentlemen, you have heard the testimony

12   that when the police apprehended one or more of the defendants

13   they recovered evidence from that defendant.  The evidence

14   allegedly obtained at the time of the arrest was properly

15   admitted and may be properly considered by you.  Whether you

16   approve or disapprove of how it was obtained should not enter

17   into your deliberations.  I instruct you that the government's

18   use of this evidence is entirely lawful.  Regardless of any

19   personal opinion you may have, you must give this evidence full

20   consideration, along with all the other evidence in the case.

21             During the trial you also have heard testimony of

22   witnesses and arguments by the lawyers that the government did

23   not utilize specific investigative techniques.  You may

24   consider these facts in deciding whether the government has met

25   its burden of proof because you should look to all the evidence

J5MTDUN2                        Charge

1    or lack of evidence in deciding whether a defendant guilty.

2    However, I also instruct you that there's no legal requirement

3    that the government use any specific investigative technique to

4    prove its case.  Law enforcement techniques are not your

5    concern.  Your concern is solely to determine whether or not,

6    on the evidence or lack of evidence, each defendant's guilt has

7    been proved beyond a reasonable doubt.

8         The defendants did not testify in this case.  Under

9    our Constitution, a defendant has no obligation to testify or

10   to present any other evidence, because, as you know, it's the

11   government's burden to prove that defendant guilty beyond a

12   reasonable doubt, and that burden remains with the prosecution

13   throughout the entire trial and never shifts to the defendant.

14   The defendant is never required to prove that he is innocent.

15        You may not attach any significance to the fact that

16   the three defendants here did not testify.  No adverse

17   inference against any of them may be drawn by you because that

18   defendant did not take the witness stand.  You may not consider

19   this against the defendant in any way in your deliberations in

20   the jury room.

21        You also may not draw any inference, favorable or

22   unfavorable, toward the government or a defendant from the fact

23   that any person other than the defendants are not on trial

24   here.  You may not speculate as to the reasons why other

25   persons are not on trial.  These matters are wholly outside

J5MTDUN2                    Charge

1    your concern and have no bearing on your function as jurors.

2    In other words, your job is to determine whether or not these

3    defendants are guilty or not.  Don't be concerned with why

4    other people aren't here, focus on these three defendants

5    alone.

6         There are people whose names you heard during the

7    course of the trial but who did not testify, and one or more of

8    the attorneys has referred to their absence from this trial.  I

9    hereby instruct you that each party had an equal opportunity or

10   lack of opportunity to call any witness.  You should not draw

11   any inference or reach any conclusion as to what they would

12   have testified to had they been called.  Their absence must not

13   affect your judgment in any way.  However, remember my

14   instruction that the law does not impose on a defendant in a

15   criminal case the burden or duty of calling any witness or

16   producing any evidence.

17        You have also heard the testimony of witnesses who

18   have testified under grant of immunity from me, which is formal

19   immunity, or have been promised by the government in a written

20   agreement that in consideration for truthful testimony by them

21   and their cooperation with the government, they will not be

22   prosecuted by the federal government for certain crimes which

23   they may have admitted either here in court or in any

24   interviews with the prosecutors.  That's called informal

25   immunity.

1          With respect to both categories of witnesses, that is

2     those who have formal immunity and those who have informal

3     immunity, what this means is that the testimony of the witness

4     may not be used against her or him in a criminal case except

5     for the prosecution for perjury or for giving a false statement

6     or otherwise failing to comply with the immunity order of this

7     Court or the agreement they entered into with the Office of the

8     U.S. Attorney for the Southern District of New York.

9          I instruct you that the government is permitted to

10    enter into non-prosecution agreements and is entitled to call

11    as witnesses people to whom these promises have been given.

12    You may convict a defendant on the basis of such a witness's

13    testimony alone if you find that that testimony indeed proves

14    that defendant guilty beyond a reasonable doubt.

15         However, the testimony of a witness who has been given

16    a written non-prosecution agreement by the government should be

17    examined by you with greater care than the testimony of an

18    ordinary witness.  You should scrutinize it closely to

19    determine whether or not it has colored in such a way as to

20    place guilt upon the defendant in order to further that

21    witness's own interests, for such a witness, confronted with

22    the realization that she could win her own freedom by helping

23    to convict another, has a motive to testify falsely.  So such

24    testimony should be scrutinized by you with great care, and you

25    should act upon it with caution if you believe it to be true.

J5MTDUN2                        Charge

1    If you determine to accept the testimony, you may give it such

2    weight, if any, that you believe it deserves.

3           One final note, it's no concern of yours why the

4    government made agreements with witnesses.  Your only concern

5    is to decide whether the witness was truthful when he

6    testified.  Look to all the evidence to decide what weight, if

7    any, you will give to the witness's testimony.

8           Again, the issue of credibility doesn't have to be

9    decided in an all-or-nothing fashion, you could accept a

10   witness's testimony in part and reject it in part, you could

11   disregard all of it and you could accept all of it.  That's a

12   determination for you.

13          Now let's go to the indictment.  The defendants here,

14   Mr. Duncan and Mr. Locust and Mr. Rainford, have been charged

15   in an indictment, and you know an indictment is simply an

16   accusation, it is simply the means by which a criminal case is

17   started.  It's not evidence, it's not proof, it creates no

18   presumption and it permits no inference that the defendants are

19   guilty.  You are to give no weight to the fact that an

20   indictment has been returned by a grand jury against these

21   defendants.

22          Before you begin deliberating I'm going to give you a

23   copy of the indictment, but let me summarize the charges now.

24   The indictment contains six counts, that is, six charges.

25          Count One charges that from at least in or about

J5MTDUN2                    Charge

January 2013, up to and including in or about April 2018,

Mr. Duncan, Mr. Locust and Mr. Rainford engaged in a conspiracy

to commit mail and wire fraud in violation of 18 USC 1349 in

connection with an alleged scheme to defraud businesses and

insurance companies by staging accidents and filing fraudulent

lawsuits arising from those staged accidents.

     A conspiracy is a criminal agreement to violate the

law.  The counts in the indictment that allege conspiracy

offenses are different from those alleging substantive

offenses.  Unlike a conspiracy charge, which is a charge of

agreeing to commit certain offenses, a substantive count

alleges the actual commission of a criminal offense.

     Count Two of the indictment charges that from

January 2013 up to April 2018 the defendants committed the

substantive crime of mail fraud in violation of 18, USC, 1341

and 2, in connection with the same alleged scheme I described

in relation to Count One.

     Count Three charges from those same dates, that is,

2013 to 2018, the defendants committed the substantive crime of

wire fraud in violation of 18, USC, 1343 and 2, in connection

with the same scheme I described in relation to Count One.

     Count Four charges from 2015 until 2018 the defendant

Bryan Duncan engaged in a separate conspiracy to commit mail

and wire fraud in violation of 18, USC, 1349 in connection with

an alleged scheme to defraud that was substantially similar to

1   the one I described in Count One.  The government in essence

2   alleges that in or about 2015 Mr. Duncan withdrew from the

3   conspiracy that's charged in Count One and entered into a

4   separate conspiracy to commit mail and wire fraud which

5   operated in essentially the same way as the conspiracy charged

6   in Count One did.

7          Count Five charges from 2015 to 2018 Mr. Duncan

8   committed mail fraud in violation of 18, USC, 1341 and 2 in

9   connection with the same alleged scheme as described in Count

10  Four.

11         Count Six charges from 2015 to 2018 Mr. Duncan

12  committed wire fraud in violation of 18, USC, 1343 and 2, in

13  connection with the same conspiracy I described in relation to

14  Count Four.

15         That's a summary of all six counts.  You have to

16  consider each count and each defendant separately.  And I'm

17  going to give you a verdict sheet which will help your

18  deliberations, it will help guide your deliberations.  But you

19  have to consider each count and each defendant separately.

20  Whether you find the defendant guilty or not guilty to one and

21  offense should not affect your verdict when you consider that

22  defendant in regard to any other offense.

23         Let's go in more detail in Counts One through Six.

24         As I said, there are certain counts that are

25  conspiracy counts and certain counts that are substantive

counts.  Conspiracy counts allege agreements to commit certain

offenses.  The substantive counts are based on the actual

commission of the offenses or the aiding and abetting others to

actually commit offenses.

        Is that clear?  There are certain counts that allege a

conspiracy to the commit crimes, and there are other counts

that allege the commission of the crimes themselves.

        A conspiracy to commit a crime is an entirely separate

and different offense from the substantive crime which may be

the object of that conspiracy.  Congress has deemed it

appropriate to make conspiracy, standing alone, a separate

crime, even if the object of the conspiracy is not achieved.

This is because collective criminal activity poses a greater

threat to public safety and welfare than individual conduct,

and increases the likelihood of success of a particular

criminal venture.

        The essence of the crime of conspiracy is an agreement

or understanding to violate other laws.  Thus, if a conspiracy

exists, even if it fails, it's still punishable as a crime.

Consequently, in a conspiracy charge, there's no need to prove

that the crime that was the objective of the conspiracy was

actually committed.

        By contrast, the substantive counts require proof that

the crime charged was actually committed but do not require

proof of an agreement.  Of course, if the defendant both

J5MTDUN2                          Charge

1    participates in a conspiracy to commit a crime and then

2    actually commits that crime, that defendant may be guilty of

3    both the conspiracy and the substantive crime.

4            Let's first turn to the substantive crimes and then

5    we'll go to the conspiracy crimes, because it's easier for me

6    to describe the substantive crimes first, then we'll have a

7    better understanding when I get to the conspiracy crimes.

8            Counts Two and Five allege the substantive crime of

9    mail fraud.  Count Two charges that Duncan, Locust and Rainford

10   committed mail fraud from January 2013 up to April 2018.  Count

11   Five charges Mr. Duncan alone with a separate count of mail

12   fraud from 2015 until April 2018.

13           The relevant part of that statute states:

14           Whoever having devised or intending to devise any

15   scheme or artifice to defraud, or for obtaining money or

16   property by means of false or fraudulent pretenses,

17   representations or promises for the purpose of executing such

18   scheme or artifice, or attempting to do so, places in any post

19   office or authorized depository for mail matter, any matter or

20   thing whatever to be sent or delivered by the postal service,

21   or takes and receives therefrom any such matter or thing or

22   knowingly causes to be delivered by mail, according to the

23   direction thereon, or at the place at which it is directed to

24   be delivered by the person to whom it is addressed, any such

25   matter or thing, shall be guilty of a federal crime.

