USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/7/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

UNITED STATES OF AMERICA

v.

BRYAN DUNCAN,

            Defendant.

18-Cr-289 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

On May 28, 2019, after a nine-day trial, a jury convicted defendants Bryan Duncan, Robert Locust, and Ryan Rainford of conspiracy to commit mail and wire fraud and also convicted Duncan of the substantive crimes of mail and wire fraud. Duncan has moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the following reasons, the Court denies Duncan's motion.

## I. BACKGROUND

Duncan's motion comes after the jury found him guilty of the charges in Counts One, Four, Five, and Six of the Superseding Indictment.[1] At trial, the government presented evidence that Duncan participated in two conspiracies to defraud businesses and insurance companies by recruiting individuals to stage slip-and-fall accidents, directing them to seek unnecessary medical attention, and bringing them to attorneys who then initiated lawsuits against the owners of the sites where the individuals claimed to have fallen and the insurance companies.

Duncan was charged in Count One with participating in such a conspiracy that began in 2013 and was orchestrated by Duncan's co-defendant Peter Kalkanis, a former chiropractor. In that conspiracy, Duncan was a "runner"—someone who would recruit individuals to stage the phony slip-and-fall accidents, drive those individuals to medical and legal appointments, and deliver payments in exchange for their undergoing unnecessary surgeries.

---

[1] Because the jury was unable to reach a verdict on Counts Two and Three, the Court declared a mistrial on those counts. The government has represented that it will move to dismiss those counts at sentencing. Trial tr. at 1923.

In 2015, Duncan and one of his co-defendants, Kerry Gordon, broke off from Kalkanis's operation to start their own substantially similar scheme in order to keep more of the proceeds from the fraudulent lawsuits as well as the referral fees from the companies that funded loans to the victims. In the second conspiracy, charged in Count Four, Duncan and Gordon were "case managers"—they continued to recruit individuals to stage the phony accidents, but they also took charge of finding attorneys to bring the lawsuits, arranging for the individuals' medical procedures, and referring the individuals to funding companies who would supply the high-interest loans to cover the individuals' medical procedures.

Duncan now moves for a judgment of acquittal or, alternatively, a new trial. Duncan argues that he is entitled to a judgment of acquittal because his conviction rests on legally insufficient evidence with regard to each of the counts on which he was found guilty. Duncan contends alternatively that he is entitled to a new trial because (1) the guilty verdicts are against the weight of the evidence; (2) Counts Four, Five, and Six were improperly joined to Counts One, Two, and Three; (3) hearsay evidence in the form of the recruited individuals' "intake sheets" was improperly admitted against Duncan in support of Counts Four, Five, and Six; (4) evidence from Duncan's cell phone was illegally obtained and therefore should not have been admitted at trial; (5) the government improperly coerced and/or coached its witnesses; and (6) the prosecution was race-based.

## II. DISCUSSION

### A. Duncan's Motion for a Judgment of Acquittal

#### 1. *Legal Standard*

Pursuant to Federal Rule of Criminal Procedure 29, the Court may grant a motion for judgment of acquittal upon a showing that "the evidence is insufficient to sustain a conviction." The U.S. Court of Appeals for the Second Circuit has instructed that "[t]he jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (emphasis in original) (internal quotations omitted). In considering a Rule 29 motion, a district court "view[s] the evidence presented in the light most favorable to the government, and . . . draw[s] all reasonable inferences in its favor." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). The Court must also "consider the evidence in its totality, not in isolation," and bear in mind that "the government need not negate every theory of innocence." *Id.* Finally, the Court "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury," but rather "must determine whether upon the evidence, giving full play to the right of

the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Id.*

### 2. *The Evidence Was More Than Sufficient To Uphold the Jury's Verdict on Count One.*

Duncan contends that his conviction on Count One is legally insufficient because the government failed to prove the existence of a conspiratorial agreement between Duncan and Kalkanis or any of the other alleged co-conspirators. Duncan also argues that the Court should direct a verdict of acquittal because the government's evidence gave "nearly equal circumstantial support" to the theory that Duncan worked for Kalkanis in order to learn the funding side of the business and not in furtherance of any conspiracy.

