UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

UNITED STATES OF AMERICA

v.

BRYAN DUNCAN,

          Defendant.

---

18-Cr-289 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

    Following a nine-day trial in May 2019, a jury convicted defendant Bryan Duncan on Counts One, Four, Five, and Six of the Superseding Indictment. At trial, the government presented evidence that Duncan participated in two conspiracies, Fraud Scheme-1 and Fraud Scheme-2, which sought to defraud businesses and insurance companies by recruiting individuals to stage slip-and-fall accidents, directing them to seek unnecessary medical procedures—most often surgeries—and bringing them to attorneys who then initiated lawsuits against the business owners and insurance companies.

    On January 7, 2020, the Court initiated sentencing proceedings. Duncan's counsel at that time objected to the proposed forfeiture order, arguing that the government cited no evidence supporting its calculation. (Jan. 7, 2020 Tr. at 28:5–11, ECF No. 252.) The Court adjourned the proceeding to resolve this issue and to allow the government additional time to calculate restitution.

    Following a series of adjournments due to the COVID-19 pandemic and the substitution of defense counsel, the Court held in-court proceedings on July 27, 2020, to formally impose sentence and resolve the lingering forfeiture and restitution issues. For the reasons set forth at that proceeding and detailed below, the Court orders forfeiture in the amount of $644,056. The Court will not enter the government's proposed restitution order because the government has failed to meet its burden.

I. **FORFEITURE**

    A. **The Government Has Met Its Burden**

    "It is well-settled in the Second Circuit that once the defendant is convicted of an offense on proof beyond a reasonable doubt, the government is only required to establish the forfeitability of the property subject to criminal forfeiture as a result of that offense by a preponderance of the evidence." *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271

(E.D.N.Y. 2005) (citing *United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005)), *aff'd*, 514 F.3d 277 (2d Cir. 2008)).

The government has submitted a revised proposed forfeiture order pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), seeking the entry of a money judgment for the proceeds traceable to the commission of Counts Four, Five, and Six (i.e., Fraud Scheme-2). Under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable" to mail or wire fraud, or a conspiracy to commit such an offense, "is subject to forfeiture to the United States." "[T]he term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." *Id.* § 981(a)(2)(A).

The trial record demonstrates that at some point in 2015, Duncan and Gordon stopped working with Peter Kalkanis on Fraud Scheme-1, and began operating a separate and substantially similar fraud scheme (i.e., Fraud Scheme-2). To finance the second scheme, Duncan and Gordon formed their own company, D&G Premier Solutions LLC, from which they received case management fees. (PSR ¶ 26.) Duncan and Gordon were joint 50-50 owners and served as the company's only employees. (Trial Tr. at 908, 949.) From January 2015 through December 2018, D&G made a gross profit of $1,610,140.75. (Trial Tr. at 917; GX 807; PSR ¶ 26.) Initially, the government sought forfeiture for this full amount. (*See* ECF No. 246, Ex. A.)

At the July 27 proceeding, however, the government conceded that in light of new evidence obtained from a cooperating witness, the proposed forfeiture should be reduced by 60 percent—to $644,056. (July 27, 2020 Tr. at 9–12.)[1] To support this significant downward adjustment, the government cited the cooperator's estimate that only 40 percent of the deposits shown on D&G's ledger came from trip-and-fall cases; the remaining cases were *not* trip-and-fall accidents. (*Id.* at 11–12; *see also* Def. July 17 Letter, at 9–10 ("[T]here are cases in the record that show D&G serviced clients with other, legitimate motor vehicle accident or general negligence claims.").)

The Court finds support in the record for this revised estimate by a preponderance of the evidence and will sign the government's proposed forfeiture order in the amount of $644,056. "The calculation of forfeiture amounts is not an exact science." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011). "'The court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *Id.* (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).

---

[1] The government maintains its position that this figure considerably understates the proceeds that Duncan and Gordon derived from Fraud Scheme-2. (*See* July 27, 2020 Tr. at 13; *see also* Gov't Feb. 28 Letter, at 7 n.3.)