J5MTDUN2                        Charge

1              For the substantive mail fraud counts, the government

2     has to prove three elements beyond a reasonable doubt:  One,

3     the existence of either a scheme or artifice to defraud or a

4     scheme or artifice to obtain money or property by means of

5     materially false and fraudulent pretenses, representations, or

6     promises.  So there has to be a scheme, that's the first one.

7              Second, that the defendant knowingly and willfully

8     devised or participated in the scheme or artifice to defraud

9     with knowledge of its fraudulent nature and with the specific

10    intent to defraud, or that he knowingly and intentionally aided

11    and abetted others in the scheme -- so the second element is

12    participation -- and third, that in executing the scheme, the

13    defendant used or caused the use of the mails or private or

14    commercial interstate carrier.

15             So the three elements are the existence of the scheme,

16    the participation in the scheme, and the use of the mails in

17    connection with the scheme.

18             So let's look at element one of Counts Two and Five

19    those are the substantive mail fraud counts.

20             The first element the government has to prove beyond a

21    reasonable doubt is that there was a scheme or artifice to

22    defraud by means of false or fraudulent pretenses,

23    representations or promises.

24             A "scheme or artifice" is simply a plan for the

25    accomplishment of an object.  "Fraud" is a general term that

J5MTDUN2                        Charge

1    includes all possible means by which a person seeks to gain

2    some unfair advantage over someone else by false

3    representations, false suggestions, false pretenses or

4    concealment of the truth.  Thus, a scheme to defraud is merely

5    a plan to deprive another of money or property by trick,

6    deceit, deception or swindle.

7           Apart from proving a scheme or artifice to defraud, as

8    I have explained it to you, the mail fraud statute

9    alternatively provides that it could be satisfied by the

10   existence of scheme or artifice to obtain money or property by

11   means of false or fraudulent pretenses, representations or

12   promises.  Such things are fraudulent if they were made falsely

13   and with intent to deceive.  A representation, statement, claim

14   or document may also be fraudulent if it contains half-truths

15   or if it conceals material facts in a manner that makes what is

16   said or represented deliberately misleading or deceptive.

17          The deception does not have to be premised on spoken

18   or written words alone.  The arrangement of words or the

19   circumstances in which they are used may convey the false and

20   deceptive appearance.  If there is deception, the manner which

21   it is accomplished does not matter.

22          This element does not require that any particular

23   person actually relied on or actually suffered damages as a

24   consequence of any fraudulent representation or concealment of

25   facts.  Nor need you find that the defendant you are

considering profited from the fraud.  It is enough that a false

statement or statement omitting material facts that made what

was said deliberately misleading was made as part of a

fraudulent scheme in the expectation that it would be relied

on.  You must concentrate on whether there was such a scheme,

not on the consequences of the scheme.  Of course, proof

concerning the accomplishment of the goals of the scheme may be

the most persuasive evidence of the existence of the scheme

itself.

          In addition, the false or fraudulent representation or

failure to disclose must relate to a material fact or matter.

A "material fact" is one which would reasonably be expected to

be of concern to a reasonable and prudent person in relying on

the representation or statement in making a decision.

          That means that if you find a particular statement or

representation to be false, you must determine whether that

statement or representation was one that a reasonable person

might have considered important in making his or her decision.

The same principle applies to fraudulent half-truths or

omissions, that is, failure to disclose facts.

          The scheme to defraud need not be shown by direct

evidence but may be established by all the circumstances and

facts of the case.

          So that's the first element, the existence of the

scheme.  The second element of mail fraud is knowing

participation with intent to defraud.  That element is that the

government has to establish beyond a reasonable doubt that the

defendant you're considering devised or participated in the

fraudulent scheme knowingly and with the specific intent to

defraud.  You're familiar with the words "devised" and

"participated."  To "devise" a scheme to defraud is to concoct

or plan it.  To "participate" in a scheme to defraud means to

associate one's self with it with a view and intent toward

making it succeed.  That's logical, ladies and gentlemen.

While a mere onlooker is not a participant in the scheme of

fraud, it's not necessary that a participant be someone who

personally and visibly executes the scheme to defraud.

          The government must prove that the defendant knowingly

participated in the charged scheme with the intent to defraud.

To act "knowingly" means to act voluntarily and deliberately

rather than mistakenly or inadvertently.

          In order to satisfy this element, it is not necessary

for the government to establish that the defendants originated

the scheme to defraud.  It is sufficient if you find that a

scheme to defraud existed, even if originated by someone else,

and that the defendants, while aware of the scheme's existence,

knowingly participated in it.

          It's also not required that the defendants

participated in or have knowledge of all the operations of the

scheme.  The guilt of a defendant is not governed by the extent

J5MTDUN2                    Charge

1   of his participation.

2            It also is not necessary that the defendants

3   participated in the alleged scheme from the beginning.  A

4   person who comes in at a later point with knowledge of the

5   scheme's general operation, although not necessarily all of its

6   details, and intentionally acts in a way to further the

7   unlawful goals, becomes a member of the scheme and is legally

8   responsible for all that may have been done in the past before

9   that person became a member of the scheme in furtherance of the

10  criminal objective and all that is done thereafter.

11           Even if someone participated in the scheme to a lesser

12  degree than others, he is nonetheless equally guilty so long as

13  he became a member of the scheme to defraud at some point in

14  its existence with knowledge of its general scope and purpose.

15           The question of whether a person acted knowingly and

16  with intent to defraud is a question of fact for you to

17  determine like any other fact question.  This question involves

18  one's state of mind.

19           Direct proof of knowledge and fraudulent intent is

20  almost never available.  It would be a rare case where it could

21  be shown that a person wrote or stated that as of a given time

22  in the past he committed an act with fraudulent intent.  Such

23  direct proof is not required, and seldom exists, obviously.

24           The ultimate facts of knowledge and criminal intent

25  are subjective and may be established by circumstantial

J5MTDUN2                      Charge

1   evidence based on someone's outward manifestations, words,

2   conduct, acts, and all the surrounding circumstances disclosed

3   by the evidence and the rational or logical inferences that may

4   be drawn therefrom.

5           As you know, circumstantial evidence, if you believe

6   it, is of no less value than direct evidence.  In each case,

7   the essential elements of the crime have to be established

8   beyond a reasonable doubt.

9           You see some themes in these instructions, ladies and

10  gentlemen.

11          As a practical matter, in order to sustain the charge

12  against the defendant you are considering, the government must

13  establish beyond a reasonable doubt that that defendant knew

14  that his conduct as a participant in the scheme was calculated

15  to defraud, and nonetheless he associated himself with the

16  alleged fraudulent scheme for the purpose of causing some loss

17  to another.

18          First element of mail fraud, the existence of the

19  scheme; the second element, participation; third element is the

20  use of mails in furtherance of the scheme.  Use of mail could

21  be from one state to another or within a state or even within a

22  single city, it doesn't matter, as long as the United States

23  mails were used.  The mail matter does not have to contain

24  fraudulent representation or requests for money, but it must

25  further or assist in carrying out the scheme to defraud.

J5MTDUN2                        Charge

1          It's not necessary for the perpetrator to be directly

2     or personally involved in the mailing, as long as the mailing

3     was reasonably foreseeable in the execution of the scheme to

4     defraud.

5          Here, the government alleges that the mails or

6     commercial carriers were used in furtherance of the fraud in a

7     number of ways, including by mailing or causing to be mailed

8     documents, legal correspondence, court filings between the

9     attorneys representing the patients who participated in the

10    staged accidents and the businesses or attorneys representing

11    the businesses or insurance companies named in the fraudulent

12    lawsuits, as well as by mailing or causing to be mailed money

13    to patients' attorneys and others involved in the fraud scheme.

14         That's mail fraud.  Now we'll go to wire fraud, which

15    is Counts Three and Six.

16         Count Three charges the three defendants here with

17    wire fraud from at least the January 2013 up to April 2018.

18         Count Six charges Mr. Duncan with a separate count of

19    wire fraud from 2015 to 2018.

20         The wire fraud statute provides:

21         Whoever, having devised or intending to devise any

22    scheme or artifice to defraud, or for obtaining money or

23    property by means of false or fraudulent pretenses,

24    representations or promises, transmits or causes to be

25    transmitted by means of wire, radio or television communication

 1   in interstate or foreign commerce, any writings, signs,

 2   signals, pictures or sounds for the purpose of executing such

 3   scheme or artifice, shall be guilty of a federal crime.

 4        The government has to prove three elements beyond a

 5   reasonable doubt for these wire fraud counts:

 6        First element is the existence of a scheme or artifice

 7   to defraud or a scheme or artifice to obtain money or property

 8   by means of materially false or fraudulent pretenses,

 9   representations or promises; the second is the knowing and

10   willfully devising or participating in the scheme or artifice

11   to defraud by the defendant with knowledge of its fraudulent

12   nature and with the specific intent to defraud, or that

13   defendant knowingly and intentionally aided and abetted others

14   in the scheme; and third, that in the execution of that scheme,

15   the defendant used or caused to be used interstate wires.

16        So the first element is the existence of the scheme,

17   the second element is the participation of the defendant in it,

18   and the third is that the defendant used interstate wires.

19        The first two elements are wire fraud are identical to

20   first two elements of mail fraud, so just use those

21   instructions.

22        Now we'll go to the third element, which is use of

23   interstate wires, which are phone calls or emails, text

24   messages, things of that nature.

25        Wire communication has to be an interstate wire, it

must pass between two or more states.  The use of a wire may

not itself be a fraudulent misrepresentation but it must assist

in some way in carrying out the scheme to defraud.

          It's not necessary for the defendants to be directly

and personally involved in any wire communication, as long as

that communication is reasonably foreseeable in the execution

of the scheme to defraud in which the defendants are accused of

participating.  In this regard, it would be sufficient to

establish this element of the crime if the evidence justifies a

finding that the defendants caused the wires to be used by

others.  This does not mean that the defendants themselves must

have specifically authorized others to execute a wire

communication.  When one doesn't act with knowledge that the

use of the wires would follow in the ordinary course of

business, where such use of the wires can reasonably be

foreseen, even though not actually intended, then he causes the

wires to be used.  This wire communication requirement is

satisfied even if the wire communication is done by a person

with no knowledge of the fraudulent scheme, including the

victim of the alleged fraud.