Duncan's arguments as to the sufficiency of the evidence are unavailing. As the Court instructed the jury, the elements of conspiracy are (1) that the charged conspiracy existed and (2) that the defendant intentionally joined and participated in this conspiracy during the applicable time period. Trial tr. at 1816. The Government presented plentiful evidence supporting each element.

The jury heard from several witnesses who testified to the existence of the conspiracy charged in Count One. For example, the government's witness Reginald Dewitt testified that he first heard about the "slip-and-fall scam" from Duncan in 2013, when Duncan explained to Dewitt that to start a case, he should go to the hospital, say he had hurt his knee and back, get "paperwork" attesting to those alleged injuries, and then call Duncan who would pick up the paperwork and "take care of everything from there." Trial tr. at 183. Dewitt described following Duncan's instructions and subsequently meeting with Kalkanis and George Constantine, the attorney who brought Dewitt's fraudulent lawsuit, to discuss his case. *Id.* at 186–92. He also described getting an MRI, attending chiropractor appointments, and eventually having three unnecessary surgeries. *Id.* at 192–206. Dewitt testified that he was driven to and from many of these appointments by Duncan and Gordon, and that they guided him through the process by instructing him about which appointments were coming up. *Id.* at 186–206. Dewitt also testified that Duncan told him he would receive $500 after undergoing his first surgery. *Id.* at 201.

Tina Nichols, Carol White, and Alvin Martin similarly testified that Duncan explained to them the steps they would need to take to initiate their slip-and-fall lawsuits and that Duncan remained involved with their cases by driving them to and from appointments. *See id.* at 452–73, 669–84, 1291–1311. Each of these witnesses' testimony supported a conclusion by the jury that the conspiracy charged in Count One existed between Duncan and a variety of players (included Kalkanis, Constantine, and Gordon,

among others), as well as the witnesses themselves. Their testimony also helped establish that Duncan intentionally joined and participated in the conspiracy.

These witnesses' testimony also belies Duncan's argument that the government's evidence gave nearly equal circumstantial support to the theory that Duncan worked for Kalkanis solely because he was "interested in the funding aspect of the business." Def.'s Mem. at 10. Dewitt, Nichols, White, and Martin each explained that Duncan was not only aware that their lawsuits were fraudulent, but also instructed them as to the steps they needed to take to inflate the value of their lawsuits through medical visits and surgeries.

Duncan's objections to the government's evidence largely boil down to disputing the witnesses' credibility. The credibility of witnesses on a Rule 29 motion, however, is the province of the jury, and the court "may not substitute [its] own determinations of credibility or relative weight of the evidence." *Autuori*, 212 F.3d at 114. The jury in this case evidently believed these witnesses to be telling the truth about Duncan's significant involvement in the charged conspiracies.

### 3. *The Evidence Was More than Sufficient to Uphold the Jury's Verdict on Count Four.*

Duncan also urges that the evidence is insufficient to sustain the jury's verdict on Count Four on the grounds that the government failed to prove the existence of a conspiratorial agreement between Duncan and another person with regard to that count.

As Duncan was charged in Count Four with conspiracy to commit mail and wire fraud, the elements are the same as in Count One. Because the government presented ample evidence that a conspiracy to commit mail and wire fraud existed between Duncan and others from 2015—when Duncan and Gordon broke off from Kalkanis's operation and started their own slip-and-fall scheme—until 2018, when they were arrested, Duncan's argument is in vain.

This evidence included the testimony of Jasmond Cunningham, who stated that his roommate told him about the possibility of making money through a fraudulent personal injury lawsuit in 2015, when Cunningham was living in a homeless shelter. Trial tr. at 630–43. Cunningham's roommate knew about the scheme because he had worked with Duncan on his own case. *Id.* Cunningham told the jury that he met with Duncan and other individuals who were interested in starting their own slip and fall scam; that Duncan instructed him to stage an accident and the specific injuries to claim when he went to the hospital after the phony accident; that Duncan drove him to medical and legal appointments; that he underwent surgeries after Duncan told him that the lawsuit would be more profitable if he did so; and that Duncan gave him money orders from Fast Trak, a litigation funding company. *Id.* at 633–44.