2

The evidence at trial included the testimony of Jasmond Cunningham, who stated that in 2015, while he was living a homeless shelter, his roommate told him about the possibility of making money through a fraudulent personal injury lawsuit. (Trial Tr. at 630–43.) Cunningham told the jury that he met with Duncan and other individuals interested in starting their own slip-and-fall scam; that Duncan instructed him on how to stage an accident and on the specific injuries to claim when he went to the hospital after the phony accident; that Duncan drove him to medical and legal appointments; that he underwent surgeries after Duncan told him that the lawsuit would be more profitable if he did so; and that Duncan gave him money orders from Fast Trak, the relevant litigation-funding company. (*Id.* at 633-44.)

In addition to Cunningham's testimony, the evidence showed that Fraud Scheme-2 employed many of the same lawyers, doctors, and runners as Fraud Scheme-1. (*See* Trial Tr. at 814, 1490–91.) Duncan also relied on the same primary funding company, Fast Trak. (*Id.* at 814–15.) This evidence, in conjunction with the other evidence presented at trial, demonstrates that Duncan and Gordon's operation was indeed a "fraud mill" (July 27, 2020 Tr. at 14), and allows the Court to conclude by a preponderance of the evidence that $644,056 appropriately represents, if not understates, the proceeds traceable to the pair's criminal conduct. Duncan and Gordon are jointly and severally liable for this full amount. *See United States v. Coleman Com. Carrier Inc.*, 232 F. Supp. 2d 201, 204 (S.D.N.Y.2002) ("[C]oconspirators are liable jointly and severally to forfeit the reasonably foreseeable proceeds of their criminal activity. To hold otherwise would encourage strategic behavior on the part of coconspirators to hide funds and thwart the purpose of the criminal forfeiture statute.").

### B. Duncan's Eighth Amendment Challenge

Duncan also contends that the government's proposed order would violate the Eighth Amendment's prohibition against excessive fines. In analyzing this claim, the Court must apply the two-step inquiry established in *United States v. Bajakajian*, 524 U.S. 321 (1998), for determining whether a financial penalty is excessive under the Eighth Amendment. "At the first stage, we determine whether the Excessive Fines Clause applies at all." *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016). "If we conclude that it does, we proceed to the second step and determine whether the challenged forfeiture is unconstitutionally excessive." *Id.* "The burden rests on the defendant to show the unconstitutionality of the forfeiture." *Id.*

Here, the Excessive Fines Clause applies because the proposed preliminary forfeiture order is punitive in nature: it will be "imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony," and "could not have been imposed upon an innocent party." *Id.* at 109 (citations omitted).

To determine whether the forfeiture is unconstitutionally excessive, the Court must assess whether "it is grossly disproportional to the gravity of [Duncan's] offense" using the four *Bajakajian* factors:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Id.* at 110 (citing *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015). In conjunction with the above factors, the Court may also consider "whether the forfeiture would deprive the defendant of his livelihood, i.e. his 'future ability to earn a living.'" *Id.* at 111 (quoting *United States v. Levesque*, 546 F.3d 78, 84 (1st Cir. 2008)).

Here, each of the four factors weigh firmly against a finding that the proposed order is grossly disproportional in relation to the gravity of Duncan's offense. Duncan engaged in two multiyear conspiracies that involved repeated instances of mail and wire fraud to exploit vulnerable individuals and defraud insurance companies. *See id.* at 113 (finding that the first factor weighed in favor of a proportionality finding where the defendant "engaged in a multi-year conspiracy involving repeated instances of money laundering, mail fraud, wire fraud, and related offenses").

Duncan falls comfortably within the class of persons for whom the federal mail and wire fraud statutes were designed—namely, those who use facilities of interstate commerce to engage in fraudulent schemes. *See United States v. Finazzo*, No. 10-CR-457 RRM RML, 2014 WL 3818628, at *33 (E.D.N.Y. Aug. 1, 2014) ("[T]he mail and wire fraud statutes are designed to prevent the use of interstate communications facilities—the mails and wires—to affect a broad range of fraudulent schemes to obtain money or property through false pretenses, representations, or promises."), *vacated and remanded on other grounds*, 850 F.3d 94 (2d Cir. 2017); *see also Viloski*, 814 F.3d at 114.

Duncan's Guidelines range is 324 to 405 months' incarceration, and the maximum Guidelines fine is $240,000,000. (PSR at 28.) Accordingly, the maximum fine is more than 370 times the proposed $644,056 forfeiture order, "which suggests that Congress did not view offenses like [Duncan's] as trivial, and thus also weighs strongly in favor of the forfeiture's constitutionality." *Viloski*, 814 F.3d at 114; *see also United States v. George*, 779 F.3d 113, 123–24 (2d Cir. 2015) (finding that the third *Bajakajian* factor "points to no disproportionality," much less gross disproportionality, even where the challenged forfeiture exceeded the Guidelines fine, because the forfeiture was "well below" the statutory maximum); *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1310 (11th Cir. 1999) ("[I]f the value of the property forfeited is within or near the permissible range of fines under the sentencing guidelines, the forfeiture almost certainly is not excessive.").