          Let me also add the following:  Only the wire

communication must be reasonably foreseeable, not the

interstate or foreign component.  Thus, if you find that the

wire communication reasonably foreseeable, and the interstate

or foreign wire communication actually took place, then that

J5MTDUN2                         Charge

1    element is satisfied even if it was not foreseeable that the

2    wire communication would cross state or national lines.

3              Now in addition to charging the defendants with the

4    substantive counts of mail and wire fraud, all of the

5    substantive counts I'm talking about, they also charge the

6    defendants with what is called aiding and abetting.

7              Aiding and abetting is one manner of committing a

8    crime.  A defendant can be convicted of committing a crime if

9    the defendant helps someone else to commit the crime.  That's

10   logical, ladies and gentlemen.  For example, if the government

11   proves beyond a reasonable doubt that the defendant you are

12   considering committed the mail fraud alleged in, for example,

13   Count Two, then you need not consider aiding and abetting with

14   respect to that count and that defendant.  But if you find that

15   the government did not prove beyond a reasonable doubt that

16   that defendant engaged in mail fraud, for example, you should

17   consider whether the government has nonetheless proved beyond a

18   reasonable doubt that the defendant aided and abetted someone

19   else in committing mail fraud.

20             The concept of aiding and abetting is alleged in all

21   the substantive counts, I'm just using mail fraud as an

22   example, that is, Counts Two, Three, Five and Six, those are

23   the substantive counts, One and Four are the conspiracy counts.

24   And again, you will see this in the verdict sheet.  It will

25   help you.

J5MTDUN2                          Charge

1              Under the federal aiding and abetting statute,

2    whatever "aids, abets, counsels, commands, induces or procures"

3    the commission of an offense is punishable as a principal.  A

4    person who aid and abets another to commit a substantive crime

5    is just as guilty of that crime as if he had personally

6    committed it.  You may thus find a defendant guilty if you find

7    beyond a reasonable doubt that the government has proven that

8    someone committed the substantive offense and that the

9    defendant you are considering helped or assisted that person in

10   the commission of the offense.

11             The first requirement of aiding and abetting is that

12   someone else has committed the crime.  The defendant you are

13   considering cannot be convicted of aiding and abetting if

14   nobody committed the underlying crime.  That makes sense, too,

15   right?  It does.  But if you do find that the underlying crime

16   was committed by someone other than the defendant you are

17   looking at, consider whether that defendant aided or abetted

18   the person who actually committed the crime.

19             To aid and abet another to commit a crime, the

20   defendant you are considering must have willfully and knowingly

21   associated himself in some way with the crime, and he must have

22   willfully and knowingly sought by some act to help make the

23   crime succeed.  Participation in a crime is willful if action

24   is taken voluntarily and intentionally.  Mere presence of a

25   defendant that you are considering in a place where a crime is

J5MTDUN2                         Charge

1    being committed, even coupled with knowledge that a crime is

2    being committed, is not enough to make him an aider or abettor.

3    A defendant's acquiescence in the criminal conduct of others,

4    even with guilty knowledge, is not enough to establish aiding

5    and abetting.  An aider and abettor must have his on

6    affirmative interest in the criminal venture.

7            To determine whether the defendant you are considering

8    aided and abetted the commission of the crime, ask these

9    questions:

10           Did someone other than the defendant you are

11   considering commit the crime at issue?  If no, go on to the

12   next count.

13           Did the defendant you are considering participate in

14   the crime charged as something that he wished to bring about?

15           Did he associate himself with an attempt to commit the

16   crime with other people knowingly and willfully?

17           Did he seek by his actions to make the criminal

18   venture succeed?

19           If so, then the defendant you are considering is an

20   aider and abettor and therefore guilty of the offense under the

21   consideration.  If not, he's not an aider and abettor and not

22   guilty of the offense under consideration.

23           Now let's go to Counts One and four, which are

24   conspiracy to commit mail and wire fraud.  Because I talked

25   about the substantive counts, now I'm going to talk about the

J5MTDUN2                         Charge

1   conspiracy counts.

2           I have told you that a conspiracy to commit a crime is

3   an entirely separate and different offense from the substantive

4   crime which is the object of the conspiracy.

5           Count One charges that Duncan, Locust and Rainford

6   committed conspiracy to commit mail and wire fraud from

7   January 2013 to April 2018.  Count Four charges Duncan alone

8   with conspiracy to commit mail and wire fraud from 2015 to

9   April 2018.

10           As you know, the government alleges that in 2015

11   Duncan withdrew from the conspiracy that involved Rainford and

12   Locust and entered into a separate fraud conspiracy which

13   operated essentially the same way as the first charged

14   conspiracy.

15           The conspiracy statute provides that any person who

16   conspires to commit any offense under this chapter, including

17   wire fraud, shall be guilty of a crime.

18           In order to sustain its burden of proof on each

19   charge, the government must prove beyond a reasonable doubt the

20   following two elements:

21           One, that the conspiracy that is charged actually

22   existed -- that makes sense, ladies and gentlemen -- and two,

23   the defendant that you are considering intentionally joined and

24   participated in the conspiracy during the applicable time

25   period.

J5MTDUN2                          Charge

1              The first element is the existence of the conspiracy.

2    Conspiracy is an agreement or an understanding by two or more

3    persons to accomplish one or more unlawful objectives by

4    working together.

5              In order for the government to satisfy this element,

6    you need not find that the alleged members of the conspiracy

7    met together and entered into any express or formal agreement.

8    You don't have to find that the alleged conspirators stated in

9    words or writing what the scheme was, its object or its

10   purpose, or every precise detail of the scheme, or the means by

11   which its object or purpose was to be accomplished.  What the

12   government must prove is that there was a mutual understanding,

13   either spoken or unspoken, between two or more people to

14   cooperate with each other to accomplish the unlawful objectives

15   alleged, which, for the purpose of this count, is mail and wire

16   fraud.

17             You may, of course, find that the existence of an

18   agreement to commit mail and wire fraud has been established by

19   direct proof.  However, since conspiracy is by its very nature

20   characterized by secrecy, you may also infer its existence from

21   the circumstances of this case and the conduct of the parties

22   involved.

23             In a very real sense then, in the context of a

24   conspiracy charge, actions often speak louder than words.  In

25   this regard, you may, in determining whether an agreement

1    existed here, consider the actions and statements of all of

2    those whom you found to or find to be participants as proof

3    that a common design existed on the part of the persons

4    involved in the conspiracy to act together to accomplish an

5    unlawful purpose.

6            You will recall that I have admitted into evidence

7    against the defendants the acts and statements of others,

8    because these acts and statements were committed by persons who

9    the government charges were co-conspirators of the defendants

10   at trial.

11           The reason for allowing this evidence to be received

12   against these defendants has to do with the nature of the crime

13   of conspiracy.  A conspiracy is often referred to as

14   partnership in crime.  As with other partnerships, when someone

15   enters into a conspiracy to accomplish an unlawful end, every

16   member of the conspiracy becomes an agent for all the other

17   co-conspirators in carrying out the conspiracy because they're

18   working together.

19           Accordingly, the reasonably foreseeable acts,

20   declaration, statements, and omissions of any member of the

21   conspiracy, and in furtherance of the common purpose of the

22   conspiracy, are deemed under the law to be the acts of all

23   members, and all of the members are responsible for such acts,

24   declarations, statements, and omissions.

25           If you find beyond a reasonable doubt that the

J5MTDUN2                          Charge

1     defendant you are considering was a member of the conspiracy

2     charged in the indictment, then any acts done or statements

3     made in furtherance of the conspiracy by persons also found by

4     you to have been members of that conspiracy may be considered

5     against that defendant.  This is so even if such acts were done

6     and statements were made in that defendant's absence and

7     without his knowledge.

8                 That's the first element, there's always the existence

9     of the conspiracy.  The second element is always membership in

10    the conspiracy.

11                If you find that the government has proven beyond a

12    reasonable doubt that the charged conspiracy existed, then go

13    to the second element, whether the defendant knowingly and

14    voluntarily became a member of the alleged conspiracy.

15                Apply the definition of "knowingly" that I have given

16    you already.

17                In deciding whether the defendant you are considering

18    was actually a member of the conspiracy, consider whether the

19    defendant knowingly joined the conspiracy.  Did he participate

20    in it with knowledge of its unlawful purpose and with the

21    intention of furthering its objective?

22                Note that each defendant's participation in a

23    conspiracy must be established by independent evidence of that

24    defendant's own acts or statements, as well as those of the

25    other alleged co-conspirators, and the inferences that you draw

J5MTDUN2                          Charge

1    from them.

2             A defendant's knowledge is a matter of inference from

3    the facts proved.  In that connection, I instruct you that to

4    become a member of the conspiracy, the defendant you are

5    considering need not have known the identities of each and

6    every other member, nor need he have been apprised of all of

7    their activities.  Moreover, the defendants you are considering

8    need not have been fully informed as to all of the details or

9    the scope of the conspiracy in order to justify an inference of

10   knowledge on his part.

11            Furthermore, the defendant you are considering need

12   not have joined in all the conspiracy's unlawful objectives.

13            The extent of a defendant's participation has no

14   bearing on the issue of the defendant's guilt.  A conspirator's

15   liability is not measured by the extent or duration of that

16   defendant's participation.  Indeed, each member may perform

17   separate and distinct acts and may perform them at different

18   times.  Some conspirators may play major roles, others may play

19   minor roles.  An equal role is not required.  Even a single act

20   could be enough to draw a defendant within the ambit of a

21   conspiracy.

22            But remember, someone's mere presence at the scene of

23   a crime does not make him a member of the conspiracy.  Mere

24   association with one or more members of the conspiracy does not

25   automatically make that person a member.  Someone can know a

J5MTDUN2                          Charge

1    criminal without being a criminal himself.  Mere similarity of

2    conduct or the fact that they may have assembled together and

3    discussed common aims and interests does not necessarily

4    establish membership in the conspiracy.