Cunningham's testimony established both of the elements of conspiracy. The first element—that the conspiracy existed—is satisfied by his testimony that he and Duncan agreed to facilitate the filing of a fraudulent lawsuit based on Cunningham's staged accident. The jury was also entitled to conclude from this testimony that the conspiracy included others such as the doctors and lawyers who helped facilitate Cunningham's lawsuit. Cunningham's testimony also supported the second element of conspiracy: namely, that Duncan intentionally joined and participated in this conspiracy during the applicable time period.

Duncan argues that Cunningham's testimony was wholly incredible because he was "hostile, combative, and admitted he has lied in the past under oath and to get out of jail," among other things. Def.'s Mem. at 14. But, in considering a Rule 29 motion, the district court must "view the evidence presented in the light most favorable to the government" and "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." *Autuori*, 212 F.3d at 114. The jury was certainly entitled to find Cunningham's testimony credible based on their evaluation of its content and their observations of his demeanor. Additionally, his testimony was corroborated by the accounts of several other witnesses who described how the slip-and-fall conspiracies operated. Finally, it is worth noting that Cunningham testified pursuant to an immunity order, presumably reducing any incentive to lie on the stand. *See* trial tr. at 629–30.

Duncan contends that the Court should grant a verdict of acquittal because "the defense established that Mr. Duncan was visiting his aunt, the President of Liberia," on the date that Cunningham claimed he staged his accident. Def.'s Mem. at 14. This assertion is based on the testimony of Duncan's brother, Kyle Duncan. *See* trial tr. at 1573–75.[2] However, the jury was not compelled to believe Kyle Duncan's testimony; a reasonable juror could certainly have rejected his account given his relationship to Duncan and the fact that his testimony had no independent support in the record. Additionally, Kyle Duncan's testimony that he and Duncan were in Liberia from June 25, 2015 to July 2, 2015 does not necessarily undermine Cunningham's testimony, as Cunningham did not testify that he met with Duncan on June 25, 2015, but merely that Cunningham staged his accident on that date. *Id.* at 1574–75, 651. Cunningham did say that he saw Duncan after his accident, but he was not sure if it was "a week or two weeks after." *Id.* at 652.

In any event, the jury's guilty verdict on Count Four was also supported by documentary evidence, such as text messages that Duncan sent to various individuals

---

[2] Kyle Duncan actually testified that his uncle, not his aunt, is the President of Liberia. *Id.* at 1575.

5

whom he coached through the fraudulent slip and fall lawsuit process during the time period of the Count Four conspiracy. *See* GXs 711-B, 754, 836. The Court therefore denies Duncan's Rule 29 motion as to Count Four.

### 4. *The Evidence Was More Than Sufficient to Uphold Counts Five and Six.*

Finally, Duncan urges the Court to direct a verdict of acquittal as to Counts Five and Six because the government failed to introduce evidence that Duncan committed mail or wire fraud between 2015 and 2018.

The elements of mail fraud are: (1) the existence of either (a) a scheme or artifice to defraud or (b) a scheme or artifice to obtain money or property by means of materially false and fraudulent pretenses, representations, or promises; (2) that the defendant knowingly and willfully devised or participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with the specific intent to defraud, or that he knowingly and intentionally aided and abetted others in the scheme; and (3) that in executing the scheme, the defendant used, or caused the use of, the mails or a private or commercial interstate carrier. Trial tr. at 1804. As to the elements of wire fraud, the first two elements are identical to the first two elements of mail fraud, and the third element of wire fraud is (3) that in execution of the scheme, the defendant used, or caused to be used, interstate wires. Trial tr. at 1811.

The evidence just discussed in relation to Count Four is more than sufficient to establish the first and second elements of mail and wire fraud.

As to the third element of mail fraud, it is undisputed that Duncan was involved in facilitating lawsuits on behalf of individuals who claimed they had injured themselves in slip and fall accidents. The government presented ample evidence that the U.S. mail was used to initiate and litigate these lawsuits. *E.g.* GXs 403, 404. As the jury was instructed, "[i]t's not necessary for the [defendant] to be directly or personally involved in the mailing, as long as the mailing was reasonably foreseeable in the execution of the scheme." Trial tr. at 1810. Given that Duncan orchestrated the scheme charged in Counts Four, Five, and Six, it was reasonably foreseeable to him that lawsuits would be filed, which necessarily would involve the use of the mails. Therefore, the government's evidence satisfied the third element of mail fraud.