Finally, the nature of the harm caused by Duncan's conduct was extensive. Together, Duncan and Gordon recruited at least 300 patients into the fraudulent schemes. (PSR ¶ 32.) Duncan is accountable for intended losses ranging between $25,000,000 and $65,000,000. (*Id.*) The government explains that this loss range is a "conservative estimate" assuming that that "the attempted loss per recruited patients was only $100,000," which is on the lower end of the settlements paid out. (*Id.*)

Nonetheless, Duncan notes that during the July 10, 2020 teleconference, the Court acknowledged that it was extremely unlikely that Duncan would be able to pay the judgment over the course of his lifetime. (Def. July 17 Letter at 11 (citing July 10, 2020 Tr. at 15).) Duncan thus urges that the proposed forfeiture amount would deprive him of his livelihood. However, "a forfeiture that deprives a defendant of his livelihood might nonetheless be constitutional, depending on his culpability or other circumstances." *Viloski*, 814 F.3d at 112. As discussed above, the gravity of the conduct and the extensive harm that Duncan caused support the government's proposed figure. Accordingly, the proposed forfeiture amount is not grossly disproportional to the gravity of Duncan's conduct, and Duncan's Eighth Amendment challenge must be rejected.

## II. RESTITUTION

The government seeks restitution from Duncan in the amount of $727,600 pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. (*See* March 7 Letter, at 1.) The government bears the burden of demonstrating the amount of any loss sustained by a victim, *see* 18 U.S.C. § 3664(e); *United States v. Reifler*, 446 F.3d 65, 122 (2d Cir. 2006), and all disputes as to the proper amount or type of restitution are resolved by a preponderance of the evidence, *United States v. Bahel*, 662 F.3d 610, 647 (2d Cir. 2011) (citation omitted).

"[I]n or around 2015," Duncan withdrew from Fraud Scheme-1 and "started his own substantially similar Fraud Scheme." (March 7 Letter, at 8.) Thus, in calculating restitution for Duncan, the government included "only those Patients who were a part of the Fraud Scheme[-1] before Bryan Duncan withdrew, or for whom there is evidence showing that Duncan remained involved with their cases." (*Id.*) Initially, the government identified six patients who fit these criteria, whose cases allegedly supported $727,600 in restitution. During the July 27 proceeding, however, the government removed three of the six patients from this calculation, lowering the proposed restitution total to $275,600. (*See* July 27, 2020 Tr. at 15-16.)

Still, the Court finds that the government has not established that this reduced figure is an appropriate amount for restitution by a preponderance of the evidence because the government has not shown that the three patients for whom the government seeks restitution are individuals "who were a part of [Fraud Scheme-1] before Bryan Duncan withdrew, or for whom there is evidence showing that Duncan remained involved with their cases." (March 7 Letter, at 8.)

5

Those three patients had litigations filed by Marc Elefant, an attorney who began working with Kalkanis at a time when Duncan had *already withdrawn* from Fraud Scheme-1. (*See* Trial Tr. at 1099, 1102.) The government attempts to show that Duncan nonetheless remained involved in these patients' cases by including emails between Duncan and a conspiring doctor. The emails attach the doctor's daily schedule with the names of eleven to fifteen patients. But the government fails to produce any evidence suggesting that Duncan was specifically seeking information regarding any one of the three patients. Thus, the government has not shown that Duncan remained involved in these cases after he withdrew from Fraud Scheme-1, and the Court declines to sign the government's proposed order.

### III. CONCLUSION

Because the government has established by a preponderance of the evidence that $727,600 represents Duncan's proceeds traceable to Fraud Scheme-2 and the figure does not violate the Eighth Amendment, the Court will enter the proposed forfeiture order. (*See* ECF No. 295.) The Court will not enter the government's proposed order for restitution because it failed to meet its burden by a preponderance of the evidence

Dated: New York, New York
       July 29, 2020

                                SO ORDERED:

                                _____
                                Sidney H. Stein, U.S.D.J.