5            I also want to caution you that mere knowledge or

6    acquiescence without participation in the unlawful plan is not

7    sufficient.  Remember, you have to have participated in the

8    unlawful plan.  The fact that the acts of a defendant, without

9    knowledge, merely happen to further the purposes or objectives

10   of the conspiracy does not make the defendant a member.  More

11   is required.  What is necessary is that defendant must have

12   participated with knowledge of at least some of the purposes or

13   objectives of the conspiracy and with the intention of aiding

14   the accomplishment of those unlawful ends.  The government is

15   not required to prove that the members of the alleged

16   conspiracy were successful in achieving any or all of the

17   objects of the conspiracy.

18           Once a conspiracy is formed, it is presumed to

19   continue until either its objective is accomplished or there's

20   some affirmative act of termination by its members.  So too,

21   once a person is found to be a member of a conspiracy, he is

22   presumed to continue as a member in the conspiracy until the

23   conspiracy is terminated, unless it is shown by some

24   affirmative proof that the person withdrew and disassociated

25   himself from it.

1        If you find a conspiracy existed and that a defendant

2    was a member, you may take into account against the defendant

3    any acts or statements made during and in furtherance of the

4    conspiracy by any of his co-conspirators, even though such acts

5    or statements were not made in the presence of the defendant or

6    even if they were made without his knowledge.

7        In sum, in order to find a defendant guilty of

8    conspiracy, you must find that the defendant, with an

9    understanding of the unlawful nature of the conspiracy,

10   intentionally engaged, advised or assisted in it for the

11   purpose of furthering the illegal undertaking.  He thereby

12   becomes a knowing and willing participant in the unlawful

13   agreement, that is, a conspirator.

14       Let's look at the objects of the conspiracy.  The

15   objects are the illegal goals the conspirators agreed on or

16   hoped to achieve.  In Counts One and Four the indictment

17   charges the objects of the conspiracy were mail fraud and wire

18   fraud.  The government has to prove beyond a reasonable doubt

19   that at least one of the objects of the charged conspiracy was

20   mail fraud or wire fraud.  There must be unanimous agreement on

21   at least one object in order for you to find that the

22   conspiracy existed, but you need not find that each defendant

23   conspired with others to achieve the same object.  If the

24   government fails to prove that at least one of the two objects

25   was the goal of any conspiracy that you find existed, then you

1    must find the defendants not guilty on the count alleging that

2    conspiracy.

3            I already instructed you on the elements of mail fraud

4    and wire fraud when I was going through the substantive counts.

5    Follow those instructions here.

6            Bear in mind that the actual commission of an

7    objective of the conspiracy is not an element of the crime of

8    conspiracy.  You need not find that the conspirators actually

9    committed mail fraud or wire fraud, but only that they agreed

10   to commit mail fraud or wire fraud.

11           As I explained, all of the counts charged require the

12   government to prove that each defendant acted knowingly.  In

13   determining whether that is true, you may consider whether the

14   defendant deliberately closed his eyes to what otherwise would

15   have been obvious.  This is called "conscious avoidance."

16           I wish to point out that the necessary knowledge on

17   the part of any defendant with respect to any particular charge

18   cannot be established by showing that that defendant was

19   careless, negligent or foolish.  However, one may not willfully

20   and intentionally remain ignorant of a fact material and

21   important to his conduct in order to escape the consequences of

22   criminal law.  The law calls this "conscious avoidance" or

23   "willful blindness."  The government can prove either that the

24   defendant actually knew the objective of the conspiracy or he

25   consciously avoided knowing the object of the conspiracy.

Thus, if you find beyond a reasonable doubt that the defendant you are considering was aware that there was a high probability a crime was being committed but he deliberately and consciously avoided confirming that fact, such as by closing his eyes to it or intentionally failing to investigates it, then you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge, unless you find that the defendant you are considering actually believed that he was not engaged in unlawful behavior.  The defendant cannot avoid criminal responsibility by deliberately closing his eyes or remaining purposefully ignorant of the facts that would confirm to him that he was in fact engaging in unlawful conduct.

Keep in mind that there's an important difference between knowingly and intentionally participating in a conspiracy and knowing the specific objective of the conspiracy.  You may consider conscious avoidance in deciding whether someone knew the objectives of the conspiracy, that is, whether he reasonably believed there was a high probability that a goal of the conspiracy was to commit the crime charged as objects of the conspiracy and took deliberate and conscious action to avoid confirming that fact and participated in the conspiracy anyway.  Conscious avoidance cannot be used as a substitute for finding that that defendant knowingly and intentionally joined the conspiracy in the first place.  It is logically impossible for a defendant to intend and agree to

1    join a conspiracy if he doesn't know it exists.  That makes

2    sense.  However, if you find beyond a reasonable doubt that the

3    defendant knowingly chose to participate in such a joint

4    undertaking, you may consider whether he took deliberate and

5    conscious action to avoid confirming otherwise obvious facts

6    about the purpose of the undertaking.

7            In sum, if you find that a defendant believed there

8    was a high probability that a fact was so and that the

9    defendant took deliberate and conscious action to avoid

10   learning the truth of that fact, you may find that the

11   defendant acted knowingly with respect to that fact.  But if

12   you find that the defendant actually believed the fact was not

13   the so, then you may not find that he acted knowingly with

14   respect to that fact.

15           I again wish to instruct you that the patients on the

16   intake sheets referred by individuals other than Bryan Duncan

17   or Kerry Gordon, those intake sheets can only be considered by

18   you as evidence of the charges in Counts One, Two and Three.

19           Now in addition to the foregoing elements of the

20   offenses, you must consider whether the crimes charged or any

21   acts in furtherance of them occurred within the Southern

22   District of New York, and the Southern District of includes

23   Manhattan, the Bronx, Westchester, Rockland, Putnam, Sullivan,

24   Orange and Dutchess County.

25           (Continued on next page)

J5m1dun3                          Charge

1          THE COURT:  On the issue of venue, and venue alone,

2     the government's burden is not to prove venue beyond a

3     reasonable doubt.  The government's burden is simply to prove

4     venue by a preponderance of the evidence -- that is, it simply

5     has to prove it's more likely than not that an act in

6     furtherance of the charges you're considering occurred in the

7     Southern District of New York.  With respect to each of the

8     counts, the government has satisfied its venue obligations if

9     you conclude that it's more likely than not that the crime

10    charged for any act in furtherance of it occurred within the

11    Southern District of New York.

12          The defendant you're considering need not be the

13    individual who committed or caused the act in furtherance of

14    the conspiracy.  And the act may have been committed by a

15    co-conspirator even if the co-conspirator is not a defendant

16    here.

17          If you find that the government has failed to prove

18    venue requirement by a preponderance of the evidence, you must

19    acquit the defendants of the charges.

20          The indictment alleges that certain acts occurred on

21    or about a specific date.  It does not matter if the evidence

22    you heard at trial indicates that a particular act occurred on

23    a different date.  The law requires only a substantial

24    similarity between the dates and amounts alleged in the

25    indictment and dates and amounts established by the evidence.

J5m1dun3                              Charge

1          Do one of the parties have the indictment?  Does

2     somebody have the indictment?

3          MS. ROTHMAN:  We can provide it to your Honor right

4     after you finish your charge.

5          THE COURT:  You'll what?

6          MS. ROTHMAN:  We'll provide it to your Honor.

7          THE COURT:  Provide it.  Okay.

8          So I'm going to send you in with the verdict form and

9     these charges, and if you want copies of the charge for

10    everyone, let me know.

11         You know you have to decide the facts here.  You have

12    to decide whether each defendant is guilty or not guilty solely

13    on the basis of evidence or lack of any evidence, and these

14    instructions.

15         You can't be influenced by sympathy or any assumption

16    stemming from personal feelings, the nature of the charges, or

17    your views on the relative seriousness or lack of seriousness

18    of the charged crimes.

19         You must not consider any punishment that may be

20    imposed upon any defendant who may be convicted.  The duty of

21    imposing sentence in the event of conviction rests exclusively

22    on me.  You must weigh the evidence and determine the guilt or

23    nonguilt of each defendant solely on the evidence and the law

24    that I'm giving you.

25         Each juror is entitled to his or her opinion, but you

J5m1dun3                        Charge

1    are required to exchange views with your fellow jurors.  This

2    is the very essence of jury deliberations.  It's your duty to

3    discuss the evidence.  If you have a point of view and after

4    reasoning with other jurors it appears that your own judgment

5    is open to question, then of course you should not hesitate in

6    yielding your original point of view if you are convinced that

7    the opposite point of view is really one that satisfies your

8    judgment and conscience.  However, don't give up a point of

9    view that you conscientiously believe in simply because you are

10   outnumbered or outweighed.  You should vote with the others

11   only if you are convinced on the evidence and the facts and the

12   law that that is the correct way to decide the case.

13          You know we've made a record of these proceedings.  If

14   you want to have any of the testimony read back, we'll find the

15   testimony and bring you in.  Just remember, be as specific as

16   you can, because we're going to have to locate that testimony.

17   And remember also it may take some time.  Also remember, if

18   you're asking for a day's worth of testimony, it will take a

19   day to read it back, or something shy of a day.  But

20   nonetheless, we can make available any testimony that you're

21   seeking.  And also, any exhibits.  If you want an exhibit sent

22   back, let me know.  The foreperson will send me a note and say,

23   Judge, the jury requests Exhibit No. whatever it is, or you

24   describe it, and again, the more specific you can be, the less

25   time it will take to get that back to you.  The exhibits will

J5m1dun3                          Charge

1    go back into the jury room, exhibits that you want.  For

2    testimony, we have to bring you here into open court and read

3    it in open court.  So be patient if you do ask for specific

4    testimony.

5           I'm going to ask you, any note should be signed by the

6    foreperson with a question and date it and time it.

7           I'm going to ask that the jurors choose its own

8    foreperson.  If the jury can't choose a foreperson, let me know

9    and I'll choose a foreperson.  But normally jurors are very

10   successful in choosing a foreperson.

11          In the note, don't give me any indication of your

12   thinking on any disputed issue, or any tentative votes you may

13   have taken.  Just ask questions or ask for exhibits or

14   readbacks.