As to the third element of wire fraud, the government presented evidence that members of the conspiracy used emails in the course of the scheme, and that some of these emails were sent across state lines. *E.g.* GX 1101 (executed funding agreement sent via email from Michael Singer, one of the attorneys who brought the fraudulent lawsuits in the conspiracy alleged in Count Four, in New York, to Fast Trak, a funding company that provided litigation funding, in New Jersey, on which Duncan was cc'd). Similarly

6

to mail fraud, "[i]t's not necessary for the defendants to be directly and personally involved in any wire communication, as long as that communication is reasonably foreseeable in the execution of the scheme." Trial tr. at 1812. The evidence at trial established that Duncan referred cases to Fast Trak for funding; given that Duncan was cc'd on emails to and from Fast Trak from other members of the conspiracy, such as the email in GX 1101, the government's evidence has certainly established that it was foreseeable to Duncan that interstate email would be used in the execution of the scheme.

For these reasons, the Court denies Duncan's motion for a judgment of acquittal.

### B. Duncan's Motion for a New Trial.

#### 1. *Legal Standard*

The Court may grant a motion for a new trial under Rule 33 "if the interests of justice so require." Fed. R. Crim P. 33. "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *Id.*

In evaluating a Rule 33 motion, the district court "may weigh the evidence and credibility of witnesses," but it may not "wholly usurp the jury's role." *Autuori*, 212 F.3d at 120. "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.*

#### 2. *The Guilty Verdict Was Well-Supported by the Evidence.*

As set forth above, the government provided substantial credible evidence that established each element of each of the counts on which Duncan was found guilty. The Court's evaluation of the witnesses' credibility leads it to the selfsame conclusion as the jury: that Duncan is guilty beyond a reasonable doubt of the charges brought against him in Counts One, Four, Five, and Six of the Superseding Indictment.[3]

---

[3] The fact that the jury was unable to reach a verdict as to Counts Two and Three does not undermine the sufficiency of the evidence as to the counts on which Duncan was found guilty.

7

### 3. *Duncan Waived His Improper Joinder Argument by Failing to Raise It Prior to Trial.*

Duncan's next argument is that Counts Four, Five, and Six were improperly joined to Counts One, Two, and Three in the Superseding Indictment and Duncan was prejudiced by this improper joinder.

Pursuant to the Federal Rules of Criminal Procedure, defendants may be charged in a single indictment "with two or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). The court may order separate trials of counts "[i]f the joinder of offenses . . . appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a).

Motions for the severance of charges pursuant to Rule 14 "must be made before trial." Fed. R. Crim. P. 12(b)(3)(D); *see United States v. Bliss*, 188 F. App'x 13, 17 (2d Cir. 2006); *United States v. Cheng*, 131 F.3d 132 (2d Cir. 1997). There is no question that Duncan first raised his improper joinder argument *after* trial. Although the Court may consider an untimely defense covered by Rule 12(b)(3) "if the party shows good cause," Duncan has made no attempt to explain why he did not move to sever Counts Four, Five, and Six before trial. *See* Fed. R. Crim. P. 12(c)(3). This argument is therefore waived. In any event, there is no reason to conclude that Duncan was prejudiced by any lack of severance of the counts.

### 4. *The Alleged Variance Does Not Warrant a New Trial.*

Duncan next contends that he was substantially prejudiced by an improper variance between the Superseding Indictment and the evidence presented at trial. Specifically, Duncan contends that he was prejudiced by the fact that the Superseding Indictment stated that the first conspiracy, charged in Count One, lasted from 2013 to April 2018, while the evidence at trial showed that Duncan separated from Kalkanis in 2015. Duncan claims he was prejudiced by this discrepancy because the allegations in Counts One, Two, and Three "overlapped and encompassed" the conspiracy charged in Count Four and the substantive crimes charged in Counts Five and Six, each of which were alleged to have taken place between 2015 and April 2018. Def.'s Mem. at 21.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.3d 608, 621–22 (2d Cir. 2003). To prevail on a variance claim, a defendant must show prejudice. *Id.* "A defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant

8

at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.* (internal quotations omitted).