15          When you do have a verdict, don't tell me what that

16   verdict is.  The foreperson should just send out a note saying:

17   Your Honor, we've reached a verdict.  And then we'll bring you

18   in here and in a formal proceeding, we'll take that verdict.

19   So the foreperson should have the verdict form, obviously.  And

20   you'll go through the verdict form and the jury will decide

21   unanimously what the answers are, and then you'll all sign it.

22   And then the foreperson, as I say, will send me a note saying:

23   We have a verdict.  And then when I bring you out here, the

24   foreperson will have the verdict form with him and will read it

25   in open court.

J5m1dun3

1              The verdict must be by unanimous vote of all of you.

2              All right.  Any additional objections or additional

3      charges for the parties?

4              MR. DINNERSTEIN:  Could we have a sidebar, your Honor.

5              THE COURT:  All right.  Then, ladies and gentlemen,

6      I'm going to give you a verdict form and I'll give you the

7      charge, I'm going to give you paper and pencil --

8              MR. FOLLY:  Your Honor, I believe Mr. Dinnerstein

9      wants a sidebar.

10             MR. DINNERSTEIN:  Sidebar?

11             THE COURT:  Pardon me?  Yes.

12             Let me ask the Marshal to come forward.

13             (At the sidebar)

14             MR. DINNERSTEIN:  Your Honor, based on the argument

15     that the government made this morning, I think they kind of, I

16     felt, merged the idea of participation, which you mentioned on

17     several occasions, but participation must be merged with intent

18     to defraud, and I believe first that the government in their

19     arguments tried to say participation was sufficient, and I

20     felt, your Honor, that it would be appropriate for you to speak

21     to the jurors and talk about how participation is not enough.

22     What I said was something like this:  Mere participation is not

23     sufficient.  The government must also prove beyond a reasonable

24     doubt --

25             THE COURT:  Well, I have that in the charge, that we

J5m1dun3

1    talk about participation not being enough.  I've given a

2    charge.  Intent.  It's intent.

3              MR. DINNERSTEIN:  The defendant you are considering

4    has a specific intent to defraud.

5              THE COURT:  That's in the charge.

6              MR. DINNERSTEIN:  Is it?  That's my objection.

7              The other objection --

8              THE COURT:  Overruled.

9              MR. DINNERSTEIN:  -- deals with the conscious

10   avoidance charge.

11             THE COURT:  I have your objection.

12             MR. DINNERSTEIN:  Okay.

13             THE COURT:  I think there's basis in the case law and

14   in the record for a conscious avoidance charge.

15             Yes, ma'am.

16             MS. AL-SHABAZZ:  I just want to make a record that the

17   government, in both its opening and its closing -- and I would

18   ask the Court to give a curative instruction with respect to

19   the government's vouching for its witnesses, and on closing,

20   Mr. Folly said one of the witnesses had an incredible memory

21   and said one of the witnesses had no reason to lie.  That's

22   impermissible.

23             THE COURT:  But I think I addressed that.  Didn't you

24   object to that and I addressed that?

25             MR. DINNERSTEIN:  I did object.

J5m1dun3

1    MS. AL-SHABAZZ:  Okay.

2    THE COURT:  All right.  Mr. Folly, what's your

3 response?

4    MR. FOLLY:  Your Honor, my response is that that's

5 entirely appropriate argument that I made to the jury and that

6 if we're going to go down this road, we would be here for a

7 long time based on the arguments that were made yesterday.

8    THE COURT:  You have your objection.  I'm not going to

9 give anything particular at this point.

10    MS. ROTHMAN:  Your Honor, we're printing the trial

11 indictment.  Just to note, we had sent them to defense counsel

12 I think two days ago and had not heard back of any proposed

13 changes, but I would ask that defense, if they --

14    THE COURT:  Do you have copies to give to the defense

15 counsel?

16    MS. ROTHMAN:  We've already done that, your Honor, but

17 we're having hard copies printed out and we'll get them from

18 our paralegal.

19    THE COURT:  I'll tell them I'm not going to be

20 available from about 2:15 to 3:15, just to let them know that,

21 okay?

22    MR. DINNERSTEIN:  Okay.  Their lunch is here?

23    THE COURT:  Yes.  Okay.  Thank you.

24    MR. DINNERSTEIN:  What about us, Judge?  When can we

25 go for lunch?

J5m1dun3

1          THE COURT:  I need everyone to stay pretty close.

2     Make sure my deputy knows where you are, either on this floor

3     or the government has some offices somewhere, or the cafeteria.

4     Just make sure my --

5          MR. DINNERSTEIN:  We won't leave the building.

6          THE COURT:  Make sure my deputy can reach you.

7          MS. ROTHMAN:  All right.  Thank you, your Honor.

8          (In open court)

9          THE COURT:  Please administer the oath to the Marshal.

10          (Marshal sworn)

11          THE COURT:  All right.  Ladies and gentlemen, you can

12     send notes out at any time.  I'm not going to be available to

13     this jury from approximately 2:15 to approximately 3:15 or

14     3:30, just so you know.  You can send notes out, my deputy will

15     take them, but I can't respond during that period of time.

16          All right.  I'm going to ask the jurors in the first

17     row and the second row to stand.  And you may begin your

18     deliberations.  I'm going to ask the jurors in the third row to

19     remain.

20          (At 1:14 p.m., the jury retired to deliberate)

21          THE COURT:  Be seated in the courtroom.

22          Jurors 13, 14, 15, and 16, I'm not going to dismiss

23     you at this time.  We can only deliberate with 12 people, but

24     I'm not going to dismiss you at this time, for the following

25     reason:  If for any reason one of those 12 cannot continue and

J5m1dun3

1  they haven't reached a verdict, there is authority under the

2  law for me to seat one of you in their place.  The law has said

3  that the jurors have to commence their deliberations over

4  again.  I can tell you a couple of things.  But if I've

5  discharged you, I can't bring you back, so I'm not going to

6  discharge you.  But I also can tell you, in 24 years of being a

7  judge, that has never happened to me.  But nonetheless, I'm not

8  going to formally discharge you.

9        I thought you had to go to the jury clerk.  My deputy

10  informs me that you can go straight home.  My deputy knows how

11  to reach you.  If we need to reach you, we will.  You don't

12  have to come back here again.  So almost certainly your service

13  is over, but maybe not.

14        And you have the appreciation of everybody, really,

15  because it's quite frequent that we take people from the back

16  row.  It didn't happen this time, but I was concerned very much

17  about Memorial Day and whether we would start to lose people

18  because of vacations and so forth.  So everyone appreciates

19  your being here.

20        If you would tell my deputy what you ordered for

21  lunch, she'll go in, because the lunches are here, correct?

22        Okay.  You can get your lunches and take them home.

23  Thank you very much.  You may now get your lunches and go home,

24  and we thank you.

25        (Alternate jurors excused)

J5m1dun3

1           THE COURT:  All right.  Stay close.  Do you have that

2     trial subpoena?

3           MS. ROTHMAN:  The trial indictment?  Our paralegal is

4     printing it right now.

5           THE COURT:  The trial indictment.  Give it to

6     Ms. Blakely.

7           MS. ROTHMAN:  Will do.  Thank you.

8           THE COURT:  Oh, wait.  Are there no objections from

9     anyone?

10          MR. DINNERSTEIN:  We haven't seen it.

11          THE COURT:  All right.

12          MR. DINNERSTEIN:  But I presume it's the same you gave

13    us before?

14          MS. ROTHMAN:  Yes.

15          MR. DINNERSTEIN:  No objection from us.

16          THE COURT:  All right.  Thank you.

17          (Recess pending verdict)

18

19

20

21

22

23

24

25

J5MTDUN4a

1          THE COURT:  It's 2:15, I believe I told the jury I

2     would be unavailable for about an hour.  We have now note

3     number 1, which states who is the foreperson.

4          And we have note 2 that has various requests, witness

5     list, prosecution agreements in evidence, can we have a copy of

6     the prosecution agreement, can we look at Bryan's texts and

7     email that are in evidence in addition to WhatsApp messages,

8     definitions on aiding and abetting regarding wire fraud and

9     mail fraud.

10          I gather that at least the government is gathering the

11     documents they believe is responsive.  What's the position of

12     the parties in regard to request for witness list?

13          MR. FOLLY:  We have no objection to that.

14          THE COURT:  Where is such a list?

15          MS. AL-SHABAZZ:  There is no witness list.

16          THE COURT:  Ten at a time only.

17          MS. ROTHMAN:  We have no objection to providing it.

18     We're typing a list now, which we have show it to defense

19     counsel.  If your Honor wants to give it back to the jury,

20     that's fine with the government.

21          MS. AL-SHABAZZ:  There is no witness list in evidence

22     and I'm not sure what they want, if they want to know a list of

23     all the witnesses that testified at this trial or something to

24     that effect.

25          THE COURT:  What's the other option?  I think it's

J5MTDUN4a

1    obvious they want a list of the witnesses who testified at this

2    trial.  Separate question as to whether we can manufacture such

3    a thing.

4              MS. AL-SHABAZZ:  I don't want the government to give

5    them their witness list which has more witnesses than

6    testified.

7              THE COURT:  No, it would only be the witnesses that

8    testified on this trial.

9              MS. AL-SHABAZZ:  I'm just making sure.

10             THE COURT:  Assuming that, you have no objection?

11             MS. AL-SHABAZZ:  Right.  If I see it first, I have no

12   objection.

13             THE COURT:  Nothing is going back into the jury

14   without all the parties seeing it.

15             The government then will make a list of all the

16   witnesses who testified at this trial and show it to the

17   parties, and if everyone agrees, it can could back in.

18             MS. ROTHMAN:  Thank you, your Honor.

19             THE COURT:  It seems to me that number three, can we

20   have a copy of the prosecution agreement is the same as number

21   two.  The prosecution agreement is in evidence.

22             MS. ROTHMAN:  We would agree with that interpretation.

23             THE COURT:  And I take it the defense does as well.

24             So the parties should get those together as well, and

25   if there's agreement, they should go back in.

1          Now what about Bryan's texts and emails that are in

2     evidence?  The WhatsApp messages are pretty clear, but what

3     about Bryan's texts and emails that are in evidence?