Here, Duncan cannot show that he was prejudiced by the variance between the Superseding Indictment and the evidence presented at trial. As Duncan states in his motion, both Kalkanis and Dewitt testified that Duncan left Kalkanis's operation in 2015. It therefore was clear to the jury that Duncan was no longer involved in the activities of Kalkanis and his associates after that time; in fact, the Government's opening stated as much. Trial tr. at 49 ("Duncan is charged with the same crimes for his separate conspiracy, a conspiracy that he started when he and Gordon went off on their own in 2015.").

Moreover, "[p]articularly with respect to allegations of time, the Second Circuit has permitted proof to vary from the indictment provided that the proof fell within the period charged." *Williams v. United States*, No. 09-Cr-558-02, 2017 WL 4174927, at *4 (S.D.N.Y. Sept. 12, 2017) (quoting *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983)). Indeed, other courts have held that "[t]here is no fatal variance as long as the conspiracy proved at trial falls within the period charged in the Indictment." *United States v. Ulbricht*, No. 14-Cr-68, 2015 WL 413426, at *5 (S.D.N.Y. Feb. 2, 2015); *accord United States v. Ortiz*, 666 F. Supp. 2d 399, 404 (S.D.N.Y. 2009), *aff'd*, 394 F. App'x 722 (2d Cir. 2010) ("In general, where the dates of a conspiracy proven at trial are within the dates charged in the indictment, courts conclude that the variance is not prejudicial."). The government proved that Duncan was involved in the first conspiracy within the period charged in the indictment; therefore, there was no prejudice to Duncan.

### 5. The Intake Sheets Were Properly Admitted.

Duncan also moves for a new trial on the grounds that he was unfairly prejudiced by the admission of the "intake sheets" that each recruited individual filled out with Kalkanis and the lawyer who would be handling his or her lawsuit.[4] Because the Court already considered and rejected the arguments that Duncan makes in this motion when Duncan objected to the admission of this evidence at trial, that reasoning is not reiterated here. *See* trial tr. at 929–45.

The one argument that the Court did not address is Duncan's contention that the intake sheets should not have been admitted because Kalkanis testified that he did not know whether any given case reflected in an intake sheet involved a real injury or a

---

[4] Defendant also states in his motion that he "moved to preclude" Government Exhibits 1001 to 1067 and 1125 to 1152. Def.'s Mem. at 21. However, Duncan makes no arguments as to why the admission of these exhibits was in error, or in what way he was prejudiced by their admission.

fraudulent injury. Trial tr. at 1145. But the fact that Kalkanis could not state whether particular intake sheets reflected real or fraudulent injuries does not diminish the relevance of the intake sheets, as Kalkanis testified that at least eighty percent of the approximately 300 cases he managed between 2012 and the time of his arrest in 2018 were fraudulent. *Id.* at 1052.

The Court also declines to grant Duncan's motion for a new trial based on his argument that the admission of this evidence through Kalkanis was unfairly prejudicial with respect to Counts Four, Five, and Six, given that Kalkanis was not alleged to have been a co-conspirator in the conduct underlying those counts. The Court issued limiting instructions to the jury stating that they were only to consider the intake sheets as evidence of the charges in Counts One, Two, and Three. *Id.* at 1264, 1825. Jurors are presumed to follow such instructions, and there is no basis to believe that they did not do so here. *United States v. Salameh*, 152 F.3d 88, 116–17 (2d Cir. 1998).

### 6. *The Evidence from Duncan's Cell Phone Was Properly Admitted.*

Duncan next argues that the Court should grant his motion for a new trial because evidence obtained from his phone illegally should have been suppressed.