4          MS. ROTHMAN:  Your Honor, we have pulled what we

5     understand to be the universe of Mr. Duncan's text messages

6     pulled from his cell phone.  We can share them with defense

7     counsel.

8          THE COURT:  That are in evidence.

9          MS. ROTHMAN:  Correct, your Honor.  And we're working

10    to pull the emails right now.

11         MS. AL-SHABAZZ:  Well, all of his text messages and

12    calls are in evidence, so I ask the Court to ask the jury what

13    specifically are they looking for because there's -- it's

14    voluminous, and I don't want the government to pick and choose.

15         THE COURT:  No, the government is not going to pick

16    and choose, the government is going to provide Bryan's texts

17    and emails that are in evidence.  They're not going to pick and

18    choose among them.  So we're going to send that back in.

19         Again, the defense has a right to see them, and if

20    there's an objection I will handle it when I get back.

21         MS. ROTHMAN:  With respect to Mr. Duncan's cell phone

22    there are text messages and photographs.  We have not included

23    the photographs because we do not believe the jury asked for

24    the photographs.  That's the government's position.

25         THE COURT:  Fine.  All right.

J5MTDUN4a

1          MR. DINNERSTEIN:  Your Honor, one thing I would say is

2    there may be a distinction between 2 and 3, and one is

3    non-prosecution and the other is prosecution.  I'm wondering if

4    what they mean by that is a cooperation agreement, so I ask

5    your Honor that that also be sent back to the jurors.

6          MS. ROTHMAN:  We provided both.

7          MR. DINNERSTEIN:  Okay.  Because you said they seem

8    like the same, but maybe not.

9          THE COURT:  I will hand this back to the parties.  To

10   the extent there's an agreement, the documents should all go

11   back in.  To extent there isn't, I will handle it when I come

12   back.  I encourage agreement.  Plus the government will make up

13   that witness list.

14         MR. DINNERSTEIN:  Your Honor, you'll be back at 3:15?

15         THE COURT:  I certainly will try, it may be 3:30.

16         MS. AL-SHABAZZ:  That's fine.  I want to know if we

17   have time to eat.  I would like to eat.  We haven't had a lunch

18   hour.

19         THE COURT:  Nor has the Court.  Make it 3:45 then.

20         MS. AL-SHABAZZ:  One more question, how long are we

21   going today?  We have finals tonight.

22         THE COURT:  Whenever the jury wants to leave.

23         MS. AL-SHABAZZ:  I need to know so I could let the

24   school know.  I have finals this evening.

25         THE COURT:  When do you have to leave?

J5MTDUN4a

1           MS. AL-SHABAZZ:  I need to be there by 6:00.

2           THE COURT:  When do you have to leave?

3           MS. AL-SHABAZZ:  5:30.

4           THE COURT:  Thank you.

5           MS. AL-SHABAZZ:  Thank you.

6           THE COURT:  The indictment went back.

7           (Recess taken)

8           THE COURT:  I'm told that the parties agreed on all

9      the documents to go back in for Court Exhibit Number 2, which I

10     already read into the record, and the documents have gone back.

11          The last item is definitions on aiding and abetting

12     regarding wire fraud and mail fraud.  We have an instruction on

13     aiding and abetting.  Does anyone have any idea what they want?

14          MS. ROTHMAN:  Your Honor, we propose that you reread

15     that instruction to the jury.

16          THE COURT:  I will tell them they have it and give

17     them the number.

18          MS. ROTHMAN:  That's fine.  I didn't realize you sent

19     back a copy of the jury charge.

20          THE COURT:  Yes.  You weren't listening to my

21     instructions.

22          MR. DINNERSTEIN:  Your Honor, I ask if they mean

23     something other than that, other than the charge that you have

24     already given them.

25          THE COURT:  I'm not going to do that in open court, I

J5MTDUN4a

1     will do it in writing, but I will direct them first to the

2     aiding and abetting charge.

3           Now we have another note on a torn piece of paper,

4     it's marked as Court Exhibit 3.  Can we have any communications

5     between lawyers, Peter Kalkanis and Ryan (Ace), Robert or

6     Bryan?

7           Do the parties have an issue on this or what's the

8     issue, if any?

9           MR. FOLLY:  Your Honor, I think the issue on both 1

10    and 2 --

11          THE COURT:  Let me read 2.  Are there communications

12    between Fast Trak and Bryan and Peter Kalkanis or doctors of

13    funding companies or or funding companies.

14          MS. AL-SHABAZZ:  Or.

15          THE COURT:  Doctors or funding companies from 2013 to

16    2014, December.

17          MR. FOLLY:  Your Honor, I think the main disagreement

18    is who the jury is asking for as far as who is actually on the

19    email communications, whether it's request for emails that

20    would involve every individual that's mentioned there and a

21    lawyer, for example, or any of those individuals listed there

22    and a lawyer, for example, sticking with the first one.

23          THE COURT:  I think that is unclear.  Does everyone

24    agree?

25          MS. AL-SHABAZZ:  Well, your Honor, it's unclear only

1    because we have already sent the communications.  All of the

2    text and emails of Bryan Duncan have gone back from the first

3    note.  So I'm thinking, since they already have his individual

4    emails, they're looking to see if there are joint emails with

5    all of them.  So I would propose the Court not answer this

6    question and ask the jury for clarification.

7              THE COURT:  I think you're doing the same thing.

8              MR. FOLLY:  Yeah, we would request clarification as to

9    who they are requesting is on the emails, any of those

10   individuals listed there, and the lawyer, for example, or the

11   funder or whether they're looking for ones involving all.

12             THE COURT:  I understand.

13             This is what we're doing:  Jury, in response to your

14   request for definitions on aiding and abetting regarding wire

15   fraud and mail fraud, I direct your attention to charge number

16   32 on pages 50 to 53 of my charge.

17             2.  You wrote, "Don't we have any communications

18   between lawyers, Peter Kalkanis and Ryan (Ace), Robert or

19   Bryan?"  Are you asking for any communication that has all of

20   those individuals in it or are you instead asking only for

21   communications between lawyers on the one hand and Kalkanis,

22   Ryan, Robert or Bryan on the other?

23             I think that's what this comes down to.

24             MS. ROTHMAN:  Could you reread that, your Honor?

25             THE COURT:  Are you asking for any communication that

J5MTDUN4a

1   has all of those individuals on it?  I think that's one

2   possibility.  And I thought the other possibility is they're

3   asking for communications between lawyers on one hand and

4   Kalkanis, Ryan, Robert or Bryan on the other, because those are

5   not lawyers.  So that would make sense.

6           MS. ROTHMAN:  That's fine from the government, your

7   Honor.

8           MS. AL-SHABAZZ:  That's fine as well.

9           THE COURT:  Okay.  So now let's go to the other one.

10          Are there communication -- is there any issue about

11  this one:  Are there communications between Fast Trak and Ryan

12  and Peter Kalkanis or doctors or funding companies from 2013 to

13  2014, December?

14          MS. AL-SHABAZZ:  I believe the answer is no.

15          MR. FOLLY:  Your Honor, I think it's the same question

16  as to the first one as to whether it's a group, meaning it's

17  Peter Kalkanis and Bryan Duncan and a funder, or if it's Peter

18  Kalkanis and a funder or Bryan Duncan and a funder, or Peter

19  Kalkanis and a lawyer or Bryan Duncan and a lawyer.

20          MS. AL-SHABAZZ:  Judge, the reason why I disagree with

21  the government is because they specifically are asking for 13

22  and 14, and they already have all of his text messages and

23  emails from the first note.

24          THE COURT:  I'll get them to tell us.

25          MS. AL-SHABAZZ:  Okay.

J5MTDUN4a

1          THE COURT:  My deputy will read -- we have another

2     note -- will read to you what I just dictated?

3          DEPUTY CLERK:  In response to your request,

4     definitions on aiding and abetting regarding wire fraud and

5     mail fraud, I direct your attention to charge 32 on pages 50-53

6     of my charge.

7          2.  You wrote, "Can we have any communications between

8     lawyers, Peter Kalkanis and Ryan (Ace), Robert or Ryan," are

9     you asking for any communication that has all of those

10    individuals in it, or are you instead asking only for

11    communications between lawyers on one hand and Kalkanis, Ryan,

12    Robert or Bryan on the other?

13         3.  Are there communications between Fast Trak and

14    Ryan and Peter Kalkanis or doctors and funding companies from

15    2013 to 2014 December?

16         My question is the same as above, i.e., you want

17    communications on who on one hand and who on the other?

18         MS. AL-SHABAZZ:  Sorry, can you read that last

19    sentence again?

20         THE COURT:  My question is the same as above.  You

21    want communications between who on one hand and who on the

22    other?

23         MS. AL-SHABAZZ:  The "who" part I think is confusing.

24         THE COURT:  Between what individuals.

25         MS. AL-SHABAZZ:  Yeah, I think.

J5MTDUN4a

1          THE COURT:  Make it the same question.  Between what

2     individuals?

3          MS. AL-SHABAZZ:  Yeah.  2013 and 2014.

4          THE COURT:  It's there.  My question is the same as

5     above, i.e., you want communications between what individuals?

6          All right.  I will sign that.  And time it, please,

7     and I will sign it.

8          Here's a new note, note number 4.  Can we have

9     information regarding Bryan's slip and fall case?  Can we have

10    information regarding Ace's slip and fall?

11         I'm going to sign that and bring it in to the jury.

12         What's the position of the parties?  They want

13    information, I don't know what that means, testimony and

14    there's documents.

15         MS. AL-SHABAZZ:  With respect to Bryan Duncan, I

16    believe that there is only Government Exhibit 501, which is the

17    intake sheet for Bryan Duncan from 2012.  I don't believe there

18    is any other evidence that is responsive.

19         THE COURT:  Government, do you agree?

20         MR. FOLLY:  Your Honor, I think that's right as to the

21    documentary evidence.  Our view is that also testimonial

22    evidence is responsive to that request.

23         THE COURT:  What about the second one?

24         MR. FOLLY:  I believe that's testimony evidence.

25         MS. AL-SHABAZZ:  Can the government offer what witness

J5MTDUN4a

1    they believe testified regarding this?  I don't remember there

2    being any information about the slip and fall.  Whether or not

3    he was a patient, which is corroborated by the 501, is one

4    thing, but is there any information?