A motion for the suppression of evidence must be made before trial pursuant to Rule 12(b)(3). However, the Court may consider an untimely defense covered by Rule 12(b)(3) "if the party shows good cause." Fed. R. Crim. P. 12(c). Duncan argues that good cause exists to consider the suppression issue in spite of the fact that he raised it for the first time during trial because (1) Duncan's counsel, Ikiesha Al-Shabazz, was retained for trial and first appeared in this case on April 8, 2019, approximately one month prior to trial, and (2) it was not until trial that Al-Shabazz learned that "the recovering agent instructed Mr. Duncan's girlfriend to retrieve his phone from inside his home after he was already in their custody." Def.'s Mem. at 24.

Duncan's argument fails, however, because courts have held that counsel's failure to conduct proper pretrial investigation does not establish good cause for a defendant's failure to raise an argument covered by Rule 12(b)(3) in a timely fashion. *See United States v. Howard*, 998 F.2d 42, 52 (2d Cir. 1993) (attorney's failure to discuss with her client the circumstances of his arrest, which later gave rise to defendant's untimely suppression motion, did not establish good cause for the court to consider that defense); *United States v. Forrester*, 60 F.3d 52, 59 (2d Cir. 1995) ("Inadvertence by counsel . . . does not constitute cause."); *United States v. Smith*, 1998 U.S. App. LEXIS 7711 (4th Cir. 1998) ("Defendants were present at the apartment when officers arrived and conducted the search and should have relayed what they knew to counsel [and] during a pretrial investigation, counsel could have discovered whether or not [the witness] consented [to the contested search]

and if the consent was given voluntarily."). Because Duncan has "offered no reasonable excuse for [his] untimely objection that would justify relief from . . . waiver," he has forfeited his suppression argument. *United States v. Wilson*, 11 F.3d 346 (2d Cir. 1993).

### 7. *Duncan's Allegations of Prosecutorial Misconduct Do Not Warrant a New Trial.*

Duncan argues that "the witnesses in this case were improperly coached which resulted in an obfuscation of the truth." Def.'s Mem. at 24. Duncan points to the following as evidence supporting this claim:

- A text message that an individual named Jabari Buckner sent to FBI Special Agent Richard Prince accusing Prince of pressuring him into telling Prince what the government wanted to hear during an interview. Def.'s Mem. at 24–25.
- The statements of an individual named Eva Lozado who allegedly told Duncan's investigator that she was "accused of committing a crime" when she was interviewed by the government in connection with this case and that the federal agents "intimidated and threatened" her by informing her that she would be prosecuted if she maintained her innocence. Def.'s Reply at 7–8.
- The testimony of Reginald Dewitt and Tina Nichols about their relationship, specifically (1) the fact that Dewitt claimed they were married even though they were not and (2) the fact that Nichols claimed they had only been dating for eight years when in fact they have a daughter in her thirties. Def.'s Mem. at 25.
- The testimony of Alvin Martin and Carol White differed in their accounts of whether Duncan was already present at White's home with Martin when White arrived home on the night she fell and injured herself. *Id.* at 26–27.

The Court declines to grant a new trial based on these accusations. Neither Buckner's nor Lozado's alleged statements are relevant to the question of whether letting the jury's guilty verdict stand would be "a manifest injustice," as neither testified at trial.[5] *See*

---

[5] Additionally, the government's opposition to Duncan's motion for a new trial sheds further light on Buckner's text message. According to the government, Buckner (whom the government refers to as "Individual-1") sent the above-referenced text message to Prince after Buckner recanted his initial statement, in which he told the FBI that he had been recruited into the slip-and-fall scheme by Duncan and had in fact staged an accident and had unnecessary surgery in exchange for payments. Gov't Mem. at 25. It is also worth noting that Buckner and Duncan are cousins. *Id.* The Court has already seen evidence of Duncan's attempts to pressure other witnesses (Martin and White) to lie and/or recant their prior statements about their involvement in the scheme. May 3, 2019 conference tr. at 8; trial tr. at 1933–34. It is entirely possible that Buckner's decision to change his story was the result of similar pressure from Duncan, his cousin.