5              THE COURT:  No, information -- I don't know whether

6    they want documents or testimony, but we can't define

7    "information" so narrowly.  It's either testimony or documents

8    regarding the slip and fall.

9              MS. AL-SHABAZZ:  So should we ask them for

10   clarification on this note as well?

11             THE COURT:  Why don't we give them the documents and

12   the testimony.

13             MS. AL-SHABAZZ:  That's why I asked what testimony is

14   the government referring to?

15             THE COURT:  If the government seems to think there's

16   testimony, let them find it.

17             MR. FOLLY:  Thank you, your Honor.

18             THE COURT:  Was there testimony regarding Ace's slip

19   and fall?

20             MR. FOLLY:  Yes, I believe there was testimony I think

21   from -- we're looking, but I believe it was from Peter

22   Kalkanis.

23             THE COURT:  Take a look right now.  We'll take some

24   time on this.

25             The parties should try to find that, and I'm going to

J5MTDUN4a

1    go down to chambers, and then if there are documents and

2    testimony, I'll bring them out and I will ask them did they

3    want documents and testimony, if so, we'll read it to them.

4              (Recess taken)

5              THE COURT:  The jury has returned my note to them.

6              1.  Any email or text or photos to or from Robert's

7    submitted as evidence.

8              2.  Any email or text or photos to or from (Ace) Ryan

9    submitted as evidence.

10             I take it the parties are gathering that.

11             MS. ROTHMAN:  Yes, your Honor.

12             THE COURT:  3.  Now up above where I typed to the jury

13   when I said, "Are you asking for any communication that has all

14   of those individuals in it or are you instead asking only for

15   communications between lawyers on one hand and Kalkanis, Ryan,

16   Robert or Bryan on the other," they wrote "Answered below."

17             And number 3 below says, "Any email or text or photos

18   to or from Bryan Duncan and Kalkanis, lawyers, doctors, funders

19   between 2013 and January 2015."

20             Are the parties gathering that?

21             MS. ROTHMAN:  We are, your Honor.

22             THE COURT:  4.  Intake sheets for (Ace) Ryan and Bryan

23   Duncan.

24             5.  In simple terms, does the aiding and abetting

25   clause mean that if we convict one, we must inherently convict

J5MTDUN4a

1    the rest?

2            The answer to that is no.  I'm going to write that.

3    Anyone object to that?

4            MR. SCHOLAR:  No, your Honor.

5            MR. DINNERSTEIN:  Maybe an exclamation point.

6            MR. FOLLY:  Your Honor, I think going back to the note

7    before this one, there is disagreement about a few things.

8            And also, your Honor, what is your practice with

9    respect to testimony as far as whether we read it back?

10           THE COURT:  Yes, we read it back here.

11           MR. FOLLY:  There is some disagreements about what is

12   responsive to that.

13           THE COURT:  Well, come on, let's get it together,

14   people.  There shouldn't be disagreements.  If there are I will

15   handle them.  But what does that have do -- that doesn't have

16   to do with whether we read it in open court or send it back.

17           MR. FOLLY:  No, I wanted to clarify what your practice

18   was so if we should be pulling copy for the jury.

19           THE COURT:  Unless it's voluminous, hours, I do it in

20   open court.  That's the preference of the Second Circuit.

21           I'm going write on Exhibit 4 that Number 5:  Jury, the

22   answer is no.

23           MS. ROTHMAN:  Your Honor, the one proposal with

24   respect to that response is we propose that you instruct the

25   jury that on page 35 of the charge you have told them that they

J5MTDUN4a

must consider each count and each defendant separately and you
must return a separate verdict of guilty or not guilty for each
count and for each defendant.  That seems like a more fulsome
answer to their question than just the word "No," so we propose
that your Honor refer them to that language in the charge.

          MR. DINNERSTEIN:  Your Honor, I oppose that.  The
question is clear.

          MS. ROTHMAN:  I think "inherently" is a little
complicated of a word.  I think what they're asking is how
should we consider the fact that there are multiple charges and
multiple defendants.  And your Honor already told them the
answer to that in the jury charge, so we see no harm in
pointing them to that provision of the charge.

          MS. AL-SHABAZZ:  I would object to that, your Honor.
I think the Court's first response to answer that no is
adequate to the jury's request, and I think anything more than
that would be crossing the line into the purview of the jury.

          MS. ROTHMAN:  I don't think that's right when you're
citing back the jury charge they have already received.

          MS. AL-SHABAZZ:  They didn't ask for it.  They could
have if that's what they wanted.

          MR. DINNERSTEIN:  They asked your Honor -- I won't say
anything.

          THE COURT:  That's good.

          Gather the information, I'm going to write something.

1            This is the note I'm sending back to the jury:  Jury,

2    in response to your question number 5, the answer is no.  You

3    must consider each count and each defendant separately and you

4    must return a separate verdict of guilty or not guilty for each

5    count for each defendant.  Whether you find the defendant

6    guilty or not guilty as to one offense should not affect your

7    verdict as to any other offense charged.

8            Send this back to the jury.

9            MS. ROTHMAN:  No objection, your Honor.

10            THE COURT:  Pardon me?

11            MS. ROTHMAN:  No objection.

12            THE COURT:  Now are we ripe for the issues of what is

13   relevant to the evidence testimony?

14            MS. ROTHMAN:  Your Honor, I think we're happy to

15   explain what the disagreement is to your Honor.  The jury has

16   asked for information on Mr. Duncan and Mr. Rainford's cases.

17   We have pulled --

18            THE COURT:  We're back on the earlier one, Number 4,

19   yes.

20            MS. ROTHMAN:  So we pulled Mr. Duncan's intake sheet.

21   There's also testimony from Mr. Kalkanis about that case and

22   specifically about that intake sheet.  It was elicited on

23   cross-examination.  So we propose reading that testimony back

24   to the jury in conjunction with providing the intake sheet.

25            THE COURT:  Well, if there's testimony about his slip

J5MTDUN4a

1    and fall, it's relevant, it should be read back.

2             MS. AL-SHABAZZ:  It's not, your Honor, that's the

3    problem.  The intake sheet has on it a recitation of the slip

4    and fall incident or whatever, but the emails -- the testimony

5    simply says pull up 501, when did he become a patient, and the

6    date, and that's it.  There's nothing about a slip and fall.

7    Nothing.

8             THE COURT:  What's the testimony?

9             MS. ROTHMAN:  I can read it, your Honor, it begins --

10   it actually occurs twice, the first is on page 993 where

11   Mr. Kalkanis, in sum and substance says that --

12            MS. AL-SHABAZZ:  -- please.

13            MS. ROTHMAN:  Gladly.

14            THE COURT:  You know, there's a little too much

15   personal clashing here.  Let's adjudicate the issues without

16   the personal friction between two of the attorneys.

17            What page?

18            MS. ROTHMAN:  993, line 7 to 16 is the first reference

19   to Mr. Duncan's case.

20            THE COURT:  What lines?

21            MS. ROTHMAN:  Lines 7 to 16.

22            THE COURT:  Go ahead.

23            MS. ROTHMAN:  Should I read them, your Honor?

24            THE COURT:  I have it in front of me.  It's easy

25   enough, put it in.

J5MTDUN4a

1          MS. ROTHMAN:  Thank you.

2          The second reference to Mr. Duncan's case is on page

3    1225, beginning on line 12.

4          THE COURT:  Ms. Al-Shabazz, what's your point?

5          MS. AL-SHABAZZ:  My point is those passages are not

6    responsive to the jury's question.  The jury is looking for

7    information about a slip and fall.  They're not asking about

8    who referred him to Peter Kalkanis, but if they were, that's in

9    there.  It's not responsive.

10         THE COURT:  Government?

11         MS. ROTHMAN:  So your Honor, I'm focusing beginning on

12   line 12 going to the next page, line 16, Ms. Al-Shabazz asks --

13         THE COURT:  Any particular page?

14         MS. ROTHMAN:  Page 1225 begins on line 12.

15         THE COURT:  Yes.

16         MS. ROTHMAN:  2012 is when Bryan Duncan came to you as

17   a patient, right?  Yes.  There's some additional questions

18   about that and Ms. Al-Shabazz asked to pull up the intake

19   sheet, Government Exhibit 501, and then Ms. Al-Shabazz asks if

20   Mr. Duncan was a patient, that's line 7 of 1226, and then

21   Mr. Kalkanis responds he wasn't a patient, what he was was a

22   finance deal, we financed money for his -- in conjunction with

23   his attorney and a major funder that I used throughout this

24   business.

25   "Q.  He had an injury, right?

1    "A.  Sorry?

2    "Q.  He had an injury?

3    "A.  He claimed he did, yes."

4           I think that's probably responsive to the request for

5    information about Mr. Duncan's case.

6           THE COURT:  Ms. Al-Shabazz?

7           MS. AL-SHABAZZ:  I'm looking at it now.  That's not

8    what the government gave me.

9           MS. ROTHMAN:  Finally, your Honor, with respect to

10   Mr. Rainford --

11          THE COURT:  Before you go on, I will allow the last

12   section you read because I think that's relevant, that is 501,

13   I have it right here, what's the date, it was a patient, he had

14   an injury, right down what he claims he did, yes.

15          MS. ROTHMAN:  Thank you.

16          THE COURT:  But not the earlier stuff.  What else?

17          MS. ROTHMAN:  So we begin on I guess line 23 of page

18   1225.

19          THE COURT:  Yes.

20          MS. ROTHMAN:  Okay.  With respect to Mr. Rainford, he

21   also had a case, there's testimony from Ms. Norwood on page 117

22   of the transcript.  This is on consent.  Mr. Scholar agrees

23   with the government's proposal.

24          THE COURT:  All right.  Then I don't have to deal with

25   it.

J5MTDUN4a

1        MS. ROTHMAN:  It will be 117, line 12, to 119, line

2    12.

3        THE COURT:  All right.

4        MS. ROTHMAN:  And then the other disagreement -- the

5    only disagreement with Mr. Scholar relates to whether we should

6    be able to show the jury Government Exhibit 733, this is a

7    conversation between Mr. Duncan and Mr. Gordon in which they

8    discuss that Mr. Rainford, and I will quote, "he probably got

9    his bread," after discussing that he has a new car, and that's

10   in reference to Mr. Rainford's lawsuit.  That's the

11   government's position, his settlement.