11

*Ferguson*, 246 F.3d at 134. The issue of whether the agents' alleged tactics constituted inappropriate coercion is therefore irrelevant to the question of whether Duncan is entitled to a new trial, as they could not have had any impact on the evidence presented at trial. Furthermore, the Court declines Duncan's invitation to infer that if the Court assumes the government used improper investigatory techniques with Buckner and Lozado, the government must also have done so with other witnesses. Three sets of defense attorneys had the opportunity to question each government witness at trial, and none of them elicited any testimony from any government witness to suggest that this was the case.

Duncan's other examples of indications that the government engaged in "improper coaching" of its witnesses do not reflect any improper influence. Nichols did testify that she and Dewitt had been together for eight years. Trial tr. at 447. The fact that she and Dewitt have a 32-year-old daughter in common does not make that statement untrue; in fact, Nichols readily admitted on cross-examination that she first met Dewitt when she was fifteen, that they dated at that time, that they broke up when she was seven months pregnant with their daughter, and then got back together many years later. *Id.* at 506–07. None of this testimony suggests that the government "coached her to lie." Def.'s Mem. at 25.

Nor does Dewitt's inconsistent testimony about his and Nichols' marital status. *Compare* trial tr. at 181, 207-08, *with id.* at 351. Similarly, the minor contradiction between Martin's testimony and White's testimony is not evidence that the government "coached" Martin to say that Duncan was involved in White's slip-and-fall case. To the extent these inconsistencies cast doubt on any of these witnesses' testimonies, the jury was free to make that evaluation for themselves, but they do not compel the Court to grant a new trial.

### 8. *Duncan's Allegations that the Prosecution Was Race-Based Is Untimely and Unfounded.*

Duncan's final argument is that the Court should grant a new trial because the prosecution was racially motivated such that it violated his rights under the Equal Protection Clause of the U.S. Constitution. The Court finds Duncan's claim to be "both untimely and insubstantial." *United States v. Taylor*, 562 F.2d 1345 (2d Cir. 1997).

A selective prosecution claim is among the defenses that must be raised by pretrial motion pursuant to Rule 12(b)(3). Fed. R. Crim. P. 12(b)(3)(A)(iv). "If a defendant fails to bring such a motion before trial, the defendant waives the defense, unless the defendant can show (1) good cause for failing to raise the issue in a timely manner, and (2) actual prejudice arising from the waiver." *United States v. Beras*, 131 F. App'x 313, 314

(2d Cir. 2005) (quoting *Howard*, 998 F.2d at 52). Duncan claims he has "always maintained that this case was about selective prosecution based on race," but in fact did not make this argument until, at the earliest, during the trial itself. *See* trial tr. at 1870 (MS. AL-SHABAZZ: Judge . . . I think this is a racist prosecution. I think this is a race based-prosecution. I think it's selective prosecution . . . THE COURT: Did you raise that at all in any motion? MS. AL-SHABAZZ: No."). Duncan provides no explanation as to why he did not make this argument in a timely manner; therefore, no good cause exists for the court to consider it at this time.

Even if Duncan's motion had been timely, he has not presented any evidence to show that (1) similarly situated individuals of a different race were not prosecuted or (2) the government's decision to prosecute him was based on a discriminatory purpose. *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996); *United States v. Fares*, 978 F.2d 52, 59–60 (2d Cir. 1992). Duncan's claim that the government's decision not to charge the lawyer and doctor co-conspirators satisfies the first element falls flat because Kalkanis, the leader of the scheme who in fact was charged in the same Indictment as Duncan, is Caucasian. Additionally, the government has represented that "the Fraud Scheme's doctors, lawyers, and chiropractors are coconspirators, and the Government's investigation remains ongoing." Gov't Mem. at 28. Furthermore, Duncan has not even attempted to show that the government's decision to prosecute him was based on a discriminatory purpose. The Court therefore declines to grant Duncan's motion for a new trial on these grounds.

### III. CONCLUSION

The government's evidence was more than sufficient to sustain the jury's verdict on each of the counts on which Duncan was convicted, and Duncan has not raised any grounds on which "letting [the] guilty verdict[s] stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. Duncan's motion for a judgment of acquittal or a new trial is therefore denied.

Dated: New York, New York
November 7, 2019

SO ORDERED:

*Sidney H. Stein*
Sidney H. Stein, U.S.D.J.

13