12       MR. SCHOLAR:  Judge, I have four concerns.  One, the

13   email or text chain doesn't reference the slip and fall in any

14   way.

15       THE COURT:  Let me see it.

16       MR. SCHOLAR:  Two, it appears to be a text that

17   involves multiple subjects throughout their back and forth.

18       Three, it mentioned another person, another male

19   person inside that text chain, and then references "he," so

20   there's confusion as to what is being spoken about.

21       And four, it was never explained during the trial.  It

22   was never explained during the trial, so the jury has to

23   speculate to reach the conclusion that the government wants.

24       MS. ROTHMAN:  I mean, your Honor, this is directly in

25   reference to Mr. Rainford's case and his statement.  We argue

J5MTDUN4a

1    that it should be shown to the jury as they requested

2    information on his case.

3              THE COURT:  It's out.

4              MR. SCHOLAR:  Thank you, Judge.

5              MS. AL-SHABAZZ:  Could I get some clarity where we're

6    stopping with the statement that you're letting in that starts

7    at 1225, line 23?

8              THE COURT:  Ms. Rothman just put it on the record.

9              MS. AL-SHABAZZ:  I don't know.

10             MS. ROTHMAN:  1225, 23 to 1226, 14.  That's the

11   government's proposal.

12             THE COURT:  Court Exhibit Number 5 from the jury:  How

13   much longer will it take to get the evidence?  If it's not

14   ready in 15 minutes, our plan is to be back tomorrow at 10.  We

15   have file folders that need to be picked up.

16             There you have it.

17             MS. ROTHMAN:  I guess they're done with what we gave

18   them.

19             There was also a request for communications by

20   Mr. Rainford, and so we have Government Exhibit 711M and 1054,

21   which are a text message exchange between Mr. Rainford and

22   Mr. Duncan, and then also an email from Mr. Rainford to

23   Mr. Kalkanis.  Those would be responsive to the jury's request

24   that we propose sending back, and I believe that's on consent.

25             MR. SCHOLAR:  That's fine.

J5MTDUN4a

1          MS. ROTHMAN:  And then there's one additional email

2     between Mr. Duncan and Sady Ribeiro, Government Exhibit 1069.

3     That would be responsive to the jury's request for

4     communications in January 2015 between Mr. Duncan and doctors.

5     So we propose sending that back, and we have shown that to

6     Ms. Al-Shabazz.

7          MS. AL-SHABAZZ:  Yeah, I have no objection to that.  I

8     believe that the only thing from 2013 to January 2015 is the

9     request.  I believe that's the only piece of evidence that is

10    responsive to the jury's request.

11         MS. ROTHMAN:  I think they may have text messages

12    involving Mr. Duncan and the relevant people already back with

13    them, so I think we want to check and make sure nothing needs

14    to go back again, but I think that's right.

15         THE COURT:  If they have it there I'm not sending it

16    back.

17         MS. ROTHMAN:  Finally, Mr. Duncan's intake sheet.

18         THE COURT:  Everything that is agreed upon and that I

19    ruled upon, give to my deputy and she will bring it back to the

20    jury.

21         MR. DINNERSTEIN:  Your Honor, I think there's nothing

22    for Robert Locust in terms of text messages.

23         THE COURT:  Then you can't send it back.

24         MR. DINNERSTEIN:  Your Honor, just to be clear, it

25    seems to me that they should receive an answer that there's

J5MTDUN4a

1    nothing regarding Robert Locust, which was their first request

2    under note number 5.

3             THE COURT:  I have two note number 4s here.

4             MR. DINNERSTEIN:  The first one.

5             THE COURT:  We're renumbering.  Exhibit 4 is asking

6    for information regarding Bryan's slip and fall and regarding

7    Ace's slip and fall, where Exhibit 5 is my note to the jury

8    about aiding and abetting the others and their responses.

9             That's what you are talking about, right?

10            MR. DINNERSTEIN:  Yes, your Honor.

11            THE COURT:  Photos to or from Robert submitted as

12   evidence.

13            MR. DINNERSTEIN:  I'd say that you could affirmatively

14   say there was none.

15            THE COURT:  What's the position of the government?

16            MS. ROTHMAN:  I don't think I would respond.  I think

17   we're just sending back things that are responsive.

18            THE COURT:  That's what it seems to me.

19            MS. ROTHMAN:  Also I propose, since it's almost

20   5:30 --

21            THE COURT:  And Court Exhibit 6 is how much longer

22   will it take.

23            MS. ROTHMAN:  What I propose is have the jury come in,

24   we could read the small excerpts that they requested and then

25   send them home for the night and come back at 10 o'clock

 1    tomorrow to resume their deliberations.

 2              THE COURT:  Any objections to that?

 3              MS. AL-SHABAZZ:  Yes, because the Court promised me I

 4    could leave at 5:30.  It's 5:20.

 5              THE COURT:  I understand.  It is 5:20, and this will

 6    not take ten minutes.

 7              MS. ROTHMAN:  It should take three minutes, maybe

 8    five.

 9              THE COURT:  Bring the jury in.  As long as people are

10    agreed, we'll get you out of here by 5:30.  Matter of fact, if

11    it doesn't take ten minutes, you'll get out sooner.

12              MS. ROTHMAN:  Would we be able to get copies of the

13    notes --

14              THE COURT:  Yes.

15              MS. ROTHMAN:  -- so we could make a copy of it and

16    keep it for our file?

17              THE COURT:  I don't see why not.  Is there any

18    objection?

19              MR. DINNERSTEIN:  Could we also get copies?

20              THE COURT:  I'm going to give it the lawyers and the

21    lawyers can do whatever they want, but make sure we get the

22    originals back.

23              My deputy will make the copies.

24              Jury entering.

25              (Jury present)

J5MTDUN4a

1       THE COURT:  Ladies and gentlemen, you've kept us very

2   busy.  What we're going to do now is read back testimony that

3   you asked for.  And we have been sending a lot of documents

4   back, and if nothing was responsive, you didn't get the

5   documents because it wasn't responsive.  We're going to collect

6   all that information.

7       And you asked to start at 10:00 a.m. tomorrow.  That's

8   fine.  All twelve of you have to be here.  You will gather just

9   where you did, that is my jury deliberation room.  You will

10  come out and I will see all twelve of you here and I will

11  direct you to recommence your deliberations.  Don't deliberate

12  until I see all twelve of you here and I tell you to

13  deliberate.  And we'll give you all those documents back again.

14      Government, you are going to read the testimony that

15  is agreed upon.

16      MS. ROTHMAN:  Sure, your Honor, I'm happy to read it.

17      MS. AL-SHABAZZ:  Sorry, Judge, could we have the

18  reporter read it?

19      THE COURT:  Does the reporter have what you have

20  agreed upon?

21      MS. ROTHMAN:  We could provide it to him, your Honor.

22      THE COURT:  Mike, take a look.

23      (Discussion held off the record)

24      THE COURT:  Maybe we shouldn't have even started the

25  process.

J5MTDUN4a

1          Ladies and gentlemen, you're dismissed for the

2     evening.  We'll see you tomorrow by 10:00 a.m.  You can give my

3     deputy the documents that are in there.

4               (Jury not present)

5          THE COURT:  Let me see the excerpts physically.  Let

6     me see them.

7          That's right, this section I cut out.  The section

8     about Kerry Gordon I cut out.

9          MS. ROTHMAN:  Your Honor, I may have misunderstood,

10    but there are actually two portions of the transcript that

11    relate to Mr. Duncan's case.  This is the first one, which I

12    believe your Honor said would be allowed, and then there's the

13    second portion which provides some background on Mr. Duncan and

14    then talks about his intake sheet.  And as I understood your

15    ruling was that with respect to the second portion we were

16    going to start at line 23 and go to line 14 on the next page,

17    but this, the first provision, would be admitted where

18    Mr. Kalkanis says that Mr. Duncan was a patient.

19         MS. AL-SHABAZZ:  No, Judge, that wasn't your ruling.

20    In fact, you said you weren't going to allow the first request

21    of the government and only the second request.

22         MS. ROTHMAN:  I don't believe that's right, and I

23    think we could pull it back on the transcript.

24         MS. AL-SHABAZZ:  Fine.

25         THE COURT:  Pull it back, if you can.

1      (Record read)

2          MS. AL-SHABAZZ:  Then after that, when we pulled it

3   up, 1225, you changed your mind and you said you would put that

4   part in and then the first part --

5          THE COURT:  Let's pull up 1225 and see.

6          (Record read)

7          MS. ROTHMAN:  I think the ruling is with respect to

8   second provision.  There is two portions.  There's the before

9   the line 23 portion and the after line 23, and I understood

10  your Honor's ruling to say with respect to this portion on page

11  1225 and 1226 we'll start at line 23 and not include the things

12  before it on this page, nothing to do with your earlier ruling

13  about the other excerpt.  That's obvious, your Honor.

14         MS. AL-SHABAZZ:  Judge, that doesn't make any sense.

15  We specifically put the lines -- 1225, line 23 to 1226, line

16  14.  I even asked for clarity on where we were going.  We knew

17  exactly where we were starting.  And so the only reference the

18  Court could have made was to the 993 application.

19         MS. ROTHMAN:  That's simply not true.  In the

20  readback, before we got to this provision, I started on line

21  1225 -- page 1225, line 12, and your Honor asked me to move

22  ahead.  We could read back even further.

23         I think just objectively I would like to zoom out,

24  your Honor.  The question is about Mr. Duncan's case.  This is

25  about Mr. Duncan's case, as was the earlier transcript.  These

J5MTDUN4a

1    are small readbacks.  I don't see the prejudice to Mr. Duncan

2    by having this read to the jury.  They want to hear about his

3    case, and there's testimony directly on point.  There's no

4    reason not to allow it.

5           THE COURT:  Let me look at the note.

6           My deputy took it.

7           Zooming out, they did ask for information regarding

8    his case, so I will allow the earlier part.  And to make it

9    clear, it's 993, 7 to 16.

10          Good night.  I will see everybody at 10:00 a.m.

11          I really want the personal byplay to stop.

12          (Adjourned to May 23, 2019 at 10:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25